| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY DENVER, COLORADO** <br> Court Address: 1437 Bannock Street <br> Denver, Colorado 80202 <br><br> **Plaintiff(s):** <br><br><br> JOHN PAULSON, individually and on behalf of all others similarly situated <br><br> **Defendant(s):** <br><br> TWO RIVERS WATER AND FARMING COMPANY, a Colorado corporation; <br> JOHN R. MCKOWEN, an individual; <br> WAYNE HARDING, an individual; and <br> TIMOTHY BEALL, an individual, | DATE FILED: August 13, 2019 11:24 AM <br> FILING ID: 5E9CEBEF91D95 <br> CASE NUMBER: 2019CV33099 <br><br><br><br><br><br><br><br> **COURT USE ONLY** |
| Attorneys for Plaintiff: <br><br> Name:      Steve A. Miller, Atty. Reg. # 8758 <br> Address:   Steve A. Miller, P.C. <br>              1625 Larimer Street, Suite 2906 <br><br>              Denver, CO 80202 <br><br> Phone Number:  (303) 892-9933 <br><br> Fax Number:     (303) 892-8925 <br><br> E-mail:        Sampc01@gmail.com | Case Number: <br><br><br> Div: <br> Courtroom: |
| **COMPLAINT** ||

Plaintiff John Paulson, on his behalf and as putative representative of Class members

defined herein ("Plaintiff"), by and through undersigned counsel, alleges the following upon

information and belief, except as to those allegations concerning Plaintiff, which are alleged

upon personal knowledge. Plaintiff's information and belief are based upon, among other things,

**EXHIBIT**
**1**

counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by GrowCo, Inc. ("GrowCo") and Two Rivers Water and Farming Company ("Two Rivers") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by GrowCo and Two Rivers, and the other Defendants; (c) media reports concerning GrowCo, Two Rivers, and the other Defendants; and (d) review of other publicly available information concerning GrowCo, Two Rivers, and the other Defendants.

Plaintiff brings this class action under the Colorado Securities Act and Colorado common law on behalf of all persons or entities who purchased or otherwise acquired securities of GrowCo, a Colorado corporation, from January 2015 until March 2017 (the "Class Period").

## JURISDICTION AND VENUE

1.      The District Court, City and County of Denver has jurisdiction over these proceedings because the causes of action herein involve violations of Colorado statutory and common law. Defendant John R. McKowen is a resident of the City and County of Denver and the securities offerings at issue originated there.

2.      Venue for this proceeding in the City and County of Denver is proper in the City and County of Denver pursuant to C.R.C.P. Rule 98(c).

## PARTIES

**A.      Plaintiff**

3.      Plaintiff John Paulson ("Mr. Paulson") is a natural person residing in Phelan, California. Mr. Paulson is an investor in GrowCo, and purchased securities in GrowCo, in reliance upon GrowCo's Offering Documents as defined below, during the Class Period. Mr.

Paulson learned that he suffered losses as a result of his investment when GrowCo filed for bankruptcy.

**B.**     **Defendants**

4.     Defendant Two Rivers is a Colorado corporation with its principal place of business located at 3025 S. Parker Road, Suite 140, Aurora, Colorado. The business of Two Rivers began in the development of irrigated farmland, associated water rights, and infrastructure. In 2014 Two Rivers formed GrowCo, as a wholly owned subsidiary, to capitalize on Colorado's burgeoning marijuana industry. Since 2016 the company has shifted its focus to monetizing its assets.

5.     Defendant John R. McKowen ("McKowen") is a natural person who served as Chief Executive Officer and/or otherwise was and acted as control person of both Two Rivers and GrowCo during the Class Period.

6.     Defendant Wayne Harding ("Harding") is a natural person who served as Chief Executive Officer and Chief Financial Officer and/or otherwise was and acted as control person of both Two Rivers and GrowCo during the Class Period.

7.     Defendant Timothy Beall ("Beall") is a natural person who served as Chief Operations Officer and/or otherwise was and acted as control person of GrowCo during the Class Period.

8.     Collectively, Defendants McKowen and Harding, each acting in their respective capacity as a control person of Two Rivers, are referred to hereinafter as the "Two Rivers Individual Defendants."

9.     Collectively, Defendants McKowen, Harding, and Beall, each acting in their respective capacity as control persons of GrowCo, are referred to hereinafter as "the GrowCo

3

Individual Defendants." The Two Rivers Individual Defendants and the GrowCo Individual Defendants are sometimes referred to as the "Individual Defendants."

10.     It is appropriate to treat the Two Rivers Individual Defendants and GrowCo Individual Defendants as respective groups for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Offering Documents by each, as alleged herein, are the collective actions of each narrowly defined group of defendants identified above. Each of the above as officers and directors of their respective entities, and subsidiaries, and affiliates, by virtue of their positions, directly participated in the management of GrowCo, was directly involved in the operations of GrowCo at the highest levels, was privy to confidential proprietary information concerning GrowCo, and directed and played an instrumental role in the GrowCo securities offering at issue in this case.

### C.     Non-Defendant

11.     GrowCo is a Colorado corporation with its principal place of business located at 2000 S. Colorado Boulevard, Denver, Colorado. GrowCo was formed in 2014 as a wholly owned subsidiary of Two Rivers. GrowCo's business consisted primarily of developing and leasing large-scale, computer-controlled greenhouses to marijuana growers. GrowCo is currently in bankruptcy and therefore cannot be made a party to this litigation.

12.     GrowCo Partners 1, LLC ("GrowCo Partners 1") is a Colorado limited liability company created on or about October 31, 2014 by Two Rivers.

13.     GCP Super Units, LLC is a Colorado limited liability company created on or about September 25, 2015. It is owned by GrowCo and used to hold real estate assets.

### <u>FACTS</u>

### A.     Defendant McKowen Forms and Becomes A Control Person of Two Rivers and GrowCo.

4

14.     On or about December 20, 2002 Defendant McKowen became CEO and Board Member of Navidec Financial Services, Inc. ("Navidec"), a Colorado corporation with its principal place of business located at 6399 South Fiddlers Green Circle, Suite 300, Greenwood Village, Colorado 80111. The stated purpose of Navidec was to capitalize on the market for mortgage lending.

15.     On or about December 11, 2012 Navidec became Two Rivers. At the same time, Two Rivers refocused its business on acquiring and developing irrigated farmland, associated water rights, and infrastructure in the Arkansas river basin in southwestern Colorado.

16.     On or about November 6, 2012 Colorado Amendment 64, a ballot initiative allowing for the recreational use of marijuana throughout the state, was passed.

17.     On or about May of 2014, Two Rivers and Defendant McKowen formed GrowCo, as a wholly owned subsidiary of Two Rivers, in order to try and capitalize on burgeoning marijuana industry in Colorado.

18.     At all relevant times, Two Rivers and the Two Rivers Individual Defendants, together with the GrowCo Individual Defendants, exercised complete control over the business and operations of GrowCo.

19.     During the Class Period, each of the Two Rivers and GrowCo Individual Defendants, as control persons of Two Rivers and its subsidiaries and affiliates (including GrowCo), were privy to information concerning its business, finances, products, markets, present and future business prospects, as well as information regarding the backgrounds of its control persons, including Defendant McKowen.

**B.      Defendants Organize and Carry Out Securities Offerings for GrowCo.**

20.     On or about May 11, 2015, GrowCo filed a Notice of Exempt Offering with the SEC, for a securities offering of $5 million in debt securities and warrants. Sales of securities in this offering by GrowCo and Defendants began on or about March 16, 2015.

21.     On or about October 1, 2015, GrowCo filed a Notice of Exempt Offering with the SEC for a securities offering of over $4 million in stock and warrants. Sales of securities in this offering by GrowCo and Defendants began on or about July 29 2015.

22.     On or about January 5, 2016, GrowCo filed a Notice of Exempt Offering with the SEC for a securities offering of $5,500,000 in stock and warrants. Sales of securities in this offering by GrowCo and Defendants began on or about October 8, 2015.

23.     On or about September, 07, 2016, GrowCo amended its previous filing to change the acting CEO from Defendant McKowen to Defendant Harding.

24.     On or about September, 07, 2016, GrowCo, filed a Notice of Exempt Offering with the SEC to offer $7 million in senior exchange notes due July 1, 2021. Sales of securities in this offering by GrowCo and Defendants began on or about March 16, 2016.

25.     On or about March 9, 2017, GrowCo filed an amendment to the previous notice stating that the offering had been terminated as of March 9, 2017.

26.     Taken together the securities offerings listed above constitute the "Securities Offerings" or the "Offerings."

27.     As part of the Securities Offerings, GrowCo and Defendants prepared and distributed to prospective investors documents including sales presentations, memoranda of terms, exchange note purchase agreements, exchange agreements, investor questionnaires, and other documents ("the Offering Documents") which purported to make material disclosures to investors about GrowCo and the Securities Offerings.

6

28.     The purpose of the GrowCo Securities Offerings was to raise money from investors across the country to support the operations of Defendant Two Rivers, GrowCo, a GrowCo affiliate.

29.     In their capacity of control persons of GrowCo, the Individual GrowCo Defendants, the Individual Two Rivers Defendants, and Defendant Two Rivers played a central role in organizing and carrying out the GrowCo Securities Offerings, preparing and distributing the Offering Documents, and selling the GrowCo securities directly to investors, including Plaintiff.

### C.     The Offering Documents Contain Material Omissions.

30.     The GrowCo Securities Offerings' Offering Documents contained material omissions regarding McKowen, the founder of GrowCo and Two Rivers and the key driving force behind the two entities and the Securities Offerings, as more fully detailed below.

31.     Specifically, on or about July 22, 1986 a complaint was filed with the NASD against Defendant McKowen based on allegations that he violated securities laws, and his client's trust, by engaging in a series of deceptive and fraudulent securities transactions ("the NASD Complaint").

32.     On February 9, 1987, the NASD rendered a decision fining, censoring, and suspending McKowen and his co-defendant until they repaid the amount of $513,041 which appear to have represented the damages that McKowen and his co-defendant caused their customer to suffer as a result of their misconduct.

33.     On or about February 17, 1987, McKowen appealed the decision to NASD's Board of Governors.

34.     On or about June 9, 1987, the NASD Board of Governors affirmed the decision and increased McKowen's fine and suspension.

35.     On or about July 8, 1987, McKowen appealed the NASD Board of Governors' decision to the SEC.

36.     On or about August 20, 1987, the SEC affirmed the findings in the NASD Complaint on appeal and ordered McKowen sanctioned for his fraudulent sales of securities.

37.     On or about August 23, 1990 Defendant McKowen 's securities registration with the NASD was permanently revoked.

38.     On or about January 25, 1995 Defendant McKowen filed for bankruptcy in United States Bankruptcy Court for the District of Colorado.

39.     The Offering Documents provided to Plaintiffs as part of the Offerings omitted to disclose Defendant McKowen's fraudulent securities sales, the revocation of his securities license, or his personal bankruptcy.

40.     It would have been material – indeed crucial – to an investor evaluating whether to invest his or her money in McKowen's businesses, GrowCo and/or Two Rivers, to know that McKowen had engaged in fraudulent securities sales, had caused substantial losses to his customers through such fraudulent sales, was sanctioned as a result, had his securities license revoked, and had filed for bankruptcy.

   **D.     Defendants Failed to Disclose Material Information to Prospective Investors.**

41.     Because of their Board membership and/or executive and managerial positions with Two Rivers and GrowCo, respectively, each of the Two Rivers Individual Defendants and GrowCo Individual Defendants, with the exception of Defendant McKowen and Defendant Two

Rivers, knew and/or had access to the adverse facts outlined above, while Defendants McKowen and Two Rivers (through McKowen) had actual knowledge of the adverse facts outlined above.

42.     The Two Rivers Individual Defendants and the GrowCo Individual Defendants, along with Defendant Two Rivers, participated in the drafting, preparation, dissemination and/or approval of the Offering Documents described herein. They were aware of or recklessly disregarded the omissions therein and were aware of their materially false and misleading nature.

43.     The Two Rivers Individual Defendants and GrowCo Individual Defendants had a duty to conduct adequate due diligence as to the information in the Offering Documents before offering and selling the GrowCo securities to investors and were reckless in offering and selling the GrowCo securities to investors without disclosing the facts outlined above surrounding Defendant McKowen's background.

44.     The Two Rivers Individual Defendants and GrowCo Individual Defendants, along with Defendant Two Rivers, because of their positions of control and authority as control persons of GrowCo, were able to and did control the content of the various securities filings, press releases, and other public statements pertaining to the Offerings, including the Offering Documents, during the Class Period.

45.     Each of the Two Rivers Individual Defendants and GrowCo Individual Defendants, as well as Defendant Two Rivers, was provided with or had an opportunity to see copies of the Offering Documents, alleged herein to be misleading, prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or to cause them to be corrected.

46.     Accordingly, each of the Two Rivers Individual Defendants and GrowCo Individual Defendants is responsible for the accuracy of the Offering Documents and is a maker of the omissions detailed above.

**E.      Investors Purchase the Offerings in Reliance Upon Misleading Offering Documents.**

47.     Plaintiff and the class members, as part of the solicitation by Defendant Two Rivers and Individual Two Rivers and GrowCo Defendants, were provided with the Offering Documents by Defendants.

48.     Plaintiff and the class members reasonably relied on the information in the Offering Documents as they reviewed the Offerings and considered whether to invest.

49.     On or about August 14, 2016 Mr. Paulson, relying on the Offering Documents, made his initial investment of $60,000 in The Offerings.

50.     On or about September 30, 2016 Mr. Paulson, relying on the Offering Documents, made an additional investment of $140,000 in The Offerings.

51.     On or about November 29, 2016 Mr. Paulson, relying on the Offering Documents, made his final investment of $57,000 in The Offerings.

52.     Mr. Paulson and the class members purchased the GrowCo securities directly from GrowCo and the Defendants.

53.     The securities purchased by Mr. Paulson included senior exchange notes and common stock purchase warrants which allowed for the purchase of units of GrowCo common stock at a purchase price of twenty-five cents per share, payable in cash.

54.     Upon information and belief, funds received from the Offerings were immediately commingled with and passed through as capitalization for the operation of Two Rivers.

F.      **GrowCo Files for Bankruptcy.**

55.     One or about January 21, 2019, GrowCo held a special meeting of the Board of Directors wherein Defendant McKowen announced that the company would file for voluntary bankruptcy under Chapter 11 of the United States Bankruptcy Code. Defendant McKowen, in his capacity as CEO, further resolved to appear in the proceedings and execute documents on behalf of GrowCo.

56.     On or about January 24, 2019, GrowCo filed for Chapter 11 bankruptcy in United States Bankruptcy Court for the District of Colorado.

57.     Plaintiff was notified of the bankruptcy because he is listed as a creditor in GrowCo's bankruptcy filing.

58.     Upon GrowCo's bankruptcy filing, Plaintiff was injured because his investments in the Offerings became effectively worthless.

59.     Upon being notified of GrowCo's bankruptcy, Plaintiff was prompted to investigate the Offerings.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action, for himself and on behalf of all others similarly situated, as a class action pursuant to C. R. C. P. Rule 23 (a) and (b)(3).

## CLASS DEFINITION

61.     The Proposed Class is defined as follows: All persons and entities that purchased or otherwise acquired the Offerings during the Class Period and were damaged thereby.

62.     Excluded from the class are: (1) Any of the Defendants, their agents or employees; (2) any judge or judicial officer who may hear any aspect of this case and his or her

law clerks; and (3) any person, firm, trust, corporation, or other entity related to or affiliated with
any of the Defendants.

## NUMEROSITY

63.     The members of the Proposed Class are so numerous and geographically
dispersed that joinder of all members is impracticable. While the exact number of Proposed Class
members remains unknown at this time, GrowCo's bankruptcy schedules filed with the Court in
its bankruptcy proceedings indicate there are approximately fifty members of the proposed class.
The exact number investors in the Offerings is within the knowledge of Defendants.

## TYPICALITY

64.      Plaintiff's claims are typical of the claims of all Class members. Plaintiff is
situated identically to all members of the Class with respect to the Offerings presented in this
case, as Plaintiff and all members of the Class were investors in the Offerings and suffered the
exact same loss (in proportion to the amount of their investment). The claims of Plaintiff are
based on the same fundamental factual allegations and legal theories as the claims of all other
members of the Class.

65.     All investors in the Offerings, respectively, have been adversely affected by the
wrongdoing of Defendants as described herein.

## COMMONALITY

66.     There are common questions of law and fact in this class action that relate to and
affect the rights of each member of the Class including, *inter alia*:

>     a.  Whether Defendants failed to disclose the NASD Complaint, related
>         investigation, and sanctions for fraudulent securities transactions

perpetrated by Defendant McKowen, as well as the underlying fraudulent securities transactions and damages.

b.  Whether Defendants failed to disclose that Defendant McKowen's securities license had been permanently revoked as a result of his conduct.

c.  Whether Defendants failed to disclose that Defendant McKowen had declared bankruptcy.

d.  Whether the omissions in the Offering Documents were material to GrowCo investors.

## ADEQUACY

67.  The representative parties and undersigned counsel will fairly and adequately protect the interests of the proposed class.

68.  Plaintiff also satisfies Rule 23(b) of the Colorado Rules of Civil Procedure because the questions of law or fact common to the members of the proposed class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## CLAIMS

### FIRST CLAIM
### SALE OF SECURITIES IN VIOLATION OF C.R.S. 11-51-101 *et seq*.

69.  Plaintiff repeats and realleges each of the allegations set forth above.

70.  Defendants violated the provisions of the Colorado Securities Act (the "Act"), C.R.S. 11-51-101 *et seq.*, by (1) offering and selling the unregistered GrowCo securities to Plaintiff and the putative class of GrowCo investors through material omissions.

71.     According to the Colorado Securities Act:

(1)  It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

(a)  To employ any device, scheme, or artifice to defraud;
(b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
(c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

C.R.S. 11-51-501.

72.     The Colorado Securities Act sets forth the civil liability of sellers of securities

through misrepresentations or omissions as follows:

(3)  Any person who recklessly, knowingly, or with an intent to defraud sells … a security in violation of section 11-51-501 (1) … is liable to the person buying … such security … in connection with the violation for such legal or equitable relief that the court deems appropriate, including rescission, actual damages, interest at the statutory rate, costs, and reasonable attorney fees.

(4)  Any person who sells a security in violation of section 11-51-501 (1)(b)(the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission is liable to the person buying the security from such person, who may sue to recover the consideration paid for the security, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security, or is liable for damages if the buyer no longer owns the security. Damages are deemed to be the amount that would be recoverable upon a tender, less the value of the security when the buyer disposed of it, and interest at the statutory rate from the date of disposition.

C.R.S. 11-51-604 (3) and (4).

73.     As alleged herein, Defendant Two Rivers, along with the GrowCo Individual

Defendants and the Two Rivers Individual Defendants, offered and sold GrowCo securities to

Plaintiff and the proposed class by means of their omissions to state material facts pertaining to

14

Defendant McKowen, necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

74.    Defendants knowingly and/or recklessly sold the GrowCo securities to Plaintiff. More specifically, Defendants Two Rivers (through McKowen) and McKowen had actual knowledge of the material omissions in the Offering Documents, while the other Defendants had a duty to conduct adequate due diligence before offering and selling the GrowCo securities to Plaintiff and the class members, and were reckless in selling the GrowCo securities without disclosing the material facts outlined above about McKowen.

75.    In the alternative, Defendants cannot sustain the burden of proof that they did not know, and in the exercise of reasonable care could not have known, about the material omissions outlined above.

76.    The omissions about McKowen's background – and in particular his fraud in connection with the sale of securities and his permanent ban from the securities industry – were certainly material to Plaintiff and prospective GrowCo investors, all of whom were reasonable to rely on such omissions to invest in GrowCo.

77.    Defendant Two Rivers and Individual Two Rivers and GrowCo Defendants directly participated in the business and operations of GrowCo, including drafting, preparation and/or approval of the Offering Documents. They prepared securities filings, solicited sales, conducted presentations, and sought out prospective investors for the Offerings.

78.    Defendant Two Rivers and Individual Two Rivers and GrowCo Defendants provided Plaintiff and the class members with the Offering Documents which omitted the material facts set forth above about Defendant McKowen, with the intent that Plaintiff and the

class members rely upon such Offering Documents and omissions to invest in GrowCo, and sold the GrowCo securities to Plaintiff.

79.     As a direct and proximate result of Defendant Two Rivers and Individual Two Rivers and GrowCo Defendants' material omissions, Plaintiff and the class members purchased GrowCo securities from Defendants and suffered losses.

80.     Defendants are liable to Plaintiff and the class members for damages as set forth in the Act, as a result of their misconduct in an amount to be determined at the hearing of this case.

## TENDER OF SECURITIES

81.     Plaintiff hereby gives notice to Defendant Two Rivers and Individual Two Rivers and GrowCo Defendants that he is rescinding his respective purchase of the Offerings and is tendering his GrowCo securities in exchange for:

- The consideration paid by each Plaintiff or class member for his respective investment in the Offerings, plus
- The interest thereon at the legal rate from the date of purchase, plus
- Costs and attorneys' fees, less
- The amount, if any, of income received on such securities.

## SECOND CLAIM
## PROVIDING SUBSTANTIAL ASSISTANCE IN THE SALE OF SECURITIES BY MEANS OF UNTRUE STATEMENTS OR OMISSIONS IN VIOLATION OF C.R.S. 11-51-101 *et seq*. (in the alternative)

82.     Plaintiff repeats and realleges each of the allegations set forth above.

83.     GrowCo knowingly and/or recklessly offered and sold its securities through Plaintiff and the other class members through material omissions as more fully outlined above,

in violation of the Colorado Securities Act Section 11-51-501(1), and is thus liable under C.R.S.
11-51-604(3) and (4).

  84. Pursuant to the Colorado Securities Act,

> (c) Any person who knows that another person liable under subsection (3) or (4) of this section is engaged in conduct which constitutes a violation of section 11-51-501 and who gives substantial assistance to such conduct is jointly and severally liable to the same extent as such other person.

C.R.S. 11-51-604(5)(c).

  85. Defendants knew that GrowCo was liable under CRD 11-51-604(3) and (4) because it was offering and selling securities to Plaintiff and the class members through material omissions.

  86. Despite such knowledge, Defendants provided substantial assistance to GrowCo's sales of GrowCo securities to Plaintiff and the class members, through their efforts in drafting, producing, reviewing, and/or disseminating to Plaintiff and the class members the Offering Documents that contained the omissions set forth above, and helping GrowCo sell GrowCo securities to Plaintiff and the class members through misrepresentations and omissions.

  87. As a direct and proximate result of the knowing assistance provided by Defendants, Plaintiff invested in GrowCo securities and suffered losses.

  88. Defendants are jointly and severally liable to Plaintiff and the class members to the same extent as GrowCo in connection with GrowCo's securities sales.

### THIRD CLAIM
### CONTROL PERSON LIABILITY IN THE SALE OF SECURITIES BY MEANS OF UNTRUE STATEMENTS OR OMISSIONSIN VIOLATION OF C.R.S. 11-51-101 *et seq*. (in the alternative)

  89. Plaintiff repeats and realleges each of the allegations set forth above.

90.     GrowCo knowingly and/or recklessly offered and sold its securities through Plaintiff and the other class members through material omissions as more fully outlined above, in violation of the Colorado Securities Act Section 11-51-501(1), and is thus liable under C.R.S. 11-51-604(3) and (4).

91.     Pursuant to the Colorado Securities Act,

> (a) Every person who, directly or indirectly, controls a person liable under subsection … (3) of this section is liable jointly and severally with and to the same extent as such controlled person, unless the controlling person sustains the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.
>
> (b) Every person who, directly or indirectly, controls a person liable under subsection (3) or (4) of this section is liable jointly and severally with and to the same extent as such controlled person, unless such controlling person sustains the burden of proof that such person acted in good faith and did not, directly or indirectly, induce the act or acts constituting the violation or cause of action.

C.R.S. 11-51-604(5)(a) and (b).

92.     A person is liable as a "control person" where he or she has the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company.

93.     All Defendants were control persons of GrowCo. In that capacity, Defendants directed and controlled GrowCo's misconduct alleged herein, and knew and/or should have known of such misconduct.

94.     Specifically, the GrowCo Individual Defendants were all officers and directors of GrowCo, and each directly or indirectly possessed the power to direct or cause the direction of the management or policies of GrowCo. Defendant Two Rivers was GrowCo's corporate parent, shared the same management with GrowCo, and directed and controlled GrowCo and the Securities Offering through material omissions, as illustrated by the fact that investment proceeds from the GrowCo Securities Offering were intended to be transferred to, and used by, Two Rivers for its own business. Lastly, the Two Rivers Individual Defendants controlled both Two Rivers and its subsidiary, GrowCo, and directed and controlled its Securities Offering, which stood to benefit Two Rivers.

95.     None of the Defendants can sustain the burden of proof that they did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist, nor can they sustain the burden of proof that they acted in good faith and did not, directly or indirectly, induce the act or acts constituting the violation or cause of action.

96.     Therefore, all Defendants are jointly and severally liable with GrowCo for GrowCo's violation of the Colorado Securities Act.

<u>**FOURTH CLAIM**</u>
**COMMON LAW NEGLIGENCE**

97.     Plaintiff repeats and realleges each of the allegations set forth above.

98.     Defendant Two Rivers and Individual Two Rivers and GrowCo Defendants owed Plaintiff and the class members a duty of reasonable care in connection with their preparation of Offering Documents for the GrowCo Securities Offering for the use of Plaintiff and the class members, and their sales of GrowCo securities to Plaintiff and the class members.

99.     Defendant Two Rivers and Individual Two Rivers and GrowCo Defendants breached their duty by failing to disclose in the Offering Documents the material facts set forth above regarding Defendant McKowen.

100.    As a direct and proximate result of Defendants' breach of duty, Plaintiff and the class members have been damaged in an amount to be determined at the hearing of this case.

## FIFTH CLAIM
## NEGLIGENT MISREPRESENTATIONS AND OMISSIONS

101.    Plaintiff repeats and realleges each of the allegations set forth above.

102.    Defendant Two Rivers and Individual Two Rivers and GrowCo Defendants are liable to Plaintiff because in the course of their business they supplied false information and failed to exercise reasonable care by making material misrepresentations and/or omissions to Plaintiff in the Offering Documents, in breach of the duties they owed Plaintiffs.

103.    Defendant Two Rivers and Individual Two Rivers and GrowCo Defendants specifically omitted disclosure to Plaintiff and the class members of the following:

- Defendant McKowen fraud in connection with the sale of securities and the substantial damages caused by his misconduct;

- Defendant McKowen's investigation and sanctions by the federal securities regulators arising out of his fraudulent securities transactions;

- Defendant McKowen's permanent ban from the securities industry and loss of securities license as a result of his misconduct; and

- Defendant McKowen's bankruptcy.

104.    Defendant Two Rivers and Individual Two Rivers and GrowCo Defendants benefitted from these transactions in the course of their business, because the funds from the Offerings were ultimately used for Two Rivers' operating capital.

105.     Said omissions were material, and Defendants intended Plaintiff to rely on the material omissions in the Offering Documents to invest in GrowCo.

106.     Plaintiff justifiably, and to their detriment, relied on the omissions in the Offering Documents to their detriment in deciding to invest in the Offerings.

107.     As a direct and proximate result of Defendants' negligent omissions, Plaintiff purchased securities in the Offerings and suffered losses.

108.     Defendant Two Rivers and Individual Two Rivers and GrowCo Defendants are liable to Plaintiff for damages in an amount to be determined at the hearing of this case.

## **RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a) Certifying this action as a class action pursuant to C. R. C. P. Rule 23(b)(3);

(b) Certifying Plaintiff as class representative and appointing the undersigned counsel as class counsel;

(c) Awarding rescission and/or rescissory damages against Defendants, in favor of Plaintiff and the members of the Class, including interest;

(d) Awarding compensatory damages in favor of Plaintiff and the members of the Class against Defendants, in favor of Plaintiff and the members of the Class, including interest;

(e) Awarding Plaintiffs his reasonable attorneys' fees and costs; and

(f) Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury against Defendant Two Rivers and the Individual Two Rivers Defendants for all issues triable thereby.

Date: August 13, 2019                 Respectfully submitted,


                                       /s/ Steve A. Miller____
                                      Steve A. Miller, No. 8758
                                      STEVE A. MILLER, P.C.
                                      162 Larimer St., Suite 2906
                                      Denver, CO 80202
                                      Telephone: (303) 892-9933
                                      Fax: (303) 892-8925
                                      Email: Sampc01@gmail.com

                                      *Local Counsel for Plaintiffs*

                                      Paul J. Scarlato *(pro hac vice forthcoming)*
                                      Christian A. Pfeiffer *(pro hac vice forthcoming)*
                                      GOLDMAN SCARLATO & PENNY, PC
                                      8 Tower Bridge, Suite 1025
                                      161 Washington Street
                                      Conshohocken, PA 19428
                                      Telephone: (484) 342-0700
                                      E-mail: scarlato@lawgsp.com
                                              pfeiffer@lawgsp.com

                                      Alan L. Rosca, Esq *(pro hac vice forthcoming)*
                                      GOLDMAN SCARLATO & PENNY, PC
                                      23250 Chagrin Blvd. Suite 100
                                      Beachwood, OH 44122
                                      Telephone: (484) 342-0700
                                      E-mail: rosca@lawgsp.com

                                      J. Barton Goplerud (*pro hac vice forthcoming*)
                                      Brian O. Marty *(pro hac vice forthcoming)*
                                      SHINDLER   ANDERSON   GOPLERUD   &
                                      WEESE PC
                                      5015 Grand Ridge Dr, Ste 100
                                      West Des Moines, IA 50265
                                      Telephone: (515) 223-4567
                                      Fax: (515) 223-8887
                                      Email: goplerud@sagwlaw.com
                                              marty@sagwlaw.com

                                      *Counsel for Plaintiff and the Class*

☐ **FORM 1.2. DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT AND JURY DEMAND**

DATE FILED: August 5, 2019 11:24 AM
FILING ID: 5E9CEBEF91D95
CASE NUMBER: 2019CV33099

| | |
|---|---|
| District Court _____ **Denver** _____ County, Colorado<br>Court Address:  **1437 Bannock Street**<br>     **Denver CO 80202**<br><br>Plaintiff(s):  JOHN PAULSON, individually and on behalf of all others similarly situated<br>v.<br>Defendant(s):  TWO RIVERS WATER AND FARMING COMPANY, a Colorado corporation; JOHN R. MCKOWEN, an individual; WAYNE HARDING, an individual; and TIMOTHY BEALL, an individual, | ▲ COURT USE ONLY ▲ |
| Attorney or Party Without Attorney (Name and Address):<br> **Steve A. Miller, 1625 Larimer Street, Suite 2906, Denver, CO 80202**<br>Phone Number:  **(303) 892-9933**   E-mail: **sampc01@gmail.com**<br>FAX Number:  **(303) 892-8925**   Atty. Reg. #:  **8758** | Case Number: |

**DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT AND JURY DEMAND**

1. This cover sheet shall be filed with the initial pleading of a complaint, counterclaim, cross-claim or third party complaint in every district court civil (CV) case. It shall not be filed in Domestic Relations (DR), Probate (PR), Water (CW), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2. Simplified Procedure under C.R.C.P. 16.1 **applies** to this case **unless** (check one box below if this party asserts that C.R.C.P. 16.1 **does not** apply):

   ✓ This is a class action, forcible entry and detainer, Rule 106, Rule 120, or other similar expedited proceeding, **or**

   ☐ This party is seeking a monetary judgment against another party for more than $100,000.00, including any penalties or punitive damages, but excluding attorney fees, interest and costs, as supported by the following certification:

      By my signature below and in compliance with C.R.C.P. 11, based upon information reasonably available to me at this time, I certify that the value of this party's claims against one of the other parties is reasonably believed to exceed $100,000."

   **Or**

☐   Another party has previously filed a cover sheet stating that C.R.C.P. 16.1 does not apply to this case.

3. ☑   This party makes a **Jury Demand** at this time and pays the requisite fee. See C.R.C.P. 38. (Checking this box is optional.)

Date:   **8/13/2019**                                         */s/ Steve A. Miller*
                                         **Signature of Party or Attorney for Party**

**NOTICE**
This cover sheet must be served on all other parties along with the initial pleading of a complaint, counterclaim, cross-claim, or third party complaint.

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| TWO RIVERS FARMS F-2, INC., | ) | Case No. 23-15627 KHT |
| Debtor. | ) | Chapter 11 |
| | ) | Subchapter V |
| | ) | |

## CHAPTER 11 PLAN OF REORGANIZATION FOR
## SMALL BUSINESS DEBTOR UNDER SUBCHAPTER V

TWO RIVERS FARMS F-2, INC. ("Debtor"), through counsel, respectfully submits its Chapter 11 Plan of Reorganization for a Small Business Debtor under Subchapter V of Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and states as follows:

## I. INTRODUCTION

1.1     This document constitutes the Plan of Reorganization ("Plan") for the Debtor. This document is designed to provide all creditors and parties in interest with sufficient information with which to make an informed vote as to the acceptance or rejection of the Debtor's Plan.

1.2     Any terms which are set forth in this document and defined in the Bankruptcy Code shall have the meaning attributed to them as set forth on **Appendix A** attached hereto.

1.3     Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" under the Plan are entitled to vote to accept or reject the Plan. Classes of Claims and Interests that are not impaired are not entitled to vote and are deemed to have accepted the Plan. Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules, and a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting. Each holder of an

-1-

Allowed Claim in Classes 1, 2, 3, 4, 6 and 7, shall be entitled to vote to accept or reject the Plan.

1.4    Regardless of creditor votes, if the Plan meets all of the applicable requirements of 11 U.S.C. §1129(a), other than subsections (8), (10), and (15), the Court may confirm the Plan if it does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

1.5    As discussed more fully below, the Debtor believes that the Plan represents the best alternative for providing the maximum value for creditors. The Plan provides creditors with a distribution on their Claims in an amount greater than any other potential known option available to the Debtor.

1.6    **THIS PLAN AND THE DISCLOSURES CONTAINED HEREIN HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION. THE COMMISSION HAS SIMILARLY NOT REVIEWED THE ACCURACY OR ADEQUACY OF THIS PLAN.**

## II. HISTORY AND EVENTS LEADING UP TO BANKRUPTCY

The Debtor is a Colorado corporation owned by Two Rivers Farms F-1, Inc. ("F-1").  F-1 is in turn owned by Two Rivers Water and Farming Company ("Two Rivers").  The Debtor owns real property and certain water rights which were obtained from a related entity The Orlando Reservoir No. 2 Company, LLC ("Orlando") who commenced a Chapter 11 bankruptcy case in July 2023. *See Case No. 23-13178-KHT*.  Orlando is owned by TR Capital Partners, LLC ("TR Capital") and Mr. Greg Harrington.  TR Capital is also owned, in part, by Two Rivers.

A.     **Prior Management's Fraudulent Activities**

In 2014, Two Rivers and certain other companies were owned and operated by John R. McKowen (as CEO) and Wayne Harding (as CFO and Treasurer). Mr. McKowen and Mr. Harding reorganized ownership of their operating subsidiaries based on two functional operations, water and farming. As discussed below, one such set of companies was GrowCo, Inc. ("GrowCo"), and its subsidiaries, which was used to solicit investors for funds to purchase real estate, construct greenhouses and then lease such facilities to cannabis growers. Cannabis is illegal under Federal Law.[1] Assisting others in businesses and activities that violate the CSA is also a crime. *See* 21 U.S.C. §846.

Mr. McKowen's solicitations for GrowCo and its subsidiaries were made without proper disclosures to investors and during a time when Mr. McKowen was not licensed to sell, offer or solicit securities in Colorado, among other things. Mr. McKowen and Mr. Harding convinced many investors to put funds into GrowCo and its subsidiaries with the promise of additional collateral from their groups of companies. Mr. McKowen and Mr. Harding failed to follow required corporate formalities, let alone proper methods for ordinary course business transactions.

Pre-petition, the Securities Commissioner for the State of Colorado, Ms. Tung Chan ("Securities Commissioner") sued GrowCo, GrowCo Partners 1, LLC ("GCP-1"), Two Rivers, TR Capital, Mr. Harding, and Mr. McKowen, among others, alleging Mr. Harding and Mr. McKowen,

---

[1] At all times relevant hereto, cannabis is a Schedule I controlled substance under the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801, et seq. The CSA broadly provides that possessing, growing, and dispensing cannabis and assisting others to do so are illegal. Specifically, it is unlawful for any person knowingly or intentionally "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." See 21 U.S.C. § 841(a)(1). "Manufacture" includes the production, preparation, and propagation of a drug or other substance. See 21 U.S.C. § 802(15). Further, 21 U.S.C. § 856(a) makes it unlawful to "knowingly open, lease, rent, use, or maintain any place" to manufacture or distribute a controlled substance.

through GrowCo, Two Rivers and TR Capital sold unregistered non-exempt securities in Colorado between 2014 and 2019 ("Commissioner Action"). A copy of the Commissioner's Complaint is attached hereto as **Exhibit 1** and incorporated herein.

To resolve the Commissioner Action, Two Rivers, TR Capital (both under new ownership and management), and the Commissioner entered into a Stipulation for Injunction and Other Relief ("Stipulation"). A copy of the Stipulation is attached hereto as **Exhibit 2** and is incorporated herein. The Stipulation alleges, among other things, Mr. McKowen and Mr. Harding, as well as various co-conspirators, undertook a series of fraudulent private placement offerings to enter the cannabis business. *Id.* The ultimate result of those offerings raised well over $19 million dollars. *Id.* However, much of the proceeds were diverted for the personal gains of Mr. McKowen and Mr. Harding, among other conspirators. *Id.* Included in this pattern of fraud was the encumbrance of the Debtor's assets for no consideration. *Id.*

Under the terms of the Stipulation, Two Rivers and TR Capital agreed to cause Orlando and the Debtor (if necessary) to each file their own Chapter 11 bankruptcy cases under Subchapter V, if applicable. The Stipulation presumed the Debtor (and/or Orlando) could "clear title on the assets improperly and fraudulently encumbered [sic] by the Defendants [Mr. Harding, Mr. McKowen, GrowCo, and GCP-1] and alleged unnamed co-conspirators." *Id.*

**B.    Transition to Current Management**

Mr. Greg Harrington assumed his position as Chief Executive Officer of Two Rivers, subsidiaries and affiliates including the Debtor, on September 19, 2019. On this transition, given the complexity of the fraudulent financial statements, Mr. Harrington was initially unaware of the precarious financial position of the Debtor. Mr. Harrington began his tenure believing that Two

-4-

Rivers, through its water subsidiary, was an asset rich company with resolvable financial issues. Unfortunately, the prior management created unresolvable issues which required assistance of this Court. *See Exh. 1.*

The Debtor's current management, through affiliates and unrelated parties, secured the necessary interim financing to conduct administrative functions but was hampered by the fraudulent actions of prior management to secure further development financing. Based upon an independent analysis conducted by an auditing firm, Two Rivers, the Debtor and other entities suffered from, among other things, unnecessary complexity, cross allegations by prior management, incomplete books and records, ambiguous ownership of assets, valuation inconsistencies and historical lack of internal controls.

The Debtor's current owner and management, after securing the advice of legal counsel, accounting specialists, water asset rights valuation firms and financial advice, determined that reorganization could be a viable opportunity to realize the value of the Debtor's assets for the benefit creditors and equity participants. In large part, they reached this conclusion by weighing the increasing value of water rights and the Debtor's pending revenue stream from its Service Agreement, as set forth below.

**C.      Pre-Petition Transfers of Assets and Liens**

The Debtor acquired the Reservoir, additional land, and water rights to, among other things, improve the Reservoir to store and deliver more water, provide water for agricultural, commercial and municipal uses, and to benefit the Huerfano County community.  The land and water rights were acquired through a series of transactions with Marksheffel-Woodman Investments, LLC and/or Family Ranch Holdings, LLC (collectively "MWI") (and Orlando, among others).

-5-

These agreements included a Purchase Agreement (and related documents) in or around January 2011, a Service Agreement on or about January 28, 2011, a Master Agreement dated May 9, 2011, and a Metering Agreement. These agreements allowed the Debtor to acquire title to the Reservoir Parcel and surrounding land, along with all of the Huerfano Water Rights. More importantly, the Debtor used the associated water rights upon the real property in accordance with the historic consumptive use of the water rights, namely agriculture. In order for the water rights to be converted from agricultural use to commercial and municipal use, among others, the parties needed to document such use over a period of at least 10 years. These agreements facilitated such use by providing, among other things, a mechanism for the metering of the water use and documentation evidencing same. Ultimately, MWI intended to develop real estate near the Reservoir Parcel into residential and commercial uses which would not only require water, but the legal rights to use water for such purposes.

Following acquisition, the Debtor then set about to improve the Reservoir including the dam to increase the safety of the dam structure but also increase storage capacity. Similarly, the Debtor needed to develop the necessary infrastructure to deliver its water to MWI for their intended use. As set forth above, the Debtor used funds from the CWCB loan as well as worked with Orlando to accomplish all of the necessary improvements and infrastructure.

The Service Agreement was amended several times over the years. Under the Service Agreement, the Debtor is required to deliver a certain amount of water for MWI's real estate development which is near the Reservoir along with additional water for future development. In order to provide water for such commercial and municipal use, the Debtor must obtain a decree from Colorado's Water Courts changing the use from historically agricultural uses.

-6-

Pre-petition, the Debtor and Orlando engaged the services of a water attorney and a water engineering firm to provide the necessary work to submit such application. Upon information and belief, the Debtor is required to show at least 10 years of historic consumptive use of the water from its water rights in order to convert the use. The Debtor's pre-petition professionals have most of the records on the 10 year historic consumptive use going back to 2000. Some additional investigation and work needs to be performed to complete the historic consumptive use analysis and calculations. However, a water court application could take anywhere from three (3) to six (6) years to obtain Court approval changing the use.

In the interim, the Debtor intends to submit a Temporary Water Supply Plan to Colorado's State Water Engineer. Such Temporary Plan is based on the same historic use. Obtaining approval from Colorado's State Water Engineer may only take a few months after submission of the Temporary Plan. Once approved, the Debtor may begin supplying water to MWI on a temporary basis while the water court application is pending.

### 1. The Reservoir Parcel

The "Reservoir Parcel" is generally described as: a parcel of land containing Orlando Reservoir Number Two, situated in Sections 17, 18, 19, and 20, Township 26 South, Range 66 West of the 6th P.M., in Huerfano County, Colorado. The Reservoir Parcel was originally acquired by Orlando via a warranty deed on or about May 9, 2005 from Mr. Leo Payne.

On October 21, 2011, Orlando conveyed legal title to the Reservoir Parcel to the Debtor, and again on February 15, 2012, via Quit Claim Deeds.

On November 9, 2011, the Debtor granted a Deed of Trust to Buxman, Kwitek, and Ohlsen, P.C. (as Lenders' Agent) encumbering the Reservoir Parcel (and Huerfano Water Rights, *see infra*)

-7-

to secure approximately 57 promissory notes with the total principal amount of $5,527,000.00. The Debtor (and Orlando) assert the underlying promissory notes were fully satisfied pre-petition and were but another one of the schemes perpetrated by Mr. McKowen and Mr. Harding. *See infra.*

On or about March 5, 2012, the Debtor granted a Deed of Trust to CWCB encumbering the Reservoir Parcel to secure a loan in the principal amount of $1,184,882.00. The purpose of this loan was to provide funding to the Debtor to, among other things: (1) improve the storage capacity of the reservoir; (2) repair and improve the water delivery systems into and out of the Reservoir; (3) add additional infrastructure for delivering water to various types of water users; and (4) provide funds for overhead and operations during such improvements. Prior to filing for relief, the Debtor, and/or Two Rivers for the benefit of the Debtor, significantly paid down the indebtedness to CWCB such that the amount owing on the Petition Date was less than $500,000.

On or about March 13, 2012, the Debtor, Buxman, and CWCB entered into a Subordination Agreement whereby the Buxman Deed of Trust was subordinated to CWCB's Deed of Trust due to this funding for the improvements.

On or about September 9, 2015, the Debtor and Orlando (both by Mr. Harding) allegedly executed a Deed of Trust to GCP-1, for the benefit of approximately 150 beneficiaries for a total principal amount of $4,000,000, which was recorded with the Clerk and Recorder of Huerfano County, Colorado at Reception No. 404224 on September 25, 2015 to allegedly encumber the Reservoir Parcel (and Huerfano Water Rights, *see infra*) (the "GCP-1 Deed of Trust"). The Debtor and Orlando dispute this encumbrance for, among other things, lack of consideration, fraud and illegality.

On or about September 9, 2015, the Debtor and Orlando, again both through Mr. Harding, allegedly executed a Deed of Trust to GrowCo for the benefit of approximately 17 beneficiaries for a total principal amount of $4,000,000, which was recorded with the Clerk and Recorder of Huerfano County, Colorado at Reception No. 404225 on September 25, 2015 to allegedly encumber the Reservoir Parcel (and Huerfano Water Rights, *see infra*) (the "GrowCo Deed of Trust"). The Debtor and Orlando dispute this encumbrance for, among other things, lack of consideration, fraud and illegality.

<u>2. Water Rights</u>

Orlando acquired certain decreed water rights (the "Initial Water Rights") from Mr. Payne on or about May 9, 2005, via Warranty Deed, located in Huerfano County, Colorado.

These Initial Water Rights include certain rights and priority rights to the Butte Valley Ditch, storage of water in the Orlando Reservoir No. 2, the Mexican Branch Ditch, the Chitwood Ditch, the Parsons Ditch, the Weston Spring No. 1, the Weston Spring No. 2, the Weston Spring No. 4, and the Weston Spring No. 5.

Orlando also acquired certain decreed water rights from Marksheffel-Woodman Investments, LLC ("MWI") via a Quit Claim Deed on January 28, 2011. These water rights are described as 3 C.F.S. No. 19 to the Robert Rice Ditch #15, based upon a decree dated March 1, 1987, which are also in Huerfano County, Colorado (the "MWI Water Rights"). Orlando acquired additional water storage rights for the Orlando Reservoir No. 2 from Randall W. Case, II on or about January 28, 2011 via a Quit Claim Deed (the "Case Water Rights"). The Initial Water Rights, the MWI Water Rights and the Case Water Rights are collectively referred to hereinafter as the "Huerfano Water Rights."

However, on or about January 28, 2011, Orlando conveyed some of the Huerfano Water Rights to TRW Orlando Water Assets, LLC ("TRW") via a Water Deed - Special Warranty Deed. Such water rights were re-conveyed back to the Debtor on or about September 7, 2011 via a Special Warranty Deed. On or about July 27, 2011, Orlando conveyed some of the Huerfano Water Rights to Family Ranch Holdings, LLC ("Family Ranch") via a Water Deed - Special Warranty Deed. Such water rights were re-conveyed back to Orlando on or about September 7, 2011 via a Special Warranty Deed. On October 21, 2011, TRW conveyed the Huerfano Water Rights to the Debtor via a Quit Claim Deed.

As noted above, the November 9, 2011 Deed of Trust granted by the Debtor to Buxman, Kwitek, and Ohlsen, P.C. (as Lenders' Agent) encumbers both the Huerfano Water Rights and Reservoir Parcel to secure approximately 57 promissory notes with the total principal amount of $5,527,000.00. The Debtor and Orlando assert the underlying promissory notes were fully satisfied pre-petition.

On February 15, 2012, Orlando conveyed legal title in the Water Rights to the Debtor via a "Water Deed - Quit Claim Deed." Similar to the Buxman Deed of Trust, the March 5, 2012 Deed of Trust granted by the Debtor to CWCB encumbers the Huerfano Water Rights and Reservoir Parcel to secure the same loan in the principal amount of $1,184,882.00.

On or about March 13, 2012, the Debtor, Buxman, and CWCB entered into a Subordination Agreement whereby the Buxman Deed of Trust as to the Huerfano Water Rights was also subordinated to CWCB's Deed of Trust.

As noted above, the alleged GCP-1 Deed of Trust encumbers both the Reservoir Parcel and the Huerfano Water Rights to secure approximately 150 promissory notes with a total principal

amount of $4,000,000.  The Debtor and Orlando dispute this encumbrance for, among other things, lack of consideration, fraud and illegality.

As noted above, the alleged GrowCo Deed of Trust encumbers both the Reservoir Parcel and the Huerfano Water Rights to secure approximately 17 promissory notes with a total principal amount of $4,000,000.  The Debtor and Orlando dispute this encumbrance for, among other things, lack of consideration, fraud and illegality.

### III.  DEBTOR'S ASSETS AND LIABILITIES

A.      **Debtor's Assets and Value**

The Debtor's principal assets are the Reservoir Parcel and the Huefano Water Rights all located in Huerfano County, Colorado.   In 2012, these assets were valued at approximately $5,195,000 prior to the Debtor completing the improvements to the Reservoir and water delivery systems.

The Debtor (and Orlando), also entered into a Service Agreement with, among others, MWI in or around January of 2011.  MWI is developing approximately 7,000 acres of real property in Huerfano County, Colorado, in the vicinity of the Debtor's Reservoir for agricultural, energy and future municipal uses.  The Service Agreement has been amended several times by the parties prior to the Debtor's bankruptcy case.

Under the terms of the Service Agreement, as amended, the Debtor will supply the water for MWI's development project.  Based upon the amendments to the Service Agreement, the Debtor will supply water service for approximately 10,000 single family equivalents ("SFEs") annually from the Debtor's Huefano Water Rights.  Upon information and belief, MWI has requested the Debtor supply the first 50 SFEs in May of 2024.

-11-

In order to meet its obligations under the Service Agreement, the Debtor expended in excess of $2,380,000 in rebuilding and developing its Huefano Water Rights. Financing for such work was provided from the CWCB loan, as well as through Two Rivers and MWI. The Debtor's Huefano Water Rights include a certain amount water in and to the Cucharas Reservoir. The Debtor ultimately connected the Cucharas Reservoir with its Reservoir through certain ditches and other delivery systems so that it could provide water to MWI under the Service Agreement.

The Debtor asserts and believes the Service Agreement, as amended, constitutes another valuable asset. The revenues from the Service Agreement will be used to repay all of its allowed creditor claims. Under the Service Agreement, as amended, MWI will pay an initial water resource charge of $6,500 per SFE tap. MWI is required to purchase at least 50 SFE taps per year, which equals approximately $325,000 in annual revenue. The total value of such the tap fees to the Debtor is approximately $65,000,000. Depending upon MWI future needs, including a wastewater service, a treatment plant, and/or recreation uses, the Debtor could realize additional profit from the Service Agreement. Following the improvements to the Reservoir for the Service Agreement, along with the additional demand for the Debtor's Huefano Water Rights from other users, the potential realized value of the Debtor's assets could exceed $70,000,000.

**B.**     **Avoidance and/or Satisfaction of Certain Claims and Liens**

1.     The GrowCo and GCP-1 Deeds of Trust

The Debtor scheduled GrowCo and GCP-1, the agents for the alleged Beneficiaries of each deed of trust, as disputed, contingent, unliquidated "creditors." Each Deed of Trust asserts "claims" of $4,000,000 on behalf of the Beneficiaries of each encumbrance, 17 investors for GrowCo and approximately 100 investors for GCP-1, respectively. The Debtor also listed these individual

Beneficiaries of as disputed, contingent and unliquidated. Such "creditors" and "claims" are therefore duplicates of the scheduled GrowCo and GCP-1 "creditors" and "claims." The Debtor did so in order to give adequate notice to all affected parties, including disputed creditors and disputed claimants. Thus, the total amount of alleged "claims" related to the GrowCo and GCP-1 Deeds of Trust, if all such claims were construed as valid claims, could exceed $8,000,000, which is denied.

On or about May 26, 2021, GrowCo, GCP-1, Two Rivers, TR Capital, among others, entered into a Settlement Agreement in connection with GrowCo's bankruptcy case. A copy of this Settlement Agreement is attached hereto as **Exhibit 3** and incorporated herein. Under the terms of the Settlement Agreement, GrowCo and GCP-1 agreed to release the GCP-1 Deed of Trust as such document was not a valid encumbrance, including as against any assets of the Debtor and/or Orlando. *Exh. 2, at 2*. Under the terms of the Settlement Agreement, GrowCo and GCP-1 agreed to waive and release all claims against Two Rivers and TR Capital, including their affiliates such as the Debtor and Orlando, from any and all claims. *Id.* at 3. Such waiver and release is extremely broad. *Id.*

Because of the broad waiver and release signed by GrowCo and GCP-1 in the Settlement Agreement, among other reasons, the GrowCo Deed of Trust is also invalid as against any assets of the Debtor and/or Orlando as well as any *in personam* claims against the Debtor and/or Orlando. *Id.*

Moreover, the GrowCo and GCP-1 Deeds of Trust were both issued for the same or similar investment offering by Mr. McKowen in connection with GrowCo. *See Exh. 1*. As set forth in the Commissioner's Complaint against Mr. McKowen, Mr. Harding and others, Mr. McKowen raised more than $19,000,000 through several debt and equity offerings of unregistered, non-exempt securities. *Id.*

-13-

At the time, Mr. McKowen had been suspended from association with any securities dealer by the NASD. *Id.* at 8. Mr. McKowen also had prior bankruptcies. *Id.* Such information, among other things, was not disclosed to prospective investors. *Id.* Mr. McKowen then participated in raising over $1,775,00 in private debt from at least 22 transactions. *Id.* As a result, the AG claimed Mr. McKowen and Mr. Harding, among others, committed securities fraud under Colorado law by offering and/or selling securities in a scheme to defraud, with untrue statements of material fact or omissions of material facts, to investors. *Id.* at 28-32.

Mr. McKowen has been the subject of several regulatory actions concerning securities broker's license. A copy of a report from FINRA, the SEC regulatory arm, on Mr. McKowen is attached hereto as **Exhibit 4** and incorporated herein. *See also, Exh. 1.* Notwithstanding such prior disciplinary actions and the Colorado Securities Commissioner's action, Mr. McKowen continues to unlawfully solicit investors. Mr. McKowen confirms, in this solicitation, the GrowCo and GCP-1 Deeds of Trust were granted as part of his schemes to raise capital for their illegal cannabis business in 2015. *Id.*

The GrowCo offerings in 2014 and 2015 conducted by Mr. McKowen and Mr. Harding offered and used the Reservoir and Water Rights to the GrowCo and GCP-1 investors additional collateral as a "back-stop" to their investments in GrowCo and GCP-1. *Exh. 1,* at 10-11; *Id.* at 12-13. Such unlawful use further evidences the schemes of Mr. McKowen's and Mr. Harding's GrowCo solicitations.

No consideration was paid to either this Debtor or Orlando by any person, by GrowCo or GCP-1, or by any of the GrowCo and GCP-1 Beneficiaries, for the granting of encumbrances against the Reservoir Parcel and Water Rights. In reality, Mr. McKowen and Mr. Harding used the

Reservoir Parcel and Water Rights to further their scheme to defraud the investors in GrowCo and

GCP-1, as well as the legitimate creditors of this Debtor and/or Orlando like CWCB. *Id.*  Thus, the

Debtor intends to file one or more adversary proceedings to declare the GrowCo and GCP-1 Deeds

of Trust void and/or to quiet title of the Reservoir Parcel and Water Rights in the Debtor.  The

Debtor asserts the GrowCo and GCP-1 Beneficiaries, respectively, are therefore not legitimate

creditors of the Debtor.

Such adversary proceedings are necessary for other reasons including, but not limited to, to

demonstrate the Debtor's lack of affiliation with and in GrowCo and GrowCo's cannabis business,

an illegal activity.[2]  In other words, should either the GrowCo and/or GCP-1 Deeds of Trust (and

related indebtedness to the Beneficiaries) be allowed as claims in this bankruptcy case, such

determination could also include a finding that the creditor/investor note-holders (e.g. the

Beneficiaries) conspired with, aided and abetted the Debtor (and others) to facilitate illegal cannabis

related transactions, all of which violate the Controlled Substances Act. *See In re Way to Grow*, 597

B.R. 111, 124 (Bankr.D.Colo. 2018), aff'd, 610 B.R 338, 345 n.2 (D.Colo. 2019).  The Debtor

denies it knowingly and/or actively participated in such schemes, or, by any lawful corporate action,

violated the CSA.  Thus, the Debtor's adversary proceedings are necessary to shield the Debtor and

its assets from Mr. McKowen's and Mr. Harding's, as well as GrowCo's and GCP-1's, illegal

activities. *Id.*  Notably, GrowCo and GCP-1 failed to respond to the Commissioner's Complaint and

the Court entered a default against them.

---

[2] *See Case No. 18-14330 MER, Docket Nos. 186, 262 & 263.*

2.       Pre-Bankruptcy Satisfaction of the Beneficiaries of Buxman Deed of Trust

As set forth above, on or about November 9, 2011, the Debtor granted a Deed of Trust to Buxman, Kwitek, and Ohlsen, P.C. (as Lenders' Agent) encumbering the Reservoir Parcel (and Huerfano Water Rights, *see infra*) to secure approximately 57 promissory notes with the total principal amount of $5,527,000.00.  Each of the note holders are beneficiaries of the Buxman Deed of Trust (the "Buxman Beneficiaries").

However, the underlying promissory notes represented by the Buxman Deed of Trust were satisfied pre-petition. In or around August of 2014, each of the Buxman Beneficiaries agreed to exchange their promissory notes, issued by the Debtor, with Preferred Unit membership interests in TR Capital Partners, LLC (one of the equity owners of Orlando).  Each Buxman Beneficiary executed a Membership Interest Purchase Agreement and Exchange Agreement whereby they released their promissory notes from the Debtor for the equity conversion in TR Capital Partners. The Debtor understands TR Capital Partners then issued share certificates to the Buxman Beneficiaries for their pro-rata conversion.[3]

Therefore, the Debtor asserts the debts represented by the Buxman Deed of Trust, specifically the 57 promissory notes, were satisfied and released pre-petition.  The Debtor intends to initiate an adversary proceeding to also avoid the Buxman Deed of Trust and quiet title of the Reservoir and Water Rights in the Debtor.

**C.       Resolution of Issues with the Transfers of Reservoir and Water Rights From Orlando**

Prior to filing this bankruptcy case, the Debtor undertook an investigation as to whether the transactions with Orlando could be avoided for the benefit of its creditors.  This investigation also

---

[3]Such documents are voluminous and confidential, but will be produced at any trial or hearing.

-16-

occurred during a time when both Orlando and this Debtor were reconciling all of its business and financial records.  This Debtor's ultimate corporate parent, Two Rivers, assisted with the Debtor's investigation.

Prior to the filing of this case and following those investigations, Orlando and this Debtor entered into an Asset Resolution Agreement effective December 1, 2023.[4]  A copy of the Asset Resolution Agreement ("ARA") is attached hereto as **Exhibit 5** and incorporated herein.  Under the terms of the ARA, the parties recognized that as part of Orlando's transfer of real estate and water rights to this Debtor, this Debtor agreed to assume all of the indebtedness associated with such assets.  *Id.*  This indebtedness includes the valid secured lien of the CWCB of just under $500,000.  *Id.*  The ARA also includes this Debtor assuming all responsibility under the Service Agreement, as amended, with MWI including all costs associated with creating, improving and maintaining the water delivery systems to perform the Service Agreement. *Id.*

Similarly, Two Rivers obtained an opinion letter from independent counsel as to the propriety of the Debtor's and Orlando's ARA, on behalf of the Debtor.  Such opinion confirmed the Debtor's understanding as to the transactions with Orlando including valid and sufficient consideration for the Reservoir and Water Rights.  Orlando, on the other hand, has assets that are separate and apart from this Debtor's assets which were not involved in the 2011 and 2012 transfer of properties between the entities. Orlando determined that its "stand alone" assets were sufficient to restructure its financial affairs and propose a plan of reorganization in its bankruptcy case. *Id.*

---

[4] Orlando filed a motion in its case, pursuant to Fed.R.Bankr.P. 9019, to approve the ARA as such agreement occurred post-petition. MWI filed an objection to the ARA.

Consequently, the Debtor understands Orlando will not seek to avoid the 2011 and 2012 transfer of properties to the Debtor. Such action will permit the Debtor to focus on its reorganization efforts.

**D.     Debtor's Liabilities**

The Debtor scheduled numerous liquidated and non-contingent creditors and claims, both secured and unsecured. *See Docket Nos. 25-30.* The Debtor also scheduled many alleged creditors as disputed, contingent and unliquidated claims. *Id.* A summary of all of the Scheduled Creditors and amounts is attached hereto as **Exhibit 6** and incorporated herein. The Debtors scheduled a total amount of secured claims of $13,805,107.12, including disputed, contingent and unliquidated claims. The Debtor scheduled two priority creditors, the IRS and State of Colorado, for 2019-2023 taxes in an unknown amount. The Debtor scheduled a total of 145 unsecured creditors holding claims totaling $2,294,754.84, including disputed, contingent and unliquidated claims.

A total of 21 claimants filed proofs of claim in this bankruptcy case. Of those filed claims, 16 claimants asserted secured claims totaling $43,600,974.82. One claimant asserted a priority claim (IRS) of $6,768.86. Four claimants asserted unsecured claims totaling $172,394.22. A summary of the filed proofs of claim is attached hereto as **Exhibit 7.** Many of these claims are duplicates of the claims of disputed, contingent, unliquidated GrowCo, GCP-1 and/or Buxman Beneficiaries as scheduled by the Debtor or the other filed claims. *Id.* At least one claim appears to be the obligation of TR Capital, specifically the proof of claim filed by certain members of TR Capital in the amount of $24,500,000. *Id.* The Debtor disputes such claim as the Debtor is not an obligee under the instruments identified by these members of TR Capital.

-18-

# IV.  BANKRUPTCY CASE

**A.      Bankruptcy Filing**

The Debtor filed for relief on December 6, 2023.  The Debtor elected to be treated as a small business debtor under the new Subchapter V provisions of the Bankruptcy Code. 11 U.S.C. §1182. Mr. Mark Dennis was appointed the Subchapter V Trustee in this case.

As discussed above, the Debtor filed its Amended Schedules of Assets and Liabilities with the Court, along with its Statement of Financial Affairs, on or about December 21, 2023.  The Debtor intends to make a few minor modifications to such documents following the meeting of creditors in this Case.

**B.      Post-Bankruptcy Events**

<u>1.</u>      <u>Administrative Matters</u>

The Debtor employed the law firm of Buechler Law Office, LLC ("Law Firm") as counsel in this bankruptcy case. The Debtor selected the Law Firm by reason of its expertise and experience in bankruptcy matters who is well qualified to represent the Debtor in these proceedings.

Prior to the Debtor's Chapter 11 filing, the Law Firm received funds from Investors Fiduciary, LLC, a company affiliated with Mr. Harrington, the managing member of the Debtor, in the amount of $25,000.00. The Law Firm was paid pre-petition fees and costs in the amount of $10,349.47 from these funds, including the filing fee. The Law Firm is holding the remaining amount of $14,650.53 as a retainer ("Retainer") in its trust account subject to Court approval.  The Law Firm asserts a security interest in the Retainer from the Debtor.

The US Trustee objected to the Debtor's employment of the Law Firm for, among other things, the Law Firm also represents Orlando.  As set forth above, prior to this Debtor's bankruptcy

-19-

filing, the Debtor entered into an agreement with Orlando resolving the disputes between the companies.  Similarly, independent counsel retained by Two Rivers examined the agreement between Orlando and the Debtor, along with the pre-petition transactions, and believed the ARA was supported by valid consideration as were the pre-petition transfers.  The Law Firm therefore supplemented its Application to Employ with this information.

Based upon an understanding between the Law Firm and the US Trustee's office, once the ARA is approved, the US Trustee will withdraw its opposition to the employment of the Law Firm as the Debtor's bankruptcy counsel.

     2.      US Trustee's Objection to Debtor's Subchapter V Eligibility

On February 13, 2024, the U.S. Trustee filed an Objection to the Debtor's Eligibility as a Subchapter V debtor under Chapter 11 of the Bankruptcy Code. *See Docket No. 54.*  To qualify as a debtor under Subchapter V, a debtor must have non-contingent, liquidated debts of less than $7,500,000. 11 U.S.C. §1182(1).  Blue & Green, one of the beneficiaries of the GrowCO DOT, filed a joinder to the US Trustee's Objection.

The US Trustee asserts, among other things, the debts secured by the GrowCo Deed of Trust and GCP-1 Deed of Trust were not contingent and were liquidated debts for purposes of eligibility under Subchapter V.  The US Trustee also asserted even if the Debtor was not the obligor on such indebtedness, as the owner of the Reservoir, related water rights and land, the Debtor's liability could be calculated as up to the market value of the Reservoir, related water rights and land. *In re Reed*, 2017 WL 1491763 * 4 (Bankr.D.Colo. 2017)(Rosania, J.)(citations omitted).

The Debtor filed a Response asserting the GrowCo DOT and GCP-1 DOT were, among other things, fraudulent transfers of interests of the Debtor in property, the product of an illegal securities

-20-

offering, used for the purposes of GrowCo's and GCP-1's illegal cannabis operations and business ventures, and part of a scheme by Mr. McKowen and Mr. Harding to defraud investors in GrowCo and GCP-1, as well as the lawful creditors of the Debtor.

The Debtor also asserts under the GCP-1 Settlement Agreement, the GCP-1 Deed of Trust is required to be released and therefore not a valid obligation of the Debtor. *See Exh. 3.* The Debtor also asserts the release language in the GCP-1 Settlement Agreement, to which GrowCo was a party, also caused the release of the GrowCo DOT. Thus, the two deeds of trust, each in the principal amount of $4,000,000, are not actual obligations of the Debtor, whether such instruments are contingent and/or unliquidated.

Similarly, the Debtor asserts the indebtedness underlying the Buxman DOT was satisfied pre-petition when the holders of such debts exchanged their promissory notes from this Debtor to stock in TR Capital. As a result, the alleged indebtedness of approximately $5,500,000 in also not a valid obligation of the Debtor.

Pursuant to the Court's Minute Order of April 17, 2024, the US Trustee and Blue & Green are required to file their legal briefs on the Debtor's eligibility by May 3, 2024. The Debtor's responsive brief is due May 17, 2024. As of the filing of this Plan, the Court has not ruled on whether the Debtor may proceed under Subchapter V. To the extent the Court rules the Debtor is not eligible under Subchapter V, the Debtor would have to proceed under the regular Chapter 11 provisions of the Bankruptcy Code. As set forth below, the Debtor asserts this Plan complies with the *absolute priority rule*, regardless of whether the Debtor is eligible under Subchapter V.

3.      Further Amendments to Schedules & Statement of Financial Affairs

In connection with this Plan, the Debtor has filed Amended Schedules and Amended Statement of Financial Affairs.  Such amendments clarify certain responses and information previously provided.  These include, but are not limited to, disclosure of Mr. Harrington's pre-petition salary, the Debtor's deposits with the utility and insurance company, and correctly identifying the beneficiaries under the Buxman, GrowCo and GCP-1 Deeds of Trust.

4.      Related Bankruptcy Case

Orlando filed its own Chapter 11 case on July 20, 2023, Case No. 23-13178 KHT.  Orlando also elected to be treated as a small business debtor under Subchapter V.  Orlando has assets that are not affiliated with this Debtor.  However, Orlando was an alleged signor on the GrowCo and GCP-1 Deeds of Trust.  Thus, there are a significant amount of duplicate creditors between the two cases.

5.      Adversary Proceedings

Contemporaneously with the filing of this Plan, the Debtor has initiated two (2) adversary proceedings: one of them against GrowCo, GCP-1, the GrowCo Beneficiaries, the GCP-1 Beneficiaries, among other defendants; and, the second against the Buxman Beneficiaries.  Both of these proceedings seek, among other things, to avoid the respective deeds of trust, to quiet title to the real estate and water rights in the name of the Debtor, subject only to senior lien(s), and, a declaratory judgment as to the rights of the parties to the various instruments.  The Debtor asserts it will be successful in those proceedings because of, among other things, the pre-petition actions by the respective beneficiaries, as well as by Mr. McKowen and Mr. Harding, are the basis to avoid such encumbrances.  This Plan is dependant upon the avoidance of the GrowCo DOT, the GCP-1 DOT and the Buxman DOT.

-22-

## V.  PLAN OVERVIEW AND CLASSIFICATION OF CLAIMS AND INTERESTS

| Class | Status | Treatment |
|---|---|---|
| Class 1 - Colorado Water Conservation Board | **Impaired** | Debtor will cure arrears over 1 year from Effective Date. Debtor to remain current on annual payments for term of Note. |
| Class 2 - Buxman Beneficiaries | **Impaired** | Disallowed: Debt is void and/or avoided based upon the pre-petition substitution of equity in TR Capital for the promissory notes issued by the Debtor. In the event any Class 2 claims are allowed, Debtor will issue new promissory notes to the Allowed Claimants in the principal amount as determined by the Bankruptcy Court. Such new notes will bear interest at 6%, annual interest only payments starting on first anniversary of Effective Date. Maturity on 10th Anniversary from Effective Date.  All principal and interest paid in full at maturity. |
| Class 3 - GCP-1 Beneficiaries | **Impaired** | Disallowed: Debt is void and/or avoided pursuant to Adversary Proceeding. If any claim is allowed, similar treatment as Class 2. |
| Class 4 - GrowCo Beneficiaries | **Impaired** | Disallowed: Debt is void and/or avoided pursuant to Adversary Proceeding. If any claim is allowed, similar treatment as Class 2. |
| Class 5 - Marksheffel-Woodman Investments, LLC (Family Ranch Holdings, LLC) | Not Impaired | Service Agreement is Assumed under the Plan and/or treated as a fully secured claim. MWI rights and interests under Service Agreement not affected. |
| Class 6 - Unsecured Creditors | **Impaired** | Payment on Effective Date from DIP Financing; otherwise payment of all Unsecured Claims within one (1) year from Effective Date. |
| Class 7 - Subordinated Claims of Insiders | **Impaired** | Will not receive a distribution under Plan until all senior classes paid in full. |
| Class 8 - Membership Interests | Not Impaired | Two Rivers Farms F-1, Inc., to retain equity interests. |

## VI.  DESCRIPTION OF ASSETS

The values of the Debtor's assets, owned on the Petition Date unless otherwise noted, are set forth in the following chart:

| Asset | Value | Undisp., Non-contingent, liquidated Liens |
|-------|-------|-------------------------------------------|
| Wells Fargo DIP Account | 5400 | |
| Accounts Receivable | 14000 | |
| Office Furniture | 10000 | |
| Computer Equipment & Software | 4000 | |
| Orlando Reservoir No. 2 | 2554000 | 473107.12 |
| Ditch Water Rights & Land (Sections 17, 18, 19 & 20) | 2641000 | [Same as above] |
| Water Rights in Orlando Reservoir | Unknown | [Same as above] |
| Capital Improvements | 615000 | |
| Service Agreement | 75,000,000 | |
| Grazing Rights | unknown | |
| Digital Assets | 750000 | |
| **TOTALS** | **81593400** | **473107.12** |

The asset values set forth above are as of the Petition Date unless otherwise noted.  The Debtor estimates the value of the Service Agreement, as amended, will be at least $75,000,000 over the life of the contract depending upon how much water MWI draws.

The value of "Liquid Gold Tokens" was based on the amount of monies, time and effort infused by the Debtor to create these tokens.  As set forth herein, the Debtor no longer asserts these assets will have any feasible value.

-24-

The Debtor asserts by using all of its assets for the Debtor's continued operations such assets will have significantly more value over time which will then generate proceeds for creditors, parties in interest and equity holders in this case.

## VII. CLAIMS AND INTERESTS

### A.      Unclassified Priority Claims

Claims which are more particularly defined under Sections 507(a)(1), 507(a)(2) or 507(a)(8) are not classified and will be paid in full on the effective date of the Plan or as otherwise provided by this Plan. These claims consist of administrative expenses incurred during the course of the Chapter 11 case, claims incurred in an involuntary case (which are not applicable) and certain post-petition priority tax claims.

### B.      Administrative Expense Claims

The Debtor retained Buechler Law Office, LLC ("Law Firm") as its bankruptcy counsel. Prior to the Debtor's Chapter 11 filing, the Law Firm received funds from Investors Fiduciary, LLC, a company affiliated with Mr. Harrington, the managing member of the Debtor, in the amount of $25,000.00. The Law Firm was paid pre-petition fees and costs in the amount of $10,349.47 from these funds, including the filing fee. The Law Firm is holding the remaining amount of $14,650.53 as a retainer ("Retainer") in its trust account subject to Court approval.  The Law Firm asserts a security interest in the Retainer from the Debtor.

The Debtor estimates that the total legal fees for the Law Firm through Plan confirmation will be $30,000 assuming moderate litigation over the various contested matters, which will be reduced by the retainer. The total amount owed to the Law Firm after application of the retainer is anticipated to be approximately $15,000.  If there is extensive litigation and discovery with respect to the Plan,

or other issues arising in the case, attorney fees could increase to be approximately $50,000 through confirmation of the Plan.

The Subchapter V Trustee, Mark Dennis, also has an administrative expense for claims incurred during the course of the Debtor's bankruptcy case. Mr. Dennis' fees are not expected to exceed $5,000

Administrative claims will be paid in full on the Effective Date of the Plan or upon allowance, or as otherwise agreed to by the Debtor and administrative expense claimants. Should the Debtor lack sufficient cash on the Effective Date to pay all administrative claimants, Debtor's counsel has agreed to take payment over one (1) year from the Effective Date outside the terms of the Plan. Such terms are consistent with Section 1191(e).

**C.      Tax Claims**

*1.      Internal Revenue Service*

The Debtor scheduled the IRS with an unknown amount of a claim as the Debtor, individually, has not filed its tax returns since 2018 when it was included as a non-filing entity for tax purposes in Two Rivers' consolidated tax returns for Two Rivers and all of its subsidiaries.  The IRS filed a proof of claim in the total amount of $6,768.86 for unpaid income taxes, including penalties. This was an estimated claim.  The IRS asserted an unsecured priority claim for $1,698.03, and a general unsecured claim for $5,070.83.

The Debtor is presenting working on its past due tax returns.  The Debtor anticipates filing those returns prior to the hearing on confirmation of this Plan. Given the amount of carry forward losses, the Debtor does not anticipate owing the IRS any income taxes.

Notwithstanding such, the IRS shall have an Allowed Unsecured Priority Claim in the

amount of $1,698.03 or the amount of unpaid taxes assessed and pre-petition interest thereon for the tax years 2019, 2020, 2021 and 2022, whichever is greater, alternatively, in an amount as determined by the Bankruptcy Court or by any accepted amendments to the Debtor's tax returns. Such claim shall bear interest at the rate of 6.0% per annum and shall be paid in full within five (5) years from the Petition Date in equal monthly installments commencing on the Effective Date of the Plan. To the extent the IRS has a secured claim for its Allowed Unsecured Priority Claim, such claim shall be treated as secured for purposes of Section 1129(a)(9)(D). For example only, the monthly payment on the IRS' Priority Claim (as filed) will be approximately $25.00 per month.

For the avoidance of a doubt, the IRS priority claim will be paid in full no later than five (5) years following the Petition Date, and all returns shall be timely filed on a post-petition and post-confirmation basis. Failure to timely file tax returns shall constitute an event of default, and shall be treated as set forth below.

2.    *State of Colorado, Department of Revenue*

The Debtor also scheduled the Department of Revenue ("Department") an unknown amount of a claim as the Debtor, individually, has not filed its tax returns since 2018 when it was included as a non-filing entity for tax purposes in Two Rivers' consolidated tax returns for Two Rivers and all of its subsidiaries. The Debtor is presenting working on its past due tax returns. The Debtor anticipates filing those returns soon. Given the amount of carry forward losses, the Debtor does not anticipate owing the Department any income taxes.

Notwithstanding such, the Department shall have an Allowed Unsecured Priority Claim in the amount of $0 or the amount of unpaid taxes assessed and pre-petition accrued interest thereon for the tax years 2019, 2020, 2021 and 2022, whichever is greater, alternatively, in an amount as

-27-

determined by the Bankruptcy Court or by any accepted amendments to the Debtor's tax returns.

Such claim shall bear interest at the rate of 11.0% per annum and shall be paid in full within five (5)

years from the Petition Date in equal monthly installments commencing on the Effective Date of the

Plan. To the extent the Department has a secured claim for its Allowed Unsecured Priority Claim,

such claim shall be treated as secured for purposes of Section 1129(a)(9)(D).

For the avoidance of a doubt, the Department's priority claim will be paid in full no later than

five (5) years following the Petition Date, and all returns shall be timely filed on a post-petition and

post-confirmation basis.

## VIII.  CLASSIFIED CLAIMS

### 8.1    Class 1. Colorado Water Conservation Board

Class 1 consists of the claim of the Colorado Water Conservation Board ("CWCB") pursuant

to that certain Loan Contract dated February 7, 2012 and related documents, including a Promissory

Note dated March 5, 2012 in the principal amount of $1,184,882 with interest at the rate of 2.5% per

annum, maturing 20 years thereafter, executed by the Debtor. The Loan Contract and Promissory

Note are secured by a Security Agreement and two (2) deeds of trust granted by the Debtor in favor

of CWCB on or about March 5, 2012, recorded with the Huerfano County Clerk and Recorder on

April 13, 2012 at Reception No. 393727 and 393728, against the Debtor's water rights and land,

respectively.

CWCB sent a Notice of Default to the Debtor, among others, pre-petition asserting as of

March 1, 2023 the arrears owed on the Promissory Note were $161,057.55, with a payoff as of

August 21, 2023 of $453,020.16, including late fees. The Debtor scheduled owing CWCB the sum

of $473,107.12. CWCB did not file a proof of claim. The Debtor estimates, as of the filing of this

Plan, the arrears total approximately $165,822.51, including interest.

**This Class is Impaired.** On the Effective Date:

a.   CWCB shall have an Allowed Secured Claim in the amount of $473,107.12.

b.   the Debtor shall cure the arrears to CWCB, which are approximately $165,822.51, in equal monthly installments over 12 months following the Effective Date, approximately $13,818.54 per month, representing all pre- and post-petition accrued interest and charges on the Promissory Note.

c.   the Debtor shall continue to perform all other terms, conditions and covenants of the Loan Contract, Promissory Note, Security Agreement and Deeds of Trust.

d.   The Debtor shall have the option to pre-pay the Promissory Note and/or any portion thereof, in full prior to the maturity of the obligation without premium or penalty.

c.   The Class 1 claimant shall retain its lien on the Debtor's land and water rights as set forth in the Security Agreement and Deeds of Trust, in the same priority as existed on the Petition Date, pending payment in full of the Allowed Class 1 Secured Claim, pursuant to Section 506(a).

c.   To the extent any portion of the Class 1 claim is determined and/or becomes unsecured, including under Section 506(a), the Debtor shall treat any deficiency amount of the Class 1 Claim as a general unsecured claim in accordance with Class 6 of this Plan.

**8.2     Class 2. Buxman Beneficiaries.**

Class 2 consists of the claims of all of the Buxman Beneficiaries.  The Buxman Beneficiaries are all of those Holders of Certain Notes described in that certain Deed of Trust (previously defined as the "Buxman DOT") allegedly executed by the Debtor on November 9, 2011, in favor of Buxman, Kwitek, and Ohlsen, P.C. (as Lenders' Agent) and recorded with the Huerfano County Clerk and Recorder on November 28, 2011 at Reception No. 392702 and re-recorded on February 17, 2012. The alleged obligations secured by said Deed of Trust consist of approximately 57 promissory notes with the total principal amount of $5,527,000.00.  The Deed of Trust encumbers the Reservoir Parcel and Huerfano Water Rights, as described therein. Upon information and belief, the Buxman Deed of Trust was part of a private offering by F-2 to raise capital for Mr. McKowen's and Mr. Harding's schemes. *See Exh. 1.*

-29-

Pursuant to a Subordination Agreement between the Buxman Beneficiaries and CWCB, as well as the Debtor, the Buxman DOT was subordinated to the CWCB Deeds of Trust on or about March 13, 2012. The Subordination Agreement was recorded with the Huerfano County Clerk and Recorder on April 13, 2012 at Reception No. 393726.

Prior to filing for relief, the Buxman Beneficiaries exchanged their notes and stock in F-2 for stock in TR Capital (one of the owners of the Orlando), thereby releasing all obligations owed by F-2 on the Buxman Deed of Trust and related promissory notes.

In or around August of 2014, the Buxman Beneficiaries each agreed to cancelled their interests in the Debtor, including their promissory notes, in exchange for preferred shares in TR Capital via an Exchange Agreement, Membership Interest Purchase Agreement and related documents. These transactions were consummated shortly afterwards. The Buxman Beneficiaries surrendered their interests in the Debtor and their promissory notes to TR Capital and TR Capital issued new stock certificates to them. However, the Deed of Trust was not released following these series of transactions.

The Debtor scheduled the Buxman Beneficiaries (i.e., the 57 note holders) as contingent, disputed, and unliquidated creditors. Several of the Buxman Beneficiaries filed claims against the Debtor including Frank Guy, Francis and Jeffrey Chan, Charles and Sandra Curtis, etc. Many of the Buxman Beneficiaries are also investors in GrowCo and/or GCP-1.

Contemporaneously with this Plan, the Debtor is commencing an adversary proceeding against the Buxman Beneficiaries for, among other things, a declaration that their obligations issued by the Debtor were satisfied and therefore, the Deed of Trust should be released, as well as an objection to each of the claims asserted by the Buxman Beneficiaries under Section 502. The Debtor

-30-

also asserts these Class 2 Claims should not be paid because they are not enforceable against the

Estate and are afforded no rights under Section 1111(b).  **This Class is Impaired.**

On the Effective Date, the Class 2 Claimants shall be treated as follows:

1.  All of the claims of the Class 2 Claimants shall be disallowed, unless they are determined to hold an Allowed Claim by further order of the Bankruptcy Court.

2.  If all of the Class 2 Claims are disallowed and/or determined to be in an amount equal to or less than $0.00:
    a.  The Class 3 Claimants shall not be afforded any rights under the Plan pursuant to Section 1111(b).
    b.  The Class 2 Claimants shall not receive any distributions under the Plan.
    c.  to the extent not previously released, the Debtor shall be entitled to an Order from a court of competent jurisdiction authorizing the Clerk of said Court and/or the Debtor to execute a Release of the Buxman Deed of Trust on behalf of all of the Buxman Beneficiaries. *See C.R.C.P. 70.*

3.  To the extent any of Class 2 Claimants are determined to hold Allowed Claims against the Estate, such claims shall be treated as follows:
    a.  the Debtor shall execute and deliver a new Promissory Note ("New Buxman Note") in a form acceptable to each Allowed Class 2 Claimant, replacing and modifying the terms of the original promissory notes. The principal amount of each of the New Buxman Notes shall be in the amount of the Allowed Claim, and shall bear interest at the rate of 6% percent per annum payable in annual installments of interest commencing on the first anniversary of the Effective Date and continuing each year thereafter for a period of 10 years, with the entire principal and interest due upon the 10th anniversary of the Effective Date (i.e., maturity). In the case of any default or after maturity, the New Buxman Notes shall bear interest at the rate of 10% per annum. All payments on the New Buxman Notes shall be applied first to costs, then to interest, then to principal.  The Debtor shall have the option to pre-pay the amounts due on the New Buxman Notes and/or any portion thereof, in full prior to the maturity of the obligation without premium or penalty.
    b.  The Allowed Class 2 Claimants shall be treated as a secured claim.  The Allowed Class 2 Claimants shall retain their lien on the Debtor's real property identified in the Buxman DOT as set forth in the Buxman Deed of Trust, in the same priority as existed on the Petition Date, pending payment in full of the Allowed Class 2 Secured Claim(s), pursuant to Section 506(a). To the extent necessary, the Debtor shall execute and deliver a modification of the Buxman Deed of Trust, in a form acceptable to the Allowed Class 2

-31-

Claimants, collectively, incorporating the terms of the New Buxman Notes.

    c.    To the extent any portion of any Allowed Class 2 Claim is determined and/or becomes unsecured, including under Section 506(a), the Debtor shall treat any deficiency amount of the Class 2 Claim as a general unsecured claim in accordance with Class 6 of this Plan.

    4.    Any claims of the Class 2 Claimants filed after the Bar Date or any Class 2 Claimants who have not filed claims of whom the Debtor scheduled as disputed, unliquidated, and/or non-contingent, shall be disallowed in their entirety. *See Grynberg v. U.S. (In re Grynberg)*, 986 F.2d 367 (10th Cir. 1993).

**8.3    Class 3 - GCP-1 Beneficiaries.**

Class 3 consists of all of the GCP-1 Beneficiaries. The GCP-1 Beneficiaries are approximately 101 persons identified as beneficiaries on that certain Deed of Trust (previously defined as the "GCP-1 DOT") allegedly executed by the Debtor on or about September 9, 2015, in favor of GrowCo Partners 1, LLC and all the persons identified on Exhibit A to said Deed of Trust, which was recorded with the Huerfano County Clerk and Recorder on September 25, 2015, at Reception No. 404224. This Class also includes GCP-1 to the extent GCP-1 asserts any claims against the Estate. The Debtor asserts all such obligations secured by the GCP-1 Deed of Trust are owed by GCP-1 and/or GrowCo to the GCP-1 Beneficiaries, not the Debtor. *See Exh. 1, supra.* The GCP-1 Deed of Trust encumbers the Debtor's real estate and water rights, including the Reservoir Parcel and Huerfano Water Rights, as described therein.

The Debtor scheduled GCP-1 and the GCP-1 Beneficiaries as contingent, disputed, and unliquidated creditors. Several of the GCP-1 Beneficiaries filed claims against the Debtor including John McKowen and VetaNova, LLC companies (an entity owned and/or controlled by Mr. McKowen).

As set forth above, pre-petition GCP-1 entered into an agreement with Two Rivers and GrowCo whereby GCP-1 agreed to release the GCP-1 Deed of Trust and all claims against the Debtor's real property for valid consideration. *See Exh. 3.* To the best of the Debtor's knowledge, such release was not signed or recorded pre-petition. As a result, the Debtor intends to complete such ministerial act upon confirmation of the Plan.

Contemporaneously with this Plan, the Debtor is commencing an adversary proceeding against the GCP-1 Beneficiaries for, among other things, a declaration that their obligations are not owed by the Debtor, that the GCP-1 Deed of Trust should be released pursuant to the GCP-1 Settlement Agreement, and, objecting to each of the claims asserted by the GCP-1 Beneficiaries under Section 502. GrowCo and GCP-1 are now deemed to have admitted to the illegality and fraudulent schemes of Mr. McKowen and Mr. Harding who unlawfully used the Debtor's assets for their private gain as the court in the Commissioner's Action entered a default against GrowCo and GCP-1.

The Debtor also asserts these Class 3 Claims should not be paid because they are not enforceable against the Estate and are afforded no rights under this Plan or under Section 1111(b).

**This Class is Impaired.** On the Effective Date, the Class 3 Claimants shall be treated as follows:

1.  All of the timely filed claims of the Class 3 Claimants shall be disallowed, unless they are determined to hold an Allowed Claim by further order of the Bankruptcy Court.

2.  To the extent the Class 3 Claims are disallowed:

    a.  The Class 3 Claimants shall not be afforded any rights under the Plan pursuant to Section 1111(b).
    b.  The Class 3 Claimants shall not receive any distributions under the Plan.
    c.  To the extent not previously released, the Debtor shall be entitled to an Order from a court of competent jurisdiction authorizing the Clerk of said Court

-33-

and/or the Debtor to execute a Release of the GCP-1 Deed of Trust on behalf of the disallowed GCP-1 Beneficiaries. *See C.R.C.P. 70.*

3.  To the extent the Class 3 Claimants are determined to hold Allowed Claims:

    a.  The Debtor shall issue new promissory notes to such Allowed Claimants similar to the New Buxman Notes described above, including the same interest rates, maturity date, and payout ("New GCP-1 Notes").

    b.  The Allowed Class 3 claimants shall be treated as a secured claim. The Allowed Class 3 Claimants shall retain their lien on the Debtor's real property identified in the GCP-1 DOT as set forth in the GCP-1 Deed of Trust, in the same priority as existed on the Petition Date, pending payment in full of the Allowed Class 3 Secured Claim, pursuant to Section 506(a). To the extent necessary, the Debtor shall execute and deliver a modification of the GCP-1 DOT, in a form acceptable to the Allowed Class 3 Claimants, collectively, incorporating the terms of the New GCP-1 Notes.

    c.  To the extent any portion of any Allowed Class 3 Claim is determined and/or becomes unsecured, including under Section 506(a), the Debtor shall treat any deficiency amount of the Class 3 Claim as a general unsecured claim in accordance with Class 6 of this Plan.

4.  Any claims of the Class 3 Claimants filed after the Bar Date or any Class 3 Claimants who have not filed claims of whom the Debtor scheduled as disputed, unliquidated, and/or non-contingent, shall be disallowed in their entirety. *See Grynberg v. U.S. (In re Grynberg)*, 986 F.2d 367 (10th Cir. 1993).

**8.4    Class 4 - GrowCo Beneficiaries**

Class 4 consists of all of the GrowCo Beneficiaries. The GrowCo Beneficiaries are approximately 18 persons identified as beneficiaries on that certain Deed of Trust, Security Agreement and Fixture Filing (previously defined as the "GrowCo DOT") allegedly executed by the Debtor on or about September 9, 2015, in favor of GrowCo, Inc., and all the persons identified on Exhibit A to said Deed of Trust, which was recorded with the Huerfano County Clerk and Recorder on September 25, 2015, at Reception No. 404225. This Class also includes GrowCo to the extent GrowCo asserts any claims against the Estate, including as a result of said GrowCo DOT. The alleged obligations secured by the GrowCo Deed of Trust are obligations owed by GrowCo and/or

-34-

GCP-1 to the GrowCo Beneficiaries, not the Debtor. *See Exh. 1, supra.* The GrowCo Deed of Trust encumbers the Debtor's real estate and water rights, including the Reservoir Parcel and Huerfano Water Rights, as described therein.

The Debtor scheduled GrowCo and the GrowCo Beneficiaries as contingent, disputed, and unliquidated creditors. Several of the GrowCo Beneficiaries filed claims against the Debtor including Blue & Green, LLC, VetaNova, LLC and/or John McKowen.

As set forth above, pre-petition GrowCo entered into an agreement with Two Rivers and GCP-1, the GCP-1 Settlement Agreement, which contained a broad general release of all claims and interests by GrowCo, among other things. The Debtor asserts this release includes the Debtor and the Debtor's real property. As a result, even if the GrowCo Deed of Trust is valid (which is denied), any obligation of the Debtor and/or security provided by the Debtor has been released. *See Exh. 3.*

As set forth above, the GrowCo DOT was offered by GrowCo, Mr. McKowen and Mr. Harding, among others, in connection with a fraudulent and illegal scheme to solicit investments in GrowCo for their federally illegal cannabis business.  No consideration was provided to the Debtor in exchange for the purported granting of the GrowCo Deed of Trust.  As a result, any obligations owing to the GrowCo Beneficiaries by the Debtor and/or any security interest in the Debtor's and the Estate's property, including all of the Debtor's real estate and water rights, is void for, among other things, as against public policy, an illegal scheme, a fraudulent transfer, and unjust enrichment. GrowCo and GCP-1 are now deemed to have admitted to the illegality and fraudulent schemes of Mr. McKowen and Mr. Harding who unlawfully used the Debtor's assets for their private gain as the court in the Commissioner's Action entered a default against GrowCo and GCP-1.

-35-

Contemporaneously with this Plan, the Debtor is commencing an adversary proceeding against the GrowCo Beneficiaries for, among other things, a declaration that their obligations are not owed by the Debtor, that the GrowCo Deed of Trust should be avoided and/or declared *void ab initio*, and, objecting to each of the claims asserted by the GCP-1 Beneficiaries under Section 502. The Debtor also asserts these Class 4 Claims should not be paid because they are not enforceable against the Estate and are afforded no rights under the Plan or under Section 1111(b).  **This Class is Impaired.** On the Effective Date, the Class 4 Claimants shall be treated as follows:

1.  All of the timely filed claims of the Class 4 Claimants shall be disallowed, unless they are determined to hold an Allowed Claim by further order of the Bankruptcy Court.

2.  To the extent the Class 4 Claims are disallowed:

    a.  The Class 4 Claimants shall not be afforded any rights under the Plan pursuant to Section 1111(b).
    b.  The Class 4 Claimants shall not receive any distributions under the Plan.
    c.  To the extent not previously released, the Debtor shall be entitled to an Order from a court of competent jurisdiction authorizing the Clerk of said Court and/or the Debtor to execute a Release of the GrowCo Deed of Trust on behalf of the disallowed GrowCo Beneficiaries. *See C.R.C.P. 70.*

3.  To the extent the Class 4 Claimants are determined to hold Allowed Claims:

    a.  The Debtor shall issue new promissory notes to such Allowed Claimants similar to the New Buxman Notes described above, including the same interest rates, maturity date, and payout ("New GrowCo Notes").
    b.  The Allowed Class 4 claimants shall be treated as a secured claim.  The Allowed Class 4 Claimants shall retain their lien on the Debtor's real property identified in the GrowCo DOT as set forth in the GrowCo Deed of Trust, in the same priority as existed on the Petition Date, pending payment in full of the Allowed Class 4 Secured Claim, pursuant to Section 506(a). To the extent necessary, the Debtor shall execute and deliver a modification of the GrowCo DOT, in a form acceptable to the Allowed Class 4 Claimants, collectively, incorporating the terms of the New GrowCo Notes.
    c.  To the extent any portion of any Allowed Class 4 Claim is determined and/or becomes unsecured, including under Section 506(a), the Debtor shall treat

-36-

any deficiency amount of the Class 4 Claim as a general unsecured claim in accordance with Class 6 of this Plan.

4.      Any claims of the Class 4 Claimants filed after the Bar Date or any Class 4 Claimants who have not filed claims of whom the Debtor scheduled as disputed, unliquidated, and/or non-contingent, shall be disallowed in their entirety. *See Grynberg v. U.S. (In re Grynberg)*, 986 F.2d 367 (10th Cir. 1993).

## 8.5     Class 5 - Marksheffel-Woodman Investments, LLC (Family Ranch Holdings, LLC)

Class 5 consists of the claim(s) of Marksheffel-Woodman Investments, LLC and/or Family Ranch Holdings, LLC (as set forth above, collectively "MWI"). As the Debtor was acquiring the Reservoir Parcel and surrounding land, along with all of the Huerfano Water Rights, the Debtor entered into a number of agreements with MWI, Orlando, Two Rivers and others including the aforementioned Service Agreement, as well as a Recreational Use and Access Agreement (the "Recreational Easement") of same date. A Memorandum of Service Agreement was recorded in the Huerfano County, Colorado real estate records on April 11, 2011 at Reception No. 390722, and the full Recreational Easement was recorded in the Huerfano County records on February 3, 2011 at Reception No. 390211. The Service Agreement has been amended twice and a Memorandum of Second Amended Service Agreement was recorded in the real property records of Huerfano County, Colorado, on May 9, 2018, at Reception No. 2104815.

To that end, the Debtor and Marksheffel-Woodman Investments, LLC and/or Family Ranch Holdings, LLC (collectively "MWI") (and Orlando, among others) entered into a Service Agreement on or about January 28, 2011. Under the Service Agreement, the Debtor is required to deliver a certain amount of water for MWI's real estate development which is near the Reservoir along with additional water for future development. In order to provide water for such commercial and municipal use, the Debtor must obtain a decree from Colorado's Water Courts changing the use from

-37-

historically agricultural uses.

The Service Agreement was amended several times over the years including after the Colorado Division of Water Resources ("DWR") advised the parties the proposed Substitute Water Plan was not approved. DWR also advised the parties the water at issue was required to be used to irrigate the land which had historically been irrigated with that water. Since MWI owned that land, MWI agreed via the Amended Service Agreement to convey 1,500 acres of its land to the Debtor (and its assignee Farm Land, LLC, so that the Debtor could thereafter purchase Farm Land, LLC and its assets). The Amended Service Agreement also added as signatories thereto Family Ranch Holdings, LLC (an affiliate of MWI) and the Debtor.

On September 7, 2017, the Service Agreement was amended again via a Second Amended Service Agreement. The Second Amendment added additional water rights commitments from TRW and Two Rivers in favor of MWI and FRH, to be stored in the Debtor's Reservoir, if an appropriate system could be approved and built to transfer that water from the Cucharas Reservoir to the Orlando Reservoir.

As set forth above, these agreements included a Recreational Use and Easement Agreement ("Recreation Easement"). MWI asserts this Recreation Easement entitles MWI to use the Orlando Reservoir for numerous activities, including but not limited to boat use, trail use, open space use, beach use, water use, the right to construct improvements. MWI further asserts the Recreation Easement also requires the Debtor to maintain no less than $1 million of liability insurance on its assets.

MWI asserts both the Service Agreement, as amended, and the Recreation Easement run with the land and therefore are covenants. MWI also asserts MWI is a secured creditor as a result of these

-38-

agreements as the Memorandum of Service Agreement and/or Recreation Easement are recorded

documents. MWI further asserts its security interest is superior to the CWCB Deed of Trust given

the date of recording.  MWI filed a proof of claim asserting a secured claim in the amount of $0.00.

*See Proof of Claim No. 18.*

The Debtor asserts the Service Agreement, as amended, to the extent the Debtor has

remaining obligations thereunder is an executory contract that can be assumed by the Debtor under

the Plan pursuant to Section 365(a).  A contract is executory if "performance remains due to some

extent on both sides." *Olah v. Baird (In re Baird)*, 567 F.3d 1207, 1211 (10th Cir. 2009)(adopting

the *"Countryman"* definition of executory contract). *See* Vern Countryman, Executory Contracts in

Bankruptcy: Part 1, 57 Minn. L.Rev. 439, 460 (1973)).  **This Class is NOT Impaired.**  On the

Effective Date,

1. To the extent the Service Agreement, as amended, is construed as an executory contract:
   a. the Debtor will assume the Service Agreement, as amended, under this Plan, pursuant to Section 365(a).
   b. To the extent there are any amounts necessary to cure the Service Agreement, and/or actions necessary to cure said Service Agreement, the Debtor shall pay such amounts and/or perform the required actions to cure all arrears and/or pre-petition defaults on or before the Effective Date.
   c. The Debtor shall provide adequate assurance of future performance by, among other things, retaining water law counsel and a water engineer to complete the Debtor's Water Court application and Temporary Supply Plan as soon as possible.
   d. From and after the Effective Date, the Debtor shall continue to perform all obligations required of the Debtor under the Service Agreement, as amended.

2. To the extent the Service Agreement, as amended, is construed to be a security agreement (which is denied),
   a. the claim of MWI will be allowed as filed in the amount of $0.00.
   b. the Debtor shall continue to perform all other terms, conditions and covenants of the Service Agreement, as amended.
   c. The Debtor shall have the option to pre-pay the obligation, if any, to MWI

and/or any portion thereof, in full prior to the maturity of the obligation without premium or penalty.

d.     The Class 5 claimant shall retain its interest in the Debtor's property under the Security Agreement, as amended, in the same priority as existed on the Petition Date, pending payment in full of the Allowed Class 4 Secured Claim, pursuant to Section 506(a).

e.     To the extent any portion of the Class 5 claim is determined and/or becomes unsecured, including under Section 506(a), the Debtor shall treat any deficiency amount of the Class 5 Claim as a general unsecured claim in accordance with Class 6 of this Plan.

**8.6    Class 6 - Unsecured Creditors**

Class 6 consists of all of those unsecured creditors of the Debtors who hold Allowed Claims under Section 502, that were either scheduled by the Debtors as undisputed, subject to timely filed proofs of claim to which the Debtors do not successfully object, or as otherwise allowed by further order of the Court. Class 6 also includes any claim for tax penalties which are subordinated under this Plan in accordance with Section 726. Such creditors hold claims of approximately $150,000 which are not disputed, not contingent and are liquidated, including Mr. Robert M Harrington's unsecured claim for $17,500 representing advances he made on behalf of the Debtor, among other expenses.

While Mr. Anderton was scheduled by the Debtor as holding an undisputed unsecured claim of $500,000, the above amount does not include such claim. The Debtor asserts Mr. Anderton's claim was satisfied pre-petition. To the extent Mr. Anderton's claim is an unsecured Class 6 Claim and allowed as scheduled, the pool of such creditors would increase to $650,000.

However, Class 6 does not include the claims of Investors Fiduciary and the Easby Trusts Nos. 1 through 6. Such creditors hold unsecured claims of approximately $325,000. Such creditors are insiders of the Debtor as they are companies owned and/or controlled by Mr. Harrington, the

Debtor's managing member.  Such creditors are treated as Class 7 creditors under this Plan.

The total amount of unsecured creditors and claims may change depending upon whether governmental entities file amended and/or additional claims for unpaid taxes and/or penalties owed by the Debtor. **Class 6 is Impaired**.  On the Effective Date,

1.  Each Class 6 creditor scheduled by the Debtor as undisputed, non-contingent and liquidated shall have an Allowed Claim in an amount as scheduled by the Debtor, as determined by the Bankruptcy Court, or if no timely objection is made to the Class 6 creditor's proof of claim, an Allowed Claim in an amount set forth in their Proof of Claim.

2.  Class 6 creditors shall receive payment on their Allowed Claims in full from the Creditor Fund within thirty (30) days of the Effective Date.

3.  To the extent there are insufficient funds in the Creditor Fund to satisfy the Allowed Class 6 Claims within thirty (30) days of the Effective Date, the Class 6 Claimants shall be paid in full on or before one year from the Effective Date from the Creditor Fund.

**8.7    Class 7 - Subordinated Claims of Insiders**

Class 7 consists of all insider claims against the Debtor, namely all pre-petition amounts advanced by Investors Fiduciary, the Easby Trusts Nos. 1 through 6, TR Capital and/or Mr. Greg Harrington, to the extent such claims are allowed under Section  502. These claims were incurred by the Debtor when such insiders paid for expenses of the Debtor, paid debts of the Debtor and/or loaned to the Debtor on a wholly unsecured basis. **Class 7 is Impaired.**  On the Effective Date:

1.  Each Class 7 creditor scheduled by the Debtor as undisputed, non-contingent and liquidated shall have an Allowed Claim in an amount as scheduled by the Debtor, as determined by the Bankruptcy Court, or if no timely objection is made to the Class 7 creditor's proof of claim, an Allowed Claim in an amount set forth in their Proof of Claim.

2.  Class 7 shall receive nothing on account of their claims under the Plan unless and until all other claimants holding claims senior to those of Class 7 have been paid in full.

**8.8    Class 8 - Equity Interests**

Class 8 includes the equity interests in the Debtor held by Two Rivers Farms F-1, Inc. (100%).  **Class 8 is Not Impaired** by this Plan.  Class 8 shall retain their equity interest in the Debtor as such interests existed on the Petition Date as of the Effective Date.  To the extent necessary, the Debtor's Bylaws shall be amended to comply with the Plan.

## IX. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1    The Debtor assumes, the following executory contracts and unexpired leases as of the Effective Date:

a.    The Service Agreement, as amended, with Marksheffel-Woodman Investments, LLC (and/or Family Ranch Holdings, LLC), pursuant to Sections 365(a) and 365(b). As adequate assurance of future performance, the Debtor understands Two Rivers Farms F-2, Inc., will also assume the Service Agreement, as amended, and cure any amounts due and owing under such agreement.

b.    All contracts and leases, including real estate and equipment leases, previously assumed or for which a motion to assume is pending on the Effective Date.

c.    All equipment leases and contracts entered into in the ordinary course of the Debtor's financial affairs that are not specifically rejected, including insurance contracts and open customer contracts.

9.2    The Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases for which a motion to reject has been granted or is pending as of the Effective Date or which are otherwise not assumed under Section 9.1.

9.3    **A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 60 days after the date of the order confirming this Plan.**

## X. FEASIBILITY OF THE PLAN & LIQUIDATION ANALYSIS

**A.    FEASIBILITY**

The Debtor's Plan is feasible based upon the Debtor's prepared Projections, attached hereto as **Exhibit 8,** which reflect a conservative prediction of the Debtor's operations during the term of the Plan. As evidenced by the projections, the Debtor anticipates that its income will be positive each year of the Plan, and will generate sufficient revenue to meet its obligations under the Plan. The Debtor has used its best efforts to prepare accurate projections. The Debtor's actual income will fluctuate based on actual sales and changes in the market.

The Debtor has based payments to Class 6 Unsecured Creditors on the funds from the DIP Financing, as set forth below.  Payments to Class 1 to cure their pre-petition arrears will also come from the DIP Financing.

Payments of the post-confirmation indebtedness of Classes 1, 2, 6 (if necessary) and 7, will come from the Debtor's revenues from its leases and/or sales of water over the life of the Plan including the Service Agreement. As set forth in the Debtor's Projections, its revenues for any given year support the feasibility of the Plan. The Debtor's revenues may fluctuate depending upon the amount of water leased and/or sold to MWI, among other parties. Thus, the amount set aside for creditors will fluctuate as well, but the Debtor will not be overburdened with fixed debt payments.

As the Debtor emerges from bankruptcy and continues to operate under a confirmed Plan, the Debtor's revenues are anticipated to increase significantly given the increasing demand for water, including residential water, in Southern Colorado and the surrounding areas.

-43-

B.     LIQUIDATION ANALYSIS

The principal alternative to a Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. Chapter 7 requires the liquidation of the Debtor's assets by a Trustee who is appointed by the United States Trustee's office. In a Chapter 7 case, the Chapter 7 Trustee would take over control of the Debtor's assets. The assets would be liquidated and the proceeds distributed to creditors in the order of their priorities.

As set forth on the Liquidation Analysis attached hereto as **Exhibit 9**, if the Debtor's case were converted to a case under Chapter 7, assets would be sold primarily to satisfy the secured claims of CWCB and/or MWI, then to Buxman Beneficiaries. Only after payment of costs of sale and 100% of such secured claims (with interest), would distributions then be paid to priority claims such as the IRS and CDOR. Once all secured and priority claims are paid in full with interest, only then could unsecured creditors see a distribution. The Debtor estimates that in a liquidation, unsecured creditors would receive nothing on account of their allowed claims (including disputed claims). *See Exh.9.* In contrast, the Debtor's Plan provides that Allowed Unsecured Creditors will receive 100% on the Effective Date. Thus, only through confirmation of the Plan will unsecured creditors receive anything significant on account of their claims.

## XI. TAX CONSEQUENCE

The Debtor is not providing tax advice to creditors or interest holders. U.S. Treasury Regulations require you to be informed that, to the extent this section includes any tax advice, it is not intended or written by the Debtor or its counsel to be used, and cannot be used, for the purpose of avoiding federal tax penalties. Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation. Generally, unsecured creditors

-44-

should have no tax impact as a result of Plan confirmation. The recovery of each creditor is payment

on account of a debt and generally not taxable, unless the creditor wrote off the debt against income

in a prior year in which case income may have to be recognized. Interest holders may have very

complicated tax effects as a result of Plan confirmation.

## XII. IMPLEMENTATION OF THE PLAN

12.1 **Effectuating the Plan.** On the Effective Date of the Plan, Greg Harrington shall be appointed

pursuant to 11 U.S.C.§1142(b) for the purpose of carrying out the terms of the Plan, and taking all

actions deemed necessary or convenient to consummating the terms of the Plan. Mr. Harrington shall

receive a management fee of $100,000 per year on a contract basis, subject to adjustment as the

Debtor determines is reasonable and appropriate. Upon request by any party in interest, the Debtor

shall provide a quarterly financial statement, including amounts disbursed to all creditors in

accordance with the Plan.

12.2 **Exit Financing**

On the Effective Date, the Debtor will obtain post-confirmation financing in the amount of

up to $500,000 from Investors Fiduciary (the "Exit Financing"). The Debtor will issue a revolving

promissory note to Investors Fiduciary which shall bear interest in the amount 5% per annum (the

"Exit Note"). The DIP Note shall mature on the 36th month following the Effective Date, or such

other time as extended by the holder. The Debtor shall make annual installment interest only

payments to Investors Fiduciary, with all principal and unpaid interest due upon maturity. The Exit

Note, including any payment of interest and/or principal, shall, similar to the New IF Note. The Exit

Note, similar to the new IF Note, shall be convertible to a 10% equity stake in the Debtor, at the

option of Investors Fiduciary exercised anytime prior to maturity.

From the proceeds of the DIP Financing, the Debtor shall use approximately $165,000 to cure the CWCB debt, as set forth above. The remaining proceeds of the DIP Financing shall be used to pay all Allowed Unsecured Claims, as set forth below. After payment of Allowed Unsecured Claims, the Debtor shall hold the remaining funds for use as a line of credit for the Debtor's operations and development of both its land and water rights, including the employment of water counsel and a water engineer.

12.3    **Water Leasing and Sales Revenues**

The Debtor intends to lease and/or sell the water from its water rights in the Reservoir and the Huerfano Water Rights to MWI. The Debtor's principal assets are the Reservoir Parcel and the Huefano Water Rights all located in Huerfano County, Colorado. In 2012, these assets were valued at approximately $5,195,000 prior to the Debtor undertaking a number of improvements to the Reservoir and water delivery systems.

The Debtor (and Orlando), also entered into a Service Agreement with, among others, MWI in or around January of 2011. MWI is developing approximately 7,000 acres of real property in Huerfano County, Colorado, in the vicinity of the Debtor's Reservoir for agricultural, energy and future municipal uses.

Under the terms of the Service Agreement, as amended, the Debtor will supply the water for MWI's development project. Based upon the amendments to the Service Agreement, the Debtor will supply water service for approximately 10,000 single family equivalents ("SFEs") annually from the Debtor's Huefano Water Rights. Upon information and belief, MWI has requested the Debtor supply the first 50 SFE taps in May of 2024.

The Debtor asserts and believes the Service Agreement, as amended, constitutes another

-46-

valuable asset. The revenues from the Service Agreement will be used to repay all of its allowed
creditor claims.

Under the Service Agreement, as amended, MWI will pay an initial water resource charge
of $6,500 per SFE tap. MWI is required to purchase at least 50 SFE taps per year, which equals
approximately $325,000 in annual revenue. The total value of such the tap fees to the Debtor is
approximately $65,000,000. Depending upon MWI future needs, including a wastewater service,
a treatment plant, and/or recreation uses, the Debtor could realize additional profit from the Service
Agreement.

Following the improvements to the Reservoir for the Service Agreement, along with the
additional demand for the Debtor's Huefano Water Rights from other users, the potential realized
value of the Debtor's assets could exceed $70,000,000.

**12.4    Payments to Unsecured Creditors.**

On the Effective Date, the Debtor shall use the proceeds from Exit Financing, water sales
and/or leases, to cure Class 1 and commenced payments under the Plan to creditors. Should the funds
from the Debtor's financing sources not be sufficient to pay all Allowed Unsecured Claims in full
on the Effective Date, the Debtor shall pay all remaining amounts owed to Allowed Unsecured
Claims within one (1) year from the Effective Date.

Upon the Debtor's payment of the Allowed Class 6 Claims in full, the Debtor's obligations
to Allowed Class 6 Creditors shall be deemed satisfied.

**12.5    Subchapter V Trustee, Unsecured Creditor Payments, and Disbursing Agent.**

a.    Provided the Plan is confirmed by consent pursuant to Section 1191(a), the Trustee
and their services shall be terminated at such time as the Plan has been substantially consummated,

-47-

consistent with Section 1183(c)(1).  In such event, the Debtor shall serve as the Disbursing Agent for the payment of Class 6 as provided herein.

       b.      In the event that the Plan is confirmed on a non-consensual basis pursuant to Section 1191(b), the Trustee will continue to serve as Trustee. However, because the payments to creditors will be made from Exit Financing, the Debtor shall make or cause to be made all payments to creditors under the Plan pursuant to Section 1194(b).

12.6    **Effective Date.** The Plan will become effective on the date the Bankruptcy Court enters its Order confirming the Plan and said Order becomes final and non-appealable (the "Effective Date").

12.7    **Disputed Claims.** Any claimant or the Debtor may file an objection to any claim no later than 60 days following the Effective Date. The Debtor shall have standing to commence, prosecute, and settle claim objections, and avoidance actions with the principal amount of $25,000 or less, without Court approval. Any claims or avoidance actions above such amount shall require Court approval pursuant to Fed.R.Bankr.P. 9019. The Debtor does not believe there are any avoidance actions in this case.

12.8    **Administrative Expense Bar Date.** Any creditor seeking allowance and payment of an administrative expense priority claim must do so no later than 60 days following the entry of the Order confirming the Plan.

12.9    **Final Decree**. The Debtor will request entry of a final decree within 180 days of the Effective Date or if confirmed under Section 1191(b), as allowed under the Bankruptcy Code.

12.10    **Discharge**.

       a.      If the Debtor's Plan is confirmed under Section 1191(a), on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the

extent specified in Section 1141(d)(1)(A), except that the Debtor will not be discharged of any debt:

      (i) imposed by this Plan; or
      (ii) to the extent provided in Section 1141(d)(6).

      b.      If the Debtor's Plan is confirmed through a nonconsensual confirmation under Section 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due during the term of this Plan, or as otherwise provided in Section 1192 of the Code, and the creditors' rights in the event of default may be greater.  In such event, the Debtor will not be discharged from any debt:

      (i)      on which the last payment is due after the term of the Plan, or as otherwise provided in Section 1192; or
      (ii)      excepted from discharge under Section 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

## 12.11  **Contractual Relationship**.

The Plan, upon confirmation, constitutes a new contractual relationship by and between the Debtor and its creditors. In the event of a default by the Debtor under the Plan, including failure to timely file and pay any post-petition taxes, creditors shall be entitled to enforce all rights and remedies against the Debtor for breach of contract, the Plan.

Any secured creditor claiming a breach of the Plan by the Debtor will be able to enforce all of their rights and remedies including foreclosure of their deed of trust, security agreement, lien, or mortgage pursuant to the terms of such document.

Any creditor claiming a breach by the Debtor must provide written notice to the Debtor and counsel for the Debtor of the claimed default, the notice must provide the Debtor a ten (10) day period within which to cure the claimed default, unless a longer period is specified elsewhere in the Plan.

Upon the Debtor's failure to cure the default within such ten-day period, all amounts to be paid under the Plan shall become due and payable and, the creditors may proceed to exercise their rights and remedies under applicable State and Federal Law, including seeking to enforce the terms of the Plan or conversion of the Debtor's case to a case under Chapter 7.

In the event the Debtor's Plan is confirmed through a non-consensual confirmation under Section 1191(b), creditors may have greater rights in the event of default, as debts are not discharged until the completion of all payments due under the Plan.

12.12   **Revestment.**

The entry of an Order confirming this Plan under Section 1191(a) shall revest in the Debtor all property of the estate free and clear of all liens except those specifically set forth in the Plan.

To the extent the Plan is confirmed pursuant to Section 1191(b), all property of the Debtor shall remain property of the Estate until the Debtor completes all payments required under this Plan. Upon payment in full of all claims, except Classes 1, 2, (if necessary, 3 and 4), and 7, all property of the Estate shall revest in the Debtor, as such debts, if allowed, will survive the Debtor's discharge.

12.13   **Retention of Jurisdiction.** Notwithstanding confirmation of the Plan, the Court shall retain jurisdiction for the following purposes:

a.   Determination of the allowability of claims upon objection to such claims by the Debtor-in-Possession or by any other party in interest;

b.   Determination of the request for payment of claims entitled to priority under Section 507(a)(1), including compensation of the parties entitled thereto;

c.   Resolution of any disputes regarding interpretation of the Plan;

d.   Implementation of the provisions of the Plan and entry of orders in aid of consummation of the Plan, including without limitation, appropriate orders to protect the revested Debtor from action by creditors;

     e.       Modification of the Plan pursuant to Section 1193;

     f.       Adjudication of any causes of action, including avoiding powers actions, brought by the Debtor-in-Possession, by the representative of the estate or by a Trustee appointed pursuant to the Code;

     g.      Adjudication of any cause of action brought by the Debtor-in-Possession, by a representative of the estate, or by a Trustee appointed pursuant to the Code, or the revested Debtor exercising rights and powers as provided in Sections 542-551. This section shall not be construed to limit any other power or right which the Debtor may possess under any section of the Code; and

     h.       Entry of a final decree.

12.14  **Satisfaction of Claims.** Except as otherwise required by or provided in this Plan, the Debtor shall receive a discharge on the confirmation date pursuant to Section 1141(d). Confirmation of the Plan shall constitute a modification of any note or obligation for which specification and treatment is provided under the Plan as set forth in the Plan. Any obligation or note, previously in default, so modified, shall be cured as modified as of the Confirmation Date. This provision shall be operable regardless of whether the Plan provides for any obligation to be evidenced by a rewritten loan or security document following confirmation of the Plan.

12.15  **Headings.** The headings used in the Plan are for convenience of reference only and shall not limit or in any manner affect the meaning or interpretation of the Plan

12.16  **Notices.** All notices, requests, demands, or other communications required or permitted in this Plan must be given in writing to the party(ies) to be notified. All communications will be deemed delivered when received at the following addresses:

     a.      **To the Debtor:**
             Two Rivers Farms F-2, Inc.
             999 18th Street, Suite 3000-S
             Denver, CO 80202

b.    **with a copy to:**
K. Jamie Buechler, Esq.
Buechler Law Office, LLC
999 18th Street, Suite 1230-S
Denver, Colorado 80202
Tel: 720-381-0045
Fax: 720-381-0382
Jamie@KJBlawoffice.com

c.    To an allowed claimant, at the addresses set forth in the allowed Proof of Claim, if filed, otherwise, at the address set forth for the claimant in the Debtor's Schedules filed with the Court.

12.17 **Substantial Consummation.**  Pursuant to Section 1183(c)(2), within fourteen (14) days after the Plan has been substantially consummated, the Debtor shall file a notice of the same with the Court, and serve the Subchapter V Trustee, the United States Trustee, and all parties in interest.

### XIII. CONFIRMATION REQUEST

The Debtor, as proponent of the Plan, requests confirmation of the Plan pursuant to Section 1191(a). The Court may confirm the Plan pursuant to Section 1191(b) if it does not discriminate unfairly and is fair and equitable with respect to each class of Claims or Interests that is impaired under, and has not accepted, the Plan.

WHEREFORE, the Debtor respectfully submits its Chapter 11 Plan of Reorganization for a Small Business Debtor under Subchapter V, on May 6, 2024.

| | |
|---|---|
| Two Rivers Farms F-2, Inc.<br>DEBTOR<br><br>*/s/ Greg Harrington*<br>_____<br>Mr. Greg Harrington, Managing Member | BUECHLER LAW OFFICE, LLC<br>Attorneys for the Debtor<br><br>*/s/ K. Jamie Buechler*<br>_____<br>K. Jamie Buechler, #30906<br>999 18th Street, Suite 1230-S<br>Denver, Colorado 80202<br>Tel:720-381-0045/Fax: 720-381-0382<br>Jamie@KJBlawoffice.com |

-52-

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 6, 2024, I served by prepaid first class mail [or other acceptable means, i.e., via hand delivery] a copy of the **CHAPTER 11 PLAN OF REORGANIZATION FOR SMALL BUSINESS DEBTOR UNDER SUBCHAPTER V** on all parties pursuant to FED.R.BANKR.P. and these L.B.R. at the following addresses:

**Via U.S. Mail and/or Email**

Two Rivers Farms F-2, Inc.
999 18th Street, Suite 3000-S
Denver, CO 80202

**Via CM/ECF**:

| | |
|---|---|
| Matthew T. Faga | Mark Dennis |
| Scott A. Meiklejohn | Jennifer M. Salisbury |
| Deanna L. Westfall | R. Samuel Boughner |
| US Trustee | David Miller |
| Jennifer M. McCallum | |

*/s/ K. Jamie Buechler*
_____
For Buechler Law Office, LLC

-53-

# APPENDIX 1

## DEFINITIONS

1.  **Administrative Claim** shall mean a Claim for payment of an administrative expense of a kind specified in Sections 503(b) or 1114(e)(2) and entitled to priority pursuant to Section 507(a)(2), including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estate and operating the business of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) all claims for Professional Fees; (c) all fees and charges assessed against the estates under 28 U.S.C. § 1930; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under Section 546(c)(2).

2.  **Allowed Claim** shall mean a claim in respect of which a Proof of Claim has been filed with the Court within the applicable time period of limitation fixed by Court Order in this case or scheduled in the list of creditors prepared and filed with the Court pursuant to Bankruptcy Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, in either case as to which no timely objection to the allowance thereof has been filed pursuant to Bankruptcy Rules 3001 and 3007 or as to which any such objection has been determined by a Final Order.

3.  **Allowed Secured Claim** shall mean an allowed claim secured by a lien, security interest or other charge against or interest in property in which the Debtor has an interest, or which is subject to setoff under Section 553, to the extent of the value (determined in accordance with Section 506(a) of the Code) of the interest of the holder of any such allowed claim and the Debtor's interest in such property or to the extent of the amount subject to such setoff as the case may be.

4.  **Avoidance Actions** means each Debtor's estate's interest in any and all Claims, rights and causes of action which have been or may be commenced by or on behalf of the Debtor to avoid and recover any transfers of property determined to be preferential, fraudulent or otherwise avoidable pursuant to Sections 544 to  553, or under any other applicable law, or

otherwise subject to equitable subordination under Section 510 of the Bankruptcy Code, regardless of whether or not such actions have been commenced prior to the Effective Date.

5.     **Bar Date** shall mean March 14, 2024, the date the Bankruptcy Court extended the date for all creditors and parties in interest to file proofs of claim with the Court.

6.     **Claim** shall mean any right to payment, or right to any equitable remedy for breach of performance if such breach gives rise to the right to payment, against the Debtor in existence on or as of the Petition Date, whether or not such right to payment or right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured or unsecured.

7.     **Class** shall mean any Class into which Allowed Claims are classified pursuant to Article VI.

8.     **Classes of Claims and Interests** shall mean the Allowed Claims and Interests so classified in Article VI.

9.     **Code** shall mean the Bankruptcy Code, 11 U.S.C. § 101, *et seq.,* and any amendments thereof.

10.    **Confirmation Date** shall mean the date upon which the Order of Confirmation is entered by the Court.

11.    **Court** shall mean the United States Bankruptcy Court for the District of Colorado in which the Debtor's Chapter 11 case is pending, pursuant to which this Plan is proposed, and any Court having competent jurisdiction to hear appeal or certiorari proceedings therefrom.

12.    **Disbursing Agent** shall mean either the Debtor or the Subchapter V Trustee, whichever is applicable, as set forth in the Plan.

13.    **Disposable Income** shall have the meaning ascribed in Section 1191(d).

14.    **Disputed Claim** shall mean any Claim which is not an Allowed Claim, including, without limitation, any Claim designated as disputed, contingent or unliquidated in Debtor's schedules filed in connection with this case, or any Claim against which an objection to the allowance thereof has been interposed, and as to which no Final Order has been entered.

15.    **Effective Date** shall mean the date the Bankruptcy Court enters its Order confirming the Plan and said Order becomes final and non-appealable, as described in the Plan.

16.    **Gross Revenues** shall having the meaning under the Generally Accepted Accounting

Principles (GAAP), which is the total amount of sales recognized for a reporting period, prior to any deductions.

17.   **Order of Confirmation** shall mean the Order entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Code.

18.   **Petition Date** shall mean the date on which the voluntary petition was filed by the Debtor on December 6, 2023.

19.   **Plan** shall mean this Plan of Reorganization, as it may be amended from time to time, in accordance with the terms hereof or modified in accordance with the Code, including all exhibits and schedules attached hereto or referenced herein or therein.

20.   **Post-Petition** shall mean any date on or after the Debtor's voluntary petition was filed, i.e. on or after December 6, 2023.

21.   **Pre-Petition** shall mean any date prior to the date on which the Debtor's voluntary petition was filed, i.e. prior to December 6, 2023.

22.   **Priority Claim** shall mean any Pre-Petition Claim entitled to a priority in payment under Section 507(a), but shall not include any Administrative Claim or Tax Claim.

23.   **Professional Fees** shall mean the Administrative Claims for compensation and reimbursement submitted pursuant to Sections 330, 331 and 503(b) by a Professional Person as allowed by the Court.

24.   **Rules** shall mean the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules for the District of Colorado as adopted by the Court.

25.   **Section** shall mean a section of the Bankruptcy Code.

26.   **Tax Claim** shall mean any unsecured Claim of a governmental unit for taxes entitled to priority pursuant to Section 507(a)(8).

27.   **Unclassified Priority Claims** shall mean Claims pursuant to Section 507(a)(2) which are Administrative Claims allowed under Section 503(b) and any fees and charges against the estate under Chapter 123 of Title 28 of the United States Code and shall further mean Allowed Unsecured Claims of governmental units to the extent provided for in Section 507(a)(8) of the Code.

28.   **Other Definitions.** Unless the context otherwise requires, any capitalized term used and not

-56-

defined herein or elsewhere in the Plan but that is defined in the Code or Rules shall have the meaning set forth therein.



Colorado Secretary of State
Date and Time: 06/12/2016 10:23 AM
ID Number: 20161403102

Document number: 20161403102
Amount Paid: $50.00

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.sos.state.co.us.

ABOVE SPACE FOR OFFICE USE ONLY

# Articles of Organization
filed pursuant to § 7-80-203 and § 7-80-204 of the Colorado Revised Statutes (C.R.S.)

1. The domestic entity name of the limited liability company is

McGrow, LLC
.

*(The name of a limited liability company must contain the term or abbreviation "limited liability company", "ltd. liability company", "limited liability co.", "ltd. liability co.", "limited", "l.l.c.", "llc", or "ltd." See §7-90-601, C.R.S.)*

*(Caution: The use of certain terms or abbreviations are restricted by law. Read instructions for more information.)*

2. The principal office address of the limited liability company's initial principal office is

Street address

456 Madison St
*(Street number and name)*

Denver                              CO    80206
*(City)*                               *(State)*    *(ZIP/Postal Code)*
Colorado                         United States
*(Province – if applicable)*          *(Country)*

Mailing address
(leave blank if same as street address)

456 Madison St
*(Street number and name or Post Office Box information)*

Denver                              CO    80206
*(City)*                               *(State)*    *(ZIP/Postal Code)*
Colorado                         United States
*(Province – if applicable)*          *(Country)*

3. The registered agent name and registered agent address of the limited liability company's initial registered agent are

Name
(if an individual)

McKowen              John
*(Last)*                  *(First)*              *(Middle)*          *(Suffix)*

or

(if an entity)

*(Caution: Do not provide both an individual and an entity name.)*

Street address

456 Madison St
*(Street number and name)*

Denver                              CO    80206
*(City)*                               *(State)*    *(ZIP Code)*

Mailing address
(leave blank if same as street address)

456 Madison St
*(Street number and name or Post Office Box information)*

Denver _____   CO____   80206 _____ .
*(City)*                          *(State)*   *(ZIP Code)*

*(The following statement is adopted by marking the box.)*

☑ The person appointed as registered agent has consented to being so appointed.

4. The true name and mailing address of the person forming the limited liability company are

Name
(if an individual)   McKowen _____   John _____   _____   _____
                                    *(Last)*                    *(First)*              *(Middle)*        *(Suffix)*

or

(if an entity)   _____
*(Caution: Do not provide both an individual and an entity name.)*

Mailing address   456 Madison St _____
                                 *(Street number and name or Post Office Box information)*

Denver _____   CO____   80206 _____
*(City)*                          *(State)*   *(ZIP/Postal Code)*

Colorado _____   United States ___ .
*(Province – if applicable)*          *(Country)*

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ The limited liability company has one or more additional persons forming the limited liability company and the name and mailing address of each such person are stated in an attachment.

5. The management of the limited liability company is vested in
*(Mark the applicable box.)*

☑ one or more managers.

or

☐ the members.

6. *(The following statement is adopted by marking the box.)*

☑ There is at least one member of the limited liability company.

7. *(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains additional information as provided by law.

8. *(Caution: Leave blank if the document does not have a delayed effective date. Stating a delayed effective date has significant legal consequences. Read instructions before entering a date.)*

*(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*

The delayed effective date and, if applicable, time of this document is/are _____ .
*(mm/dd/yyyy hour:minute am/pm)*

Notice:

Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is named in the document as one who has caused it to be delivered.

9. The true name and mailing address of the individual causing the document to be delivered for filing are

| McKowen | John | | |
|---|---|---|---|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

456 Madison St
*(Street number and name or Post Office Box information)*

| Denver | CO | 80206 |
|---|---|---|
| *(City)* | *(State)* | *(ZIP/Postal Code)* |

| Colorado | United States . |
|---|---|
| *(Province – if applicable)* | *(Country)* |

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

Disclaimer:
This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty. While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet. Questions should be addressed to the user's legal, business or tax advisor(s).

*[EXECUTION VERSION]*

# LIMITED LIABILITY COMPANY AGREEMENT

among

## GROWCO PARTNERS 1, LLC

and

## MEMBERS NAMED IN SCHEDULE 1

**Dated as of January 12, 2015**

## TABLE OF CONTENTS

**Page**

**ARTICLE I** DEFINITIONS ........................................................................................................... 1
    Section 1.01 .  Definitions ......................................................................................................... 1
    Section 1.02 .  Interpretation .................................................................................................... 7

**ARTICLE II** ORGANIZATION ................................................................................................... 8
    Section 2.01 .  Formation .......................................................................................................... 8
    Section 2.02 .  Name ................................................................................................................. 8
    Section 2.03 .  Principal Office ................................................................................................. 8
    Section 2.04 .  Registered Office and Agent ............................................................................ 8
    Section 2.05 .  Purpose and Powers ......................................................................................... 8
    Section 2.06 .  Term ................................................................................................................. 8
    Section 2.07 .  No State-Law Partnership ................................................................................ 8

**ARTICLE III** UNITS .................................................................................................................... 9
    Section 3.01 .  Units Generally ................................................................................................ 9
    Section 3.02 .  Authorization and Issuance of Preferred Units ................................................ 9
    Section 3.03 .  Authorization and Issuance of Common Units .................................................. 9
    Section 3.04 .  Certification of Units ....................................................................................... 9
    Section 3.05 .  Action by Consent .......................................................................................... 10

**ARTICLE IV** MEMBERS ........................................................................................................... 10
    Section 4.01 .  Admission of New Members ........................................................................... 10
    Section 4.02 .  Representations and Warranties of Members .................................................. 10
    Section 4.03 .  No Personal Liability ...................................................................................... 11
    Section 4.04 .  No Withdrawal ................................................................................................ 11
    Section 4.05 .  Death .............................................................................................................. 12
    Section 4.06 .  Voting ............................................................................................................ 12
    Section 4.07 .  Power of Members ......................................................................................... 12
    Section 4.08 .  No Interest in Company Property .................................................................... 12

**ARTICLE V** CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS .................................... 12
    Section 5.01 .  Existing Capital Contributions ....................................................................... 12
    Section 5.02 .  Additional Capital Contributions ................................................................... 12
    Section 5.03 .  Maintenance of Capital Accounts ................................................................... 13
    Section 5.04 .  Quarterly Yield on Preferred Units ................................................................ 13
    Section 5.05 .  Succession Upon Transfer .............................................................................. 13
    Section 5.06 .  Negative Capital Accounts ............................................................................. 13
    Section 5.07 .  No Withdrawal ................................................................................................ 14
    Section 5.08 .  Treatment of Loans From Members ................................................................ 14
    Section 5.09 .  Modifications .................................................................................................. 14

**ARTICLE VI** ALLOCATIONS ................................................................................................... 14
    Section 6.01 .  Allocation of Net Income and Net Loss .......................................................... 14
    Section 6.02 .  Regulatory and Special Allocations ................................................................ 14
    Section 6.03 .  Tax Allocations ............................................................................................... 15
    Section 6.04 .  Allocations in Respect of Transferred Units ................................................... 16
    Section 6.05 .  Curative Allocations ...................................................................................... 16

i

**ARTICLE VII** DISTRIBUTIONS ................................................................................................17
    Section 7.01 . Preferred Yield Distributions ............................................................................17
    Section 7.02 . Participating Distributions ................................................................................17
    Section 7.03 . Other Distributions ...........................................................................................18
    Section 7.04 . Tax Withholding; Withholding Advances ........................................................18
    Section 7.05 . Distributions in Kind ........................................................................................20
    Section 7.06 . Compliance with Law .......................................................................................20

**ARTICLE VIII** MANAGEMENT .............................................................................................20
    Section 8.01 . Establishment of the Board ...............................................................................20
    Section 8.02 . Board Composition; Vacancies ........................................................................20
    Section 8.03 . Removal; Resignation .......................................................................................21
    Section 8.04 . Meetings ............................................................................................................21
    Section 8.05 . Quorum; Manner of Acting ..............................................................................22
    Section 8.06 . Action By Written Consent ..............................................................................22
    Section 8.07 . Manager Status .................................................................................................22
    Section 8.08 . Committees .......................................................................................................22
    Section 8.09 . Officers .............................................................................................................23
    Section 8.10 . No Personal Liability .......................................................................................23

**ARTICLE IX** EXCHANGES OF PREFERRED UNITS ........................................................23
    Section 9.01 . Exchange Agreement ........................................................................................23
    Section 9.02 . Transfer of Preferred Units Upon Exchange ...................................................23

**ARTICLE X** TRANSFERS .......................................................................................................24
    Section 10.01 . General Restrictions on Transfer ...................................................................24

**ARTICLE XI** CONFIDENTIALITY ........................................................................................25
    Section 11.01 . Nondisclosure .................................................................................................25
    Section 11.02 . Permitted Disclosures .....................................................................................25
    Section 11.03 . Excluded Information ......................................................................................25

**ARTICLE XII** TAX MATTERS ...............................................................................................26
    Section 12.01 . Tax Matters Member ......................................................................................26
    Section 12.02 . Tax Returns .....................................................................................................26
    Section 12.03 . Company Funds ..............................................................................................27

**ARTICLE XIII** DISSOLUTION AND LIQUIDATION...........................................................27
    Section 13.01 . Events of Dissolution .....................................................................................27
    Section 13.02 . Effectiveness of Dissolution ..........................................................................27
    Section 13.03 . Liquidation .....................................................................................................27
    Section 13.04 . Cancellation of Articles ..................................................................................28
    Section 13.05 . Survival of Rights, Duties and Obligations ....................................................28
    Section 13.06 . Recourse for Claims .......................................................................................28

**ARTICLE XIV** EXCULPATION AND INDEMNIFICATION .................................................29
    Section 14.01 . Exculpation of Covered Persons ....................................................................29
    Section 14.02 . Liabilities and Duties of Covered Persons .....................................................29
    Section 14.03 . Indemnification ...............................................................................................30
    Section 14.04 . Survival ...........................................................................................................31

**ARTICLE XV** MISCELLANEOUS ...................................................................................31

Section 15.01 . Further Assurances ..................................................................31
Section 15.02 . Notices .....................................................................................31
Section 15.03 . Severability ...............................................................................32
Section 15.04 . Entire Agreement .....................................................................32
Section 15.05 . Successors and Assigns ...........................................................32
Section 15.06 . No Third-Party Beneficiaries ...................................................32
Section 15.07 . Amendment ..............................................................................32
Section 15.08 . Waiver ......................................................................................33
Section 15.09 . Governing Law .........................................................................33
Section 15.10 . Submission to Jurisdiction .......................................................33
Section 15.11 . Waiver of Jury Trial .................................................................33
Section 15.12 . Equitable Remedies ..................................................................33
Section 15.13 . Remedies Cumulative ..............................................................34

EXHIBIT A          Form of Joinder Agreement
SCHEDULE 1         Member Schedule

THIS LIMITED LIABILITY COMPANY AGREEMENT of GrowCo Partners 1, LLC, a Colorado limited liability company (the "**Company**"), is entered into as of January 12, 2015 among the Company, TR Capital Partners, LLC and each other individual or entity that after the date hereof becomes a member of the Company and a party hereto by executing a Joinder Agreement (as defined below).

## RECITALS

WHEREAS, the Company was formed under the laws of the State of Colorado by the filing of Articles of Organization with the Secretary of State of the State of Colorado on October 31, 2014 (the "**Articles of Organization**");

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

Section 1.01.   **Definitions**.   The following terms shall have the meanings set forth or referenced below:

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

This "**Agreement**" means this Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of:

(a)   constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority;

(b)   any consents or approvals of any Governmental Authority; and

(c)   any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Articles of Organization**" has the meaning set forth in the Recitals.

"**Board**" means the board of managers of the Company established in accordance with Section 8.01.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount that bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost

recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided* that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Board in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)    the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)    immediately prior to the Distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such Distribution;

(c)    the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as determined by the Board, as of the following times:

(i)    the acquisition of additional Units in the Company by a new or existing Member in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii)    the Distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii)    the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

*provided* that adjustments pursuant to clauses (i), (ii) and (iii) above need not be made if the Board reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d)    the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided* that Book Values shall not be adjusted pursuant to this clause (d) to the extent that an adjustment pursuant to clause (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e)    if the Book Value of a Company asset has been determined pursuant to clause (a) above or adjusted pursuant to clause (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Capital Account**" has the meaning set forth in Section 5.03.

"**Capital Contribution**" means, for any Member, the total amount of cash and property contributed to the Company by such Member, as set forth opposite the name of such Member in the Member Schedule.

"**Code**" means the Internal Revenue Code of 1986.

"**Colorado Act**" means the Colorado Limited Liability Company Act, Title 7, Article 80, Section s 80-101, *et seq.*, and any successor statute, as it may be amended from time to time.

"**Common Managers**" has the meaning set forth in Section 8.02(a)(i).

"**Common Members**" means the Members who own Common Units as listed in the Member Schedule.

"**Common Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in this Agreement.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 11.01.

"**Covered Person**" has the meaning set forth in Section 14.01(a).

"**Credit Facility**" means a credit facility agreement entered into by the Company, as lender, and a lessee under a Lease Agreement.

"**Distribution**" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided* that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Units; (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as a Manager, Officer or employee of the Company or a Subsidiary. "**Distribute**" when used as a verb shall have a correlative meaning.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Exchange Agreement**" means the Exchange Agreement to be entered into among the Company, GrowCo, Two Rivers and the Holders listed on Schedule 1 thereto, in such form as an authorized Officer shall approve (such approval to be conclusively evidenced by such Officer's execution thereof on behalf of the Company).

"**Fair Market Value**" means, with respect to an asset as of a specified date, the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's-length transaction on such date, as determined in good faith by the Board based on such factors as the Board, in the exercise of its reasonable business judgment, considers relevant.

3

"**Fiscal Quarter**" means the first three-month period, second three-month period, third three-month period or fourth three-month period of a Fiscal Year.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to the Company's taxable year.

"**GrowCo**" means GrowCo, Inc., a Colorado corporation, and any successor thereto.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Joinder Agreement**" means a written undertaking substantially in the form of the joinder agreement attached as EXHIBIT A.

"**Lease Agreement**" means a lease agreement entered into by the Company, as lessor, and a third-party lessee in connection with the leasing of any greenhouse that is owned by the Company or an Affiliate thereof, if the construction or other acquisition of such greenhouse was funded (in whole or in part) with $50,000 or more of proceeds from the sale of Preferred Units.

"**Liquidator**" has the meaning set forth in Section 13.03(a).

"**Losses**" has the meaning set forth in Section 14.03(a).

"**Manager**" has the meaning set forth in Section 8.01.

"**Member**" means:

(a)  TRCP, which as of the date of this Agreement holds 4,398,043 Common Units, has executed this Agreement and is identified as a Member on the Member Schedule, so long as it continues to be shown on the Member Schedule (as updated from time to time) as the owner of one or more Units; and

(b)  each other Person who is admitted as a Member in accordance with the terms of this Agreement and the Colorado Act, in each case so long as such Person is shown on the Member Schedule (as updated from time to time) as the owner of one or more Units.

The Members shall constitute the "members" (as that term is defined in the Colorado Act) of the Company.

"**Member Nonrecourse Debt Minimum Gain**" means, with respect to any "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4) (substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires), an amount equal to the Company Minimum Gain that would result if such debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Schedule**" has the meaning set forth in Section 3.01.

4

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable, to:

(a)   a Distributive share of Net Income, Net Losses and other items of income, gain, loss and deduction of the Company,

(b)   a Distributive share of the assets of the Company,

(c)   vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement, and

(d)   any and all other benefits to which such Member may be entitled as provided in this Agreement or the Colorado Act.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year, Fiscal Quarter or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a)   any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)   any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(i) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)   any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d)   any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e)   if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f)   to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Section 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

5

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Officers**" has the meaning set forth in Section 8.09.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Preferred Managers**" has the meaning set forth in Section 8.02(a)(ii).

"**Preferred Members**" means Members who own Preferred Units as listed in the Member Schedule.

"**Preferred Units**" means Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Preferred Units" in this Agreement.

"**Quarterly Distributable Amount**" means, with respect to a Fiscal Quarter, the sum of: (a) the Company's cash flow from operations for such Fiscal Quarter, as determined in accordance with applicable U.S. generally accepted accounting principles in effect from time to time; (b) the total amount of principal and interest received by the Company during such Fiscal Quarter pursuant to payments made under any Credit Facility; and (c) the total amount of deferred lease payments received by the Company during such Fiscal Quarter pursuant to any Lease Agreement.

"**Quarterly Yield**" has the meaning set forth in Section 5.04.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933.

"**Security Agreement**" means the pledge and security agreement to be entered into by the Company in favor of the Preferred Members, pursuant to Section 13.03(c).

"**Subsidiary**" means any Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the Company.

"**Tax Matters Member**" has the meaning set forth in Section 12.01.

"**Taxing Authority**" has the meaning set forth in Section 7.05(b).

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person.  "**Transfer**" when used as a noun shall have a correlative meaning.  "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**TRCP**" means TR Capital Partners, LLC, a Colorado limited liability company, or any of its successors or assigns.

"**Treasury Regulations**" means final or temporary regulations issued by the U.S. Department of Treasury pursuant o authority under the Code, and any successor regulations.

"**Two Rivers**" means Two Rivers Water and Farming Company, a Colorado corporation, or any successor thereto.

"**Unit**" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including Preferred Units and Common Units, *provided* that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Withholding Advances**" has the meaning set forth in Section 7.04(b).

Section 1.02.  **Interpretation**.  For purposes of this Agreement:

(a)  headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b)  any references herein to an Article, Section or Exhibit refer to an Article or Section of, or Exhibit attached to, this Agreement, unless specified otherwise;

(c)  the word "day" refers to a calendar day;

(d)  the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(e)  the words "include," "includes" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(f)  the word "or" is not exclusive;

(g)  the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(h)  whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i)  unless the context otherwise requires, (1) references herein to an agreement, instrument or other document mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (2) references herein to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and

(j)  this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

7

## ARTICLE II
### ORGANIZATION

Section 2.01.  **Formation**.

(a)   The Company was formed on October 31, 2014, pursuant to the provisions of the Colorado Act, upon the filing of the Articles of Organization with the Secretary of State of the State of Colorado.

(b)   This Agreement shall constitute the "operating agreement" (as that term is used in the Colorado Act) of the Company.  The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Colorado Act and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Colorado Act in the absence of such provision, this Agreement shall, to the extent permitted by the Colorado Act, control.

Section 2.02.  **Name**.  The name of the Company shall be "GrowCo Partners 1, LLC" or such other name or names as the Board may from time to time designate; *provided* that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."

Section 2.03.  **Principal Office**.  The principal office of the Company shall be located at 2000 South Colorado Boulevard**,** Tower 1, Suite 3100, Denver, Colorado, or such other place as may from time to time be determined by the Board.  The Board shall give prompt notice of any such change to each of the Members.

Section 2.04.  **Registered Office and Agent**.

(a)   The registered office of the Company shall be the office of the initial registered agent named in the Articles of Organization or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

(b)   The registered agent for service of process on the Company in the State of Colorado shall be the initial registered agent named in the Articles of Organization or such other Person or Persons as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

Section 2.05.  **Purpose and Powers**.

(a)   The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Colorado Act and in any and all activities necessary or incidental thereto.

(b)   The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Colorado Act.

Section 2.06.  **Term**.  The term of the Company commenced on October 31, 2014, and shall continue perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.07.  **No State-Law Partnership**.  The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes.  The Company and

8

each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member, Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this Section 2.07.

## ARTICLE III
### UNITS

Section 3.01.  **Units Generally**.  Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series.  Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series.  The Board shall maintain a schedule (the "**Member Schedule**") setting forth the name and address of each Member and, with respect to each type, class or series of Units held by such Member, (a) the number and issue date thereof, (b) the number of the certificate (if any) issued therefor, (c) the Capital Contribution of the Member with respect thereto, and (d) such other information as the Board may determine to be desirable.  The Company shall update the Member Schedule upon the issuance or Transfer of any Units to any new or existing Member.  A copy of the Member Schedule as of the date of this Agreement is attached as SCHEDULE 1.

Section 3.02.  **Authorization and Issuance of Preferred Units**.  Subject to compliance with Section 10.01(a), the Company is hereby authorized to issue a class of Units designated as Preferred Units, of which no Preferred Units are outstanding as of the date of this Agreement.  The Company may issue up to a total of 10,000,000 Preferred Units.

Section 3.03.  **Authorization and Issuance of Common Units**.  The Company is hereby authorized to issue a class of Units designated as Common Units.  As of the date hereof, (a) a total of 4,398,043 Common Units have been issued and are outstanding and (b) a total of 5,601,957 Common Units are subject to purchase by TRCP at a price of $0.0001 per Common Unit pursuant to the terms of a warrant issued by the Company to TRCP.  TRCP is entitled to exercise such warrant to purchase Common Units only to the extent that more than 4,398,043 Preferred Units are issued, and such limitation on exercise may not be amended or modified without the approval of the Board, including at least one Preferred Member.

Section 3.04.  **Certification of Units**.  The Board shall cause the Company to issue to each Member a certificate or certificates representing the Units held by the Member.  In addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

"THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY.  NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

"THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE

REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUE THAT SUCH REGISTRATION IS NOT REQUIRED."

Section 3.05.  **Action by Consent**.  Any matter that is to be voted on, consented to or approved by the holders of one or more types, classes or series of Membership Interests (including Common Units and Preferred Units) may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than a majority of such types, classes or series of Membership Interests.  A record shall be maintained by the Board of each such action taken by written consent of a Member or Members.

## ARTICLE IV
### MEMBERS

Section 4.01.  **Admission of New Members**.

(a)   New Members may be admitted from time to time subject to compliance with the provisions of Section 4.01(b) and, in connection with a Transfer of Units, Article X.

(b)   In order for any Person not already a Member to be admitted as a Member, whether pursuant to an issuance or a Transfer of Units, such Person shall have executed and delivered a Joinder Agreement to the Company.  Upon the amendment of the Member Schedule by the Board and the satisfaction of any other applicable conditions (including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units), such Person shall be admitted as a Member and issued such Units and the Board shall adjust the Capital Accounts of the Members as necessary in accordance with Section 5.03.

Section 4.02.  **Representations and Warranties of Members**.  By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date hereof or pursuant to Section 4.01, represents and warrants to the Company and acknowledges that:

(a)   The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with.

(b)   Such Member (i) unless otherwise agreed to by the Board prior to such Member's execution of a Joinder Agreement, is an "accredited investor" within the meaning of Rule 501 under the Securities Act and (ii) agrees that such Member will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 under the Securities Act with respect to the offer and sale of the Units.

(c)   Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof.

(d)   Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Subsidiaries, and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company and the Subsidiaries for such purpose.

(e)   The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Subsidiaries that may have been made or given by any other Member or by any agent or employee of any other Member.

(f)   Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto.

(g)   Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time.

(h)   The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound.

(i)   This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

(j)   Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of the Company or any Subsidiary or affect the right of the Company or any Subsidiary to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the Company or such Subsidiary, if applicable.

None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in any purchase agreement.

Section 4.03.   **No Personal Liability**.  Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company, any Subsidiary or any other Member, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 4.04.   **No Withdrawal**.  A Member shall not cease to be a Member as a result of the occurrence of any of the following:

(a)   the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets;

(b)   the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due;

(c)   the making by such Member of a general assignment for the benefit of such Member's creditors;

(d)    the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or

(e)    the expiration of sixty days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void.  As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

Section 4.05.  **Death**.  The death of any Member shall not cause the dissolution of the Company.  In such event the Company and its business shall be continued by the remaining Member or Members and the Units owned by the deceased Member shall automatically be Transferred to such Member's heirs; *provided* that within a reasonable time after such Transfer, the applicable heirs shall sign a Joinder Agreement.

Section 4.06.  **Voting**.  Except as otherwise provided by this Agreement (including Section 15.07) or as otherwise required by the Colorado Act or other Applicable Law, each Member shall be entitled to one vote per Common Unit and one vote per Preferred Unit (voting together as a single class) on all matters upon which the Members have the right to vote under this Agreement.

Section 4.07.  **Power of Members**.  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Colorado Act.  Except as otherwise specifically provided by this Agreement or required by the Colorado Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

Section 4.08.  **No Interest in Company Property**.  No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

## ARTICLE V
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 5.01.  **Existing Capital Contributions**.  TRCP has made the Capital Contribution giving rise to its initial Capital Account and is deemed to own 4,398,043 Common Units on the date hereof.

Section 5.02.  **Additional Capital Contributions**.

(a)    No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Board.

(b)    No Member shall be required to lend any funds to the Company or shall have any personal liability for the payment or repayment of any Capital Contribution by or to any other Member.

12

Section 5.03.  **Maintenance of Capital Accounts**.  The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 5.03.  Each Capital Account shall be established and maintained in accordance with the following provisions:

    (a)   Each Member's Capital Account shall be increased by the amount of:

        (i)   such Member's Capital Contributions, including such Member's initial Capital Contribution;

        (ii)   the amount of any increase in such Capital Account pursuant to Section 5.04;

        (iii)   any Net Income or other item of income or gain allocated to such Member pursuant to Article VI; and

        (iv)   any liabilities of the Company that are assumed by such Member or secured by any property Distributed to such Member.

    (b)   Each Member's Capital Account shall be decreased by:

        (i)   the cash amount or Book Value of any property Distributed to such Member pursuant to Article VII and Section 13.03(c);

        (ii)   the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to Article VI; and

        (iii)   the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

Section 5.04.  **Quarterly Yield on Preferred Units**.  Effective as of 11:59 p.m., Mountain time, on the final day of each Fiscal Quarter, the Capital Account balance of each Preferred Member shall be increased automatically by an amount equal to (a) a rate of return of 3.0% (or, if the Preferred Units held by such Preferred Member were not outstanding for the entire Fiscal Quarter, 3.0% multiplied by the percentage of the number of days in such Fiscal Quarter that such Preferred Units were outstanding), *multiplied by* (b) the amount of the Capital Account of such Preferred Member immediately prior to such time on such final day.  As used herein, the term "**Quarterly Yield**" shall mean, with respect to a specified Preferred Member for a specified Fiscal Quarter, the amount of the increase in such Preferred Member's Capital Account for such Fiscal Quarter as computed in connection with this Section 5.04.

Section 5.05.  **Succession Upon Transfer**.  In the event that any Membership Interests of Members are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units and, subject to Section 6.04, shall receive allocations and Distributions pursuant to Article VI, Article VII and Article XIII in respect of such Units.

Section 5.06.  **Negative Capital Accounts**.  In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

Section 5.07.  **No Withdrawal**.  No Member shall be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as provided in this Agreement.  No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any Distributions to any Members, in liquidation or otherwise.

Section 5.08.  **Treatment of Loans From Members**.  Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 5.03(a)(iv), if applicable.

Section 5.09.  **Modifications**.  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Board determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board may authorize such modifications.

## ARTICLE VI
### ALLOCATIONS

Section 6.01.  **Allocation of Net Income and Net Loss**.  For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 6.02 and the Preferred Unit Distributions set forth in Section 7.01, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the Distributions that would be made to such Member pursuant to Section 13.03(c) if the Company were dissolved and its affairs wound up, its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), the net assets of the Company were Distributed, in accordance with Section 13.03(c), to the Members immediately after making such allocations, minus (b) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

Section 6.02.  **Regulatory and Special Allocations**.  Notwithstanding the provisions of Section 6.01:

(a)   If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section s 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 6.02(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)   Any "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires, shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of

such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Section s 1.704-2(i)(4) and 1.704-2(j)(2). This Section 6.02(b) is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate, as quickly as possible, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

  (i) crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704 1(b)(2)(ii)(c), 1.704 2(g)(1) and 1.704 2(I HBY); and

  (ii) debiting to such Capital Account the items described in Treasury Regulations Sections 1.704 1(b)(2)(ii)(d)(4), (5) and (6).

This Section 6.02(c) is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d) The allocations set forth in Sections 6.02(a), (b) and (c) are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this Article VI (other than Sections 6.02(a), (b) and (c)), the allocations set forth in Sections 6.02(a), (b) and (c) shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the allocations to each Member in accordance with Sections 6.02(a), (b) and (c) shall be equal to the net amount that would have been allocated to such Member if the allocations in accordance with Sections 6.02(a), (b) and (c) had not occurred.

(e) The Company and the Members acknowledge that allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) result from the allocations of Net Income and Net Loss provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) and, once required by applicable final or temporary guidance, allocations of Net Income and Net Loss will be made in accordance with Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) or any successor provision or guidance.

Section 6.03. **Tax Allocations**.

(a) Subject to clauses (b) through (e) of this Section 6.03, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)    Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method of Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)    If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)    Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)    Allocations pursuant to this Section 6.03 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

Section 6.04.    **Allocations in Respect of Transferred Units**.    In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of Article X, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method.

Section 6.05.    **Curative Allocations**.    In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is:

(a)    not specified in this Article VI, or

(b)    clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)),

then the Board may allocate such item described in the foregoing clause (a), or reallocate such item described in the foregoing clause (b), to reflect such economic interests; *provided* that (i) no such allocation shall be made without the prior consent of each Member that would be adversely and disproportionately affected thereby and (ii) no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

## ARTICLE VII
### DISTRIBUTIONS

Section 7.01.   **Preferred Yield Distributions**.   Distributions pursuant to this Section 7.01 are subject only to Section 7.06, and no Distributions shall be made with respect to Common Units or any other Membership Interests unless and until all Distributions due under this Section 7.01 have been paid. The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2015, Distribute with respect to Preferred Units a total amount equal to the least of:

(a)   the aggregate Quarterly Yields of all Preferred Members for such Fiscal Quarter;

(b)   the Quarterly Distributable Amount with respect to such Fiscal Quarter; and

(c)   the aggregate amount of all Capital Accounts of Preferred Members as of the end of such Fiscal Quarter.

The total amount of Distributions, if any, due under this Section 7.01 with respect to a Fiscal Quarter shall be allocated and paid to Preferred Members as follows:   (i) if such total amount of Distributions is determined pursuant to the preceding clause (a), to each Preferred Member in an amount equal to such Preferred Member's Quarterly Yield for such Fiscal Quarter; (ii) if such total amount of Distributions is determined pursuant to the preceding clause (b), to the Preferred Member's pro rata in proportion to their holdings of Preferred Units as of the end of such Fiscal Quarter; and (iii) if such total amount of Distributions is determined pursuant to the preceding clause (c), to each Preferred Member in an amount equal to the amount of such Preferred Member's Capital Account as of the end of such Fiscal Quarter.

Section 7.02.   **Participating Distributions**.   Distributions pursuant to this Section 7.02 are subject only to Section 7.01 and Section 7.06, and no other Distributions shall be made with respect to Preferred Units, Common Units or any other Membership Interests unless and until all Distributions due under Section 7.01 and this Section 7.02 have been paid.   The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2015, Distribute with respect to those Common Units and Preferred Units that were outstanding for the entire Fiscal Quarter a total amount equal to the amount by which the Quarterly Distributable Amount with respect to such Fiscal Quarter exceeds the amount Distributable to Preferred Units in accordance with Section 7.01 for such Fiscal Quarter (that is, the amount, if any, by which the Quarterly Distributable Amount exceeds the amount determined pursuant to Section 7.01(a)).   The total amount of Distributions, if any, due under this Section 7.02 with respect to a Fiscal Quarter shall be allocated and paid:

(a)   if as of the end of such Fiscal Quarter any principal or interest under any Credit Facility is outstanding or any deferred lease amount under any Lease Agreement has not been paid in full, then to Preferred Members pro rata in proportion to their holdings of those Preferred Units that were outstanding for all of such Fiscal Quarter, *provided* that the amount Distributed to Preferred Members pursuant to this clause (a) shall not exceed the aggregate amount of all Capital Accounts of Preferred Members as of the end of such Fiscal Quarter (and any amount Distributable in excess thereof shall be paid in accordance with the following clause (b)); and

(b)   otherwise, to Preferred Members and Common Members pro rata in proportion to their holdings of those Preferred Units and Common Units, collectively, that were outstanding for all of such Fiscal Quarter (that is, for purposes of clarity, each Member shall receive a Distribution equal to the total amount to be so Distributed *multiplied by* a fraction, the numerator of which shall be the number of such Member's Preferred Units that were

17

outstanding for all of such Fiscal Quarter plus the number of such Member's Common Units that were outstanding for all of such Fiscal Quarter and the denominator of which shall be the total number of Preferred Units outstanding plus the total number of Common Units outstanding, all such Units being determined as of the end of such Fiscal Quarter).

Section 7.03.  **Other Distributions**.

(a)  **General**.  After making all Distributions then due to Preferred Members under Section 7.01 and all Distributions then due to Preferred Members and Common Members under Section 7.02, and subject to Section 7.06, the Board shall have sole discretion regarding the amounts and timing of Distributions to Members, including to decide to forego payment of other Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company, which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies.

(b)  **Priority of Distributions**.  After making all Distributions then due to Preferred Members under Section 7.01 and all Distributions then due to Preferred Members and Common Members under Section 7.02, and subject to the priority of Distributions pursuant to Section 13.03(c), if applicable, all Distributions determined to be made by the Board pursuant to Section 7.02 shall be made in the following manner:

(i)  *first,* to the Preferred Members pro rata in proportion to their holdings of Preferred Units, until Distributions under this clause (a) equal the aggregate amount of Capital Contributions attributable to the Preferred Members in respect of their acquisitions of Preferred Units;

(ii)  *second,* to the Common Members pro rata in proportion to their holdings of Common Units, until Distributions under this clause (b) equal the aggregate amount of Capital Contributions attributable to the Common Members in respect of their acquisitions of Common Units; and

(iii)  *third*, any remaining amounts to the Members holding Common Units and/or Preferred Units pro rata in proportion to their holdings of Preferred Units and Common Units, collectively, as of the end of such Fiscal Quarter (determined consistently with the provisions set forth in Section 7.02(b).

Section 7.04.  **Tax Withholding; Withholding Advances**.

(a)  **Tax Withholding**.  If requested by the Board, each Member shall, if able to do so, deliver to the Board:

(i)  an affidavit in form satisfactory to the Board that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other Applicable Law;

(ii)  any certificate that the Board may reasonably request with respect to any such laws; and

(iii) any other form or instrument reasonably requested by the Board relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Board the affidavit described in the preceding clause (i), the Board may withhold amounts from such Member in accordance with Section 7.04(b).

(b) **Withholding Advances**.  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Member based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any Distribution or allocation by the Company of income or gain to such Member and to withhold the same from Distributions to such Member.  Any funds withheld from a Distribution by reason of this Section 7.04(b) shall nonetheless be deemed Distributed to the Member in question for all purposes under this Agreement and, at the option of the Board, shall be charged against the Member's Capital Account.

(c) **Repayment of Withholding Advances**.  Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a Distribution to that Member shall be, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in *The Wall Street Journal* on the date of payment plus two percent per annum:

(i) promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii) with the consent of the Board, repaid by reducing the amount of the next succeeding Distribution or Distributions to be made to such Member (which reduction amount shall be deemed to have been Distributed to the Member, but shall not further reduce the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d) **Indemnification**.  Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts Distributable or allocable to such Member.  The provisions of this Section 7.04(d) and the obligations of a Member pursuant to Section 7.04(c) shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.04, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e) **Overwithholding**.  Neither the Company nor the Board shall be liable for any excess taxes withheld in respect of any Distribution or allocation of income or gain to a Member.  In the

event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

Section 7.05.  **Distributions in Kind**.

(a)  The Board is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company, *provided* that Distributions pursuant to Section 7.01 and Section 7.02 shall only be made in cash.  In any non-cash Distribution, the securities or property so Distributed will be Distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be Distributed among the Members pursuant to Section 7.03.

(b)  Any Distribution of securities shall be subject to such conditions and restrictions as the Board determines are required or advisable to ensure compliance with Applicable Law.   In furtherance of the foregoing, the Board may require that Members execute and deliver such documents as the Board may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the Distributed securities and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

Section 7.06.  **Compliance with Law**.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate either Colorado Act Section 7-80-606 or any other Applicable Law.

## ARTICLE VIII
### MANAGEMENT

Section 8.01.  **Establishment of the Board**.  The Board is hereby established and shall be comprised of natural Persons (each such Person, a "**Manager**") who shall be appointed in accordance with the provisions of Section 8.02.  The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Board, and the Board shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement.

Section 8.02.  **Board Composition; Vacancies**.

(a)  The Company and the Members shall take such actions as may be required to ensure that the number of managers constituting the Board initially is two and, commencing following the initial issuance of at least 1,000,000 Preferred Units and continuing at all times at which any Preferred Units are outstanding, five.  The Board shall be comprised as follows:

(i)   two individuals designated by the Common Members (the "**Common Managers**"), who initially shall be Tim Beall and John McKowen;

(ii)  effective following the initial issuance of at least 1,000,000 Preferred Units, two individuals designated by the Preferred Members (the "**Preferred Managers**"); and

(iii) effective following the initial issuance of at least 1,000,000 Preferred Units, one individual (the "**Independent Manager**") who is not an Affiliate of the Company or any Member and who is acceptable to the Common Managers and the Preferred Managers.

20

(b)   In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of a Common Manager, then the Common Members shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

(c)   In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of a Preferred Manager, then the Preferred Members shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

(d)   In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of an Independent Manager, then the Common Managers and the Preferred Managers shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

Section 8.03.   **Removal; Resignation**.

(a)   **Common Managers**.  A Common Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of the Common Members.

(b)   **Preferred Managers**.  A Preferred Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of the Preferred Members.

(c)   **General**.  A Manager may resign at any time from the Board by delivering a written resignation to the Board.  Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event.  The Board's acceptance of a resignation shall not be necessary to make it effective.

Section 8.04.   **Meetings**.

(a)   **Generally**.  The Board shall meet at such time and at such place as the Board may designate.  Meetings of the Board may be held either in person or by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, at the principal office of the Company or such other place (either within or outside the State of Colorado) as may be determined from time to time by the Board.  Written notice of each meeting of the Board shall be given to each Manager at least 24 hours prior to each such meeting.

(b)   **Special Meetings**.  Special meetings of the Board shall be held on the call of any three Managers upon at least three days' written notice (if the meeting is to be held in person) or 24 hours' written notice (if the meeting is to be held by telephone communications or video conference) to the Managers, or upon such shorter notice as may be approved by all the Managers.  Any Manager may waive such notice as to himself.

(c)   **Attendance and Waiver of Notice**.  Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not

lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

Section 8.05.  **Quorum; Manner of Acting**.

(a)  **Quorum**.  A majority of the Managers serving on the Board shall constitute a quorum for the transaction of business of the Board.  At all times when the Board is conducting business at a meeting of the Board, a quorum of the Board must be present at such meeting.  If a quorum shall not be present at any meeting of the Board, then the Managers present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(b)  **Participation**.  Any Manager may participate in a meeting of the Board by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.  A Manager may vote or be present at a meeting either in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.

(c)  **Binding Act**.  Each Manager shall have one vote on all matters submitted to the Board or any committee thereof.  With respect to any matter before the Board, the act of a majority of the Managers shall be the act of the Board.

Section 8.06.  **Action By Written Consent**.  Notwithstanding anything herein to the contrary, any action of the Board (or any committee of the Board) may be taken without a meeting if either (a) a written consent of a majority of the Managers on the Board (or committee) shall approve such action, *provided* that prior written notice of such action is provided to all Managers at least one day before such action is taken, or (b) a written consent constituting all of the Managers on the Board (or committee) shall approve such action.  Such consent shall have the same force and effect as a vote at a meeting where a quorum was present and may be stated as such in any document or instrument filed with the Secretary of State of Colorado.

Section 8.07.  **Manager Status**.

(a)  **Reimbursement; Other Capacities**.  Managers shall be reimbursed for reasonable out-of-pocket expenses incurred in the performance of their duties as Managers, pursuant to such policies as are established by the Board from time to time.  Nothing contained in this Section 8.07 shall be construed to preclude any Manager from serving the Company in any other capacity and receiving reasonable compensation for such services.

(b)  **No Employment**.  This Agreement does not, and is not intended to, confer upon any Manager any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any Manager.

Section 8.08.  **Committees**.

(a)  **Establishment**.  The Board may, by resolution approved by a majority of the Managers (including at least one of the Preferred Managers), designate from among the Managers one or more committees, each of which shall be comprised of one or more Managers; *provided* that in no event may the Board designate any committee with all of the authority of the Board.  Subject to the immediately preceding proviso, any such committee, to the extent provided in the resolution forming such committee, shall have and may exercise the authority of the Board, subject to the

22

limitations set forth in Section 8.08(b).  The Board at any time may, by resolution approved by a majority of the Managers, dissolve any committee or, by resolution approved by a majority of the Managers (including at least one of the Common Managers and at least one of the Preferred Managers), remove any member of a committee at any time.

(b)   **Limitation of Authority**.  No committee of the Board shall have the authority of the Board in reference to:

(i)   authorizing or making Distributions to Members;

(ii)   authorizing the issuance of any Membership Interest;

(iii)   approving a plan of merger or sale of the Company;

(iv)   recommending to the Members a voluntary dissolution of the Company or a revocation thereof;

(v)   filling vacancies in the Board; or

(vi)   altering or repealing any resolution of the Board that by its terms provides that it shall not be so amendable or repealable.

Section 8.09.   **Officers**.   The Board may appoint individuals as officers of the Company (the "**Officers**") as it deems necessary or desirable to carry on the business of the Company and the Board may delegate to such Officers such power and authority as the Board deems advisable.  No Officer need be a Member or Manager.  Any individual may hold two or more offices of the Company.  Each Officer shall hold office until his successor is designated by the Board or until his earlier death, resignation or removal.  Any Officer may resign at any time upon written notice to the Board.  Any Officer may be removed by the Board (acting by majority vote of all Managers other than the Officer being considered for removal, if applicable) with or without cause at any time.  A vacancy in any office occurring because of death, resignation, removal or otherwise may, but need not, be filled by the Board.

Section 8.10.   **No Personal Liability**.  Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Manager will be obligated personally for any debt, obligation or liability of the Company or any Subsidiary, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

## ARTICLE IX
### EXCHANGES OF PREFERRED UNITS

Section 9.01.   **Exchange Agreement**.   Contemporaneously with its execution and delivery of a Joinder Agreement, each Preferred Member may, at its election, execute and deliver to the Company a joinder agreement or other written understanding pursuant to which such Preferred Member becomes a party to the Exchange Agreement, *provided* that the foregoing requirement shall not apply to Two Rivers in connection with its acquisition of Preferred Units upon exchanges pursuant to the Exchange Agreement as contemplated by Section 9.02.

Section 9.02.   **Transfer of Preferred Units Upon Exchange**.   Upon the effective time of an exchange of a Preferred Unit as provided in Article II of the Exchange Agreement and without limitation by Article X, such Preferred Unit shall be Transferred to Two Rivers or GrowCo, as provided in the Exchange Agreement, and all rights under this Agreement with respect to such Preferred Unit, including

the right to receive Distributions, shall accrue to the benefit of Two Rivers or GrowCo, as the case may be.

# ARTICLE X
## TRANSFERS

Section 10.01.  **General Restrictions on Transfer**.

(a)   Each Member acknowledges and agrees that it will not, directly or indirectly, Transfer any of its Units, and the Company agrees that it shall not issue any Units:

(i)    except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Units, if requested by the Company, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)   if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Code Section 7704(b) within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii)  if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Colorado Act;

(iv)   if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)    if such Transfer or issuance would cause a termination of the Company for federal income tax purposes;

(vi)   if such Transfer or issuance would cause the Company or any of the Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940; or

(vii)  if such Transfer or issuance would cause the assets of the Company or any of the Subsidiaries to be deemed "Plan Assets" as defined for purposes of the Employee Retirement Income Security Act of 1974 or result in any "prohibited transaction" thereunder involving the Company or any Subsidiary.

In any event, the Board may refuse the Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any Governmental Authority.

(b)   Any Transfer or attempted Transfer of any Units in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the holder of such Units for all purposes of this Agreement.

## ARTICLE XI
### CONFIDENTIALITY

Section 11.01.  **Nondisclosure**.  Each Preferred Member acknowledges that during the term of this Agreement, he will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, the Subsidiaries and their Affiliates that are not generally known to the public, including information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Preferred Member acknowledges that:  (a) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (b) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (c) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Preferred Member is subject, no Preferred Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Preferred Member monitoring and analyzing his investment in the Company or performing his duties as a Manager, Officer, employee, consultant or other service provider of the Company) at any time, including use for personal, commercial or proprietary advantage or profit, either during his association or employment with the Company or thereafter, any Confidential Information of which such Preferred Member is or becomes aware.  Each Preferred Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

Section 11.02.  **Permitted Disclosures**.  Nothing contained in Section 11.01 shall prevent any Preferred Member from disclosing Confidential Information:  (a) upon the order of any court or administrative agency; (b) upon the request or demand of any regulatory agency or authority having jurisdiction over such Preferred Member; (c) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (d) to the extent necessary in connection with the exercise of any remedy hereunder; (e) to other Members; (f) to such Preferred Member's Representatives who, in the reasonable judgment of such Preferred Member, need to know such Confidential Information and agree to be bound by the provisions of this Article XI as if a Preferred Member; or (g) to any potential Transferee in connection with a proposed Transfer of Units from such Preferred Member, as long as such Transferee agrees to be bound by the provisions of this Article XI as if a Preferred Member; *provided* that in the case of clause (a), (b) or (c), such Preferred Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

Section 11.03.  **Excluded Information**.  The restrictions of Section 11.01 shall not apply to Confidential Information that:  (a) is or becomes generally available to the public other than as a result of a disclosure by a Preferred Member in violation of this Agreement; (b) is or becomes available to a Preferred Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Preferred Member and any of its Representatives in compliance with this Agreement; (c) is or has been independently developed or conceived by such Preferred Member without use of Confidential Information; or (d) becomes available to the receiving Preferred Member or any of its Representatives on a non-confidential basis from a source other than the Company, any other Member or any of their respective Representatives; *provided* that such source is not known by the recipient of the Confidential

Information to be bound by a confidentiality agreement with the disclosing Member or any of its Representatives.

# ARTICLE XII
## TAX MATTERS

Section 12.01.  **Tax Matters Member**.

(a)  **Appointment**.  The Members hereby appoint TRCP as the "**Tax Matters Member**" who shall serve as the "tax matters partner" (as such term is defined in Code Section 6231) for the Company.

(b)  **Tax Examinations and Audits**.  The Tax Matters Member is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with the Tax Matters Member and to do or refrain from doing any or all things reasonably requested by the Tax Matters Member with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings.  Each Member agrees that any action taken by the Tax Matters Member in connection with audits of the Company shall be binding upon such Members and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company.

(c)  **Income Tax Elections**.  The Tax Matters Member shall have sole discretion to make any income tax election it deems advisable on behalf of the Company; *provided* that the Tax Matters Member will make an election under Code Section 754, if requested in writing by Members holding a majority of the outstanding Common Units.  All determinations as to tax elections and accounting principles shall be made solely by the Tax Matters Member.

(d)  **Tax Returns and Tax Deficiencies**.  Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.  The Tax Matters Member shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority.  Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.04(d).

(e)  **Resignation**.  The Tax Matters Member may resign at any time.  If TRCP ceases to be the Tax Matters Member for any reason, the holders of a majority of the Common Units and Preferred Units, voting together as a single class, shall appoint a new Tax Matters Member.

Section 12.02.  **Tax Returns**.  At the expense of the Company, the Board (or any Officer that it may designate pursuant to Section 8.09) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company and the Subsidiaries own property or do business.  As soon as reasonably possible after the end of each Fiscal Year, the Board or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

Section 12.03.  **Company Funds**.  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Board.  The funds of the Company shall not be commingled with the funds of any other Person.  All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Board may designate.

# ARTICLE XIII
## DISSOLUTION AND LIQUIDATION

Section 13.01.  **Events of Dissolution**.  The Company shall be dissolved and is affairs wound up only upon the occurrence of any of the following events:

    (a)   the determination of the Board to dissolve the Company;

    (b)   an election to dissolve the Company made by holders of a majority of the Common Units;

    (c)   the sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

    (d)   the entry of a decree of judicial dissolution under Colorado Act Section 80-810.

Section 13.02.  **Effectiveness of Dissolution**.  Dissolution of the Company shall be effective on the day on which the event described in Section 13.01 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 13.03 and the Articles of Organization shall have been cancelled as provided in Section 13.04.

Section 13.03.  **Liquidation**.  If the Company is dissolved pursuant to Section 13.01, the Company shall be liquidated and its business and affairs wound up in accordance with the Colorado Act and the following provisions:

    (a)   **Liquidator**.  The Board, or, if the Board is unable to do so, a Person selected by the holders of a majority of the Common Units, shall act as liquidator to wind up the Company (the "**Liquidator**").  The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

    (b)   **Accounting**.  As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

    (c)   **Distribution of Proceeds**.  The Liquidator shall liquidate the assets of the Company and Distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

        (i)   *first*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii) *second*, to the establishment of and additions to reserves that are determined by the Board in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company;

(iii) *third,* to the Preferred Members in amounts equal to their respective Capital Accounts; and

(iv) *fourth*, to Members in the same manner as Distributions are made under Section 7.03.

The Company shall, within sixty days after the date of the initial issuance of Preferred Units, enter into the Security Agreement in favor of the Preferred Members, pursuant to which the Company shall grant the Preferred Members a security interest in substantially all of the assets of the Company solely for purposes of securing payment of amounts set forth in the preceding clause (iii).  As and to the extent set forth in the Security Agreement, the security interest granted to the Preferred Members pursuant to the Security Agreement shall be *pari passu* in all respects with any similar security interest granted in favor of the members of any other limited liability company of which TRCP is the sole or a majority holder of common units and that is formed in connection with the acquisition, construction and/or operation of up to three additional greenhouses (including related purchases of farmland and water taps) for leasing to marijuana growers.  The Security Agreement shall be in a form prepared by the Company and approved by the Board, including at least one of the Preferred Managers.

(d) **Discretion of Liquidator**.  Notwithstanding the provisions of Section 13.03(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 13.03(c), if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion, Distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 13.03(c), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such Distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.  For purposes of any such Distribution, any property to be Distributed will be valued at its Fair Market Value.

Section 13.04.  **Cancellation of Articles**.  Upon completion of the Distribution of the assets of the Company as provided in Section 13.03(c), the Company shall be terminated and the Liquidator shall cause the cancellation of the Articles of Organization in the State of Colorado and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Colorado and shall take such other actions as may be necessary to terminate the Company.

Section 13.05.  **Survival of Rights, Duties and Obligations**.  Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination.  For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to Section 14.03.

Section 13.06.  **Recourse for Claims**.  Each Member shall look solely to the assets of the Company for all Distributions with respect to the Company, such Member's Capital Account, and such Member's

share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Board, the Liquidator or any other Member.

## ARTICLE XIV
### EXCULPATION AND INDEMNIFICATION

Section 14.01.  **Exculpation of Covered Persons**.

(a)  **Covered Persons**.  As used herein, the term "**Covered Person**" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) each Manager, Officer, employee, agent or representative of the Company.

(b)  **Standard of Care**.  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)  **Good Faith Reliance**.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups:  (i) another Manager; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence.  The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in  the Colorado Act.

Section 14.02.  **Liabilities and Duties of Covered Persons**.

(a)  **Limitation of Liability**.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)  **Duties**.  Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any Applicable Law.

Section 14.03.  **Indemnification**.

(a)  **Indemnification**.  To the fullest extent permitted by the Colorado Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Colorado Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

  (i) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any Affiliate of the foregoing in connection with the business of the Company; or

  (ii) the fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any Subsidiary;

*provided* that (A) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful and (B) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction.  In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)  **Reimbursement**.  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 14.03; *provided* that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 14.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c)  **Entitlement to Indemnity**.  The indemnification provided by this Section 14.03 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise.  The provisions of this Section 14.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 14.03 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d)  **Insurance**.  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Board may determine; *provided* that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder.  If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e)  **Funding of Indemnification Obligation**.  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 14.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f)  **Savings Clause**.  If this Section 14.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 14.03 to the fullest extent permitted by any applicable portion of this Section 14.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g)  **Amendment**.  The provisions of this Section 14.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 14.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification or repeal of this Section 14.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

Section 14.04.  **Survival**.  The provisions of this Article XIV shall survive the dissolution, liquidation, winding up and termination of the Company.

### ARTICLE XV
#### MISCELLANEOUS

Section 15.01.  **Further Assurances**.  In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

Section 15.02.  **Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given:  (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next day (other than a Saturday, Sunday or other day on which commercial banks in the City of Denver are authorized or required to close) if sent after normal business hours of the recipient; or

(d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 15.02):

| If to the Company: | 2000 South Colorado Boulevard |
| | Tower 1, Suite 3100 |
| | Denver, Colorado  80222 |
| | Facsimile:  (303) 845-9400 |
| | E-mail:  info@2riverswater.com |
| | Attention:  Chief Financial Officer |
| | |
| with a copy to: | K&L Gates LLP |
| | One Lincoln Street |
| | Boston, Massachusetts  02111-2950 |
| | Facsimile:  (617) 261-3175 |
| | E-mail:  mark.johnson@klgates.com |
| | Attention:  Mark L. Johnson |

If to a Member, to such Member's mailing address as set forth on the Member Schedule.

Section 15.03.  **Severability**.  If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 15.04.  **Entire Agreement**.  This Agreement, including the Exhibit and Schedule hereto, and the Exchange Agreement, including the Exhibits and Schedule thereto, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 15.05.  **Successors and Assigns**.  Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 15.06.  **No Third-Party Beneficiaries**.  Except as provided in Article XIV, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 15.07.  **Amendment**.  Except as otherwise expressly provided herein, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and Members holding at least two-thirds of the Common Units and Preferred Units, voting together as a single class.  Any such written amendment or modification will be binding upon the Company and each Member; *provided* that (a) an amendment or modification altering any provision of this Agreement in a

32

manner that adversely alters the powers, preferences or rights of a class of Units shall be effective only with the consent of the Members holding at least two-thirds of such class of Units and (b) an amendment or modification altering the rights or obligations of any Member in a manner that is disproportionately adverse to other Members holding the same class of Units shall be effective only with that Member's consent.  Notwithstanding the foregoing, amendments to the Member Schedule following any new issuance, redemption, repurchase or Transfer of Units in accordance with this Agreement may be made by the Board without the consent of, or other action by, any of the Members.

Section 15.08.  **Waiver**.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  For the avoidance of doubt, nothing contained in this Section 15.08 shall diminish any of the explicit and implicit waivers described in this Agreement, including in Section 8.04(c) and Section 15.11.

Section 15.09.  **Governing Law**.  All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Colorado, without giving effect to any choice or conflict of law provision or rule (whether of the State of Colorado or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Colorado.

Section 15.10.  **Submission to Jurisdiction**.  The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Colorado or in the Court of Chancery of the State of Colorado (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Colorado), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Colorado.  Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form.  Service of process, summons, notice or other document by registered mail to the address set forth in Section 15.02 shall be effective service of process for any suit, action or other proceeding brought in any such court.

Section 15.11.  **Waiver of Jury Trial**.  Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

Section 15.12.  **Equitable Remedies**.  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other

parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Section 15.13. **Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 14.02 to the contrary.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

COMPANY:

**GROWCO PARTNERS 1, LLC**

By: _____
Name: WAYNE HARDING
Title: CFO

COMMON MEMBER:

**TR CAPITAL PARTNERS, LLC**

By: _____
Name: WAYNE HARDING
Title: CFO

34

EXHIBIT A

**FORM OF JOINDER AGREEMENT**

## JOINDER AGREEMENT TO LIMITED LIABILITY COMPANY AGREEMENT

Reference is hereby made to the Limited Liability Company Agreement dated as of January 12, 2015, as it may be amended from time to time (the "**Agreement**"), among GrowCo Partners 1, LLC and the Members Named in SCHEDULE 1.  Pursuant to and in accordance with Section 4.01 of the Agreement, the undersigned hereby acknowledges that the undersigned has received and reviewed a complete copy of the Agreement and agrees that, upon execution of this Joinder Agreement by the undersigned and GrowCo Partners 1, LLC, the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, and shall hold the status of a [Common][Preferred] Member.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement as of the date set forth below.  A signed copy of this Joinder Agreement delivered by facsimile, e-mail or other means of Electronic Transmission (as defined in the Agreement) shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

Date: _____          **[NAME OF NEW MEMBER]**

By: _____
    Name:
    Title:

Agreed and Accepted:

**GROWCO PARTNERS 1, LLC**

By: _____
    Name:
    Title:

A-2

SCHEDULE 1

**MEMBER SCHEDULE**

**Common Units**:

| Member Name and Address | Number of Units | Date of Issue | Capital Contribution | Certificate Number |
|---|---|---|---|---|
| TR Capital Partners, LLC<br>2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado  80222 | 4,398,043 | January 12, 2015 | $1,000.00 | CU-1 |

**Preferred Units**:     None.

Sch. 1-2

| Name | Units | Name | Units |
|---|---|---|---|
| I. Wistar Morris | 1,278,262 | John J Blum | 1,960 |
| Christopher L. Morris | 500,000 | Gregory A. Harrison | 1,960 |
| Jesse Dovich | 438,597 | Donald S Darendinger Rev. Trust u/a 7/3/2007 | 1,960 |
| Jon D. and Linda W. Gruber Trust | 250,000 | Susan Doukas | 1,960 |
| TR Capital Partners, LLC | 177,203 | Stephen D. Brown | 1,960 |
| Samuel W. Morris, Jr. | 117,562 | SLMI Holding LLC | 1,960 |
| Michael S. Barish | 108,696 | Presley Reed | 1,958 |
| Hugo Zimmermann | 106,295 | John R Rogers SEP IRA | 1,718 |
| Matt Edmundson | 104,198 | High Speed Aggregate Inc. | 1,718 |
| Jeff Porter | 100,000 | Wardenburg 2009 Family Trust | 1,718 |
| Eric Petersen | 100,000 | Growth Ventures, Inc Pension Plan & Trust | 1,718 |
| Charles J. Bloom IRA | 100,000 | Jason Paulley R/O IRA | 1,718 |
| Martha Morris | 95,598 | Maureen Miller, IRA | 1,374 |
| Cotswold Foundation | 94,506 | Charles & Sandra Curtis JWROS | 1,202 |
| Eleventh Generation | 93,506 | Frank & Shirley Mills | 1,176 |
| I. Wistar Morris IRA | 89,240 | Jordan Family LLC | 1,030 |
| JMW Fund, LLC | 65,732 | Norman McClain | 980 |
| San Gabriel Fund, LLC | 65,732 | Lawrence & Karen Cake | 980 |
| Jacob A. & Michelle K. Bevan | 50,362 | Margaret Elizabeth Crumbley | 980 |
| David A. Jenkins | 50,000 | Tom Ellison | 980 |
| Njevity, Inc. | 43,767 | Robert Stanger | 980 |
| Richland Fund, LLC | 34,640 | Adam Linn | 980 |
| Michael and Linda Harnish | 32,885 | John N. Alessandro | 980 |
| Elevation Fund | 29,332 | Nazim Lokhandwala | 980 |
| Wayne Harding | 28,292 | Lloyd Grant | 980 |
| Maureen Miller | 25,000 | Brenda Forwood | 980 |
| Gus Blass, III | 23,592 | F. Richard Stark | 980 |
| Capital Properties LLC | 23,592 | Francis & Jeffrey Chan | 980 |
| L.A. & Linda Walker | 21,816 | John Black | 980 |
| West Hampton Special Situations Fund | 12,740 | Joseph R. Stanger | 980 |
| JPG Investments, LLC | 12,268 | Konrad & Linda Kuhn | 980 |
| James Cochran | 11,796 | Belva Barbalace | 980 |
| Eric Porter | 10,000 | Charles Biemiller, IRA | 980 |
| Kirby Enterprise Fund | 9,038 | Carl Swarts, IRA a/c 177072 | 858 |
| Thomas Prasil Trust | 8,334 | William C Kottke R/O IRA | 858 |
| Charles B Kirby | 7,078 | Constantine Hagepanos R/O IRA | 858 |
| Thomas Prasil | 6,870 | Ashley Weatherford R/O IRA | 858 |
| San Gabriel Benefit Plan fbo John McGrain | 6,554 | Paul Hartmann R/O IRA | 858 |
| Growth Ventures, Inc Profit Sharing Plan & Trust | 4,676 | John Black | 858 |
| Paul Powell | 4,624 | John Alesandro | 806 |
| JDC Ventures, LLC | 3,922 | Timothy & Patricia Gillis | 746 |
| Sondra W Margolies | 3,922 | Constantine Hagepanos | 490 |
| San Gabriel Benefit Plan fbo Justin Yorke | 3,278 | George Rosch | 490 |
| John R Rogers | 2,820 | Stephen Troutman | 430 |
| Frank Guy | 2,476 | Heather Evans | 344 |
| Sandra Diaz R/O IRA | 2,164 | Thomas Forti | 344 |
| Michael Berenhaus | 1,960 | Jason Paulley Roth IRA | 344 |
| Charles and Sandra Curtis | 1,960 | Ernest Dufresne | 172 |
| | | Total | 4,417,949 |

Page 6



Colorado Secretary of State
Date and Time: 10/31/2014 02:13 PM
ID Number: 20141670821

Document number: 20141670821
Amount Paid: $1.00

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.sos.state.co.us.

ABOVE SPACE FOR OFFICE USE ONLY

## Articles of Organization
filed pursuant to § 7-80-203 and § 7-80-204 of the Colorado Revised Statutes (C.R.S.)

1. The domestic entity name of the limited liability company is

GrowCo Partners 1, LLC

*(The name of a limited liability company must contain the term or abbreviation "limited liability company", "ltd. liability company", "limited liability co.", "ltd. liability co.", "limited", "l.l.c.", "llc", or "ltd." See §7-90-601, C.R.S.)*

*(Caution: The use of certain terms or abbreviations are restricted by law. Read instructions for more information.)*

2. The principal office address of the limited liability company's initial principal office is

Street address      2000 S Colorado Blvd
*(Street number and name)*

Ste 1-3100

Denver      CO    80222
*(City)*      *(State)*    *(ZIP/Postal Code)*

United States
*(Province – if applicable)*      *(Country)*

Mailing address
(leave blank if same as street address)
*(Street number and name or Post Office Box information)*

*(City)*      *(State)*    *(ZIP/Postal Code)*

*(Province – if applicable)*      *(Country)*

3. The registered agent name and registered agent address of the limited liability company's initial registered agent are

Name
(if an individual)

*(Last)*      *(First)*      *(Middle)*    *(Suffix)*

or

(if an entity)      Two Rivers Water & Farming Company

*(Caution: Do not provide both an individual and an entity name.)*

Street address      2000 S Colorado Blvd
*(Street number and name)*

Denver      CO    80222
*(City)*      *(State)*    *(ZIP Code)*

Mailing address
(leave blank if same as street address)
*(Street number and name or Post Office Box information)*

_____    CO    _____.
            *(City)*                              *(State)*          *(ZIP Code)*

*(The following statement is adopted by marking the box.)*
☑ The person appointed as registered agent has consented to being so appointed.

4. The true name and mailing address of the person forming the limited liability company are

Name
   (if an individual)    _____  _____  _____  _____
                                                *(Last)*          *(First)*        *(Middle)*      *(Suffix)*

   or

   (if an entity)    **Two Rivers Water & Farming Company**
*(Caution:  Do not provide both an individual and an entity name.)*

Mailing address    **2000 S Colorado Blvd**
                                     *(Street number and name or Post Office Box information)*

**Denver**                     **CO**  **80222**
            *(City)*                              *(State)*      *(ZIP/Postal Code)*

_____    **United States** .
      *(Province – if applicable)*          *(Country)*

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*
☐ The limited liability company has one or more additional persons forming the limited liability
   company and the name and mailing address of each such person are stated in an attachment.

5. The management of the limited liability company is vested in
*(Mark the applicable box.)*
☑ one or more managers.

or

☐ the members.

6. *(The following statement is adopted by marking the box.)*
☑ There is at least one member of the limited liability company.

7. *(If the following statement applies, adopt the statement by marking the box and include an attachment.)*
☐ This document contains additional information as provided by law.

8. *(Caution:  Leave blank if the document does not have a delayed effective date.  Stating a delayed effective date has
   significant legal consequences.  Read instructions before entering a date.)*

   *(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*
The delayed effective date and, if applicable, time of this document is/are _____.
                                      *(mm/dd/yyyy hour:minute am/pm)*

Notice:
Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or
acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the
individual's act and deed, or that the individual in good faith believes the document is the act and deed of the
person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity
with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic
statutes, and that the individual in good faith believes the facts stated in the document are true and the
document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is named in the document as one who has caused it to be delivered.

9. The true name and mailing address of the individual causing the document to be delivered for filing are

| Harding | Wayne | | |
|---|---|---|---|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

2000 S colorado blvd

*(Street number and name or Post Office Box information)*

| Denver | CO | 80222 |
|---|---|---|
| *(City)* | *(State)* | *(ZIP/Postal Code)* |

United States .

| *(Province – if applicable)* | *(Country)* |
|---|---|

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

Disclaimer:
This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty.  While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet.  Questions should be addressed to the user's legal, business or tax advisor(s).

*Draft of 11/19/14*

SECURITIES PURCHASE AGREEMENT


between


GROWCO PARTNERS 1, LLC


and


INVESTORS NAMED IN SCHEDULE 1



Dated as of November __, 2014

TABLE OF CONTENTS

**Page**

1. Purchase and Sale of Offered Units.................................................................................................1
    1.1    Issuance and Sale...............................................................................................................1
    1.2    Closing..............................................................................................................................1
    1.3    Closing Deliverables........................................................................................................1

2. Representations and Warranties of Partners.....................................................................................2
    2.1    Organization, Good Standing, Power and Authority........................................................2
    2.2    Capitalization....................................................................................................................3
    2.3    Authorization....................................................................................................................3
    2.4    Transfers...........................................................................................................................4
    2.5    Governmental Consents and Filings.................................................................................4
    2.6    Litigation..........................................................................................................................4
    2.7    Compliance with Other Instruments................................................................................4
    2.8    Permits..............................................................................................................................5

3. Representations and Warranties of the Investors.............................................................................6
    3.1    Authorization....................................................................................................................6
    3.2    Purchase Entirely for Own Account.................................................................................6
    3.3    Disclosure of Information.................................................................................................6
    3.4    Restricted Securities.........................................................................................................6
    3.5    No Public Market.............................................................................................................7
    3.6    Accredited Investor..........................................................................................................7
    3.7    No General Solicitation....................................................................................................7
    3.8    Exculpation Among Investors..........................................................................................7
    3.9    Residence.........................................................................................................................7

4. Conditions to Obligations of Investors at Closing..........................................................................7
    4.1    Representations and Warranties.......................................................................................7
    4.2    Performance......................................................................................................................8

5. Conditions to Obligations of Partners at Closing............................................................................8
    5.1    Representations and Warranties.......................................................................................8
    5.2    Performance......................................................................................................................8

6. Post-Closing Covenants of Partners.................................................................................................8
    6.1    Use of Proceeds................................................................................................................8
    6.2    Security Agreement..........................................................................................................8
    6.3    Support Agreement..........................................................................................................8

7. Miscellaneous...................................................................................................................................8
    7.1    Notices..............................................................................................................................8
    7.2    Severability......................................................................................................................9
    7.3    Entire Agreement.............................................................................................................9
    7.4    Survival of Warranties.....................................................................................................9
    7.5    Interpretation....................................................................................................................9
    7.6    Successors and Assigns..................................................................................................10
    7.7    Amendments and Waivers.............................................................................................10
    7.8    Governing Law...............................................................................................................10
    7.9    Counterparts...................................................................................................................10
    7.10   Dispute Resolution.........................................................................................................10

SCHEDULE 1.    Schedule of Investors
EXHIBIT A.    LLC Agreement
EXHIBIT B.    Form of GrowCo OU Warrant
EXHIBIT C.    Form of Exchange Agreement

THIS SECURITIES PURCHASE AGREEMENT (this "**Agreement**") is entered into as of November __, 2014 between GrowCo Partners 1, LLC, a Colorado limited liability company ("**Partners**"), and the several investors named in SCHEDULE 1 (collectively the "**Investors**" and, together with Partners, the "**Parties**").

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **Purchase and Sale of Offered Units**.

   1.1  **Issuance and Sale**.

   (a)  Partners proposes to sell to the Investors a total of 6,000,000 units ("**Offered Units**"), each consisting of (i) one preferred unit of Partners (a "**Partners Preferred Unit**") issued under the Limited Liability Company Agreement of Partners dated as of the date hereof, in the form of EXHIBIT A (the "**LLC Agreement**"), and (ii) a common stock purchase warrant (a "**GrowCo OU Warrant**") issued by GrowCo, Inc., a Colorado corporation ("**GrowCo**"), in a series identified by certificate numbers designated "OU" and otherwise in substantially the form of EXHIBIT B, which GrowCo OU Warrant shall be exercisable to purchase one share of common stock, without par value, of GrowCo (a "**GrowCo Common Share**").

   (b)  Subject to the terms and conditions of this Agreement, each Investor agrees to purchase, and Partners agrees to sell and issue to each Investor, at the Closing (as defined in Section 1.2), the number of Offered Units, if any, set forth opposite such Investor's name on SCHEDULE 1, for a purchase price of $1.00 in cash for each such Offered Unit. The Investors will enter into an exchange agreement with Partners and Parent in substantially the form of EXHIBIT C (the "**Exchange Agreement**") pursuant to which an Investor may in the future elect to receive shares of common stock, $0.001 par value per share ("**Parent Common Shares**"), of Two Rivers Water and Farming Company, a Colorado corporation ("**Parent**"), in exchange for (i) Offered Units, (ii) Partners Preferred Units and GrowCo Common Shares, or (iii) Partners Preferred Units, all to the extent, and subject to the terms and conditions, set forth in the Exchange Agreement.

   1.2  **Closing**. A closing of issuances and sales of Offered Units, which shall take place remotely via the exchange of documents and signatures, shall be held at 10:00 a.m., Mountain standard time, on _____, 2014 (the "**Closing**"). The time or date of the Closing may be changed by Partners upon at least 48 hours' notice to each of the Investors.

   1.3  **Closing Deliverables**.

   (a)  At the Closing, each Investor purchasing Offered Units shall deliver to Partners payment of the purchase price for such Offered Units by transmission of a wire transfer to a bank account designated by Partners or delivery of a check payable to Partners.

   (b)  At the Closing, Partners shall deliver to each Investor:

      (i)  the LLC Agreement, executed by Partners and TR Capital Partners, LLC, as sole holder of common units of Partners ("**Partners Common Units**"), and reflecting the Investors' purchases of Partners Preferred Units at the Closing;

(ii)    a certificate, executed by Partners, issued to the Investor and representing a number of Partners Preferred Units equal to the number of Offered Units being purchased by such Investor at the Closing;

(iii)   a GrowCo OU Warrant, executed by GrowCo, providing the Investor the right to purchase a number of GrowCo Common Shares equal to the number of Offered Units purchased by such Investor at the Closing; and

(iv)    the Exchange Agreement, executed by Partners and Parent.

2.    **Representations and Warranties of Partners**.  Partners hereby represents and warrants to each Investor acquiring Offered Units at the Closing that the following representations are true and complete as of the date hereof and will be true and complete as of the Closing, except to the extent made only as of a specified date, in which case as of such time or date:

2.1    **Organization, Good Standing, Power and Authority**.

(a)    Partners is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Colorado and has all requisite corporate power and authority to carry on its business as presently conducted and as currently proposed to be conducted.  Partners is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results of operations of Partners (a "**Partners MAE**").  Partners has made available each Investor with a true and complete copy of its Articles of Organization as initially filed, and such Articles of Organization have not been amended since the date of such filing.  Partners has all requisite corporate power and authority to execute and deliver this Agreement and the Exchange Agreement and to perform its obligations under the LLC Agreement, the Exchange Agreement and this Agreement, including to offer and sell the Offered Units and to issue the Partners Preferred Units included in the Offered Units.

(b)    GrowCo is a corporation duly organized, validly existing and in good standing under the laws of the State of Colorado and has all requisite corporate power and authority to carry on its business as presently conducted and as currently proposed to be conducted.  GrowCo is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a would have a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results of operations of GrowCo (a "**GrowCo MAE**").  GrowCo has made available each Investor with a true and complete copy of its Articles of Incorporation as initially filed, and such Articles of Incorporation have not been amended since the date of such filing.  GrowCo has all requisite corporate power and authority to perform its obligations under the Exchange Agreement and the GrowCo OU Warrants, including to issue and sell GrowCo Common Shares pursuant to the GrowCo OU Warrants.

(c)    Parent is a corporation duly organized, validly existing and in good standing under the laws of the State of Colorado and has all requisite corporate power and authority to carry on its business as presently conducted and as currently proposed to be conducted.  Parent is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a would have a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results of operations of Parent and its subsidiaries, taken as a whole (a "**Parent MAE**").  Parent has made available each Investor with a true and complete copy of its Articles of Incorporation as

2

of the date hereof, and such Articles of Incorporation will not be amended prior to the Closing. Parent has all requisite corporate power and authority to execute and deliver the Exchange Agreement and to perform its obligations under the Exchange Agreement, including to issue Parent Common Shares pursuant to the Exchange Agreement.

2.2   **Capitalization**.

(a)   The authorized membership interests of Partners consist of 10,000,000 Partners Common Units, of which 6,000,000 Partners Common Units are issued and outstanding and are held by TR Capital Partners, LLC.  There are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements to purchase or acquire from Partners any membership interest or any securities convertible into or exchangeable for any membership interest, except as contemplated by this Agreement and except that Partners has issued to TR Capital Partners, LLC a warrant to purchase up to 10,000,000 Partners Common Units at a price of $0.0001 per Partners Common Unit.  Partners has no obligation (contingent or otherwise) to purchase or redeem any of its membership interests.

(b)   The authorized capital stock of GrowCo consists of an unlimited number of GrowCo Common Shares, of which 20,000,000 are issued and outstanding.  GrowCo has no obligation (contingent or otherwise) to purchase or redeem any of its equity interests.

(c)   The authorized capital stock of Parent consists of:  (i) 100,000,000 Parent Common Shares, of which _____ are issued and outstanding as of the date of this Agreement; and (ii) 4,000,000 shares of convertible preferred stock, $0.001 par value per share, of which no shares are issued or outstanding.

2.3   **Authorization**.

(a)   All corporate action required to be taken by the managers and the member of Partners in order to authorize Partners to enter into this Agreement, the Exchange Agreement, the Security Agreement (as defined in Section 6.2) and the Support Agreement (as defined in Section 6.3) and to issue the Partners Preferred Units at the Closing has been taken or will be taken prior to the Closing.  All action on the part of the officers of Partners necessary for the execution and delivery of this Agreement and the Exchange Agreement and the performance of all obligations of Partners under the LLC Agreement, this Agreement and the Exchange Agreement to be performed as of the Closing, including the issuance of Partners Preferred Units, has been taken or will be taken prior to the Closing.  The LLC Agreement and this Agreement constitute, and upon execution thereof at the Closing the Exchange Agreement will constitute, valid and legally binding obligations of Partners, enforceable against Partners in accordance with their respective terms except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(b)   All corporate action required to be taken by the board of directors and shareholders of GrowCo in order to authorize GrowCo to issue the GrowCo OU Warrants at the Closing has been taken or will be taken prior to the Closing.  All action on the part of the officers of GrowCo necessary for the execution and delivery of the GrowCo OU Warrants as of the Closing has been taken or will be taken prior to the Closing.  Upon execution thereof at the Closing, the GrowCo OU Warrants will constitute valid and legally binding obligations of

3

GrowCo, enforceable against GrowCo in accordance with their respective terms except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c)     All corporate action required to be taken by the board of directors and shareholders of Parent in order to authorize Parent to enter into the Exchange Agreement and the Support Agreement has been taken or will be taken prior to the Closing.  All action on the part of the officers of Parent necessary for the execution and delivery of the Exchange Agreement as of the Closing has been taken or will be taken prior to the Closing.  Upon execution thereof at the Closing, the Exchange Agreement will constitute a valid and legally binding obligation of Parent, enforceable against Parent in accordance with its terms except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

2.4     **Transfers**.  The Partners Preferred Units and GrowCo OU Warrants, when issued and sold in accordance with the terms and for the consideration set forth in this Agreement, will be free of restrictions on transfer other than restrictions on transfer under the LLC Agreement, the GrowCo OU Warrants, applicable federal and state securities laws, and liens or encumbrances created or imposed by an Investor.

2.5     **Governmental Consents and Filings**.  Assuming the accuracy of the representations made by the Investors in Section 3, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of Partners, GrowCo or Parent in connection with the issuance and sale of the Offered Units, except for filings pursuant to Regulation D of the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws, which have been made or will be made in a timely manner.

2.6     **Litigation**.  There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to the knowledge of Partners, currently threatened in writing that questions (a) the validity of the LLC Agreement, this Agreement, the Exchange Agreement, the Security Agreement or the Support Agreement, (b) the right of Partners to enter into, or consummate any of the transactions contemplated by, the LLC Agreement, this Agreement, the Exchange Agreement, the Security Agreement or the Support Agreement, (c) the right of GrowCo to issue the GrowCo OU Warrants at the Closing or to issue GrowCo Common Shares upon exercise of the GrowCo OU Warrants, (d) the right of Parent to enter into the Exchange Agreement or the Support Agreement or to issue Parent Common Shares in accordance with the Exchange Agreement.  None of Partners, GrowCo and Parent or, to the knowledge of Partners, any of their respective managers, directors or officers is a party to, or is named as subject to the provisions of, any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of such directors, managers and officers, such as would affect Partners, GrowCo or Parent).

2.7     **Compliance with Other Instruments**.

(a)     Partners is not in violation or default of any provision of (i) its Articles of Organization, (ii) any judgment, order, writ or decree to which Partners or its properties are subject, (iii) any note, indenture, mortgage, lease, or other agreement or contract to which Partners is a party or by which it is bound, the violation of which would have a Partners MAE,

4

or (iv) to its knowledge, any provision of federal or state statute, rule or regulation applicable to Partners, the violation of which would have a Partners MAE.  The execution and delivery of this Agreement, the Exchange Agreement, the Security Agreement or the Support Agreement and the consummation of the transactions contemplated thereby will not (A) violate any provision of the Articles of Organization of Partners or any judgment, order, writ or decree to which Partners or its properties are subject, (B) violate or constitute, with or without the passage of time and giving of notice, a default under any note, indenture, mortgage, lease, or other agreement or contract to which Partners is a party or by which it is bound, (C) except as contemplated in connection with the Security Agreement, result in the creation of any lien, charge or encumbrance upon any assets of Partners or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to Partners, or (D) violate any provision of federal or state statute, rule or regulation applicable to Partners.

(b)   GrowCo is not in violation or default of any provision of (i) its Articles of Incorporation, (ii) any judgment, order, writ or decree to which GrowCo or its properties are subject, (iii) any note, indenture, mortgage, lease, or other agreement or contract to which GrowCo is a party or by which it is bound, the violation of which would have a GrowCo MAE, or (iv) to its knowledge, any provision of federal or state statute, rule or regulation applicable to GrowCo, the violation of which would have a GrowCo MAE.  The execution and delivery of GrowCo OU Warrants and the consummation of the transactions contemplated thereby will not (A) violate any provision of the Articles of Incorporation of GrowCo or any judgment, order, writ or decree to which GrowCo or its properties are subject, (B) violate or constitute, with or without the passage of time and giving of notice, a default under any note, indenture, mortgage, lease, or other agreement or contract to which GrowCo is a party or by which it is bound, (C) result in the creation of any lien, charge or encumbrance upon any assets of GrowCo or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to GrowCo, or (D) violate any provision of federal or state statute, rule or regulation applicable to GrowCo.

(c)   Parent is not in violation or default of any provision of (i) its Articles of Incorporation, (ii) any judgment, order, writ or decree to which Parent or its properties are subject, (iii) any note, indenture, mortgage, lease, or other agreement or contract to which Parent is a party or by which it is bound, the violation of which would have a Parent MAE, or (iv) to its knowledge, any provision of federal or state statute, rule or regulation applicable to Parent, the violation of which would have a Parent MAE.  The execution and delivery of the Exchange Agreement and the Support Agreement and the consummation of the transactions contemplated thereby will not (A) violate any provision of the Articles of Incorporation of Parent or any judgment, order, writ or decree to which Parent or its properties are subject, (B) violate or constitute, with or without the passage of time and giving of notice, a default under any note, indenture, mortgage, lease, or other agreement or contract to which Parent is a party or by which it is bound, (C) except as contemplated in connection with the Support Agreement result in the creation of any lien, charge or encumbrance upon any assets of Parent or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to Parent, or (D) violate any provision of federal or state statute, rule or regulation applicable to Parent.

2.8   **Permits**.

(a)   Partners has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a Partners

MAE.  Partners is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

(b)    GrowCo has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a GrowCo MAE.  GrowCo is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

(c)    Parent has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a Parent MAE.  Parent is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

3.    **Representations and Warranties of the Investors**.  Each Investor, severally and not jointly, hereby represents and warrants to Partners as follows:

3.1    **Authorization**.  If the Investor is a partnership, corporation, limited liability company or other entity, it has full power and authority to enter into each of this Agreement, the LLC Agreement and the Exchange Agreement.  This Agreement constitutes, and upon execution thereof by the Investor at the Closing the LLC Agreement and the Exchange Agreement will constitute, valid and legally binding obligations of the Investor, enforceable against the Investor in accordance with their respective terms, except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

3.2    **Purchase Entirely for Own Account**.  The Offered Units to be acquired by the Investor at the Closing will be acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and the Investor has no present intention of selling, granting any participation in or otherwise distributing any of such Offered Units, any of the Partners Preferred Units or GrowCo OU Warrant comprising such Offered Units, or any Parent Common Shares received pursuant to the Exchange Agreement.  The Investor does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participations with respect to any of such Offered Units, any of the Partners Preferred Units or GrowCo OU Warrant comprising such Offered Units, or any Parent Common Shares received pursuant to the Exchange Agreement.  The Investor has not been formed for the specific purpose of acquiring such Offered Units, Partners Preferred Units, GrowCo OU Warrant or Parent Common Shares.

3.3    **Disclosure of Information**.  The Investor has had an opportunity to discuss the business, management and financial affairs of Partners, GrowCo and Parent, and the terms and conditions of the offering of the Offered Units, with the management of Partners, GrowCo and Parent.  The foregoing, however, does not limit or modify the representations and warranties of Partners in Section 2 or the right of the Investor to rely thereon.

3.4    **Restricted Securities**.  The Investor understands that the Partners Preferred Units and GrowCo OU Warrant included in the Offered Units to be acquired by the Investor at the Closing, any GrowCo Common Shares acquired by the Investor upon exercise of such GrowCo OU Warrant, and any Parent Common Shares acquired by the Investor upon exchange pursuant to the Exchange Agreement, have not been, and will not be, registered under the Securities Act, by reason of specific exemptions from the registration provisions of the Securities Act that depend upon, among other things, the bona fide nature of the Investor's investment intent and the accuracy of the Investor's

representations as set forth in this Section 3. The Investor understands that such Partners Preferred Units and GrowCo OU Warrant are, and any such GrowCo Common Shares and Parent Common Shares will be, "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to those laws, the Investor may be required to hold such securities indefinitely unless they are registered with the Securities and Exchange Commission and qualified with state authorities or unless an exemption from such registration and qualification requirements is available. The Investor acknowledges that none of Partners, GrowCo and Parent has any obligation to so register or qualify any of such securities for resale. The Investor further acknowledges that if an exemption from registration or qualification is available, such exemption may be conditioned on numerous requirements (including the time and manner of sale and the period for which held), including requirements relating to Partners, GrowCo and/or Parent that are outside of the Investor's control and that Partners, GrowCo and Parent are under no obligation to, and may not be able to, satisfy. The Investor understands that the offering and sale of securities contemplated by this Agreement, the GrowCo OU Warrants and the Exchange Agreement is not intended to be part of a public offering, and that the Investor will not be able to rely on the protection of Section 11 of the Securities Act.

3.5   **No Public Market**. The Investor understands that no public market now exists for the Partners Preferred Units, GrowCo OU Warrants or GrowCo Common Shares, and confirms that none of Partners, GrowCo and Parent have made any assurances that a public market will ever exist for the Partners Preferred Units, GrowCo OU Warrants or GrowCo Common Shares.

3.6   **Accredited Investor**. The Investor is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act or has otherwise delivered to Partners, GrowCo and Parent a supplemental letter of investment representations in a form provided by Partners.

3.7   **No General Solicitation**. Neither the Investor nor any of its shareholders, partners, members, managers, directors, officers, employees or agents has directly or indirectly, including through a broker or finder, published any advertisement or otherwise engaged in any general solicitation in connection with the offer and sale of the Offered Units, the Partners Preferred Units or GrowCo OU Warrants comprising Offered Units, or any Parent Common Shares issuable pursuant to the Exchange Agreement.

3.8   **Exculpation Among Investors**. The Investor acknowledges that it is not relying upon any person or entity, other than Partners, GrowCo and Parent and their managers, directors and officers in making its decision to purchase Offered Units and thereby invest or potentially investor in Partners, GrowCo or Parent. No Investor or its controlling persons or entities, officers, directors, partners, agents, or employees shall be liable to any other Investor for any action heretofore taken or omitted to be taken by any of them in connection with the purchase of the Offered Units.

3.9   **Residence**. If the Investor is an individual, the Investor resides in the state or province identified in the address of the Investor set forth on SCHEDULE 1. If the Investor is a partnership, corporation, limited liability company or other entity, the office of the Investor in which its principal place of business is identified in the address of the Investor set forth on SCHEDULE 1.

4.   **Conditions to Obligations of Investors at Closing**. The obligations of each Investor to purchase Offered Units from Partners at the Closing are subject to the fulfillment, at or prior to the Closing, of each of the following conditions, unless otherwise waived:

4.1   **Representations and Warranties**. The representations and warranties of Partners contained in Section 2 shall be true and correct in all respects as of the Closing.

7

4.2 **Performance**. Partners shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by Partners at or prior to the Closing.

5. **Conditions to Obligations of Partners at Closing**. The obligations of Partners to sell Offered Units to any Investor at the Closing are subject to the fulfillment, at or prior to the Closing, of each of the following conditions, unless otherwise waived:

5.1 **Representations and Warranties**. The representations and warranties of such Investor contained in Section 3 shall be true and correct in all respects as of the Closing.

5.2 **Performance**. Such Investor shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by such Investor at or prior to the Closing.

6. **Post-Closing Covenants of Partners**.

6.1 **Use of Proceeds**. Partners will use the proceeds from the sale of the Offered Units primarily to finance the construction of a greenhouse for leasing to marijuana growers, to loan working capital to one or more greenhouse lessees pursuant to one or more lines of credit, to purchase farmland and water taps for such greenhouse, and for working capital and other general corporate purposes of Partners.

6.2 **Security Agreement**. Partners will prepare, execute and deliver, within sixty days after the date of the Closing, a pledge and security agreement in favor of the holders of Partners Preferred Units (the "**Security Agreement**"), which agreement shall comply with the requirements of Section 13.03(c) of the LLC Agreement and shall be in a form approved by a majority of the Board of Managers of Partners, including at least one of the Preferred Managers (as defined in the LLC Agreement), following the Closing.

6.3 **Support Agreement**. Partners will prepare, execute and deliver, within sixty days after the date of the Closing, a land and water support agreement with Parent (the "**Support Agreement**"), which agreement shall confirm the agreement of Parent to make available those land and water resources of Parent to be used in connection with the operation of the greenhouse referenced in Section 6.1 and shall be in a form approved by a majority of the Board of Managers of Partners, including at least one of the Preferred Managers, following the Closing.

7. **Miscellaneous**.

7.1 **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the Party to be notified; (b) when sent by confirmed facsimile or email if sent during normal business hours of the recipient or, if not, then on the next Business Day; (c) three Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one Business Day after deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt. Such communications shall be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 7.1):

<table>
<tr><td>If to Partners:</td><td>2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado  80222<br>Facsimile:  (303) 845-9400<br>E-mail:  info@2riverswater.com<br>Attention:  Chief Financial Officer</td></tr>
<tr><td>with a copy to:</td><td>K&L Gates LLP<br>One Lincoln Street<br>Boston, Massachusetts  02111-2950<br>Facsimile:  (617) 261-3175<br>E-mail:  mark.johnson@klgates.com<br>Attention:  Mark L. Johnson</td></tr>
</table>

If to an Investor, to the mailing address thereof set forth on SCHEDULE 1.  For purposes hereof, "**Business Day**" shall mean a day other than a Saturday or Sunday or a day on which banks in Colorado are authorized or required by law to close.

7.2   **Severability**.  If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under applicable law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

7.3   **Entire Agreement**.  This Agreement (including the Schedule and Exhibits hereto and including, with respect to any Investor, any supplemental letter of investment representations delivered by such Investor pursuant to Section 3.6), the LLC Agreement (including the Exhibit and Schedule thereto) and the Exchange Agreement constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

7.4   **Survival of Warranties**.   Unless otherwise set forth in this Agreement, the representations and warranties of the Parties contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of, or any knowledge of, the other Parties.

7.5   **Interpretation**.  For purposes of this Agreement:

(a)   headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b)   any references herein to a Section, Schedule or Exhibit refer to a Section of, or Schedule or Exhibit attached to, this Agreement, unless specified otherwise;

(c)   the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(d)   the words "include," "included" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(e)   the word "or" is not exclusive;

(f)   the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(g)   whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(h)   unless the context otherwise requires, (i) references herein to an agreement, instrument or other document (including this Agreement) mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (ii) references herein to a statute means such statute as amended from time to time and include any successor legislation thereto and any rules and regulations promulgated thereunder; and

(i)   this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

7.6   **Successors and Assigns**.  No Investor may assign its rights, remedies, obligations or liabilities under this Agreement without the written consent of Partners, and Partners may not assign its rights, remedies, obligations or liabilities under this Agreement without the written consent of Investors purchasing a majority of the Offered Units issued or to be issued hereunder.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective permitted successors and assigns of the Parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties or their respective permitted successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

7.7   **Amendments and Waivers**.  Except as otherwise expressly provided herein, any term of this Agreement may be amended, terminated or waived only with the written consent of Partners and Investors purchasing a majority of the Offered Units issued or to be issued hereunder.  Any amendment, termination or waiver effected in accordance with this Section 7.7 shall be binding upon Partners and all of the Investors.

7.8   **Governing Law**.  This Agreement shall be governed by the internal law of the State of Colorado.

7.9   **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the ESIGN Act of 2000, *e.g.*, *www.docusign.com*) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and to be valid and effective for all purposes.

7.10  **Dispute Resolution**.

(a)   The Parties (i) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Colorado and to the jurisdiction of the United States District Court for the

10

State of Colorado for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (ii) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Colorado or the United States District Court for the District of Colorado, and (iii) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

(b)     WAIVER OF JURY TRIAL:  EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS.  EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

(c)     Each Party will bear its own costs in respect of any disputes arising under this Agreement.  Each of the Parties consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Colorado or any court of the State of Colorado having subject matter jurisdiction.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, each of the Parties has executed this Agreement, or has caused this Agreement to be executed by its officer thereunto duly authorized, as of the date first written above.

**GROWCO PARTNERS 1, LLC**

By: _____
     Name:
     Title:

**SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT**

*[For Investors that are entities:]*

                               _____

                               Print or Type Name of Investor

Number of Offered Units for
  which Investor is subscribing
  (at $1.00 per Offered Unit):              By: _____

                                     Name: _____

_____                 Title: _____

 

*[For Investors who are individuals:]*

                               _____

Number of Offered Units for
  which Investor is subscribing
  (at $1.00 per Offered Unit)              Signature

                               _____

_____                 Print or Type Name

**SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT**

**SCHEDULE OF INVESTORS**

*[Investor Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Investor Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Investor Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Investor Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Investor Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Investor Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Investor Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Investor Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

EXHIBIT A

**LLC AGREEMENT**

EXHIBIT B

**FORM OF GROWCO OU WARRANT**

Exhibit C

**FORM OF EXCHANGE AGREEMENT**

*Draft of 11/19/14*

LIMITED LIABILITY COMPANY AGREEMENT

among

GROWCO PARTNERS 1, LLC

and

MEMBERS NAMED IN SCHEDULE 1

Dated as of November \_\_\_, 2014

<b>T<small>ABLE OF</small> C<small>ONTENTS</small></b>

**Page**

**ARTICLE I** DEFINITIONS ........................................................................................ 1
   Section 1.01 . Definitions .................................................................................. 1
   Section 1.02 . Interpretation ............................................................................. 7

**ARTICLE II** ORGANIZATION ............................................................................... 8
   Section 2.01 . Formation .................................................................................. 8
   Section 2.02 . Name ......................................................................................... 8
   Section 2.03 . Principal Office ......................................................................... 8
   Section 2.04 . Registered Office and Agent .................................................... 8
   Section 2.05 . Purpose and Powers ................................................................. 8
   Section 2.06 . Term .......................................................................................... 8
   Section 2.07 . No State-Law Partnership ........................................................ 8

**ARTICLE III** UNITS ................................................................................................ 9
   Section 3.01 . Units Generally ......................................................................... 9
   Section 3.02 . Authorization and Issuance of Preferred Units ........................ 9
   Section 3.03 . Authorization and Issuance of Common Units .......................... 9
   Section 3.04 . Certification of Units ................................................................. 9
   Section 3.05 . Action by Consent .................................................................... 10

**ARTICLE IV** MEMBERS .......................................................................................... 10
   Section 4.01 . Admission of New Members .................................................... 10
   Section 4.02 . Representations and Warranties of Members .......................... 10
   Section 4.03 . No Personal Liability ............................................................... 11
   Section 4.04 . No Withdrawal ......................................................................... 11
   Section 4.05 . Death ......................................................................................... 12
   Section 4.06 . Voting ....................................................................................... 12
   Section 4.07 . Power of Members .................................................................... 12
   Section 4.08 . No Interest in Company Property ............................................ 12

**ARTICLE V** CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS .................... 12
   Section 5.01 . Existing Capital Contributions ................................................ 12
   Section 5.02 . Additional Capital Contributions ............................................ 12
   Section 5.03 . Maintenance of Capital Accounts............................................ 12
   Section 5.04 . Quarterly Yield on Preferred Units .......................................... 13
   Section 5.05 . Succession Upon Transfer ....................................................... 13
   Section 5.06 . Negative Capital Accounts ...................................................... 13
   Section 5.07 . No Withdrawal ......................................................................... 13
   Section 5.08 . Treatment of Loans From Members ......................................... 14
   Section 5.09 . Modifications ............................................................................ 14

**ARTICLE VI** ALLOCATIONS ................................................................................. 14
   Section 6.01 . Allocation of Net Income and Net Loss ................................... 14
   Section 6.02 . Regulatory and Special Allocations ........................................ 14
   Section 6.03 . Tax Allocations ........................................................................ 15
   Section 6.04 . Allocations in Respect of Transferred Units ........................... 16
   Section 6.05 . Curative Allocations ................................................................ 16

i

**ARTICLE VII** DISTRIBUTIONS ....................................................................................... 16
    Section 7.01 . Preferred Yield Distributions ............................................................. 16
    Section 7.02 . Participating Distributions ................................................................. 17
    Section 7.03 . Other Distributions ........................................................................... 17
    Section 7.04 . Tax Withholding; Withholding Advances .......................................... 18
    Section 7.05 . Distributions in Kind ........................................................................ 19
    Section 7.06 . Compliance with Law ....................................................................... 20

**ARTICLE VIII** MANAGEMENT ..................................................................................... 20
    Section 8.01 . Establishment of the Board ............................................................... 20
    Section 8.02 . Board Composition; Vacancies ........................................................ 20
    Section 8.03 . Removal; Resignation ....................................................................... 21
    Section 8.04 . Meetings ........................................................................................... 21
    Section 8.05 . Quorum; Manner of Acting .............................................................. 21
    Section 8.06 . Action By Written Consent ............................................................... 22
    Section 8.07 . Manager Status ................................................................................ 22
    Section 8.08 . Committees ....................................................................................... 22
    Section 8.09 . Officers ............................................................................................ 23
    Section 8.10 . No Personal Liability ........................................................................ 23

**ARTICLE IX** EXCHANGES OF PREFERRED UNITS ................................................. 23
    Section 9.01 . Exchange Agreement ........................................................................ 23
    Section 9.02 . Transfer of Preferred Units Upon Exchange ..................................... 23

**ARTICLE X** TRANSFERS ............................................................................................... 23
    Section 10.01 . General Restrictions on Transfer .................................................... 23

**ARTICLE XI** CONFIDENTIALITY ................................................................................ 24
    Section 11.01 . Nondisclosure ................................................................................. 24
    Section 11.02 . Permitted Disclosures ..................................................................... 25
    Section 11.03 . Excluded Information ...................................................................... 25

**ARTICLE XII** TAX MATTERS ...................................................................................... 25
    Section 12.01 . Tax Matters Member ....................................................................... 25
    Section 12.02 . Tax Returns .................................................................................... 26
    Section 12.03 . Company Funds .............................................................................. 26

**ARTICLE XIII** DISSOLUTION AND LIQUIDATION .................................................. 26
    Section 13.01 . Events of Dissolution ...................................................................... 26
    Section 13.02 . Effectiveness of Dissolution ........................................................... 27
    Section 13.03 . Liquidation ..................................................................................... 27
    Section 13.04 . Cancellation of Articles .................................................................. 28
    Section 13.05 . Survival of Rights, Duties and Obligations ..................................... 28
    Section 13.06 . Recourse for Claims ....................................................................... 28

**ARTICLE XIV** EXCULPATION AND INDEMNIFICATION........................................ 28
    Section 14.01 . Exculpation of Covered Persons...................................................... 28
    Section 14.02 . Liabilities and Duties of Covered Persons ....................................... 29
    Section 14.03 . Indemnification ............................................................................... 29
    Section 14.04 . Survival........................................................................................... 31

**ARTICLE XV** MISCELLANEOUS ...................................................................................... 31
    Section 15.01 . Further Assurances ................................................................................. 31
    Section 15.02 . Notices ................................................................................................... 31
    Section 15.03 . Severability ............................................................................................ 32
    Section 15.04 . Entire Agreement .................................................................................. 32
    Section 15.05 . Successors and Assigns ........................................................................ 32
    Section 15.06 . No Third-Party Beneficiaries ............................................................... 32
    Section 15.07 . Amendment ........................................................................................... 32
    Section 15.08 . Waiver ................................................................................................... 32
    Section 15.09 . Governing Law ..................................................................................... 32
    Section 15.10 . Submission to Jurisdiction ................................................................... 33
    Section 15.11 . Waiver of Jury Trial ............................................................................. 33
    Section 15.12 . Equitable Remedies .............................................................................. 33
    Section 15.13 . Remedies Cumulative ........................................................................... 33

EXHIBIT A       Form of Joinder Agreement
SCHEDULE 1     Member Schedule

THIS LIMITED LIABILITY COMPANY AGREEMENT of GrowCo Partners 1, LLC, a Colorado limited liability company (the "**Company**"), is entered into as of November ___, 2014 among the Company, TR Capital Partners, LLC and each other individual or entity that after the date hereof becomes a member of the Company and a party hereto by executing a Joinder Agreement (as defined below).

RECITALS

WHEREAS, the Company was formed under the laws of the State of Colorado by the filing of Articles of Organization with the Secretary of State of the State of Colorado on October 31, 2014 (the "**Articles of Organization**");

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

Section 1.01.   **Definitions**.   The following terms shall have the meanings set forth or referenced below:

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

This "**Agreement**" means this Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of:

(a)   constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority;

(b)   any consents or approvals of any Governmental Authority; and

(c)   any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Articles of Organization**" has the meaning set forth in the Recitals.

"**Board**" means the board of managers of the Company established in accordance with Section 8.01.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount that bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost

recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided* that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Board in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)  the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)  immediately prior to the Distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such Distribution;

(c)  the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as determined by the Board, as of the following times:

(i)  the acquisition of additional Units in the Company by a new or existing Member in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii)  the Distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii)  the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

*provided* that adjustments pursuant to clauses (i), (ii) and (iii) above need not be made if the Board reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d)  the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided* that Book Values shall not be adjusted pursuant to this clause (d) to the extent that an adjustment pursuant to clause (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e)  if the Book Value of a Company asset has been determined pursuant to clause (a) above or adjusted pursuant to clause (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Capital Account**" has the meaning set forth in Section 5.03.

"**Capital Contribution**" means, for any Member, the total amount of cash and property contributed to the Company by such Member, as set forth opposite the name of such Member in the Member Schedule.

"**Code**" means the Internal Revenue Code of 1986.

"**Colorado Act**" means the Colorado Limited Liability Company Act, Title 7, Article 80, Section s 80-101, *et seq.*, and any successor statute, as it may be amended from time to time.

"**Common Managers**" has the meaning set forth in Section 8.02(a)(i).

"**Common Members**" means the Members who own Common Units as listed in the Member Schedule.

"**Common Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in this Agreement.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 11.01.

"**Covered Person**" has the meaning set forth in Section 14.01(a).

"**Credit Facility**" means a credit facility agreement entered into by the Company, as lender, and a lessee under a Lease Agreement.

"**Distribution**" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided* that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Units; (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as a Manager, Officer or employee of the Company or a Subsidiary. "**Distribute**" when used as a verb shall have a correlative meaning.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Exchange Agreement**" means the Exchange Agreement dated as of the date hereof among the Company, Two Rivers and the Holders listed on Schedule 1 thereto.

"**Fair Market Value**" means, with respect to an asset as of a specified date, the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's-length transaction on such date, as determined in good faith by the Board based on such factors as the Board, in the exercise of its reasonable business judgment, considers relevant.

"**Fiscal Quarter**" means the first three-month period, second three-month period, third three-month period or fourth three-month period of a Fiscal Year.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to the Company's taxable year.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Joinder Agreement**" means a written undertaking substantially in the form of the joinder agreement attached as EXHIBIT A.

"**Lease Agreement**" means a lease agreement entered into by the Company, as lessor, and a third-party lessee in connection with the leasing of any greenhouse that is owned by the Company or an Affiliate thereof, if the construction or other acquisition of such greenhouse was funded (in whole or in part) with $50,000 or more of proceeds from the sale of Preferred Units.

"**Liquidator**" has the meaning set forth in Section 13.03(a).

"**Losses**" has the meaning set forth in Section 14.03(a).

"**Manager**" has the meaning set forth in Section 8.01.

"**Member**" means:

(a)     TRCP, which as of the date of this Agreement holds 6,000,000 Common Units, has executed this Agreement and is identified as a Member on the Member Schedule, so long as it continues to be shown on the Member Schedule (as updated from time to time) as the owner of one or more Units; and

(b)     each other Person who is admitted as a Member in accordance with the terms of this Agreement and the Colorado Act, in each case so long as such Person is shown on the Member Schedule (as updated from time to time) as the owner of one or more Units.

The Members shall constitute the "members" (as that term is defined in the Colorado Act) of the Company.

"**Member Nonrecourse Debt Minimum Gain**" means, with respect to any "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4) (substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires), an amount equal to the Company Minimum Gain that would result if such debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Schedule**" has the meaning set forth in Section 3.01.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable, to:

4

(a)   a Distributive share of Net Income, Net Losses and other items of income, gain, loss and deduction of the Company,

(b)   a Distributive share of the assets of the Company,

(c)   vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement, and

(d)   any and all other benefits to which such Member may be entitled as provided in this Agreement or the Colorado Act.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year, Fiscal Quarter or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a)   any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)   any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(i) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)   any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d)   any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e)   if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f)   to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Section 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Officers**" has the meaning set forth in Section 8.09.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Preferred Managers**" has the meaning set forth in Section 8.02(a)(ii).

"**Preferred Members**" means Members who own Preferred Units as listed in the Member Schedule.

"**Preferred Units**" means Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Preferred Units" in this Agreement.

"**Quarterly Distributable Amount**" means, with respect to a Fiscal Quarter, the sum of: (a) the Company's cash flow from operations for such Fiscal Quarter, as determined in accordance with applicable U.S. generally accepted accounting principles in effect from time to time; (b) the total amount of principal and interest received by the Company during such Fiscal Quarter pursuant to payments made under any Credit Facility; and (c) the total amount of deferred lease payments received by the Company during such Fiscal Quarter pursuant to any Lease Agreement.

"**Quarterly Yield**" has the meaning set forth in Section 5.04.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933.

"**Security Agreement**" means the pledge and security agreement to be entered into by the Company in favor of the Preferred Members, pursuant to Section 13.03(c).

"**Subsidiary**" means any Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the Company.

"**Tax Matters Member**" has the meaning set forth in Section 12.01.

"**Taxing Authority**" has the meaning set forth in Section 7.05(b).

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person. "**Transfer**" when used as a noun shall have a correlative meaning. "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**TRCP**" means TR Capital Partners, LLC, a Colorado limited liability company, or any of its successors or assigns.

"**Treasury Regulations**" means final or temporary regulations issued by the U.S. Department of Treasury pursuant o authority under the Code, and any successor regulations.

"**Two Rivers**" means Two Rivers Water and Farming Company, a Colorado corporation, or any successor thereto.

"**Unit**" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including Preferred Units and Common Units, *provided* that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Withholding Advances**" has the meaning set forth in Section 7.04(b).

Section 1.02.  **Interpretation**.  For purposes of this Agreement:

(a)   headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b)   any references herein to an Article, Section or Exhibit refer to an Article or Section of, or Exhibit attached to, this Agreement, unless specified otherwise;

(c)   the word "day" refers to a calendar day;

(d)   the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(e)   the words "include," "includes" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(f)   the word "or" is not exclusive;

(g)   the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(h)   whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i)   unless the context otherwise requires, (1) references herein to an agreement, instrument or other document mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (2) references herein to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and

(j)   this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

## ARTICLE II
### ORGANIZATION

Section 2.01.  **Formation**.

(a)   The Company was formed on October 31, 2014, pursuant to the provisions of the Colorado Act, upon the filing of the Articles of Organization with the Secretary of State of the State of Colorado.

(b)   This Agreement shall constitute the "operating agreement" (as that term is used in the Colorado Act) of the Company.   The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Colorado Act and this Agreement.   To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Colorado Act in the absence of such provision, this Agreement shall, to the extent permitted by the Colorado Act, control.

Section 2.02.  **Name**.  The name of the Company shall be "GrowCo Partners 1, LLC" or such other name or names as the Board may from time to time designate; *provided* that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."

Section 2.03.  **Principal Office**.  The principal office of the Company shall be located at 2000 South Colorado Boulevard**,** Tower 1, Suite 3100, Denver, Colorado, or such other place as may from time to time be determined by the Board.   The Board shall give prompt notice of any such change to each of the Members.

Section 2.04.  **Registered Office and Agent**.

(a)   The registered office of the Company shall be the office of the initial registered agent named in the Articles of Organization or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

(b)   The registered agent for service of process on the Company in the State of Colorado shall be the initial registered agent named in the Articles of Organization or such other Person or Persons as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

Section 2.05.  **Purpose and Powers**.

(a)   The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Colorado Act and in any and all activities necessary or incidental thereto.

(b)   The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Colorado Act.

Section 2.06.   **Term**.   The term of the Company commenced on October 31, 2014, and shall continue perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.07.  **No State-Law Partnership**.  The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes.   The Company and

8

each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment.  The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member, Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this Section 2.07.

## ARTICLE III
### UNITS

Section 3.01.  **Units Generally**.  Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series.  Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series.  The Board shall maintain a schedule (the "**Member Schedule**") setting forth the name and address of each Member and, with respect to each type, class or series of Units held by such Member, (a) the number and issue date thereof, (b) the number of the certificate (if any) issued therefor, (c) the Capital Contribution of the Member with respect thereto, and (d) such other information as the Board may determine to be desirable.  The Company shall update the Member Schedule upon the issuance or Transfer of any Units to any new or existing Member.  A copy of the Member Schedule as of the date of this Agreement is attached as SCHEDULE 1.

Section 3.02.  **Authorization and Issuance of Preferred Units**.  Subject to compliance with Section 10.01(a), the Company is hereby authorized to issue a class of Units designated as Preferred Units, of which no Preferred Units are outstanding as of the date of this Agreement.  The Company may issue up to a total of 10,000,000 Preferred Units.

Section 3.03.  **Authorization and Issuance of Common Units**.  The Company is hereby authorized to issue a class of Units designated as Common Units.  As of the date hereof, (a) a total of 6,000,000 Common Units have been issued and are outstanding and (b) a total of 4,000,000 Common Units are subject to purchase by TRCP at a price of $0.0001 per Common Unit pursuant to the terms of a warrant issued by the Company to TRCP.  TRCP is entitled to exercise such warrant to purchase Common Units only to the extent that more than 6,000,000 Preferred Units are issued, and such limitation on exercise may not be amended or modified without the approval of the Board, including at least one Preferred Member.

Section 3.04.  **Certification of Units**.  The Board shall cause the Company to issue to each Member a certificate or certificates representing the Units held by the Member.  In addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

"THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY.  NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

"THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE

REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUE THAT SUCH REGISTRATION IS NOT REQUIRED."

Section 3.05.  **Action by Consent**.  Any matter that is to be voted on, consented to or approved by the holders of one or more types, classes or series of Membership Interests (including Common Units and Preferred Units) may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than a majority of such types, classes or series of Membership Interests.  A record shall be maintained by the Board of each such action taken by written consent of a Member or Members.

## ARTICLE IV
### MEMBERS

Section 4.01.  **Admission of New Members**.

(a)   New Members may be admitted from time to time subject to compliance with the provisions of Section 4.01(b) and, in connection with a Transfer of Units, Article X.

(b)   In order for any Person not already a Member to be admitted as a Member, whether pursuant to an issuance or a Transfer of Units, such Person shall have executed and delivered a Joinder Agreement to the Company.  Upon the amendment of the Member Schedule by the Board and the satisfaction of any other applicable conditions (including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units), such Person shall be admitted as a Member and issued such Units and the Board shall adjust the Capital Accounts of the Members as necessary in accordance with Section 5.03.

Section 4.02.  **Representations and Warranties of Members**.  By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date hereof or pursuant to Section 4.01, represents and warrants to the Company and acknowledges that:

(a)   The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with.

(b)   Such Member is an "accredited investor" within the meaning of Rule 501 under the Securities Act and agrees that such Member will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 under the Securities Act with respect to the offer and sale of the Units.

(c)   Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof.

(d)   Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Subsidiaries, and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company and the Subsidiaries for such purpose.

(e)   The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the

10

advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Subsidiaries that may have been made or given by any other Member or by any agent or employee of any other Member.

(f)    Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto.

(g)    Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time.

(h)    The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound.

(i)    This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

(j)    Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of the Company or any Subsidiary or affect the right of the Company or any Subsidiary to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the Company or such Subsidiary, if applicable.

None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in any purchase agreement.

Section 4.03.   **No Personal Liability**.   Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company, any Subsidiary or any other Member, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 4.04.   **No Withdrawal**.   A Member shall not cease to be a Member as a result of the occurrence of any of the following:

(a)    the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets;

(b)    the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due;

(c)    the making by such Member of a general assignment for the benefit of such Member's creditors;

(d)    the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or

(e)   the expiration of sixty days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void.  As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

Section 4.05.   **Death**.  The death of any Member shall not cause the dissolution of the Company.  In such event the Company and its business shall be continued by the remaining Member or Members and the Units owned by the deceased Member shall automatically be Transferred to such Member's heirs; *provided* that within a reasonable time after such Transfer, the applicable heirs shall sign a Joinder Agreement.

Section 4.06.   **Voting**.  Except as otherwise provided by this Agreement (including Section 15.07) or as otherwise required by the Colorado Act or other Applicable Law, each Member shall be entitled to one vote per Common Unit and one vote per Preferred Unit (voting together as a single class) on all matters upon which the Members have the right to vote under this Agreement.

Section 4.07.   **Power of Members**.  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Colorado Act.  Except as otherwise specifically provided by this Agreement or required by the Colorado Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

Section 4.08.   **No Interest in Company Property**.  No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

## ARTICLE V
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 5.01.   **Existing Capital Contributions**.  TRCP has made the Capital Contribution giving rise to its initial Capital Account and is deemed to own 6,000,000 Common Units on the date hereof.

Section 5.02.   **Additional Capital Contributions**.

(a)   No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Board.

(b)   No Member shall be required to lend any funds to the Company or shall have any personal liability for the payment or repayment of any Capital Contribution by or to any other Member.

Section 5.03.   **Maintenance of Capital Accounts**.  The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance

with this Section 5.03.  Each Capital Account shall be established and maintained in accordance with the following provisions:

    (a)    Each Member's Capital Account shall be increased by the amount of:

        (i)    such Member's Capital Contributions, including such Member's initial Capital Contribution;

        (ii)    the amount of any increase in such Capital Account pursuant to Section 5.04;

        (iii)    any Net Income or other item of income or gain allocated to such Member pursuant to Article VI; and

        (iv)    any liabilities of the Company that are assumed by such Member or secured by any property Distributed to such Member.

    (b)    Each Member's Capital Account shall be decreased by:

        (i)    the cash amount or Book Value of any property Distributed to such Member pursuant to Article VII and Section 13.03(c);

        (ii)    the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to Article VI; and

        (iii)    the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

Section 5.04.  **Quarterly Yield on Preferred Units**.  Effective as of 11:59 p.m., Mountain time, on the final day of each Fiscal Quarter, the Capital Account balance of each Preferred Member shall be increased automatically by an amount equal to (a) a rate of return of 3.0% (or, if the Preferred Units held by such Preferred Member were not outstanding for the entire Fiscal Quarter, 3.0% multiplied by the percentage of the number of days in such Fiscal Quarter that such Preferred Units were outstanding), *multiplied by* (b) the amount of the Capital Account of such Preferred Member immediately prior to such time on such final day.  As used herein, the term "**Quarterly Yield**" shall mean, with respect to a specified Preferred Member for a specified Fiscal Quarter, the amount of the increase in such Preferred Member's Capital Account for such Fiscal Quarter as computed in connection with this Section 5.04.

Section 5.05.  **Succession Upon Transfer**.  In the event that any Membership Interests of Members are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units and, subject to Section 6.04, shall receive allocations and Distributions pursuant to Article VI, Article VII and Article XIII in respect of such Units.

Section 5.06.  **Negative Capital Accounts**.  In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

Section 5.07.  **No Withdrawal**.  No Member shall be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as provided in this Agreement.  No

Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any Distributions to any Members, in liquidation or otherwise.

Section 5.08.  **Treatment of Loans From Members**.  Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 5.03(a)(iv), if applicable.

Section 5.09.  **Modifications**.  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Board determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board may authorize such modifications.

## ARTICLE VI
### ALLOCATIONS

Section 6.01.  **Allocation of Net Income and Net Loss**.  For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 6.02 and the Preferred Unit Distributions set forth in Section 7.01, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the Distributions that would be made to such Member pursuant to Section 13.03(c) if the Company were dissolved and its affairs wound up, its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), the net assets of the Company were Distributed, in accordance with Section 13.03(c), to the Members immediately after making such allocations, minus (b) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

Section 6.02.  **Regulatory and Special Allocations**.  Notwithstanding the provisions of Section 6.01:

(a)   If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section s 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 6.02(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)   Any "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires, shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share

of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Section s 1.704-2(i)(4) and 1.704-2(j)(2). This Section 6.02(b) is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)   In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate, as quickly as possible, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

> (i)   crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704 1(b)(2)(ii)(c), 1.704 2(g)(1) and 1.704 2(I HBY); and

> (ii)   debiting to such Capital Account the items described in Treasury Regulations Sections 1.704 1(b)(2)(ii)(d)(4), (5) and (6).

This Section 6.02(c) is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)   The allocations set forth in Sections 6.02(a), (b) and (c) are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this Article VI (other than Sections 6.02(a), (b) and (c)), the allocations set forth in Sections 6.02(a), (b) and (c) shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the allocations to each Member in accordance with Sections 6.02(a), (b) and (c) shall be equal to the net amount that would have been allocated to such Member if the allocations in accordance with Sections 6.02(a), (b) and (c) had not occurred.

(e)   The Company and the Members acknowledge that allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) result from the allocations of Net Income and Net Loss provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) and, once required by applicable final or temporary guidance, allocations of Net Income and Net Loss will be made in accordance with Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) or any successor provision or guidance.

Section 6.03. **Tax Allocations**.

(a)   Subject to clauses (b) through (e) of this Section 6.03, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)   Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with

Code Section 704(c) and the traditional method of Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)   If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)   Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)   Allocations pursuant to this Section 6.03 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

Section 6.04.   **Allocations in Respect of Transferred Units**.   In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of Article X, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method.

Section 6.05.   **Curative Allocations**.   In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is:

(a)   not specified in this Article VI, or

(b)   clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)),

then the Board may allocate such item described in the foregoing clause (a), or reallocate such item described in the foregoing clause (b), to reflect such economic interests; *provided* that (i) no such allocation shall be made without the prior consent of each Member that would be adversely and disproportionately affected thereby and (ii) no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

## ARTICLE VII
### DISTRIBUTIONS

Section 7.01.   **Preferred Yield Distributions**.   Distributions pursuant to this Section 7.01 are subject only to Section 7.06, and no Distributions shall be made with respect to Common Units or any other Membership Interests unless and until all Distributions due under this Section 7.01 have been paid. The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2015, Distribute with respect to Preferred Units a total amount equal to the least of:

(a)   the aggregate Quarterly Yields of all Preferred Members for such Fiscal Quarter;

16

(b)    the Quarterly Distributable Amount with respect to such Fiscal Quarter; and

(c)    the aggregate amount of all Capital Accounts of Preferred Members as of the end of such Fiscal Quarter.

The total amount of Distributions, if any, due under this Section 7.01 with respect to a Fiscal Quarter shall be allocated and paid to Preferred Members as follows:   (i) if such total amount of Distributions is determined pursuant to the preceding clause (a), to each Preferred Member in an amount equal to such Preferred Member's Quarterly Yield for such Fiscal Quarter; (ii) if such total amount of Distributions is determined pursuant to the preceding clause (b), to the Preferred Member's pro rata in proportion to their holdings of Preferred Units as of the end of such Fiscal Quarter; and (iii) if such total amount of Distributions is determined pursuant to the preceding clause (c), to each Preferred Member in an amount equal to the amount of such Preferred Member's Capital Account as of the end of such Fiscal Quarter.

Section 7.02.   **Participating Distributions**.  Distributions pursuant to this Section 7.02 are subject only to Section 7.01 and Section 7.06, and no other Distributions shall be made with respect to Preferred Units, Common Units or any other Membership Interests unless and until all Distributions due under Section 7.01 and this Section 7.02 have been paid.   The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2015, Distribute with respect to those Common Units and Preferred Units that were outstanding for the entire Fiscal Quarter a total amount equal to the amount by which the Quarterly Distributable Amount with respect to such Fiscal Quarter exceeds the amount Distributable to Preferred Units in accordance with Section 7.01 for such Fiscal Quarter (that is, the amount, if any, by which the Quarterly Distributable Amount exceeds the amount determined pursuant to Section 7.01(a)).  The total amount of Distributions, if any, due under this Section 7.02 with respect to a Fiscal Quarter shall be allocated and paid:

(a)    if as of the end of such Fiscal Quarter any principal or interest under any Credit Facility is outstanding or any deferred lease amount under any Lease Agreement has not been paid in full, then to Preferred Members pro rata in proportion to their holdings of those Preferred Units that were outstanding for all of such Fiscal Quarter, *provided* that the amount Distributed to Preferred Members pursuant to this clause (a) shall not exceed the aggregate amount of all Capital Accounts of Preferred Members as of the end of such Fiscal Quarter (and any amount Distributable in excess thereof shall be paid in accordance with the following clause (b)); and

(b)    otherwise, to Preferred Members and Common Members pro rata in proportion to their holdings of those Preferred Units and Common Units, collectively, that were outstanding for all of such Fiscal Quarter (that is, for purposes of clarity, each Member shall receive a Distribution equal to the total amount to be so Distributed *multiplied by* a fraction, the numerator of which shall be the number of such Member's Preferred Units that were outstanding for all of such Fiscal Quarter plus the number of such Member's Common Units that were outstanding for all of such Fiscal Quarter and the denominator of which shall be the total number of Preferred Units outstanding plus the total number of Common Units outstanding, all such Units being determined as of the end of such Fiscal Quarter).

Section 7.03.   **Other Distributions**.

(a)    **General**.  After making all Distributions then due to Preferred Members under Section 7.01 and all Distributions then due to Preferred Members and Common Members under Section 7.02, and subject to Section 7.06, the Board shall have sole discretion regarding the amounts and timing of Distributions to Members, including to decide to forego payment of other Distributions in

17

order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company, which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies.

(b)   **Priority of Distributions**.  After making all Distributions then due to Preferred Members under Section 7.01 and all Distributions then due to Preferred Members and Common Members under Section 7.02, and subject to the priority of Distributions pursuant to Section 13.03(c), if applicable, all Distributions determined to be made by the Board pursuant to Section 7.02 shall be made in the following manner:

(i)   *first,* to the Preferred Members pro rata in proportion to their holdings of Preferred Units, until Distributions under this clause (a) equal the aggregate amount of Capital Contributions attributable to the Preferred Members in respect of their acquisitions of Preferred Units;

(ii)   *second,* to the Common Members pro rata in proportion to their holdings of Common Units, until Distributions under this clause (b) equal the aggregate amount of Capital Contributions attributable to the Common Members in respect of their acquisitions of Common Units; and

(iii)   *third*, any remaining amounts to the Members holding Common Units and/or Preferred Units pro rata in proportion to their holdings of Preferred Units and Common Units, collectively, as of the end of such Fiscal Quarter (determined consistently with the provisions set forth in Section 7.02(b).

Section 7.04.  **Tax Withholding; Withholding Advances**.

(a)   **Tax Withholding**.  If requested by the Board, each Member shall, if able to do so, deliver to the Board:

(i)   an affidavit in form satisfactory to the Board that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other Applicable Law;

(ii)   any certificate that the Board may reasonably request with respect to any such laws; and

(iii)   any other form or instrument reasonably requested by the Board relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Board the affidavit described in the preceding clause (i), the Board may withhold amounts from such Member in accordance with Section 7.04(b).

(b)   **Withholding Advances**.  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Member based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any Distribution or allocation by the Company of income or gain to such Member and to withhold the same from

18

Distributions to such Member. Any funds withheld from a Distribution by reason of this Section 7.04(b) shall nonetheless be deemed Distributed to the Member in question for all purposes under this Agreement and, at the option of the Board, shall be charged against the Member's Capital Account.

(c) **Repayment of Withholding Advances**. Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a Distribution to that Member shall be, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in *The Wall Street Journal* on the date of payment plus two percent per annum:

> (i) promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account); or

> (ii) with the consent of the Board, repaid by reducing the amount of the next succeeding Distribution or Distributions to be made to such Member (which reduction amount shall be deemed to have been Distributed to the Member, but shall not further reduce the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d) **Indemnification**. Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts Distributable or allocable to such Member. The provisions of this Section 7.04(d) and the obligations of a Member pursuant to Section 7.04(c) shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.04, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e) **Overwithholding**. Neither the Company nor the Board shall be liable for any excess taxes withheld in respect of any Distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

Section 7.05. **Distributions in Kind**.

(a) The Board is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company, *provided* that Distributions pursuant to Section 7.01 and Section 7.02 shall only be made in cash. In any non-cash Distribution, the securities or property so Distributed will be Distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be Distributed among the Members pursuant to Section 7.03.

19

(b)   Any Distribution of securities shall be subject to such conditions and restrictions as the Board determines are required or advisable to ensure compliance with Applicable Law.   In furtherance of the foregoing, the Board may require that Members execute and deliver such documents as the Board may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the Distributed securities and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

Section 7.06.   **Compliance with Law**.   Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate either Colorado Act Section 7-80-606 or any other Applicable Law.

# ARTICLE VIII
## MANAGEMENT

Section 8.01.   **Establishment of the Board**.   The Board is hereby established and shall be comprised of natural Persons (each such Person, a "**Manager**") who shall be appointed in accordance with the provisions of Section 8.02.  The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Board, and the Board shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement.

Section 8.02.   **Board Composition; Vacancies**.

(a)   The Company and the Members shall take such actions as may be required to ensure that the number of managers constituting the Board initially is two and, commencing as of the first day following the initial issuance of any Preferred Units and continuing at all times at which any Preferred Units are outstanding, five.  The Board shall be comprised as follows:

(i)   two individuals designated by the Common Members (the "**Common Managers**"), who initially shall be Tim Beall and John McKowen;

(ii)   effective as of the first day after the initial issuance of Preferred Units, two individuals designated by the Preferred Members (the "**Preferred Managers**"), who initially shall be • and •; and

(iii)   effective as of the first day after the initial issuance of Preferred Units, one individual (the "**Independent Manager**") who is not an Affiliate of the Company or any Member and who is acceptable to the Common Managers and the Preferred Managers.

(b)   In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of a Common Manager, then the Common Members shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

(c)   In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of a Preferred Manager, then the Preferred Members shall have the right to designate an individual to fill such vacancy and the Company and each

Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

(d)    In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of an Independent Manager, then the Common Managers and the Preferred Managers shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

Section 8.03.   **Removal; Resignation**.

(a)    **Common Managers**.  A Common Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of the Common Members.

(b)    **Preferred Managers**.  A Preferred Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of the Preferred Members.

(c)    **General**.  A Manager may resign at any time from the Board by delivering a written resignation to the Board.  Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event.  The Board's acceptance of a resignation shall not be necessary to make it effective.

Section 8.04.   **Meetings**.

(a)    **Generally**.  The Board shall meet at such time and at such place as the Board may designate.  Meetings of the Board may be held either in person or by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, at the principal office of the Company or such other place (either within or outside the State of Colorado) as may be determined from time to time by the Board.  Written notice of each meeting of the Board shall be given to each Manager at least 24 hours prior to each such meeting.

(b)    **Special Meetings**.  Special meetings of the Board shall be held on the call of any three Managers upon at least three days' written notice (if the meeting is to be held in person) or 24 hours' written notice (if the meeting is to be held by telephone communications or video conference) to the Managers, or upon such shorter notice as may be approved by all the Managers.  Any Manager may waive such notice as to himself.

(c)    **Attendance and Waiver of Notice**.  Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

Section 8.05.   **Quorum; Manner of Acting**.

(a)    **Quorum**.  A majority of the Managers serving on the Board shall constitute a quorum for the transaction of business of the Board.  At all times when the Board is conducting business at a meeting of the Board, a quorum of the Board must be present at such meeting.  If a quorum shall not be present at any meeting of the Board, then the Managers present at the meeting may adjourn the

meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(b) **Participation**.  Any Manager may participate in a meeting of the Board by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.  A Manager may vote or be present at a meeting either in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.

(c) **Binding Act**.  Each Manager shall have one vote on all matters submitted to the Board or any committee thereof.  With respect to any matter before the Board, the act of a majority of the Managers shall be the act of the Board.

Section 8.06.  **Action By Written Consent**.  Notwithstanding anything herein to the contrary, any action of the Board (or any committee of the Board) may be taken without a meeting if either (a) a written consent of a majority of the Managers on the Board (or committee) shall approve such action, *provided* that prior written notice of such action is provided to all Managers at least one day before such action is taken, or (b) a written consent constituting all of the Managers on the Board (or committee) shall approve such action.  Such consent shall have the same force and effect as a vote at a meeting where a quorum was present and may be stated as such in any document or instrument filed with the Secretary of State of Colorado.

Section 8.07.  **Manager Status**.

(a) **Reimbursement; Other Capacities**.  Managers shall be reimbursed for reasonable out-of-pocket expenses incurred in the performance of their duties as Managers, pursuant to such policies as are established by the Board from time to time.  Nothing contained in this Section 8.07 shall be construed to preclude any Manager from serving the Company in any other capacity and receiving reasonable compensation for such services.

(b) **No Employment**.  This Agreement does not, and is not intended to, confer upon any Manager any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any Manager.

Section 8.08.  **Committees**.

(a) **Establishment**.  The Board may, by resolution approved by a majority of the Managers (including at least one of the Preferred Managers), designate from among the Managers one or more committees, each of which shall be comprised of one or more Managers; *provided* that in no event may the Board designate any committee with all of the authority of the Board.  Subject to the immediately preceding proviso, any such committee, to the extent provided in the resolution forming such committee, shall have and may exercise the authority of the Board, subject to the limitations set forth in Section 8.08(b).  The Board at any time may, by resolution approved by a majority of the Managers, dissolve any committee or, by resolution approved by a majority of the Managers (including at least one of the Common Managers and at least one of the Preferred Managers), remove any member of a committee at any time.

(b) **Limitation of Authority**.  No committee of the Board shall have the authority of the Board in reference to:

(i) authorizing or making Distributions to Members;

    (ii)   authorizing the issuance of any Membership Interest;

    (iii)   approving a plan of merger or sale of the Company;

    (iv)   recommending to the Members a voluntary dissolution of the Company or a revocation thereof;

    (v)   filling vacancies in the Board; or

    (vi)   altering or repealing any resolution of the Board that by its terms provides that it shall not be so amendable or repealable.

Section 8.09.  **Officers**.  The Board may appoint individuals as officers of the Company (the "**Officers**") as it deems necessary or desirable to carry on the business of the Company and the Board may delegate to such Officers such power and authority as the Board deems advisable.  No Officer need be a Member or Manager.  Any individual may hold two or more offices of the Company.  Each Officer shall hold office until his successor is designated by the Board or until his earlier death, resignation or removal.  Any Officer may resign at any time upon written notice to the Board.  Any Officer may be removed by the Board (acting by majority vote of all Managers other than the Officer being considered for removal, if applicable) with or without cause at any time.  A vacancy in any office occurring because of death, resignation, removal or otherwise may, but need not, be filled by the Board.

Section 8.10.  **No Personal Liability**.  Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Manager will be obligated personally for any debt, obligation or liability of the Company or any Subsidiary, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

## ARTICLE IX
### EXCHANGES OF PREFERRED UNITS

Section 9.01.  **Exchange Agreement**.  Contemporaneously with its execution and delivery of a Joinder Agreement, each Preferred Member may, at its election, execute and deliver to the Company a joinder agreement or other written understanding pursuant to which such Preferred Member becomes a party to the Exchange Agreement, *provided* that the foregoing requirement shall not apply to Two Rivers in connection with its acquisition of Preferred Units upon exchanges pursuant to the Exchange Agreement as contemplated by Section 9.02.

Section 9.02.  **Transfer of Preferred Units Upon Exchange**.  Upon the effective time of an exchange of a Preferred Unit as provided in Article II of the Exchange Agreement and without limitation by Article X, such Preferred Unit shall be Transferred to Two Rivers and all rights under this Agreement with respect to such Preferred Unit, including the right to receive Distributions, shall accrue to the benefit of Two Rivers.

## ARTICLE X
### TRANSFERS

Section 10.01.  **General Restrictions on Transfer**.

    (a)   Each Member acknowledges and agrees that it will not, directly or indirectly, Transfer any of its Units, and the Company agrees that it shall not issue any Units:

(i) except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Units, if requested by the Company, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii) if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Code Section 7704(b) within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii) if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Colorado Act;

(iv) if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v) if such Transfer or issuance would cause a termination of the Company for federal income tax purposes;

(vi) if such Transfer or issuance would cause the Company or any of the Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940; or

(vii) if such Transfer or issuance would cause the assets of the Company or any of the Subsidiaries to be deemed "Plan Assets" as defined for purposes of the Employee Retirement Income Security Act of 1974 or result in any "prohibited transaction" thereunder involving the Company or any Subsidiary.

In any event, the Board may refuse the Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any Governmental Authority.

(b) Any Transfer or attempted Transfer of any Units in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the holder of such Units for all purposes of this Agreement.

## ARTICLE XI
### CONFIDENTIALITY

Section 11.01.  **Nondisclosure**.  Each Preferred Member acknowledges that during the term of this Agreement, he will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, the Subsidiaries and their Affiliates that are not generally known to the public, including information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Preferred Member acknowledges that:  (a) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (b) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (c) the Company

would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Preferred Member is subject, no Preferred Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Preferred Member monitoring and analyzing his investment in the Company or performing his duties as a Manager, Officer, employee, consultant or other service provider of the Company) at any time, including use for personal, commercial or proprietary advantage or profit, either during his association or employment with the Company or thereafter, any Confidential Information of which such Preferred Member is or becomes aware.  Each Preferred Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

Section 11.02.  **Permitted Disclosures**.  Nothing contained in Section 11.01 shall prevent any Preferred Member from disclosing Confidential Information:  (a) upon the order of any court or administrative agency; (b) upon the request or demand of any regulatory agency or authority having jurisdiction over such Preferred Member; (c) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (d) to the extent necessary in connection with the exercise of any remedy hereunder; (e) to other Members; (f) to such Preferred Member's Representatives who, in the reasonable judgment of such Preferred Member, need to know such Confidential Information and agree to be bound by the provisions of this Article XI as if a Preferred Member; or (g) to any potential Transferee in connection with a proposed Transfer of Units from such Preferred Member, as long as such Transferee agrees to be bound by the provisions of this Article XI as if a Preferred Member; *provided* that in the case of clause (a), (b) or (c), such Preferred Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

Section 11.03.  **Excluded Information**.  The restrictions of Section 11.01 shall not apply to Confidential Information that:  (a) is or becomes generally available to the public other than as a result of a disclosure by a Preferred Member in violation of this Agreement; (b) is or becomes available to a Preferred Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Preferred Member and any of its Representatives in compliance with this Agreement; (c) is or has been independently developed or conceived by such Preferred Member without use of Confidential Information; or (d) becomes available to the receiving Preferred Member or any of its Representatives on a non-confidential basis from a source other than the Company, any other Member or any of their respective Representatives; *provided* that such source is not known by the recipient of the Confidential Information to be bound by a confidentiality agreement with the disclosing Member or any of its Representatives.

## ARTICLE XII
### TAX MATTERS

Section 12.01.  **Tax Matters Member**.

(a)  **Appointment**.  The Members hereby appoint TRCP as the "**Tax Matters Member**" who shall serve as the "tax matters partner" (as such term is defined in Code Section 6231) for the Company.

(b)  **Tax Examinations and Audits**.  The Tax Matters Member is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.

Each Member agrees to cooperate with the Tax Matters Member and to do or refrain from doing any or all things reasonably requested by the Tax Matters Member with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings.  Each Member agrees that any action taken by the Tax Matters Member in connection with audits of the Company shall be binding upon such Members and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company.

(c)   **Income Tax Elections**.  The Tax Matters Member shall have sole discretion to make any income tax election it deems advisable on behalf of the Company; *provided* that the Tax Matters Member will make an election under Code Section 754, if requested in writing by Members holding a majority of the outstanding Common Units.  All determinations as to tax elections and accounting principles shall be made solely by the Tax Matters Member.

(d)   **Tax Returns and Tax Deficiencies**.  Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.  The Tax Matters Member shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority.  Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.04(d).

(e)   **Resignation**.  The Tax Matters Member may resign at any time.  If TRCP ceases to be the Tax Matters Member for any reason, the holders of a majority of the Common Units and Preferred Units, voting together as a single class, shall appoint a new Tax Matters Member.

Section 12.02.  **Tax Returns**.  At the expense of the Company, the Board (or any Officer that it may designate pursuant to Section 8.09) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company and the Subsidiaries own property or do business.  As soon as reasonably possible after the end of each Fiscal Year, the Board or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

Section 12.03.  **Company Funds**.  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Board.  The funds of the Company shall not be commingled with the funds of any other Person.  All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Board may designate.

## ARTICLE XIII
### DISSOLUTION AND LIQUIDATION

Section 13.01.  **Events of Dissolution**.  The Company shall be dissolved and is affairs wound up only upon the occurrence of any of the following events:

(a)   the determination of the Board to dissolve the Company;

(b)   an election to dissolve the Company made by holders of a majority of the Common Units;

(c)   the sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(d)   the entry of a decree of judicial dissolution under Colorado Act Section 80-810.

Section 13.02.   **Effectiveness of Dissolution**.  Dissolution of the Company shall be effective on the day on which the event described in Section 13.01 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 13.03 and the Articles of Organization shall have been cancelled as provided in Section 13.04.

Section 13.03.   **Liquidation**.  If the Company is dissolved pursuant to Section 13.01, the Company shall be liquidated and its business and affairs wound up in accordance with the Colorado Act and the following provisions:

(a)   **Liquidator**.  The Board, or, if the Board is unable to do so, a Person selected by the holders of a majority of the Common Units, shall act as liquidator to wind up the Company (the "**Liquidator**").  The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)   **Accounting**.  As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)   **Distribution of Proceeds**.  The Liquidator shall liquidate the assets of the Company and Distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)   *first*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)   *second*, to the establishment of and additions to reserves that are determined by the Board in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company;

(iii)   *third,* to the Preferred Members in amounts equal to their respective Capital Accounts; and

(iv)   *fourth*, to Members in the same manner as Distributions are made under Section 7.03.

The Company shall, within sixty days after the date of the initial issuance of Preferred Units, enter into the Security Agreement in favor of the Preferred Members, pursuant to which the Company shall grant the Preferred Members a security interest in substantially all of the assets of the Company solely for purposes of securing payment of amounts set forth in the preceding clause (iii).   The

Security Agreement shall be in a form prepared by the Company and approved by the Board, including at least one of the Preferred Managers.

(d)   **Discretion of Liquidator**.   Notwithstanding the provisions of Section 13.03(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 13.03(c), if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion, Distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 13.03(c), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such Distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.   For purposes of any such Distribution, any property to be Distributed will be valued at its Fair Market Value.

Section 13.04.   **Cancellation of Articles**.   Upon completion of the Distribution of the assets of the Company as provided in Section 13.03(c), the Company shall be terminated and the Liquidator shall cause the cancellation of the Articles of Organization in the State of Colorado and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Colorado and shall take such other actions as may be necessary to terminate the Company.

Section 13.05.   **Survival of Rights, Duties and Obligations**.   Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination.   For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to Section 14.03.

Section 13.06.   **Recourse for Claims**.   Each Member shall look solely to the assets of the Company for all Distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Board, the Liquidator or any other Member.

## ARTICLE XIV
### EXCULPATION AND INDEMNIFICATION

Section 14.01.   **Exculpation of Covered Persons**.

(a)   **Covered Persons**.   As used herein, the term "**Covered Person**" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) each Manager, Officer, employee, agent or representative of the Company.

(b)   **Standard of Care**.   No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)   **Good Faith Reliance**.   A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or

amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups:  (i) another Manager; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence.  The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in  the Colorado Act.

Section 14.02.  **Liabilities and Duties of Covered Persons**.

(a)  **Limitation of Liability**.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)  **Duties**.  Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any Applicable Law.

Section 14.03.  **Indemnification**.

(a)  **Indemnification**.  To the fullest extent permitted by the Colorado Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Colorado Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)  any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any Affiliate of the foregoing in connection with the business of the Company; or

(ii)  the fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at

29

the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any Subsidiary;

*provided* that (A) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful and (B) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)   **Reimbursement**.  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 14.03; *provided* that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 14.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c)   **Entitlement to Indemnity**.  The indemnification provided by this Section 14.03 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise.  The provisions of this Section 14.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 14.03 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d)   **Insurance**.  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Board may determine; *provided* that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder.  If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e)   **Funding of Indemnification Obligation**.  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 14.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f)   **Savings Clause**.  If this Section 14.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 14.03 to the fullest extent permitted by

any applicable portion of this Section 14.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g)   **Amendment**.   The provisions of this Section 14.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 14.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.   No amendment, modification or repeal of this Section 14.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

Section 14.04.   **Survival**.   The provisions of this Article XIV shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XV
### MISCELLANEOUS

Section 15.01.   **Further Assurances**.   In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

Section 15.02.   **Notices**.   All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given:   (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next day (other than a Saturday, Sunday or other day on which commercial banks in the City of Denver are authorized or required to close) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.   Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 15.02):

|  |  |
|---|---|
| If to the Company: | 2000 South Colorado Boulevard |
|  | Tower 1, Suite 3100 |
|  | Denver, Colorado  80222 |
|  | Facsimile:  (303) 845-9400 |
|  | E-mail:  info@2riverswater.com |
|  | Attention:  Chief Financial Officer |
|  |  |
| with a copy to: | K&L Gates LLP |
|  | One Lincoln Street |
|  | Boston, Massachusetts  02111-2950 |
|  | Facsimile:  (617) 261-3175 |
|  | E-mail:  mark.johnson@klgates.com |
|  | Attention:  Mark L. Johnson |

If to a Member, to such Member's mailing address as set forth on the Member Schedule.

Section 15.03. **Severability**. If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 15.04. **Entire Agreement**. This Agreement, including the Exhibit and Schedule hereto, and the Exchange Agreement, including the Exhibits and Schedule thereto, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 15.05. **Successors and Assigns**. Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 15.06. **No Third-Party Beneficiaries**. Except as provided in Article XIV, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 15.07. **Amendment**. Except as otherwise expressly provided herein, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and Members holding at least two-thirds of the Common Units and Preferred Units, voting together as a single class. Any such written amendment or modification will be binding upon the Company and each Member; *provided* that (a) an amendment or modification altering any provision of this Agreement in a manner that adversely alters the powers, preferences or rights of a class of Units shall be effective only with the consent of the Members holding at least two-thirds of such class of Units and (b) an amendment or modification altering the rights or obligations of any Member in a manner that is disproportionately adverse to other Members holding the same class of Units shall be effective only with that Member's consent. Notwithstanding the foregoing, amendments to the Member Schedule following any new issuance, redemption, repurchase or Transfer of Units in accordance with this Agreement may be made by the Board without the consent of, or other action by, any of the Members.

Section 15.08. **Waiver**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. For the avoidance of doubt, nothing contained in this Section 15.08 shall diminish any of the explicit and implicit waivers described in this Agreement, including in Section 8.04(c) and Section 15.11.

Section 15.09. **Governing Law**. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in

accordance with the internal laws of the State of Colorado, without giving effect to any choice or conflict of law provision or rule (whether of the State of Colorado or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Colorado.

Section 15.10.  **Submission to Jurisdiction**.  The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Colorado or in the Court of Chancery of the State of Colorado (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Colorado), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Colorado.  Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form.  Service of process, summons, notice or other document by registered mail to the address set forth in Section 15.02 shall be effective service of process for any suit, action or other proceeding brought in any such court.

Section 15.11.  **Waiver of Jury Trial**.  Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

Section 15.12.  **Equitable Remedies**.  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Section 15.13.  **Remedies Cumulative**.  The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 14.02 to the contrary.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

COMPANY:

**GROWCO PARTNERS 1, LLC**

By: _____
        Name:
        Title:

COMMON MEMBER:

**TR Capital Partners, LLC**


By: _____
    Name:
    Title:

EXHIBIT A

**FORM OF JOINDER AGREEMENT**

**JOINDER AGREEMENT TO LIMITED LIABILITY COMPANY AGREEMENT**

Reference is hereby made to the Limited Liability Company Agreement dated as of November __, 2014, as it may be amended from time to time (the "**Agreement**"), among GrowCo Partners 1, LLC and the Members Named in SCHEDULE 1.  Pursuant to and in accordance with Section 4.01 of the Agreement, the undersigned hereby acknowledges that the undersigned has received and reviewed a complete copy of the Agreement and agrees that, upon execution of this Joinder Agreement by the undersigned and GrowCo Partners 1, LLC, the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, and shall hold the status of a [Common][Preferred] Member.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement as of the date set forth below.  A signed copy of this Joinder Agreement delivered by facsimile, e-mail or other means of Electronic Transmission (as defined in the Agreement) shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

Date: _____          **[NAME OF NEW MEMBER]**


By: _____
    Name:
    Title:


Agreed and Accepted:

**GROWCO PARTNERS 1, LLC**


By: _____
    Name:
    Title:

A-2

SCHEDULE 1

**MEMBER SCHEDULE**

**Common Units**:

| Member Name and Address | Number of Units | Date of Issue | Capital Contribution | Certificate Number |
|---|---|---|---|---|
| TR Capital Partners, LLC<br>2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado  80222 | 6,000,000 | November__, 2014 | $1,000.00 | CU-1 |

**Preferred Units**:    None.

*Draft of 11/19/14*

**EXCHANGE AGREEMENT**

**among**

**GROWCO PARTNERS 1, LLC,**

**TWO RIVERS WATER AND FARMING COMPANY**

**and**

**HOLDERS NAMED IN SCHEDULE 1**

**Dated as of _____, 2014**

## TABLE OF CONTENTS

**Page**

**ARTICLE I** DEFINITIONS ........................................................................................................ 1
    Section 1.01. Definitions ..................................................................................................... 1
    Section 1.02. Interpretation ................................................................................................ 3

**ARTICLE II** EXCHANGES OF SECURITIES................................................................ 4
    Section 2.01. Exchanges .................................................................................................... 4
    Section 2.02. Exchange Procedures ................................................................................. 4
    Section 2.03. Adjustments ................................................................................................ 5
    Section 2.04. Authorized Shares...................................................................................... 5
    Section 2.05. Limitations on Exchanges .......................................................................... 5

**ARTICLE III** MISCELLANEOUS ....................................................................................... 6
    Section 3.01. Notices ......................................................................................................... 6
    Section 3.02. Severability .................................................................................................. 7
    Section 3.03. Entire Agreement........................................................................................ 7
    Section 3.04. Additional Holders ..................................................................................... 7
    Section 3.05. Successors and Assigns .............................................................................. 7
    Section 3.06. Amendments and Waivers.......................................................................... 7
    Section 3.07. Governing Law ............................................................................................ 7
    Section 3.08. Counterparts................................................................................................ 7
    Section 3.09. Dispute Resolution ..................................................................................... 8

SCHEDULE 1     Schedule of Holders
EXHIBIT A      Form of Joinder Agreement

THIS EXCHANGE AGREEMENT is entered into as of _____, 2014 among GrowCo Partners 1, LLC ("**Partners**"), Two Rivers Water and Farming Company ("**Parent**"), and the several individuals and entities listed on SCHEDULE 1 (collectively the "**Holders,**" which term shall include each other individual or entity that after the date hereof becomes a member of Partners and a party hereto by executing a Joinder Agreement, and with Partners and Parent, collectively the "**Parties**").  Capitalized terms used herein have the meanings ascribed to them in Section 1.01.

## RECITALS

WHEREAS, Partners and the Holders have entered into a Limited Liability Company Agreement of Partners dated as of November __, 2014 (the "**LLC Agreement**") that, among other things, provides for the issuance of membership interests designated as Preferred Units;

WHEREAS, Section 9.01 of the LLC Agreement provides that any individual or entity acquiring Partners Preferred Units and thereby becoming a member of Partners may elect to become a party to this Agreement;

WHEREAS, the Holders are purchasing Offered Units, including Partners Preferred Units, from Partners; and

WHEREAS, the Parties wish to provide for terms pursuant to which a Holder may, at its option, exchange Offered Units or Partners Preferred Units (with or without GrowCo Common Shares), all in the circumstances and subject to the conditions provided herein, for Parent Common Shares;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
### DEFINITIONS

Section 1.01.  **Definitions.** As used herein, the following terms shall have the indicated meanings:

(a)  This "**Agreement**" means this Exchange Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

(b)  "**Applicable Law**" means all applicable provisions of:

(i)  constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority;

(ii)  any consents or approvals of any Governmental Authority; and

(iii)  any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

(c)  "**Associated GrowCo OU Warrant**" means, with respect to a Partners Preferred Unit, the GrowCo OU Warrant delivered and sold with such Partners Preferred Unit as part of an Offered Unit (or any replacement GrowCo OU Warrant issued pursuant to Section 10(b) or the last sentence of Section 2(a) of such original GrowCo OU Warrant), it being understood that an Associated GrowCo OU Warrant may relate to more than one Partners Preferred Unit.

1

(d)   "**Beneficially Own**," "**Beneficially Owned**" and "**Beneficial Ownership**" have the meanings ascribed to them for purposes of Section 13(d) of the Exchange Act.

(e)   "**Business Day**" shall mean a day other than a Saturday or Sunday or a day on which banks in Colorado are authorized or required by law to close.

(f)   "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

(g)   "**Exchange Act**" means the Securities Exchange Act of 1934.

(h)   "**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

(i)   "**GrowCo**" means GrowCo, Inc., a Colorado corporation, and any successor thereto.

(j)   "**GrowCo Common Shares**" means shares of common stock, without par value, of GrowCo.

(k)   "**GrowCo OU Warrants**" means (i) common stock purchase warrants to purchase GrowCo Common Shares, as issued by GrowCo on the date hereof, which warrants constitute part of the Offered Units and have been issued in a series identified by certificate numbers designated "OU," or (ii) a replacement warrant of such series issued pursuant to Section 10(b) or the last sentence of Section 2(a) of a GrowCo OU Warrant.

(l)   "**Holders**" has the meaning set forth in the Preamble hereto.

(m)   "**Joinder Agreement**" means a written undertaking substantially in the form of the joinder agreement attached as EXHIBIT A.

(n)   "**LLC Agreement**" has the meaning set forth in the Recitals hereto.

(o)   "**Maximum Percentage**" has the meaning set forth in Section 2.05(a).

(p)   "**Offered Unit**" means up to 10,000,000 units, each of which Offered Units consists of one Partners Preferred Unit and a GrowCo OU Warrant to purchase one GrowCo Common Share and 6,000,000 of which Offered Units are being sold by Partners to the Holders as of the date hereof.

(q)   "**Parent**" means Two Rivers Water and Farming Company, a Colorado corporation, and any successor thereto.

(r)   "**Parent Common Shares**" means shares of common stock, $0.001 par value per share, of Parent.

(s)   "**Parties**" has the meaning set forth in the Preamble hereto.

(t)  "**Partners**" means GrowCo Partners 1, LLC, a Colorado limited liability company, and any successor thereto.

(u)  "**Partners Preferred Units**" means membership interests in Partners having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Preferred Units" in the LLC Agreement.

(v)  "**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

(w)  "**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units Beneficially Owned by a Person or any interest in any securities Beneficially Owned by a Person.  "**Transfer**" when used as a noun, and "**Transferee**," "**Transferred**" and "**Transferring**" shall have correlative meanings.

Section 1.02.  **Interpretation**.  For purposes of this Agreement:

(a)  headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b)  any references herein to an Article, Section or Schedule refer to an Article or Section of, or Schedule attached to, this Agreement, unless specified otherwise;

(c)  the word "day" refers to a calendar day;

(d)  the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(e)  the words "include" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(f)  the word "or" is not exclusive;

(g)  the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(h)  whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i)  unless the context otherwise requires, (i) references herein to an agreement, instrument or other document (including this Agreement and the LLC Agreement) mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and ii) references herein to a statute means such statute as amended from time to time and include any successor legislation thereto and any rules and regulations promulgated thereunder; and

(j)  this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

## ARTICLE II
### EXCHANGES OF SECURITIES

Section 2.01.  **Exchanges**.  Unless prohibited by Applicable Law, a Holder, at any time and from time to time, at its option may:

(a)  Transfer to Parent such Partners Preferred Unit and the right to acquire one GrowCo Common Share under the Associated GrowCo OU Warrant, in exchange for one fully paid and nonassessable Parent Common Share;

(b)  Transfer to Parent such Partners Preferred Unit together with one GrowCo Common Share acquired upon exercise of the Associated GrowCo OU Warrant, in exchange for one fully paid and nonassessable Parent Common Share; and/or

(c)  if such Holder does not Beneficially Own either the Associated GrowCo OU Warrant with respect to such Partners Preferred Unit (either because such Associated GrowCo OU Warrant has been Transferred for value separately from such Partners Preferred Unit or because such Partners Preferred Unit has been exercised in full) or any GrowCo Common Shares acquired upon exercise of such Associated GrowCo OU Warrant, Transfer to Parent such Partners Preferred Unit in exchange for, subject to Section 2.03(b), nine-tenths (0.9) of a fully paid and nonassessable Parent Common Share;

*provided* that such Holder shall not be entitled to effect any exchange pursuant to this Section 2.01 (each an "**Exchange**") unless such Holder Transfers to Parent, pursuant to clauses (a), (b) and/or (c) above, at least 5,000 Partners Preferred Units or such lesser number of Partners Preferred Units as are then-Beneficially Owned by such Holder.

Section 2.02.  **Exchange Procedures**.  Before any Holder shall be entitled to effect an Exchange, such Holder shall deliver to Parent at its address for notices pursuant to Section 3.01 (or such other address as Parent may from time to time designate for such purpose by notice in writing to the Holders):

(a)  written notice of such Holder's election to effect such Exchange, including a description of the securities to be exchanged pursuant to each of clauses (a), (b) and (c) of Section 2.01;

(b)  a certificate or certificates for the Partners Preferred Units to be Transferred in such Exchange (or, if such Holder alleges that any such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to Parent and Partners to indemnify Partners against any claim that may be made against Partners on account of the alleged loss, theft or destruction of such certificate), each of which certificates shall be endorsed or accompanied by a written instrument or instruments of Transfer, in form satisfactory to Partners, duly executed by such Holder or its attorney duly authorized in writing;

(c)  in connection with an Exchange pursuant to Section 2.01(a), the Associated GrowCo OU Warrant, with a written instrument of Transfer, in form satisfactory to Partners, duly executed by the Holder or its attorney duly authorized in writing, Transferring to Parent all of such Holder's rights under such Associated GrowCo OU Warrant with respect to a number of GrowCo Common Shares equal to the number of Partners Preferred Units to be Transferred in such Exchange pursuant to Section 2.01(a); and

(d) in connection with an Exchange pursuant to Section 2.01(b), a certificate or certificates for the GrowCo Common Shares to be Transferred, each of which certificates shall be endorsed or accompanied by a written instrument or instruments of Transfer, in form satisfactory to Partners, duly executed by the Holder or its attorney duly authorized in writing.

Effective as of 5 p.m., Mountain time, on the first Business Day immediately following the date of receipt by Parent of the instruments to be delivered by such Holder pursuant to the preceding clauses (a) through (d), (i) the tendered Partners Preferred Units, together with any rights Transferred with respect to an Associated GrowCo OU Warrant and any tendered GrowCo Common Shares, shall be deemed to have been exchanged for the appropriate number of Parent Common Shares, and all rights with respect thereto shall be Transferred to Parent, other than the rights of such Holder to receive such Parent Common Shares, and (ii) such Parent Common Shares shall be deemed to be issued to such Holder and to be outstanding of record.  Parent shall, as soon as practicable thereafter deliver to such Holder (A) a certificate representing such Parent Common Shares, (B) a GrowCo OU Warrant with respect to the number, if any, of GrowCo Common Shares previously purchasable under such Associated GrowCo OU Warrant but as to which purchase rights are not Transferred to Parent pursuant to this Article II, and (C) any cash payment for fractional Parent Common Shares due pursuant to Section 2.03(b).

Section 2.03.  **Adjustments**.

(a)  The number of Parent Common Shares to be issued in accordance with an Exchange shall be subject to equitable adjustment by the Board of Managers of Partners and the Board of Directors of Parent in the event of any change that is made in, or other event that occurs with respect to, Partners Preferred Units, GrowCo Common Shares or Parent Common Shares, which change or other event is effected, without receipt of consideration by the issuer thereof, through merger, consolidation, reorganization, recapitalization, reincorporation, stock dividend, dividend in property other than cash, stock split, liquidating dividend, combination of shares, exchange of shares, change in corporate structure or any similar equity restructuring transaction.

(b)  Notwithstanding anything to the contrary contained herein, no fractional Parent Common Shares shall be issued in connection with any Exchange.  If the total number of Parent Common Shares calculated to be issued pursuant to Section 2.01 in connection with an Exchange is not a whole number, Parent shall pay in cash the fair market value of any fractional Parent Common Share.

Section 2.04.  **Authorized Shares**.  Parent covenants that, during the period that any Partners Preferred Unit is outstanding, it will reserve from its authorized and unissued capital stock a sufficient number of Parent Common Shares to provide for the issuance of Parent Common Shares upon Exchanges pursuant to this Article II.  Parent will take all such reasonable action as may be necessary to assure that Parent Common Shares may be issued as contemplated hereby without violation of any Applicable Law or of any requirements of any securities exchange upon which Parent Common Shares may be listed from time to time.

Section 2.05.  **Limitations on Exchanges**.

(a)  Notwithstanding anything to the contrary contained herein, the aggregate number of Parent Common Shares issuable as part of an Exchange shall be limited to the extent necessary to ensure that, following such Exchange, the total number of Parent Common Shares then Beneficially Owned by such Holder and any other Persons whose Beneficial Ownership of Parent Common Shares would be aggregated with such Holder's for purposes of Section 13(d) of the Exchange Act does not exceed 9.999% (the "**Maximum Percentage**") of the total number of issued and

5

outstanding Parent Common Shares (including for such purpose Parent Common Shares issuable as part of such Exchange). Each delivery of instruments by a Holder pursuant to Section 2.01 for a proposed Exchange will constitute a representation by such Holder that it has evaluated the limitation set forth in this Section 2.05(a) and determined that the issuance of the Parent Common Shares in accordance with such Exchange is permitted under this Section 2.05(a).

(b)   By written notice to Partners and Parent, any Holder may waive the provisions of Section 2.05(a) or may increase the Maximum Percentage to any other percentage specified in such notice, but any such waiver or increase will not be effective until the sixty-first day after such notice is delivered to Partners and Parent and will apply only to such Holder and not to any other Holder. Notwithstanding any other provision hereof, this Section 2.05 may not be amended as to a Holder without the written consent of such Holder.

(c)   For purposes of this Section 2.05, in determining the number of outstanding Parent Common Shares, a Holder may rely on the number of outstanding Parent Common Shares as reflected in (i) Parent's most recent Form 10-Q, Form 10-K or other public filing with the Securities and Exchange Commission, (ii) a more recent public announcement by Parent, or (iii) any other notice by Parent (or the transfer agent for Parent Common Shares) setting forth the number of Parent Common Shares outstanding. Upon the written request of any Holder, Parent shall promptly, but in no event later than one Business Day following the receipt of such notice, confirm in writing to such Holder the number of Parent Common Shares then outstanding.

## ARTICLE III
### MISCELLANEOUS

Section 3.01. **Notices**.   All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed effectively given:  (a) upon personal delivery to the Party to be notified; (b) when sent by confirmed facsimile or email if sent during normal business hours of the recipient or, if not, then on the next Business Day; (c) three Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one Business Day after deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt. Such communications shall be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 3.01):

|  |  |
|---|---|
| If to Partners or Parent: | 2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado  80222<br>Facsimile:  (303) 845-9400<br>E-mail:  info@2riverswater.com<br>Attention:  Chief Financial Officer |
| with a copy to: | K&L Gates LLP<br>One Lincoln Street<br>Boston, Massachusetts  02111-2950<br>Facsimile:  (617) 261-3175<br>E-mail:  mark.johnson@klgates.com<br>Attention:  Mark L. Johnson |

If to a Holder, to the mailing address thereof set forth on Schedule 1.

Section 3.02.  **Severability**.  If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 3.03.  **Entire Agreement**.  This Agreement (including the Schedule hereto), the LLC Agreement (including the Exhibit and Schedule thereto) and the Securities Purchase Agreement dated as of November ___, 2014 between Partners and the Holders (including the Schedule thereto) constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 3.04.  **Additional Holders**.  A Holder has the right to Transfer Partners Preferred Units in accordance with the LLC Agreement.  Any Transferee of Partners Preferred Units from a Holder may elect to become a party to this Agreement by executing and delivering a Joinder Agreement and, in such event, shall thereafter be deemed a Holder and Party for all purposes of this Agreement.  In connection with the delivery of any such Joinder Agreement, Partners shall amend and restate SCHEDULE 1 to reflect the related Transfer.

Section 3.05.  **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

Section 3.06.  **Amendments and Waivers**.  No provision of this Agreement may be amended or waived except by an instrument in writing executed by (a) Partners, (b) Parent and (c) Holders of two-thirds of the total number of Partners Preferred Units then held by all Holders.  Any such written amendment or waiver shall be binding upon Partners, Parent and each Holder, *provided* that (i) an amendment or waiver altering the rights or obligations of any Holders with respect to their holdings of GrowCo OU Warrants shall be effective only with the consent of Holders of two-thirds of the total number of GrowCo OU Warrants then held by all Holders and (ii) an amendment or waiver altering the rights or obligations of any Holder in a manner that is disproportionately adverse to such Holder relative to the rights of other Holders, as the case may be, shall be effective only with the consent of that Holder. For the avoidance of doubt, nothing contained in this Section 3.06 shall diminish any of the explicit and implicit waivers described in this Agreement, including in Section 3.09(b).

Section 3.07.  **Governing Law**.  This Agreement shall be governed by the internal law of the State of Colorado.

Section 3.08.  **Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the ESIGN Act of 2000, *e.g.*, *www.docusign.com*) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and to be valid and effective for all purposes.

Section 3.09.  **Dispute Resolution**.

(a)  The Parties (i) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Colorado and to the jurisdiction of the United States District Court for the State of Colorado for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (ii) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Colorado or the United States District Court for the District of Colorado, and (iii) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

(b)  WAIVER OF JURY TRIAL:  EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS.   EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

(c)  Each Party will bear its own costs in respect of any disputes arising under this Agreement.  Each of the Parties consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Colorado or any court of the State of Colorado having subject matter jurisdiction.

*[SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, each of the Parties has executed this Agreement, or has caused this Agreement to be executed by its officer thereunto duly authorized, as of the date first written above.

**GROWCO PARTNERS 1, LLC**

By: _____
    Name:
    Title:

**TWO RIVERS FARMING AND WATER COMPANY**

By: _____
    Name:
    Title:

**SIGNATURE PAGE TO EXCHANGE AGREEMENT**

*[For Holders that are entities:]*

_____
Print or Type Name of Holder


By: _____
    Name: _____
    Title: _____


*[For Holders who are individuals:]*

_____
Signature

_____
Print or Type Name


**SIGNATURE PAGE TO EXCHANGE AGREEMENT**

## SCHEDULE OF HOLDERS

*[Holder Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Holder Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Holder Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Holder Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Holder Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Holder Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Holder Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

*[Holder Name*
*Address*
*Phone Number*
*Fax Number*
*Email]*

## JOINDER AGREEMENT TO EXCHANGE AGREEMENT

Reference is hereby made to the Exchange Agreement dated as of _____, 2014, as it may be amended from time to time (the "**Agreement**"), among GrowCo Partners 1, LLC, Two Rivers Water and Farming Company and the Holders Named in SCHEDULE 1.  Pursuant to and in accordance with Section 3.04 of the Agreement, the undersigned hereby acknowledges that the undersigned has received and reviewed a complete copy of the Agreement and agrees that, upon execution of this Joinder Agreement by each of the undersigned, GrowCo Partners 1, LLC and Two Rivers Water and Farming Company, the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed a "Holder" and "Party" for all purposes thereof and entitled to all the rights incidental thereto.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement as of the date set forth below.  A signed copy of this Joinder Agreement delivered by facsimile, e-mail or other means of Electronic Transmission (as defined in the Agreement) shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

Date: _____        **[NAME OF NEW HOLDER]**


By: _____
    Name:
    Title:


Agreed and Accepted:

**GROWCO PARTNERS 1, LLC**


By: _____
    Name:
    Title:

**TWO RIVERS WATER AND FARMING COMPANY**


By: _____
    Name:
    Title:

# TWO RIVERS WATER AND FARMING COMPANY

## MEMORANDUM OF TERMS

### Preferred Units of GrowCo Partners 1, LLC
### and
### Common Stock Purchase Warrants of GrowCo, Inc.

This Memorandum of Terms dated as of October 31, 2014, summarizes the principal terms of an offering of preferred units of GrowCo Partners 1, LLC ("**Partners**") and associated warrants to purchase common stock of GrowCo, Inc. ("**GrowCo**"), an indirect subsidiary of Two Rivers Water and Farming Company ("**Two Rivers**").

**THIS SUMMARY DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS AND CONDITIONS OF THE COMPLETE AND DEFINITIVE SUBSCRIPTION AGREEMENT.   NOTHING HEREIN IS BINDING AND THE SALE OF THE PREFERRED UNITS AND ASSOCIATED WARRANTS IS CONTINGENT ON NEGOTIATION AND EXECUTION OF SUCH SUBSCRIPTION AGREEMENT.**

## OFFERING TERMS

| | |
|---|---|
| **ISSUERS:** | *Partners,* a Colorado limited liability company, has been formed to construct and manage either one or two greenhouse facilities (the "**Greenhouses**") that will be leased to marijuana growers. |
| | *GrowCo,* a Colorado corporation, will perform construction, management and other services for Partners pursuant to a services agreement with specified periodic fees. |
| | *Two Rivers,* a Colorado corporation, is the parent of GrowCo. |
| **SECURITIES OFFERED:** | Partners will sell either 6,000,000 or 10,000,000 units (the "**Offered Units**"), each consisting of one preferred unit of Partners (a "**GCP Preferred Unit**") and a warrant (a "**GrowCo Warrant**") to purchase one share of common stock of GrowCo ("**GrowCo Common**"). Each Offered Unit may be exchanged for one share of common stock ("**TURV Common**") of Two Rivers in the circumstances described below. |
| **PURCHASE PRICE:** | $1.00 per Offered Unit.   Offered Units will be sold in multiples of 1,000. |
| **GROSS AMOUNT OF PROCEEDS:** | Either $6.0 million or $10.0 million. |
| **USE OF PROCEEDS:** | Net proceeds will be used by Partners primarily: |

- to finance the construction of either one Greenhouse (if 6,000,000 Offered Units are sold) or two Greenhouses (if 10,000,000 Offered Units are sold), each to be leased to marijuana growers;
- to lend up to $1.0 million to Greenhouse lessees pursuant to lines of credit (the "**Credit Facility**");

- to finance the purchase of farmland and water taps for the Greenhouse(s); and
- for working capital and other general corporate purposes of Partners.

**TARGET CLOSING DATE**: The targeted closing date (the "**Closing Date**") will be on or before November 14, 2014.

**INVESTORS:** Institutional and other accredited investors, including affiliates of Emerging Growth Equities, Ltd. ("**EGE**").

**POST CLOSING CAPITALIZATION:**

**PARTNERS:** Depending upon whether 6,000,000 or 10,000,000 Offered Units are sold, either 6,000,000 or 10,000,000 common units of Partners ("**GCP Common Units**") will be issued to TR Capital Partners, LLC, a subsidiary of Two Rivers.

**GROWCO:** As of the date hereof, there are 30,000,000 shares of GrowCo Common outstanding, of which 10,000,000 are restricted shares that are held by GrowCo's management and business partners and that remain subject to vesting.

Depending upon whether 6,000,000 or 10,000,000 Offered Units are sold, an additional 6,000,000 or 10,000,000 shares of GrowCo Common would be reserved by GrowCo for issuance upon exercises of GrowCo Warrants.

**TWO RIVERS:** The current and proforma capitalization of Two Rivers is shown in Table A hereto.

## TERMS OF OFFERED UNITS

**GCP PREFERRED UNITS:**

*Capital Accounts:* Each holder of GCP Preferred Units will have a capital account initially equal to the purchase price paid for those GCP Preferred Units. Such capital account will bear a yield at the rate of 12.0% per annum, computed quarterly, with such yield being added to the capital account. Each such capital account will be decreased by the amount of any distributions with respect thereto, as described below.

*Distributions:* For the following purposes, "**Distributable Amount**" means, with respect to a specified calendar year, (a) the cash flow provided by operations of Partners for such quarter, plus (b) the amount of principal and interest received by Partners from the Credit Facility during such period, plus (c) the amount of deferred lease payments received by Partners during such period (which deferred payments may, under the lease agreements relating to the Greenhouse(s), total up to $1,000,000).

In general, and to the extent the Distributable Amount

for a calendar quarter permits, the class of GCP Preferred Units will receive each quarter preferred yield distributions totaling 3.0% of the aggregate amount of GCP Preferred Unit capital accounts, and then will participate pro rata with the class of GCP Common Units in receiving distributions of the balance (if any) of such Distributable Amount.   Each holder of GCP Preferred Units will be entitled to receive, within 45 days after the end of each calendar quarter, the following:

- a *preferred yield distribution* equal to 3.0% of such holder's capital account at the end of such quarter, *provided* that if the Distributable Amount for such quarter is not sufficient to pay such yield distribution on all of the GCP Preferred Units, such Distributable Amount will be paid to the holders of GCP Preferred Units pro rata, on the basis of their capital accounts at the end of such quarter; and

- a *participating profits distribution* equal to (a) the amount, if any, of Distributable Amount for such quarter remaining after payment of the GCP Preferred Unit preferred yield distributions for such quarter, *multiplied by* (b) the quotient, computed as of the end of such quarter, of dividing (i) the number of GCP Preferred Units held by such holder by (ii) the number of GCP Preferred Units plus, if the Credit Facility and any deferred lease amounts have been paid in full as of the end of such quarter, the number of GCP Common Units.

Holders of GCP Preferred Units will be entitled to continue to receive participating distributions even if their capital accounts have been reduced to $0 or less as a result of prior distributions.

Holders of GCP Common Units will not be entitled to receive any distributions of any kind with respect to a calendar quarter unless (A) the GCP Preferred Unit preferred yield distributions for such quarter have been paid in full and (B) the Credit Facility and any deferred lease amounts have been paid in full as of the end of such quarter.

*Redemption:*    The GCP Preferred Units will not be subject to redemption.

*TURV Exchanges:*    Each of the GCP Preferred Units may be exchanged at any time, at the election of the holder, as follows:

- such GCP Preferred Unit, together with a GrowCo Warrant to purchase one share of GrowCo Common, may be exchanged for one share of TURV Common;

- any GCP Preferred Unit for which the accompanying

3

| | |
|---|---|
| | GrowCo Warrant has been detached may be exchanged for 0.9 shares of TURV Common. |
| *Liquidation Preference and Security:* | In the event of any liquidation, dissolution or winding up of Partners, each holder of GCP Preferred Units would be entitled to receive, prior and in preference to any distribution of any assets of Partners to the holders of GCP Common Units, an amount equal to such holder's capital account with respect to such GCP Preferred Units. |
| | The payment of the GCP Preferred Unit liquidation preference will be secured by a pledge of substantially all of the assets of Partners, including the Greenhouse(s), the generators to be used for the Greenhouse(s), and certain water rights and land located in Huerfano County, Colorado owned of record by Orlando Reservoir No. 2 Company, LLC, a wholly owned subsidiary of Two Rivers. |
| *Voting:* | In general, holders of GCP Common Units and GCP Preferred Units will vote together (with each holder having one vote for each GCP Common Unit or GCP Preferred Unit on a share-for-share basis) on any matter subject to the approval of Partners. |
| *Amendments and Waivers:* | The terms of the GCP Preferred Units may be amended or waived only upon the written consent of Partners and holders of at least two-thirds of the GCP Preferred Units. |

**GROWCO WARRANTS:**

| | |
|---|---|
| *Exercise Price:* | $1.00 in cash per share of GrowCo Common (no cashless exercises). |
| *Expiration Date:* | Earlier of (a) the fifth anniversary of the Closing Date and (b) immediately prior to the closing of a Qualified IPO. |
| *Transfer:* | GrowCo Warrants will be separable from the related GCP Preferred Unit and will be transferrable subject to compliance with applicable securities laws. |

## OTHER MATTERS

| | |
|---|---|
| **PURCHASE AGREEMENT:** | Any investment will be made only pursuant to a Subscription Agreement, which will contain forms of the Partners operating agreement, the GrowCo Warrants and an Exchange Agreement with respect to the Offered Units as well as representations, warranties and covenants of Partners, GrowCo, Two Rivers and the investors and appropriate conditions of closing. |

**EQUITABLE ADJUSTMENTS:**

The conversion rates and other share- or unit-related information in this Memorandum of Terms will be subject to equitable adjustment for stock dividends, splits, combinations and similar events occurring after the Closing Date.

**CONFIDENTIALITY:**

No investor shall disclose the terms of this Memorandum of Terms to any person other than its officers, directors, members, managers, partners, accountants and attorneys, without the written consent of Partners, GrowCo and Two Rivers.

**PLACEMENT AGENT:**

EGE is serving as the exclusive Placement Agent in connection with the offering of the Offered Units and in exchange therefor will receive a placement fee of ___% of gross proceeds, together with a warrant to purchase, at a price of $1.00 per Offered Unit, a number of Offered Units equal to ___% of the total Offered Units sold in the offering.

Partners will issue to TR Capital Partners, LLC a warrant to purchase, at a price of $0.001 per GCP Common Unit, a number of GCP Common Units equal to the number of Offered Units purchased by EGE from time to time pursuant to the warrant described in the preceding paragraph.

The summary descriptions included in the other sections of this Memorandum of Terms do not give effect to any exercise of the warrants to be granted to EGE and TR Capital Partners, LLC as described above.

Table A

**Two Rivers Water and Farming Company**
As of October 31, 2014

| | | |
|---|---|---|
| Current Outstanding | 26,524,538 | $1.13 |
| TR Capital Conversion | 31,209,336 | $0.83 |
| Warrants & Options (cash only) | 17,721,688 | $2.14 |
| Incentive Plans | 10,846,060 | |
| GrowCo Partners 1, LLC | 10,000,000 | $1.00 |
| | 96,301,622 | |

**From:** Jennifer Hunt Jennifer.Hunt@coag.gov
**Date:** Thursday, January 19, 2023 at 6:04 PM
**To:** John McKowen john@vtanva.com, India Kidd-Aaron India.Kidd-Aaron@coag.gov
**Cc:** Jennifer Reynard Jennifer.Reynard@coag.gov
**Subject:** RE: Settlement Discussions

Mr. McKowen,

We continue to view this case very differently than you and do not agree either that you did not engage in any violations of Colorado securities laws or that the statute of limitations on the Commissioner's claims has

gage in serious discussions about
her written discovery we
Regardless, you are welcome to
tlement must include an
on you want against other
defendants, but that is not the Commissioner's concern .

Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203

**From:** John McKowen john@vtanva.com
**Sent:** Thursday, January 19, 2023 7:49 AM
**To:** Jennifer Hunt Jennifer.Hunt@coag.gov; India Kidd-Aaron India.Kidd-Aaron@coag.gov
**Subject:** Settlement Discussions
**Importance:** High

Ms. Hunt & Ms. Kidd-Aaron,

In our first meeting at your offices, it was stated that I would receive a settlement offer shortly.  One was not presented.  Instead, it was indicated that one would be provided
after my written disclosures and deposition.  That has not happened.

Irrespective that I did not commit any fraud or failure to disclose, the statute of limitations has run out for the State on its claims.  The statute of limitations has not run out on the GrowCo debt for debt holders, of which I am the largest noteholder.  Nor has the ability been lost to foreclose on the Orlando assets utilizing the DoTs.

I received actionable information I did not know before in Wayne Harding's deposition.  That information will greatly assist GrowCo investors, of which I am the largest, to potentially get all their capital back, perhaps with exemplary damages.

## Non-Disclosure Agreement

This Non-Disclosure Agreement (this "Agreement") is entered into as of the _____ (the "Effective Date") by and between VetaNova Inc., a Nevada corporation and any of its subsidiaries or affiliates ("VetaNova"), and _____, (the "Potential Investor"). The above parties may be referred to singularly as a "Party" or collectively as the "Parties."

RECITALS

WHEREAS, VetaNova has entered into that certain Mutual Nondisclosure Agreement with Mastronardi Produce Limited, a Canadian corporation, and its subsidiaries and affiliates ("Mastronardi") dated June 28, 2021 ("NDA") for the purpose of exchanging certain Confidential Information (as defined in the NDA) in connection with a Business Purpose (as defined in the NDA); and

WHEREAS, the NDA requires VetaNova to have appropriate written agreements with its employees, investors and associates to enable VetaNova to comply with the terms of the NDA; and

WHEREAS, the Business Purpose is important to VetaNova's business and is, therefore, beneficial to VetaNova and Potential Investor (s); and

WHEREAS, Potential Investor's relationship with VetaNova may be the result of certain agreements to completed between VetaNova and Potential Investors.

NOW WHEREFORE, in consideration of the promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Potential Investor agrees as follows:

1.      The recitals above are made an enforceable part of this Agreement.

2.      To the extent Confidential Information is disclosed by VetaNova or Mastronardi to Potential Investor, Potential Investor agrees to abide by the NDA with respect to such Confidential Information.

3.      Potential Investor agrees to retain the Confidential Information in strict confidence, to protect the security, integrity, and confidentiality of such information and to not permit unauthorized access to or unauthorized use, disclosure, publication, or dissemination of Confidential Information except in conformity with the NDA.

4.      Confidential Information is and will remain the sole and exclusive property of VetaNova and will not be disclosed or revealed by the Potential Investor, except (i) to other VetaNova Potential Investors, or consultants who have a need to know such information and agree to be bound by the terms of this Agreement or (ii) with VetaNova's express prior written consent.

5.      Potential Investor agrees that, in the event Potential Investor must download, access, process, transfer or otherwise communicate Confidential Information, Potential Investor will comply with all laws and regulation applicable to exports and re-exports of data and information and will not, directly or indirectly, export or re-export any Confidential Information in violation of such laws and regulations, including without limitation, those prohibiting export or re-export to restricted countries or without governmental authorization.

6.      Upon termination of this Agreement or at the request of VetaNova, Potential Investor will ensure that all Confidential Information and all documents, memoranda, notes and other writings or electronic records prepared by the Potential Investor that include or reflect any Confidential Information in Potential Investor's actual or constructive possession are returned to VetaNova within two (2) business days.

7.      The obligation not to disclose Confidential Information shall survive the termination of this Agreement, and at no time will Potential Investor be permitted to disclose Confidential Information, except as provided herein or in the NDA. The obligation not to disclose Confidential Information shall remain in effect as set forth in the NDA and for three (3) years following termination of the Contract.

8.      Potential Investor acknowledges that his/her use or disclosure of any Confidential Information, in a manner inconsistent with this Agreement or the NDA ("Breach") shall give rise to irreparable injury for which damages would not be an adequate remedy.  Accordingly, in addition to any other legal remedies which may be available at law or in equity, VetaNova shall be entitled to equitable or injunctive relief against Potential Investor's Breach. VetaNova shall be entitled to pursue any other legally permissible and available remedy against Potential Investor as a result of such Breach, including, without limitation, damages, both direct and consequential. In any action brought by VetaNova under this Section 8, VetaNova shall be entitled to recover its attorney's fees and costs incurred therein from Potential Investor.

9.      This Agreement may be amended or modified only by a written agreement signed by both Parties.

10.     Should any provision of this Agreement conflict with any provision of the NDA, the provision that places the greater responsibility on Potential Investor shall control.

11.     This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado, without regard to the principles of conflict of laws. Any controversy or claim arising out of this Agreement, or breach thereof, shall be resolved in the District Court, City and County of Denver, Colorado.

12.     Should Potential Investor choose not to execute this Agreement, Potential Investor's Contract with VetaNova willnot be executed, in the sole and absolute discretion of VetaNova.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.


        Potential Investor              VETANOVA INC


        By:                             By: John McKowen
        Title:                          Title: CEO

EX-20.1 2 ex20-1.htm

**Exhibit 20.1**



**Two Rivers Water & Farming Company**
**Letter to Shareholders**
**from**
**Chief Executive Officer, Mr. Greg Harrington**

Dear Two Rivers Shareholders,

As we start into the Q3 2020, I wanted to reach out to our shareholders and keep you apprised of the recent happenings within Two Rivers and our subsidiaries. I'll touch on the state of the Company in regard to how we are navigating through these challenging times during the pandemic, farm and water infrastructure updates, and legal, accounting and operational matters at hand.

First, I want to welcome our new interim Chief Financial Officer, Ms. Heather Kearns, who officially joined our team July 1, 2020. As a CPA, Ms. Kearns has a strong financial knowledge of public company accounting and has been assisting Two Rivers in their accounting filings since 2018. We are very excited to have her on board and confident that she can assist in simplifying our accounting processes and bring us up to date with our required filings. You can learn more about her background by referring to her bio inserted at the bottom of this letter.

Ms. Kearns's history of assisting the previous accounting team of Two Rivers during audits and filings, coupled with her strong financial knowledge of public company accounting, makes her the perfect fit for this position.

**WaterVault Transaction**

The acquisition of Huerfano-Cucharas Irrigation Company ("HCIC") which owns water rights of Cucharas Valley No. 05 Dam and Reservoir from our Company by WaterVault America Inc ("WaterVault"), announced in April, is in the final stages of procuring the financing for the dam. WaterVault is a service-disabled veteran owned, unaffiliated, Colorado Public Benefits Corporation dedicated to creating sustainable economic development in rural communities. We will offer additional pertinent updates as they unfold.

**COVID-19 Update**

As the COVID-19 pandemic continues to evolve, I wanted to share with you how Two Rivers is managing through the pandemic. We continue to adjust to the "new normal" environment that is consistently evolving during this time and our overall situation is both positive and steady. Among the steps that our team has made to stabilize our business are:

    o   Reducing our overhead significantly; each active team member has taken on multiple roles to ensure we maintain a low monthly overhead & our main office relocated to Pueblo, giving us a cost-effective office with easy access to our properties.

(v.4)    Office: 129 E B Street, Pueblo Colorado, 81003
Mailing: 129 E B Street, Pueblo Colorado, 81003 | www.2riverswater.com | Phone: (303) 222-1000

1

- o Reaching out to vendors and taking advantage of opportunities for payment deferral and incremental benefits offered.
- o Closely monitoring payables and actively working with our vendors on payment arrangements that are mutually beneficial.
- o Conducting scenario planning/analysis to drive management decisions and maintain the health of the business.
- o Maintaining a strong focus on preserving cash and prudent fiscal management.
- o Uncovering areas of opportunity for our company to generate revenue through sales of non-agricultural / tilled land.
- o Taking advantage of the extended filing periods offered by the SEC. Due to the nature of the pandemic, including a significant impact of our accounting department included in our companywide furlough, we anticipate our of 10K (2019) and 10Q's (Q1/Q2 2020) to be filed by during September this year.

## **Farming Operations**

With regards to our farming operations, several months ago we engaged a farm management team with over 30 years of hands on agricultural farming experience in various crop rotations, weather patterns, as well as cattle operations. In a short period of time, with minimal resources we have repaired multiple ditch structures, one of which has been damaged due to neglect for years, resulting in a more stabilized water resource for surrounding farmland.

We have also course corrected errors from the former farm & ditch management of the Butte Valley Farms, involving remedying years of accumulated damage as a result of improper tillage rotation of soil and unacceptable level of neglect towards our water management, including ditch cleaning. Additionally, we have filed charges for pursuing the disappearance of farm equipment missing in the excess of $1,000,000. This is an ongoing issue and we will disclose additional updates as it becomes available.

As you can see, these are all issues that require capital to replace, and is an inherited challenge that could have been avoided. We are happy to report that we now have a solid team onsite that continue to do an incredible job prepping the land and attending to the water infrastructure.

## **Dionisio Farms**

There have been some questions as to our level of farming surrounding the Dionisio Farms operations. In 2012 we acquired Dionisio Farms & Product, Inc. ("DFP) and in late 2016, based on three years of operational losses, we decided to sell DFP assets. You can reference our 2017 year end 10K filings for more information on that transaction.

2

## Company Operations, Legal Matters & Legacy Issues

During our internal audit that I previously spoke of in November, we uncovered a number of legal, accounting and operational issues that were not properly disclosed to us prior to the Vaxa merger and my acceptance of the interim CEO/CFO position.

My hope was that prior to the Vaxa merger, and agreeing to the CEO position, former Leadership/Management, which I'll refer to as 'Leadership', would openly and comprehensively divulge unresolved legal and financial dealings, and would behave in a cooperative manner, disclosing any and all access to information that would allow me to make future decisions regarding our company for the benefit of the shareholders. Regrettably it appears that there was a gap between the information disclosed to us prior to our merger, and the reality at hand.

Amongst those critical issues included a judgement/garnishment of nearly $225,000 in October 2019 with regards to a legal matter involving Welton Land & Water Co., of which former Leadership was aware but neglected to properly inform our current team. This financially blindsided us during one of the most critical points of our company during my time here.

In November I also referred to the share issuance obligation on a series of Promissory Notes starting in May 2017 with Black Mountain Equities where the warrants issued resulted in a severed ratcheting of the number of shares on the warrants. The ratcheting was triggered by a previous transaction and resulted in the warrants which were originally issued for 586,000 shares at $1.00 per share to balloon over 5.0 million shares at $0.0785 per share. This is another example of a serious matter where multiple modifications to the Note were agreed to by former Leadership, and improperly disclosed to us, creating weakness in our stock price likely as a result of the downward pressure imposed by the Black Mountain warrants and the convertible loans issued by Two Rivers prior to me joining the Executive Team, as opposed to any change in the underlying fundamentals of the Company during that period of time.

Former Leadership further exercised bad judgement when signing a financing agreement that was what I would refer to as 'too good to be true' deal between Water Redevelopment, a subsidiary of Two Rivers, and America 2030 & Bentley Rothchild, led by Val Sklarov, a known recidivist securities offender. Leadership had the Company reserve shares, yet America 2030 et al has never funded any money it contractually agreed to, and yet through a loophole provision in the agreement, they sought to take possession of the shares. We successfully blocked the transfer to date, but were contractually obligated to arbitration in St. Kitts, resulting in a number of hurdles for our counsel, including their inability to find out the ruling until after America 2030 was awarded $137,000 in fees, on top of what we estimate to be collectively around $150,000 in legal and administrative fees from our Company's side. It is my belief that proper due diligence from our former Leadership could have avoided this tragic and completely preventable compromising situation.

Accounting and legal delays have also occurred due to the lack of access to information. Any professional in the public market space should agree that a reliable document storage system is pertinent to maintaining up to date records that are remotely accessible and easy to navigate. Instead, former Leadership created a series of different platforms for document storage, including paper files, servers, and multiple cloud-based storage systems, with no consistent organization. This created unpredictable delays in hitting definitive deadlines, especially during this pandemic and work-from-home set-ups.

3

This may not seem like much of an issue, but I assure you it has been more than just some 'messy or missing files', whereas every hour spent searching for simple documents equaled valuable resources of time and money spent that could have been avoided. We have since initiated a streamlined documentation process and started consolidating these platforms into a centralized location. Although it seems at times, we are on a scavenger hunt to find reference materials, luckily our team is resilient and persistent.

**<u>Closing Remarks</u>**

Given my professional background, I can assure you that these issues are resolvable, but not overnight. We have made vast strides in the relatively short time our new team has taken over. Even in light of all these findings, our team remains diligent in our efforts to untangle and resolve the legacy issues we inherited and restore market confidence in what I would like to refer to as a diamond in the rough. Our assets speak for themselves, and we all know diamonds are formed under pressure but never forget they are not formed overnight.

We appreciate your ongoing participation and support in Two Rivers.

*Sincerely Yours,*

*Greg Harrington*
*CEO*

***About Two Rivers***

*Two Rivers Water & Farming Company is a vertically integrated agricultural and water rights company with over a decade of experience focused on building a portfolio of water rights and real estate in Colorado. Two Rivers is focused on expanding their agribusiness along with development and rehabilitation of its water assets. www.2RiversWater.com*

4

***About Heather Kearns***

*Ms. Heather Kearns has over 20 years of experience in accounting and financial reporting with private and public companies of various sizes. She is a Certified Public Accountant in the state of Colorado, and has almost 10 years as a firm owner, offering accounting and consulting services. Ms. Kearns's background includes managing and oversight for financial statements and disclosures, filing S-1 registration and other SEC filings, preparation of financial reports including 10-Q's, 10-K's, and 8-K's, and coordinating annual audits and quarterly reviews. She will provide oversight of the finance and accounting team, coordinate with Compliance, and work with the Company's tax consultants to prepare all tax documentation and returns. Ms. Kearns provides the assistance to strengthen the Company's processes and procedures, and also contributes to the development of a Company's strategy and long-term planning.*

*Ms. Kearns is a graduate of Auburn University in Auburn, Alabama, with a Bachelor of Science in Business Administration, and a Master of Business Administration from Auburn University in Montgomery, Alabama.*

***Forward-Looking Statements***

*This news release contains "forward-looking statements.". Statements that are not purely historical are forward-looking statements and include any statements regarding beliefs, plans, expectations or intentions regarding the future. Actual results could differ from those projected in any forward-looking statements due to numerous factors, including the inherent uncertainties associated with developing and acquiring land and water resources. There can be no assurance Two Rivers will be able to initiate and operate in accordance with its business plans. These forward-looking statements are made as of the date of this news release, and Two Rivers assumes any obligation to update the forward-looking statements or to update the reasons why actual results could differ from those projected in the forward-looking statements.*

**Investor Relations:**
Two Rivers Water & Farming Company
info@2riverswater.com

5

| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED: March 30, 2022 11:09 AM<br>FILING ID: 28B05D354DF52<br>CASE NUMBER: 2021CV33922 |
|---|---|
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff<br><br>v.<br><br>JOHN RODERICK McKOWEN, et al.<br><br>Defendants | **COURT USE ONLY**<br>_____<br><br>Case No.: 2021CV33922<br><br>Courtroom: 259 |
| **Attorneys for Defendant and Counter Cross-Claimant:**<br><br>Martin M. Berliner, Esquire<br>Berliner McDonald P.C.<br>4380 S. Syracuse Street, Suite 304<br>Denver, Colorado 80237-2625<br>(303) 830-1700<br>(303) 830-1705 (fax)<br>mberliner@berlinermcdonald.com<br>Atty. Reg. No.6316 | |

## ANSWER OF CROSSCLAIM DEFENDANT JOHN R. MCKOWEN TO CROSSCLAIMS OF CROSSCLAIM PLAINTIFF TWO RIVERS WATER & FARMING COMPANY

_____

COMES NOW JOHN R. MCKOWEN ("McKowen"), GROWCO, INC., and VITANOVA PARTNERS, by and through their attorneys, BERLINER MCDONALD P.C., and for McKowen's Answers and Responses to the Crossclaims asserted against him by Defendant and Cross-Claimant, TWO RIVERS WATER & FARMING COMPANY ("Two Rivers"), states and avers as follows:

### GENERAL STATEMENT APPLICABLE TO ANSWERS AND RESPONSES

McKowen incorporates, in his answers and responses to the Crossclaims, where not inconsistent with the answers and responses, *infra.,* his answers and responses to Paragraphs 1-228 of the underlying Complaint, as if fully set forth herein.

## INTRODUCTION

1. No response is required to Paragraph 1.

## JURISDICTION AND VENUE

2. McKowen admits that jurisdiction is proper.

3. Admitted.

4. McKowen admits that venue is proper.

## CROSSCLAIM DEFENDANTS

5. McKowen admits his gender, birth date, and current residence, as set forth in Paragraph 5.  He denies the principal address, as alleged, of the GrowCo Companies, McGrow, MCG, and GCO, and asserts affirmatively that certain of the VitaNova Companies presently exist, but some do not, and that the definition of the "VitaNova Companies" is inaccurate. McKowen denies that he was the Chief Financial Officer from 2009 to 2010.  McKowen states affirmatively that he was Chief Executive Officer and Chairman of the Board of Two Rivers between February 8, 2005, to May 26, 2016, on which date he resigned.

6. McKowen admits the gender and address of Crossclaim Defendant Harding.  He is without information of knowledge sufficient either to admit or deny the remaining allegations of Paragraph 6 and, therefore, denies them.

7. No response is required to Paragraph 7.

## FIRST CLAIM FOR RELIEF (Breach of Fiduciary Duty – McKowen)

8. McKowen incorporates his answers to Paragraphs 1-7 as if fully set forth herein.

9. McKowen denies the implied meaning of "all times" and "fiduciary" as used in Paragraph 9.  McKowen states affirmatively that he was the Chief Executive Office and Chairman of the Board of Two Rivers from February 8, 2005 to May 26, 2016, he was a fiduciary and properly discharged his duties and obligations.

10. McKowen denies that he breached any fiduciary duty to Two Rivers.

    a. Any failure to disclose material facts claimed to have required disclosure was based on the advice and actions of experience and competent securities counsel, who were provided with all facts necessary for them to determine whether such disclosure, in whole or part, was required, and upon whom McKowen was entitled to rely.

b.  Any failure to disclose disciplinary action claimed to have required disclosure was based on the advice and actions of experience and competent securities counsel, who were provided with all facts necessary for them to determine whether such disclosure, in whole or part, was required, and upon whom McKowen was entitled to rely. McKowen states affirmatively that no disclosure of the disciplinary action cited was required.

c.  Any failure to disclose a bankruptcy (not plural) claimed to have required disclosure was based on the advice and actions of experience and competent securities counsel, who were provided with all facts necessary for them to determine whether such disclosure, in whole or part, was required, and upon whom McKowen was entitled to rely. McKowen states affirmatively that there was only bankruptcy, and no disclosure of the bankruptcy was required no disclosure of the disciplinary action cited was required.

d.  McKowen is without information or knowledge sufficient either to admit or deny the allegation of subparagraph d. of Paragraph 10 and, therefore, denies the same.

e.  McKowen is without information or knowledge sufficient either to admit or deny the allegation of subparagraph e. of Paragraph 10 and, therefore, denies the same.

f.  Denied.

g.  Denied.

h.  Denied.

i.  Denied.

j.  Denied.

k.  McKowen admits that no notifications were filed with the Commissioner, but, based on the advice and actions of experience and competent securities counsel, who were provided with all facts necessary for them to determine whether such disclosure, in whole or part, was required, and upon whom McKowen was entitled to rely, and states affirmatively that no notifications were required.

l.  McKowen incorporates his response to subparagraph a. of Paragraph 10, as if fully set forth herein.

m.  Any failure to disclose any event claimed to have required disclosure was based on the advice and actions of experience and competent securities counsel, who were provided with all facts necessary for them to determine

whether such disclosure, in whole or part, was required, and upon whom McKowen was entitled to rely.

n.  This allegation duplicates subparagraph c. of Paragraph 10.  McKowen incorporates his response to subparagraph d. of Paragraph 10, as if fully set forth herein.

o.  This allegation duplicates subparagraph d. of Paragraph 10.  McKowen incorporates his response to subparagraph d. of Paragraph 10, as if fully set forth herein.

p.  This allegation duplicates subparagraph e. of Paragraph 10.  McKowen incorporates his response to subparagraph e. of Paragraph 10, as if fully set forth herein.

q.  This allegation duplicates subparagraph f. of Paragraph 10.  McKowen incorporates his response to subparagraph f. of Paragraph 10, as if fully set forth herein.

r.  This allegation duplicates subparagraph g. of Paragraph 10.  McKowen incorporates his response to subparagraph g. of Paragraph 10, as if fully set forth herein.

s.  This allegation duplicates subparagraph i. of Paragraph 10.  McKowen incorporates his response to subparagraph i. of Paragraph 10, as if fully set forth herein.

t.  This allegation duplicates subparagraph j. of Paragraph 10.  McKowen incorporates his response to subparagraph j. of Paragraph 10, as if fully set forth herein.

u.  This allegation duplicates subparagraph k. of Paragraph 10.  McKowen incorporates his response to subparagraph k. of Paragraph 10, as if fully set forth herein.

v.  Denied.

w.  Denied.

x.  Denied.

y.  Denied.

z.  Denied.

aa. Denied.

bb. McKowen states affirmatively that the Forms 10-K filed by Two Rivers during the period(s) when he was responsible for the filings made extensive disclosures concerning the marijuana business and the actual and potential

> risks and uncertainties relating to the enforcement of Federal marijuana laws, among other things.

11. McKowen denies that Two Rivers sustained any damages directly or indirectly resulting from McKowen's conduct during the time frame from May 26, 2016 to approximately the end of October 2017, during which period McKowen had resigned from and did not occupy any executive or board position with Two Rivers, TR Capital, GrowCo, or their affiliates. Rather, upon information and belief, discovered after the resignation of McKowen, GrowCo's funds amounting to millions of dollars in capital resulting from GrowCo offerings and identified in offering documents, which funds were to be used specifically and solely for the development and operation of GrowCo greenhouses, were intentionally and fraudulently diverted from GrowCo and its affiliated companies to Two Rivers.

12. McKowen incorporates his response to Paragraph 11, as if fully set forth herein.

### SECOND CLAIM FOR RELIEF (Breach of Fiduciary Duty – Harding)

13-17. No answer or response is required from McKowen.  The allegations are directed solely to Crossclaim Defendant Harding.  To the extent that any allegation in Paragraphs 13-17 may be deemed to relate to McKowen, they are denied.

### DEFENSES AND AFFIRMATIVE DEFENSES

1.  The Crossclaims fail to state a claim upon which relief may be granted.

2.  The Crossclaims and alleged damages fail or are barred because of the actions or inactions of other persons, parties, entities, or non-parties over whom or which McKowen had no control or right of control.

3.  At all times relevant hereto, McKowen acted in good faith, and at no time acted either intentionally, negligently, fraudulently, recklessly, or wantonly, with respect to any claims or conduct alleged in the Crossclaims.

4.  McKowen is entitled to, and does, claim the benefits of all defenses and presumptions set forth or arising from any applicable rule of law or statute.

5.  If any claims for breach of fiduciary duty asserted by Cross-Claimant are not barred by the three-year statute of limitations in Colorado, claims for breach of fiduciary duty may be asserted by any party to this proceeding.

6.  McKowen did not know, and could not have known, of any untruths or omissions communicated to investors or prospective investors by any persons who acted unlawfully and/or beyond the scope of their authority.

7. Upon information and belief, any damages alleged in the Crossclaims to have been incurred by Two Rivers were caused by its own actions at a time when McKowen was not involved in the management, direction, or control of Two Rivers, and not by McKowen. Further, McKowen incorporates his answers and responses to Paragraph 11 of the Crossclaims, as if fully set forth herein.

8. Any failures to disclose events claimed to require disclosure, or to have been inadequately disclosed, were based on the advice and actions of experienced and competent securities counsel who were provided with all facts necessary for them to determine whether such disclosure, in whole or part, was required, and upon whom McKowen was entitled to rely.

9. McKowen incorporates by reference herein any defense or affirmative defense which may be apparent from any motions they may file under Rules 12 or 56, C. R. Civ. P.

10. McKowen reserves the right to add affirmative defenses if additional facts become known through discovery.

WHEREFORE, Crossclaim Defendant, JOHN R. MCKOWEN, respectfully requests judgment in his favor on all Crossclaims, that Crossclaim Plaintiff Two Rivers be awarded nothing; that all claims against him be dismissed with prejudice; and the award to him of reasonable attorneys' fees, costs, and expenses, for the frivolous and groundless Crossclaims asserted against him, and for such other and further relief as the Court shall deem warranted.

## AMENDED COUNTER-CROSSCLAIMS AGAINST DEFENDANT AND CROSSCLAIM PLAINTIFF TWO RIVERS WATER & FARMING COMPANY AND CROSSCLAIMS AGAINST DEFENDANTS, TR CAPITAL PARTNERS, LLC, AND THEIR RESPECTIVE AFFILIATES

COME NOW Defendant, Crossclaim Defendant, and Crossclaim Plaintiff, JOHN R. McKOWEN ("McKowen"), Defendant and Crossclaim Plaintiffs, VITANOVA PARTNERS, LLC, and GROWCO, INC., and  for their Crossclaims against TWO RIVERS WATER & FARMING COMPANY,  a n d   TR CAPITAL PARTNERS, LLC, and their respective affiliates ("Two Rivers"), state and allege as follows:

1. McKowen personally invested substantial monies in GrowCo, Inc "(GrowCo") and its related entities, which are defendants in this proceeding.  McKowen is also a majority owner and Sole Managing Member of VitaNova Partners, which purchased a majority of the GrowCo investments from its original investors.  McKowen is the owner of GrowCo interests to the extent of his personal investments, and through VitaNova Partners for the interests purchased by it from original investors in GrowCo.

6

2. McKowen was the Chief Executive Officer and Chairman of the Board ("Board") of Two Rivers from February 8, 2005 to May 26, 2016, on which date he resigned. McKowen had no management, executive or board position, or right to control the affairs of Two Rivers after May 26, 2016.

3. Due to Federal banking regulations, most of which still exist, GrowCo could not open or maintain traditional bank accounts. Consequently, GrowCo deposited with Two Rivers, the monies GrowCo raised from its investors. Two Rivers was responsible for holding these monies in bank accounts and then distributing the monies when and as requested by GrowCo.

4. Upon information and belief, after May 26, 2016, when McKowen was no longer affiliated with, or held management, executive office, or board positions with Two Rivers, and did not have the right or ability to control the disbursement of GrowCo Monies by Two Rivers, their control persons and, perhaps, others not presently known to McKowen, Two Rivers intentionally and fraudulently took and/or diverted funds held by it, which was the property of GrowCo and its affiliated companies, and distributed the funds for individual or collective personal or corporate benefit, and to persons or entities determined by it, and, possibly, to the benefit of other parties presently unknown.

5. At the request of GrowCo, a report was prepared by an independent forensic accounting firm, Betzer Call Lausten Schwartz, in December 2018, which investigated possible financial improprieties relating to the monies deposited with Two Rivers ("Report"). The Report was attached to McKowen's Answer to the underlying Complaint in this case as Exhibit A. The Report is again attached hereto and incorporated by reference herein as Exhibit B. While the Report speaks for itself, it reached the following conclusions with a "reasonable degree of accounting probability":

> "First, GrowCo raised $18,905,500 in seven capital raises from December 2014 to September 2017.
>
> Second, GrowCo spent $8,859,610 on the construction of one greenhouse, the partial construction of another greenhouse, and the financing and management of the tenants.
>
> Third, a net amount of $5,566,381.25 was transferred from GrowCo to Two Rivers and its subsidiary entities or paid by GrowCo on behalf of Two Rivers and its subsidiary entities.
>
> Fourth, twelve of the transactions recorded in QuickBooks to offset amounts owed by Two Rivers to GrowCo are questionable and may not represent legitimate offsets to the amounts owed by Two Rivers to GrowCo. Most notable of these is the journal entry for $6,207,943.50 on August 16, 2017, for which no corroborating

documentation has been provided.

Fifth, based on our analysis thus far, Two Rivers owes GrowCo $4,227,894."

6. At or about the same time as the Report was prepared, GrowCo conducted its own investigation and internal audit of the possible improper diversion of GrowCo Monies by Two Rivers.  That internal audit ("Internal Audit") concluded that, in addition to the Report's finding that $4,227,894 was owed by Two Rivers to GrowCo, an additional $6,728,359 may have been improperly taken by Two Rivers, i.e., monies that belonged to GrowCo, although Two Rivers had no right to, or claim upon, those funds.[1]

7. There has never been the payment or restitution of any of the foregoing monies from Two Rivers to GrowCo.

8. The intentional and fraudulent diversion of GrowCo Monies by Two Rivers resulted in the ultimate failure of GrowCo.

9. After the intentional and fraudulent diversion of GrowCo Monies by Two Rivers, Two Rivers conspired to hide the fact of its conversion from McKowen and VitaNova Partners.

10. McKowen and VitaNova Partners reserve the right to amend their counter-crossclaims, or to amend the pleadings to name additional parties, consistent with the Rules of Civil Procedure, if warranted by disclosures, or written or testimonial discovery.

### FIRST CROSSCLAIM (Breach of Fiduciary Duty by Two Rivers)

11. Paragraphs 1 through 10 are incorporated by reference as if fully set forth herein.

12. Two Rivers had fiduciary responsibilities and acted in a fiduciary capacity by holding monies in its bank accounts on behalf of GrowCo, and was required, as a fiduciary, to distribute those monies ("GrowCo Monies") only as directed by Grow Co or for the benefit of Grow Co.

13. The GrowCo Monies were not to be used by Two Rivers for its own benefit or for the benefit of persons or entities who, or which, were not entitled to them.

14. Upon information and belief, in violation of its fiduciary duties and obligations to GrowCo, Two Rivers, after May 26, 2016 and prior to October 31, 2017, diverted monies belonging to GrowCo and used or distributed them for its individual or collective personal or corporate benefit, or to persons or entities determined by it, and, possibly, to the benefit of parties presently unknown, and not to the benefit of GrowCo.

15. McKowen and VitaNova Partners incorporate by reference Paragraph 14 as if fully set

---

[1]  A spreadsheet of GrowCo's calculations from the Internal Audit are attached hereto and incorporated by reference herein as Exhibit C.

forth herein.  The improper, unauthorized, and fraudulent distributions by Two Rivers of Grow Co Monies to itself, or other persons or entities at its direction, deprived GrowCo and its investors, including McKowen and VitaNova Partners, of monies properly belonging to them, and not to Two Rivers, in violation of its fiduciary duties to GrowCo, McKowen, and VitaNova Partners, and are liable to McKowen and VitaNova Partners for the payments and restoration of all such monies improperly and fraudulently taken, including interest, in such amount as may be proved at trial.

### SECOND COUNTER-CROSSCLAIM (Civil Fraud – Two Rivers)

16. Paragraphs 1-15 are incorporated by reference as if fully set forth herein.

17. Two Rivers was aware that the monies deposited with it by GrowCo was not its property and could not be used by it except for the benefit of GrowCo, or as directed by it.  Rather, upon information and belief, Two Rivers, and those persons in its management and control after May 26, 2016 through October 31, 2017, knowingly, wantonly, willfully, fraudulently and conspiratorially, utilized and diverted the GrowCo Monies, or distributed them, for its individual or collective personal or corporate benefit, or to persons or entities directed by it, and possibly to the benefit of parties presently unknown, and not to the benefit of GrowCo.

18. The improper, unauthorized, and fraudulent distributions by Two Rivers to itself, or others at its direction, has deprived GrowCo and its investors, including McKowen and VitaNova Partners, of GrowCo Monies properly belonging to them, and not to Two Rivers, or any ultimate recipients of the GrowCo Monies, in violation of its contractual obligations, and is liable for the payment of such GrowCo Monies, including interest, in such amount as may be proved at trial.

### THIRD COUNTER-CROSSCLAIM – Conversion (Two Rivers)

19. Paragraphs 1-18 are incorporated by reference as if fully set forth herein.

20. Two Rivers has committed an unauthorized act of ownership and control over GrowCo Monies that uniquely belonged to GrowCo in using them for Two Rivers' benefit, and not to the benefit of GrowCo, McKowen, and VitaNova Partners. GrowCo, alone, had ownership and legitimate interest in the GrowCo Monies when they were improperly utilized or transferred by Two Rivers, and Two Rivers had no right to convert such GrowCo Monies at the time of the conversion.

21. Two Rivers is liable to GrowCo, McKowen, and VitaNova Partners for the payments and

restoration of such monies, including interest, to them in such amount as may be proved at trial.

WHEREFORE, Defendant and Crossclaim Plaintiff John R. McKowen, and Crossclaim Plaintiffs, VitaNova Partners, LLC, and GrowCo, Inc., respectfully request judgment in their favor, and that Crossclaim Defendants Two Rivers Water & Farming Company, and TR Capital Partners, LLC, and their respective affiliates, be found liable for such amounts, including interest, as may be proved at trial; for the award to them of reasonable attorneys' fees, costs, and expenses, as provided by law; and for such other and further relief as the Court may deem warranted.

Respectfully submitted this 29th day of March, 2022, *nunc pro tunc* March 25, 2022.

BERLINER MCDONALD P.C.

s/Martin M. Berliner
Martin M. Berliner, Reg. No. 6316
4380 S. Syracuse Street
Suite 304
Denver, Colorado 80237-2625
Telephone: 303.830.1700 x102
Fax: 303.830.1705
mberliner@berlinermcdonald.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing was E-filed via the Integrated Colorado Court E-Filing System on the 29th day of March, 2022 and served on all counsel of record.

_____

s/Martin M. Berliner

### Letter of Intent

This Letter of Intent ("LOI") is made this 4th day of August, 2021 (the, "LOI Effective Date") by and between Mastronardi Produce Limited ("Mastronardi"), and Vetanova Inc., a Nevada corporation ("Vetanova"), in connection with a potential business venture among the parties relating to the development or acquisition by Vetanova of assets and property to acquire protected agriculture facilities, including controlled environment high-tech greenhouses for the manufacturing, distribution, marketing and sale of fresh produce to local and other markets within the United States and elsewhere (the, "Business Venture"). In this LOI, the term "Territory" means the geographic area that encompasses North America (including, the United States, Canada and Mexico). Mastronardi and Vetanova are collectively referred to as the "parties" and individually as a "party."

**1.    Purpose**

The purpose of this LOI is to define a framework under which all fresh produce that is grown, harvested and/or packaged from protected agriculture facilities, assets or operations and ancillary property therewith, including controlled environment high-tech greenhouses located within the Territory, that are directly or indirectly any or all of, developed, acquired, operated, financed, owned or leased by Vetanova, including their respective subsidiaries and Affiliates and persons with direct, indirect or common control of Vetanova (in each case, a "Vetanova Facility" and collectively, the "Vetanova Facilities") will be purchased by Mastronardi for marketing, distribution and sale to its customers within the Territory and elsewhere. The crops intended to be grown at the Vetanova Facilities consist of fresh fruits and vegetables, including tomatoes, peppers, cucumbers, berries, lettuce and other leafy greens (collectively, the "Products").

**2.    Obligations of the Parties**

The parties to this LOI acknowledge that except as expressly set forth in the below Binding Provisions Section 4 (the, "Binding Provisions"), no contractual relationship or obligation is created by this LOI. Except for the Binding Provisions, the other terms, timing, and plans included in this LOI are non-binding. The parties have entered into this LOI with the express understanding that except for the Binding Provisions, regardless of: (i) this LOI; (ii) any response thereto; (iii) any oral or other written communication; or (iv) any document that may be sent by or on behalf of either Mastronardi or Vetanova to the other, indicating assent to one or more provisions of a prospective agreement incident to the Business Venture contemplated in this LOI, there are and will be no other agreements obligating either Mastronardi or Vetanova to one another, or to any term or provision in this LOI, unless and until additional written agreements are approved, executed and delivered to the other party by both Mastronardi and Vetanova or their respective Affiliate with respect to the Business Venture (collectively, the "Additional Agreements"). Further, the understanding contained in the previous sentence shall nullify any claim that the parties are obligated to each other because of the performance by either party of any act, expenditure of time, money or effort in connection with the proposed Business Venture except with respect to the Binding Provisions.

**3.    The Proposed Framework**

  **3.1.1.**    An overview of the Business Venture further includes the following framework which is consistent with the Binding Provisions of Section 4.

    **3.1.1.1.**    The initial Vetanova Facilities to be developed or acquired by Vetanova are expected to be located in Pueblo County, Colorado. The specific location and type of protected agriculture facility, including the amount of production acreage and Products to be grown, harvested, package, and in turn sold to Mastronardi, is yet to be determined and will be set forth as addendum(s) to the Master Exclusive Purchase and Marketing Agreement in accordance with its terms. The master exclusive long-term purchase and marketing agreement (the, "Purchase and Marketing Agreement") will provide that each Vetanova Facility have an initial term equal to ten (10) years. Vetanova will also require that each tenant or non-owner operator (in each case, a "Tenant"), as a condition of such lease or occupancy of any Vetanova Facility, execute an addendum to be bound to the terms and conditions of the Purchase and Marketing Agreement with respect to such applicable Vetanova Facility, or at Mastronardi's election, a separate exclusive Purchase and Marketing Agreement upon the same material terms and conditions of the Purchase and Marketing Agreement, such election as determined by Mastronardi.

    **3.1.1.2.**    The Purchase and Marketing Agreement will require that all of the Products that meet certain requirements that are manufactured, grown, harvested or packaged at the Vetanova Facilities be exclusively sold by Vetanova (or the applicable Tenant) and purchased by Mastronardi, to be in turn, marketed, distributed and sold by Mastronardi to its customers in accordance with the terms and conditions of the Purchase and Marketing Agreement. The Parties will add any expansion in production of Products at the Vetanova Facilities and any and all additional Vetanova Facilities within the Territory as addendums to the Purchase and Marketing Agreement, to be effective upon the date of first commercial production of Products.

  **3.1.2.    Non-Binding Provision - Mastronardi Recommendations.** Mastronardi may be asked to provide certain general recommendations to Vetanova based upon Mastronardi's experience in the protected agriculture industry - (the, "Mastronardi Recommendations") and not in any professional or other capacity that would give rise to any duty, fiduciary or otherwise. The Mastronardi Recommendations may include recommendations related to the following: future site selection, future identification of governmental and other incentives and grants, general and subcontractor selection, selection of materials and equipment, selection of operational technology, crop selection and growing recommendations. Any binding obligation to provide Mastronardi Recommendations shall be set forth in the Additional Agreements.

DocuSign Envelope ID: B5388E5F-49C9-4553-980D-9FFEC8AD0363
Case:24-01112-KHT    Doc#:21    Filed:08/13/24    Entered:08/13/24 16:07:55    Page231 of 282

2

**4.    Binding Provisions**

The terms and conditions of this Binding Provisions Section 4 is intended to be and is legally binding on the parties. Any legally binding obligations with respect to the contemplated transaction beyond these Binding Provisions will only arise upon execution of any Additional Agreements with respect to such transactions.

**4.1.**    <u>Purchase and Marketing Agreement</u>. Mastronardi shall be granted the exclusive right to sell and market all US Grade No. 1 Products produced from all Vetanova Facilities at market prices in accordance with the terms and conditions of the Purchase and Marketing Agreement. For each sale, Mastronardi shall be paid a marketing fee in an amount equal to ten percent (10%) of the gross sale price plus all costs incurred in the sale and distribution of Products. The parties hereby agree to be bound and incorporate by reference the Purchase and Marketing Agreement attached as **Exhibit A**, including all addendums and as may be amended and superseded from time to time. Upon identification of the geographical location of the first Vetanova Facility, the parties shall execute the Purchase and Marketing Agreement and all addendums thereto, provided that the failure of the parties to execute such agreement shall not invalidate its applicability and terms, which are hereby expressly agreed and binding upon the parties.

**4.2.**    <u>No Transfer of Interest to a Competitor</u>. No holder of a direct or indirect debt or equity interests in Vetanova (including a convertible interest) may directly or indirectly sell, assign, transfer, pledge, encumber or otherwise alienate, hypothecate, or dispose of any such debt or equity interest in a Vetanova Facility to any Person or entity that competes with the Mastronardi Business (the capitalized terms, "Person" and "Mastronardi Business" including the term "Mastronardi Products" contained within such definition, shall have the meanings prescribed in the Purchase and Marketing Agreement.)

**4.3.**    <u>No Restrictions on Mastronardi's Ability to Market Products</u>. Notwithstanding anything to the contrary in this LOI or otherwise, in no event will Mastronardi be prohibited from entering into purchase and marketing agreements or any other agreements with third-parties for any transaction or business whatsoever, including to manufacture, propagate, cultivate, grow, purchase, market, distribute and/or sell plant material and resulting fresh produce, including the Products, anywhere in the world.

**4.4.**    <u>Covenants</u>. Vetanova acknowledge and agrees that as a result of entering into this LOI, including the due diligence that may lead to the development and operation of a Vetanova Facility, Vetanova will have access and obtain knowledge of the Mastronardi Business, including knowledge of Mastronardi's Confidential Information (defined below) including, without limitation, certain facility and crop modeling, crop mix, facility layout, vendor recommendations, and that such knowledge and relationships that if Vetanova were to compete with Mastronardi within the Territory, Mastronardi would be severely and irreparably damaged, and that the restrictive covenants are a fundamental element of the transactions contemplated under this LOI. Accordingly, Vetanova <u>shall not</u>, and shall cause other Persons to, directly or indirectly, either individually, in partnership, jointly, or in conjunction with, or on behalf of, any Person, other than for the direct benefit or upon the written permission of Mastronardi that specifically references this LOI, do any of the following during the period (referred to as the, "Restriction Period") from the LOI Effective Date until the earlier of (i) the commencement of the first Initial Term Commencement Date of a Vetanova Facility, or (ii) the date that is three years from the LOI Effective Date,

**4.4.1.**    employ or engage, recruit, solicit, attempt to employ or engage, or affirmatively assist any other Person in employing, engaging or soliciting for employment or engagement any employee of Mastronardi or any Affiliate ("Affiliate" has the meaning prescribed in the Purchase and Marketing Agreement) without first obtaining Mastronardi's express written consent. Nothing contained herein shall preclude the hiring of any such employee who responds to a general solicitation of employment through a general advertisement not targeted specifically at Mastronardi, its Affiliates or their respective employees, provided that such general advertisement was not directly or indirectly instructed or induced by Vetanova to solicit the employees of Mastronardi or its Affiliates; and

**4.4.2.**    invest, sell, manage, endorse, support, promote, advertise, market, sponsor, operate, control, provide any form of assistance to, or provide services or products, or otherwise engage in any undertaking that compete with the Mastronardi Business in the Territory.

**4.5.**    If any court of competent jurisdiction determines that any of the covenants set forth in this LOI, or any part thereof, is unenforceable because of the duration, geographic scope or terms of such provision, such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this LOI in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to the LOI or by making such other modifications as it deems warranted for the purpose to carry out the intent and agreement of the parties as embodied in the LOI to the maximum extent permitted by applicable law.

**4.6.**    Vetanova hereby acknowledges and agrees that a breach of this LOI with respect to provisions relating to the restrictive covenants will cause Mastronardi and its Affiliates irreparable damages, for which an award of damages would not be adequate compensation and agrees that, in the event of such breach or threatened breach, Mastronardi and its Affiliates will be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court, in addition to any other remedy to which they may be entitled under applicable law, including equity, without posting of a bond

3

or proving actual harm. Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available under applicable law including equity to Mastronardi and its Affiliates.

**4.7.** <u>No Duties</u>. With respect to any and all Mastronardi Recommendations described above and any continued recommendations and information provided by Mastronardi or their respective Affiliates and/or representatives in connection with the Business Venture, Vetanova acknowledges that (i) it is responsible for securing independent advice and opinions, including architectural, engineering, agronomical, or otherwise with respect to its acquisition, development, and operation of and Vetanova Facility and (ii) Mastronardi its Affiliates, owners, officers, directors, employees and representatives are not providing such recommendations in a professional or other capacity that would give rise to any fiduciary or other duties. The parties agree that under no circumstances does Mastronardi guaranty any yield, economic, or other performance projections, or any pricing for any Vetanova Facility in connection with the Business Venture.

**4.8.** <u>Confidentiality</u>. Neither party shall, without the prior written consent of the other party, disclose to any third party (other than the owners, employees, attorneys, accountants, consultants and other professional advisors of such party) (a) the existence of this LOI, (b) the fact that such party or any of its Affiliates or advisors is discussing or negotiating the transactions contemplated hereby, (c) the fact that any discussions or negotiations are taking place concerning the transactions contemplated hereby or any of the terms, conditions or other facts with respect thereto, and (d) any non-public information about the opposing party, its Affiliates and their respective, owners, officers, directors, subsidiaries, that is received from the other party, or on its behalf. The parties acknowledge and agree that (i) this LOI is also subject to (or is otherwise hereby deemed to be subject to) the Mutual Nondisclosure Agreement dated **June 28, 2021** (the "NDA") by and between Mastronardi and Vetanova, incorporate by reference, and (ii) the NDA (including the obligation to destroy or return Confidential Information (as defined in NDA)) continues in full force and effect in accordance with its terms; provided, however, that contemporaneously with the execution by the parties of this LOI, the parties hereby agree that the NDA is amended and modified so that NDA is governed by the governing law and choice of forum selection as provided for in this LOI and the Purchase and Marketing Agreement. The confidentiality provisions shall survive any termination of this LOI.

**4.9.** <u>Governing Law. Choice of Forum; **WAIVER OF JURY TRIAL**</u>. The validity, construction and interpretation of this LOI and the rights and duties of the parties hereto, shall be governed by and construed in accordance with the laws of the State of Michigan, excluding its conflict of laws principles. Any legal action or proceeding arising under this LOI will be brought in the state and federal courts located in the Eastern District of Michigan and the parties hereby irrevocably consent to the personal jurisdiction and venue therein. Each party hereby waives its right to a jury trial for any claims that may arise out of or relate to this LOI. If a provision of this LOI is held invalid under any applicable law, such invalidity will not affect any other provision of this LOI that can be given effect without the invalid provision. Further, all terms and conditions of this LOI will be deemed enforceable to the fullest extent permissible under applicable law, and, when necessary, the court is requested to reform any and all terms or conditions to give them such effect.

**4.10.** <u>Survival</u>. Notwithstanding anything to the contrary, the termination or expiration of this LOI shall not prejudice any rights and remedies of either party which may have accrued under this LOI up to the date of termination or expiration and shall not affect any provision of this LOI which is expressly or by implication intended to come into or remain in effect on or after termination.

**4.11.** <u>LOI Term</u>. The term of this LOI (the, "LOI Term") shall commence on the LOI Effective Date and end on the last day of the Restriction Period.

**4.12.** <u>Expenses</u>. The parties are responsible for their respective expenses incurred in furtherance of the transactions contemplated in this LOI.

**4.13.** <u>No Assignment</u>. This LOI and the rights and obligations hereunder may not be assigned by Vetanova Facility without the prior written consent of Mastronardi and may be modified only by a written agreement signed by the Parties.

**4.14.** <u>Counterparts</u>. This LOI may be signed in counterparts, all of which counterparts together will constitute one document. A facsimile, PDF or electronic transmission of executed copies of this LOI shall constitute complete and valid delivery thereof.

*(remainder blank - signatures contained on next page)*

4

The parties to this LOI through their duly authorized representatives have executed this LOI on the days and dates set out below, and certify that they have read, understood, and agreed to the terms and conditions of this LOI as set forth herein.

| "VETANOVA" | "MASTRONARDI" |
|---|---|
| By: *John Mckowen* (DocuSigned by) F1F9A03D5622481... | By: *David Einstandig* (DocuSigned by) F1214807627A485... |
| Print Name: John Mckowen | Print Name: David Einstandig |
| Title: CEO | Title: SVP and General Counsel |
| Date: 8/4/2021 | Date: 8/4/2021 |
| I have authority to bind the above company | I have authority to bind the above corporation |

**Exhibit**

Exhibit A – Purchase and Marketing Agreement

# MASTER EXCLUSIVE PURCHASE & MARKETING AGREEMENT (USA GROWER)

This Master Exclusive Purchase and Marketing Agreement ("Agreement") is made as of this _____ day of _____, _____ (the, "Effective Date") between Vetanova Inc., a Nevada corporation ("Grower") and Mastronardi Produce Limited, a corporation incorporated pursuant to the Laws of the Province of Ontario, Dominion of Canada ("Mastronardi"). Mastronardi and Grower are collectively the "Parties" and each a "Party".

## Recitals

A.   Mastronardi is engaged in business as an importer, marketer, and/or dealer of fruits and vegetables with experience in domestic and international markets.

B.   Grower conducts business as a cultivator, grower, harvester, producer, marketer and seller of protected agriculture (including greenhouse) grown fresh produce, including, the products set forth on Schedule 1 of the applicable Addendums to this Agreement (collectively and as applicable, the "Products").

C.   Grower owns, leases or otherwise occupies lands and facilities suitable for the commercial production and sale of Products, including, without limitation, the lands and all other buildings, structures, ancillary facilities, real property, fixtures, equipment and personal property used in connection therewith located upon the lands at the Grower's designated facility (or facilities) as applicable and set forth in Addendums to this Agreement (each a, "Facility" and collectively, the "Facilities").

D.   The Parties agree to set forth each Facility that is subject to this Agreement in consecutive Addendums, commencing with Addendum I.A, I.B.., and so forth, as additional Facilities may be added after the Effective Date, each of which is incorporated into this Agreement. In the event that the Parties fail to execute an Addendum for a Facility, such Facility shall be deemed included within and subject to the terms and conditions of this Agreement.

E.   Mastronardi and Grower wish to enter into an agreement by which they will cooperate in the growing, cultivation, harvesting, production, packing and general operation of the Facility, and sale of Products from the Facility by Grower to Mastronardi, upon terms and conditions set forth in this Agreement.

Therefore, in consideration of the mutual covenants herein contained, and of other good and valuable consideration, the Parties incorporate the above Recitals and further agree as follows:

1.   Grower's responsibilities include the following:

1.1. Grower hereby agrees to cultivate, grow, harvest, produce, and sell certain types and quantities of Products, and Mastronardi hereby agrees to purchase certain types and quantities of Products from Grower, in accordance with the terms and conditions of this Agreement. Grower shall grow such Products on the lands comprising of each Facility as set forth in the Addendums. Any additional or change in the geographic location of a Facility must be agreed to by the Parties in writing. Grower is responsible for the production, management, administration and operation of all Facilities and will package all Products applicable to this Agreement.

1.2. During the Term, Grower will, (i) not reduce the growing acres, growing capacity or packaging capacity of any Facility without the prior written consent of Mastronardi, and (ii) use best efforts to cultivate, grow, harvest, produce, package, deliver and sell Products of the Facilities to Mastronardi as contemplated under this Agreement.

2.   Exclusivity; Marketing; Quality; Title; Packaging; Branding.

2.1. Exclusive Production. Beginning on the Initial Term Commencement Date and for the remainder of the Term, Grower shall use one-hundred percent of each Facility in furtherance of the purpose of this Agreement, which includes, without limitation, the entire growing, production, cultivating, harvesting, grading, packaging, distribution and warehousing capacity of each Facility (collectively, the "Production Space") where Grower or any of its Affiliates, any or all of, grows, produces, cultivates, harvests, packages, distributes or warehouses Products, to manufacture and sell Products for Mastronardi's purchase, in accordance with the terms and conditions set forth in this Agreement. For greater certainty, Production Space shall include such space that is a result of the direct or indirect expansion (by way of new construction, acquisition, lease, or otherwise) in any or all of the, growing acreage, growing capacity, or growing, grading, packaging, distribution, warehousing, or related operations of the Facility.

2.2. Exclusive Marketing and Distribution; Liquidated Damages. The Parties further agree that Mastronardi is appointed by Grower as the sole and exclusive distributor of Products for all Facilities and Grower shall only utilize the Facilities in furtherance and in accordance with the terms of this Agreement and Grower shall not directly or indirectly sell, market or distribute the Products, except through Mastronardi. If either or both, (i) Grower intentionally fails or refuses to plant varieties, grow or deliver Products in accordance with the terms and conditions of this Agreement (including a failure or refusal to replanting any diseased or destroyed crop at Mastronardi's direction), or (ii) any breach in exclusivity of this Agreement by Grower; then Grower shall pay to Mastronardi as liquidated damages the sum of $50,000.00 USD for each acre assigned to Mastronardi for the growing season in which the breach occurs and applies, and for each remaining growing season thereafter for which such breach, violation or exclusivity is violated on a per acre basis. Any partial breach or violation of an acre shall be deemed a breach of the entire acre. The Parties further agree that damages would be difficult to ascertain and that the provisions of this Section are reasonable and have been negotiated in good faith.

2

2.3. <u>Compliance Requirements</u>. Grower covenants, guarantees, warrants and agrees that throughout the Term of this Agreement, including any renewal or extension thereof: (a) The quality of the produce delivered by Grower to Mastronardi from the Facilities shall fulfill the requirements of all applicable Laws, including, all Produce and any other products in connection with this Agreement shall be, free of contaminants prohibited by the Laws of all applicable jurisdictions where Products are grown, harvested and sold, will be unadulterated, properly labeled (including Country of Origin Labeling Laws), comply with weight requirements, grown, handled, wholesome, merchantable  and fit for human consumption in accordance with all applicable Laws, (b) Grower is properly registered or shall be registered prior to commencing production, by the United States Food and Drug Administration under the Bioterrorism Act of 2002 and further warrants that it will actively maintain a third party food safety certification from certifying entities recognized in the United States and Canada and further warrants that it will actively maintain a third party food safety certification to the standard required by the top three retailers that sell the Products in North America from certifying entities recognized in the final importing country, and certifications that Grower meets or exceeds applicable Global Food Safety Initiative Standards. Grower will provide a current certificate, audit report, water testing results, and proof of United States Food and Drug Administration (FDA) registration to Mastronardi, (c) The Products will be grown and harvested in compliance with all Good Agricultural Practices and Good Handling Practices for growing and harvesting the Products, and Grower will employ Good Manufacturing Practices and Grower shall provide information requested by Mastronardi to comply with the Foreign Supplier Verification Program under the FDA, and the Food Safety Modernization Act ("FSMA"), and Grower will comply with all occupational health and safety laws and regulations, all published industry standards pertaining to employment and, and all applicable labor Laws, and comply with all applicable international labor treaties, (d) Each Facility inside or outside the United State before Product is delivered to Mastronardi, will be in compliance with all applicable Laws and regulations when it enters the United States, including but not limited to the applicable portions of the Federal insecticide, Fungicide and Rodenticidc Act, the FDA, the FSMA, the and any and all other federal, state, and local Laws and regulations relating to residues, herbicides, pesticides, and other chemical products the "Pesticide Acts") and all applicable regulations adopted under any such Laws. Likewise, Grower will not use any product banned for reasons of unacceptable health or environmental risk by the United States Environmental Protection Agency, (e) Grower will keep complete and up-to-date records, incident to its operations, including the following: Material Safety Data Sheets, dosage rate, dates of application, reason for application, and restricted use chemical permits. Grower shall provide Mastronardi with any information it may require about herbicide, pesticide, or other chemical product applications to the Products, including restricted use chemical pe1mits, chemical use reports, and Material Safety Data Sheets for each chemical applied. Grower agrees that if any chemical residues on the Product exceed tolerances permitted by the Pesticide Acts, in addition to other remedies available at Law, Mastronardi may refuse to ship or market the affected Products or any portion thereof by reason of failure to comply with the requirements of the Pesticide Acts, (f) Grower will maintain current and complete documentation related to its use of crop protection products and other chemicals, environmental management programs, occupational health and safety programs, and food safety programs, and will make such information available to Mastronardi or its duly appointed representative on request either by providing original documentation or by responding to specific inquiries/questionnaires, and (g) Grower will at all times be the sole and exclusive owner of, and has the unrestricted right to transfer, sell and convey all Products sold to Mastronardi under this Agreement, free of any and all liens and encumbrances of any kind. All of the foregoing documentation must be written in the English language. All of the terms and provisions of this paragraph are collectively referred to as the "Compliance Requirements".

2.4. <u>Branding</u>. Mastronardi shall determine, in its absolute and sole discretion, the branding of Products to be marketed and sold by Mastronardi or its Affiliate under this Agreement, which may, but not be limited to include, Mastronardi's SUNSET® brand, Mastronardi or its Affiliates' other brands, a customer private label brand, or such other brand as determined by Mastronardi.

2.5. <u>Quality; Title; Forecasts; Packaging</u>.

(a)  During the Term Grower shall exclusively sell to Mastronardi, and Mastronardi shall purchase from Grower, all of the Products that are any or all of, grown, produced or packaged at the Facilities and which, (i) comply with the terms of this Agreement and further meet or exceed No. 1 grade and import quality standards and equivalents thereof within the United States of America and Canada, including United States Department of Agriculture No. 1 grade and Canada Food Inspection Agency No. 1 grade, and such other export quality standards within North America; (ii) meet or exceed all standards and specifications as required by Mastronardi and its customers, which specifications Grower will be provided; and (iii) comply with the Compliance Requirements (collectively, the "Quality Products"), in accordance with the terms and conditions set forth in this Agreement. Except as expressly provided in this Agreement, Grower shall not directly or indirectly sell, on its own account, or on account of any other Person, distribute, market or sell Quality Products, except through Mastronardi or its Affiliates.

(b)  Grower will produce, pack and have the Products ready for pick up by Mastronardi FCA (Incoterms 2010) from either, the Facility in the United States or applicable mutually agreed upon United States warehouse or distribution facility (in each case, a "US Warehouse") location, in accordance with this Agreement and any respective purchase orders for the Products issued by Mastronardi. Upon pick up of the Products at the Facility or US Warehouse by Mastronardi, Mastronardi assumes among the Parties, risk of loss in transport from the Facility, but does not take title until Product is received, inspected and accepted at the First Destination

Point. Mastronardi will be responsible for the logistics and shipment of the Products from the pick-up from the Facility or US Warehouse to the first destination point where the Products will be first inspected, which may be at a Mastronardi or Affiliate facility, Mastronardi designated third party facility, or a Mastronardi customer facility (in each case, the "First Destination Point"), which costs are included within Mastronardi's costs of sale and distribution and are in addition to Mastronardi's Marketing Fee, as provided for in determining the Price.

(c)  Upon delivery of the Products by Mastronardi to the First Destination Point, Mastronardi (or its customer) has the right within ten (10) days of receipt of such Products at the First Destination Point (each, an "Inspection Period"), to inspect the quality of the Products and shall have the right to notify Grower that the Products fail to meet the Quality Products standards or other requirements under this Agreement (in each case, "Non-Quality Products"), in which case, subject to Mastronardi exercising its right under the Non-Quality ROFR, Grower shall accept, at Grower's cost, a return of the Non-Quality Products as rejected under this Agreement, or otherwise provide for the destruction of such Non-Quality Products at Grower's cost and expense. In addition, Mastronardi may, in its sole discretion as a result of Products failing to meet the Quality Products or other standards under this Agreement, grade the Products and charge Grower all costs and fees incurred incident thereto, including repack, freight and facility costs, as reasonably determined by Mastronardi. Mastronardi will provide to Grower upon request reasonable documentation for the basis of rejections. Notwithstanding anything herein or otherwise to the contrary, (i) Mastronardi shall have the right but no the requirement, to call for a USDA inspection, including within seventy-two (72) hours of receipt of the Product at the First Destination Point, and (ii) Grower will accept inspection reports, if Mastronardi elects to obtain one, from any of the following as determined by Mastronardi, as the true quality and condition of the Products for all purposes: USDA Inspection; Mastronardi or its Affiliate In-House Inspection; Mastronardi Customer Inspection; and Third Party Private Inspection.

(d)  If Mastronardi (or its customer) returns, rejects or otherwise refuses the Products on the basis that the Products are Non-Quality Products, subject to Mastronardi exercising its right under the Non-Quality ROFR, Grower shall have the right, at its sole cost, to sell or otherwise dispose of such Non-Quality Products to a third party buyer, provided that Grower shall be prohibited from using any of Mastronardi's Intellectual Property in its marketing, promotion, solicitation for orders, or other activities relating to the disposition of such Non-Quality Products, including use of any Mastronardi's SUNSET® brand or customer brands on any packaging, documentation, or in any manner whatsoever. Notwithstanding the foregoing, Grower acknowledges and agrees that Mastronardi will not pay Grower for Products grown by Grower and sent to Mastronardi that are not Quality Products with the exception of Non-Quality Products purchased by Mastronardi or any of its Affiliates pursuant to the Non-Quality ROFR and to the extent any net sale proceeds are due Grower for such Non-Quality Products sale.

(e)  At any time during the Term, within an Inspection Period, Mastronardi shall have to right to notify Grower that Mastronardi or any of its Affiliates intends to purchase some or all of such Non-Quality Products at an open price after sale to a secondary market in accordance with the Price (defined below), subject to and in accordance with the other terms and conditions of this Agreement (the "Non-Quality ROFR"). If Mastronardi does not exercise its Non-Quality ROFR to purchase Non-Quality Products, such Non-Quality Products shall be deemed rejected and all costs and expenses incurred for return, handling or disposition of Non-Quality rejected Products shall be borne by Grower.

3.  Forecasts; Varieties.  All varieties planted are to be approved by Mastronardi in writing. Mastronardi will determine the specifications of the Product, timeframe of the crops and any interplant schedule. Given enough time to make adjustments before the beginning of each cultivation season during the Term, Grower and Mastronardi will consult with each other to plan future marketing and sales strategies for the following season, including forecasting the type of seeds and products to be grown as well as the quantities that should be cultivated for the next season and the approximate pack and schedule of delivery together with a forecast of future sales (in each case a, "Future Forecast" and collectively with the Initial Forecast referred to as a, "Forecast"). Notwithstanding anything to the contrary in this Agreement or otherwise, if Grower's actual delivery of Product under this Agreement varies by more than ten percent above or below (10%+/-) either or both, the Forecast or any applicable pack schedule for any applicable period, then (a) in the event that the Parties agreed to any set prices during any applicable Term, at Mastronardi's option, the Product prices for such period shall be determined based upon the Open Price method described above, and (b) for any such Product (open or set price) during any applicable Term with such Forecast variance, all such Product shall be and is deemed as non-conforming Product that does not conform to the terms of this Agreement, in which case Grower is also responsible for all costs and expense for such non-conformity including all costs and expenses incurred in obtaining conforming, replacement and/or supplemental Product, as reasonable determined by Mastronardi.

4.  Packaging.  Grower will produce, pack and deliver to Mastronardi, the Quality Products in the manner set forth in this Agreement, and Mastronardi shall market and sell such Quality Products, directly or indirectly, to customers in any or all of North America, Asia and Europe. Grower will only package Quality Products under Mastronardi's approved packaging and procedures for the growing, packaging, and shipping of the Quality Products. Mastronardi hereby represents and warrants to Grower that it owns, or has a right to use, any and all intellectual property incorporated into the packaging approved by Mastronardi. All packaging of the Quality Products shall be



4

purchased from either Mastronardi, an approved Affiliate of Mastronardi, or an approved supplier by Mastronardi. Unless agreed to otherwise in writing by Grower and Mastronardi, on a growing season basis, packaging prices to be paid by Grower and other sale terms will be set forth in sales invoices issued by Mastronardi or an Affiliate of Mastronardi to Grower. Mastronardi may in its sole discretion design and set the specifications for the packaging materials and the placement of all labeling and markings thereon. Mastronardi may reject nonconforming packaging materials on inspection at Mastronardi's sole discretion. Grower may not use the packaging materials for any purpose other than those expressly authorized in this Agreement and will return any unused packaging materials to Mastronardi or store such materials for later permitted use. Grower is not to inventory more than four (4) weeks of packaging materials for any given pack format. At the end of the Term, or upon any change to the packaging required by Mastronardi, Mastronardi will purchase the unused packaging applicable to the Quality Products up to the four (4) week inventory. If Grower does store more inventory levels than required by Mastronardi and the pack format changes, Mastronardi is not responsible for any dollar value, costs or other charges, claims or damages above and beyond the four (4) week inventory. Grower further warrants and represents that it will use packaging, labels, cartons, reusable plastic containers, bags and other similar materials purchased or received from Mastronardi or its Affiliate solely and exclusively in furtherance of this Agreement for which Mastronardi receives a benefit (and specifically not to benefit any competitor of Mastronardi).

5.    Open Price; Marketing Fee. Mastronardi will, except as specifically set forth in this Agreement (including any Addendums) and subject to Mastronardi's reasonable business judgment, use commercially reasonable efforts to endeavor to obtain market prices for the Quality Products that are consistent with the best and highest prices available on average over the duration of the applicable growing season, based upon and subject to seasonality, prevailing market conditions and customer commitments at the time and location of sale. Mastronardi is permitted to pool Products and costs in furtherance of utilizing its judgment during the duration of the growing season or Term. Except as may be set forth otherwise in this Agreement or in a separate written agreement by the Parties including fixed price transactions, the Parties hereby further agree and intend to establish sales terms consistent with the foregoing with respect to all produce related transactions contemplated or otherwise actually performed under this Agreement, in which case all prices include packaging and labor costs and expenses and Grower shall be paid the sale price of the Quality Product sold by Mastronardi, less a marketing fee to be paid by Grower to Mastronardi in an amount equal to ten percent (10%) of the gross sale price of the Quality Product sold by Mastronardi plus all of Mastronardi and its Affiliates' costs incurred in the sale and distribution of the Product, as reasonably determined by Mastronardi (the "Price").

6.    Set Off Rights. Notwithstanding anything to the contrary in this Agreement, and without prejudice to any other right or remedy it has or may have, Mastronardi may, set off or recoup any liability it owes to Grower against any liability for which Mastronardi determines Grower is liable to Mastronardi or any of its Affiliates, including, any amounts owed for packaging, seeds, claims, damages, advance payments or loans made to Grower or any Affiliate. The Parties hereby agree and intend to establish a running account that runs to the end of each relevant growing season and, therefore, is not a divisible contract for the sale of produce.

7.    Expansion of Production or Facilities.

    7.1.    Additional Production. Products to be sold by Grower to Mastronardi are intended to include the entire Production Space of the Facilities. The Parties agree that any products that arise as a result of the direct or indirect expansion in growing acreage or growing operations by Grower including any Affiliates or Persons under common control that utilize some or all of the same assets or operations of the Facilities (including by way of example, any or all of shared or common real property, personal property, production, grading, packaging, shipping, administrative, office, ingress, egress, basins, infrastructure, heating, ventilation, cooling systems, basin, stormwater, computer and labor management systems) (the "Additional Products ROFR"). The Additional Products ROFR shall be provided to Mastronardi in writing (in each case, a "RFR Notice"), in which case and at Mastronardi's election to be made within thirty (30) business days of receipt of a RFR Notice, Mastronardi shall have the right to elect to include any or all of such Additional Products with the Products of this Agreement ("RFR Election") for the remainder of the Term for the applicable Facility. Grower's failure to grant Mastronardi any right of first refusal shall be deemed a breach of the exclusivity provisions of this Agreement, and for each failure Grower shall pay to Mastronardi for the remainder of the Term liquidated damages in the sum of $50,000.00 USD for each acre used to grow the Additional Products for the growing season in which the breach occurs, and for each remaining growing season thereafter for which such exclusivity is violated on a per acre basis for the remainder of the Term for each applicable Facility. Any partial breach in exclusivity of an acre shall be deemed a breach of the entire acre. The remedies in this section are in addition to any other actions or remedies Mastronardi may be entitled to under applicable Law. The Parties further agree that damages would be difficult to ascertain and that the provisions of this Section are reasonable and have been negotiated in good faith.

        (a)    Additional North America Facilities.   In the event that during the Term, Grower, or any of Growers' Affiliates, directly or indirectly, conduct business in the growing, harvesting or manufacturing of fresh produce from protected agriculture facilities, including controlled environment high-tech greenhouses for the manufacturing, distribution, marketing and sale of fresh produce located in the geographic area (the, "Territory") that encompasses North America including, the United States, Canada and Mexico, including



5

their respective protectorates (in each case, a "New Grower Facility"), then each New Grower Facility shall be and is hereby deemed, at Mastronardi's election on a product by product basis, to be under a purchase and marketing agreement with Mastronardi for a term equal to ten (10) years and under the same material terms and conditions of this Agreement, as applicable to each New Grower Facility, as may be amended, replaced or superseded by the written agreement of the Parties, which grower agreement terms shall survive any subsequent termination of this Agreement (the, "New Grower Facility ROFR"). With respect to Mastronardi's timing in which to elect to exercise its New Grower Facility ROFR under this Section, the provision and time frame of the RFR Notice and RFR Election above for Additional Production will apply to each New Grower Facility on a case by case and product by product basis. The Parties agree that the intent of this provision is to insure that all fresh produce products grown directly or indirectly in a New Grower Facility during the Term, shall first be offered to be sold and marketed by Mastronardi in accordance with the provisions set forth herein for an Initial Term of ten (10) years. Grower's failure to grant Mastronardi any right of first refusal with respect to each New Grower Facility shall be deemed a breach of the exclusivity provisions of this Agreement, and for each failure Grower shall pay to Mastronardi for the remainder of the Term liquidated damages in the sum of $50,000.00 USD for each acre used to grow the production of the New Grower Facility for the growing season in which the breach occurs, and for each remaining growing season thereafter for which such exclusivity is violated on a per acre basis for the remainder of the Term. Any partial breach in exclusivity of an acre shall be deemed a breach of the entire acre. The remedies in this section are in addition to any other actions or remedies Mastronardi may be entitled to under applicable Law. The Parties further agree that damages would be difficult to ascertain and that the provisions of this Section are reasonable and have been negotiated in good faith. For purposes of determining a New Grower Facility for which Mastronardi makes a RFR Election, the "same material terms and conditions of this Agreement" means that, the same terms and conditions of this Agreement shall apply as to all New Grower Facilities, except that, (i) the Parties will identify the specific facility (that will then become a, Facility) and location and number of growing / production acreage, (ii) the varietals to be grown will be determined in accordance with the terms of this Agreement and may differ from another Facility, and (iii) the applicable Facility term will commence as of the date of first commercial planting.

7.2. The Additional Products ROFR and New Grower Facility ROFR are collectively referred to as the, "ROFR's" and individually as a "ROFR"). The ROFR's shall be further subject to the following:

(a) Each RFR Notice under the ROFR's shall, (a) be provided to Mastronardi, no earlier than one (1) year prior, and no later than six (6) months before, the expected first commercial harvest for the applicable growing / production acreage to the ROFR's (provided that Mastronardi has the right and discretion to waive such notice provisions), and (b) contain with reasonable specificity, the following: (A) the geographical location within the Territory of the Facility for which the additional growing acreage or growing operations and/or the New Grower Facility is located within the Territory, (B) the amount of growing / production acreage, (C) the design and build specifications of the applicable additional growing acreage and/or production capacity of the New Grower Facility, and (D) the date of expected first commercial harvest for such additional or New Grower Facility production.

(b) Each RFR Notice under the ROFR's shall also provide contingency information in the event that Mastronardi does not elect to proceed under the applicable ROFR, which shall include the following: (A) the location and identification of each variety to be planted, (B) the amount of growing / production acreage for each variety, (C) the crop mix and planting schedule, and (D) length of the growing season for each variety which shall be set for an industry recognized growing season that will not include any short or bumper crop, and will not consist of any varietal that are proprietary to Mastronardi (collectively, the "Contingency Information"). Upon receipt of a RFR Notice that complies with all of the foregoing and time being of the essence, Mastronardi will thereafter have as provided for above, a thirty (30) business day period under the ROFR's from receipt of the applicable RFR Notice in which to make an RFR Election under the applicable ROFR (the "Election Period"). Any deficiencies in any RFR Notice including compliance with the time period in which to provide the RFR Notice shall be a complete bar in which Grower may proceed with the underlying transaction contemplated in the Contingency Information, and Mastronardi's rights under the ROFR's, including the rights to provide a RFR Election during the Election Period, shall renew on an evergreen basis.

(c) In the event of either or both, the Additional Products ROFR or a New Grower Facility ROFR, the Parties shall promptly document such undertakings in the form and consecutive addendum and schedules to this Agreement consistent with the Addendum I.A, Schedule 1, attached hereto; provided, however, the failure to document addendums and schedules shall not invalidate the obligations and rights provided for in this Agreement.

(d) In the event that Grower has provided a timely and valid Additional Products ROFR and New Grower Facility ROFR, as applicable, and Mastronardi has timely elected not to proceed with such ROFR or otherwise not responded to the RFR Notice within the applicable Election Period, Grower may proceed with the transaction in the manner set forth in the RFR Notice and the Contingency Information, and in accordance with the Permissive Activities as defined and set forth in Exhibit A, provided, however, in the event that during the Term, Grower and/or the facility operations contemplated under the applicable RFR Notice are not consistent



with the RFR Notice including the Contingency Information variance in varieties, crop mix and planting schedules, then Mastronardi's rights under the ROFR's, including the rights to provide a RFR Election during the Election Period, shall renew on an evergreen basis.

8.    <u>Grower Liaison</u>. Mastronardi at its own discretion may maintain, at its own expense, at the Facilities, a member of its organization at any time during the Term, including, before, during or after the growing season in coordination with Grower's management team and growing schedule to undertake actions consistent with this Agreement, including, administration questions related to the fulfillment of Mastronardi and Grower obligations set out in this Agreement and verification of the quantities and qualities of the Products produced at the Facility. Grower shall provide, at no cost to Mastronardi, reasonable office facilities to accommodate any Person designated by Mastronardi pursuant to this section.

8.1. Grower will actively pursue obtaining and shall maintain as applicable for all Products sold to Mastronardi during the entire Term, products liability insurance covering risks for Products shipped to Mastronardi in the United States and Canada with a minimum coverage of $2,000,000 USD per incident and with Mastronardi as an additional named insured on such policy and Grower will further provide Mastronardi with a certificate of insurance reflecting such coverage. Grower will completely indemnify Mastronardi against any product liability claims that arise or relate to the Products that are directly or indirectly caused by or attributable to Grower. Grower hereby further agrees to fully indemnify Mastronardi, and to fully provide for the cost of any defense and to hold Mastronardi and any and all of its Affiliates, subsidiaries, parents, officers, directors, owners, employees and agents, completely harmless from any and all liability arising out of Grower's failure, for any reason, to comply with the Grower's warranties, representations and obligations in this Agreement. Mastronardi has full discretion to honor any customer request to return or reject Products previously purchased or delivered when such customer request is based upon any import alert or other recall or product safety announcement by any Governmental Authority, or in circumstances that Mastronardi believes is appropriate to protect its image and brand.

9.    <u>Notice</u>. All communications between Mastronardi and Grower for the purposes of this Agreement shall be delivered by either, hand delivery, email or overnight currier, at the address shown below for Mastronardi, and at Grower's Address for Notice as set forth in the applicable Addendum I:

    Mastronardi Produce Limited
    2100 Road 4 East
    Kingsville, Ontario
    Canada N9Y 2E5
    Attention: Paul Mastronardi
    Email Address: Paul.Mastronardi@sunsetgrown.com

        <u>With copies to</u>:
            Paul Mastronardi
            Paul.Mastronardi@sunsetgrown.com

            Kevin Safrance
            Kevin.Safrance@sunsetgrown.com

            Jason Whitcher
            Jason.Whitcher@sunsetgrown.com

            David Einstandig
            David.Einstandig@sunsetgrown.com

Any transmission by e-mail will be deemed to have been presumably received on the business day next following the transmission of such communication by e-mail, subject to reasonable proof that the communication was received. Any communication delivered by hand will be deemed to have been received on the date of receipt. Any communication sent by internationally recognized courier will be deemed to have been received on the date of receipt as shown in the records of the courier service used for such delivery.

10.    <u>Assignment</u>. This Agreement may be assignable by Mastronardi either directly or indirectly, to an Affiliate of Mastronardi or to a successor of Mastronardi in connection with a sale of substantially all of the equity or assets of Mastronardi. Grower shall not assign this Agreement or any obligations therein without the prior written consent of Mastronardi

11.    <u>Confidentiality</u>. Mastronardi and Grower shall during the Term of this Agreement and thereafter treat as confidential any and all information learned by the other concerning the non-public business or affairs of the other including, but not limited to, all documents, pacts, agreements, contracts, price policies, letters of credit, designs, verbal, written, electronic, digital, etc. information ("**Confidential**

7

Information") and, in particular, Grower and Mastronardi agree that no Confidential Information available for both Parties in this Agreement shall be shared with third parties without the written permission of both parties. In the event a Party receives a subpoena or other court or similar process for Confidential Information, such receiving Party shall promptly notify the other Party of such facts in order for such Party to undertake a timely objection to such process or proceeding. The term Confidential Information does not include information which: (i) is already in a Party's possession if such information is not subject to another confidentiality agreement with the non-disclosing Party; (ii) is currently available from public records; (iii) becomes generally available to the public other than as a result of a disclosure by a Party, its managers, members, directors, officers, shareholders, employees, agents or advisors; (iv) becomes available to a Party on a non-confidential basis from a source other than the non-disclosing Party, provided that such source is not bound by a confidentiality agreement with the non-disclosing Party; or (v) is independently developed by the Party without regard to Confidential Information as evidenced by contemporaneous written documentation. These confidentiality provisions are intended to be construed in connection with and not in replacement of any non-disclosure and confidentiality agreement that governs the parties that was entered into contemporaneously or prior to the Effective Date, provided, however, if there is any conflict between the governing Law and choice of forum provisions, the provisions of this Agreement for governing Law and choice of forum shall prevail.

12. The relationship between Mastronardi and Grower is that of an independent contractor and each Party will be responsible for the remittance of its own employee deductions and taxes. Neither Party will have any right to any additional remuneration or benefits provided by a Party to its employees. Mastronardi and Grower will be responsible for their own remittance of any income, goods and service, or other applicable taxes. Grower and Mastronardi will be responsible for their own professional expenses, including legal, accounting, and other professional fees.

13. Term.

13.1. Initial Term. The initial term of this Agreement shall be for ten (10) years commencing on the Initial Term Commencement Date as set forth in the applicable Addendum for each Facility, such Initial Term Commencement Dates as reasonably determined by Mastronardi; provided that the Initial Term of this Agreement shall be extended for any period in which an Initial Facility Term of a particular Facility in any applicable Addendum is in effect (the "Initial Term"). A growing season is typically a one (1) year period, provided, however, growing season and harvest dates may be reasonably adjusted by Mastronardi based on planting schedules, product quality, market and other conditions. In the event of any discrepancy as to the growing season and harvest dates under this Agreement, any and all such discrepancies shall be determined by Mastronardi. For clarity, the Parties intend that Mastronardi shall be afforded the exclusive right to distribute and market Products for the an initial term of ten (10) years (plus any Renewal Term) on a Facility by Facility basis (and as otherwise provided for in the ROFR's that may be on a facility by facility or variety by variety basis, at Mastronardi's election) for all Facilities owned or controlled by Grower in the Territory until such time as this Agreement is terminated as provided for herein.

13.2. Initial Facility Term; Renewal Term. At the end of the Initial Facility Term set forth in Addendum I for each applicable Facility, the Initial Facility Term for each applicable Facility shall be automatically extended for additional three (3) year terms (in each case a, "Renewal Term"), unless terminated by written notice by one Party to the other Party not later than two (2) calendar years prior to the end of the then applicable Term, on a Facility by Facility basis. The Initial Facility Term and any Renewal Term shall be collectively referred to as the "Term."

14. Termination.

14.1. Notwithstanding the above, this Agreement may be immediately terminated by either Party if:

(a) at the election of the other Party, if bankruptcy or insolvency proceedings are instituted by or against a Party, that are not otherwise dismissed within ninety (90) days of implementation of such proceedings that are not voluntarily commenced by the applicable Party;

(b) the Parties mutually agree in writing; or

(c) at the election of the non-breaching Party, upon the breach of any provision of this Agreement by the breaching Party, which has not been corrected within thirty (30) days of the giving of the notice of such breach by the non-breaching Party to the breaching Party, provided, however, the obligation of Grower to either or both, timely deliver Products and maintain exclusivity for all Production Space in favor of Mastronardi shall at Mastronardi's election not be subject to cure.

15. All payments to be made by Mastronardi to Grower for the Products purchased by Mastronardi in accordance with this Agreement, shall be made by bank transfer or any other means acceptable to both Parties in US dollars. All payments to be made by Mastronardi to Grower shall be paid no later than twenty-four (24) calendar days after the date of delivery of the Products to the First Destination Point. Grower will provide to Mastronardi on an ongoing basis the name of its bank and its account number for bank transfer purposes. Grower



8

shall provide Mastronardi with the corresponding invoices, which shall comply with all the legal and tax requirements established by the then applicable Laws.

16. <u>Indemnification</u>. Grower covenants and agrees to fully indemnify, defend and hold Mastronardi, its Affiliates, subsidiaries, officers, directors, employees, contractors, representatives, attorneys-in-fact, agents and any other Persons for whom Mastronardi is legally responsible (collectively, the "<u>Mastronardi Parties</u>"), harmless, individually and collectively, from and against any and all costs (including attorney fees, consultant fees and expert fees), claims, liens, damages, losses, expenses, fees, fines, penalties, proceedings, actions, demands, causes of action, liability and suits of any kind and nature, including but not limited to, personal or bodily injury, death and property damage, made upon any of the Mastronardi Parties, directly or indirectly arising out of, resulting from or related to: Grower, its Affiliates, subsidiaries, officers, agents, representatives, contractors, employees, directors or Person for whom Grower is legally responsible  (collectively, the "<u>Grower Parties</u>"), (i) breach of this Agreement or any other agreement with Mastronardi, and (ii) any of the Grower Parties' acts or omissions, including negligence or intentional misconduct and any acts or omissions of any Grower Parties while in the exercise of performance of the rights or duties under this Agreement or otherwise. The provisions of this indemnity are solely for the benefit of the Mastronardi Parties hereto and not intended to create or grant any rights, contractual or otherwise, to any other Person or entity. Grower shall notify Mastronardi in writing within 24 hours of any material claim or demand against Mastronardi related to or arising out of Grower's activities under this Agreement and Grower shall see to the investigation and defense of such claim. Mastronardi shall have the right, at its option and at its own expense, to participate in such defense without relieving Grower of any of its obligations under this paragraph.

17. <u>Restrictive Covenants</u>. Grower agrees and shall be subject to and governed by the terms of **Exhibit A**, including the non-Solicitation and Employ and Non-Competition provisions, set forth and incorporated herein.

18. <u>Governing Law Choice of Forum</u>. The validity, construction and interpretation of this Agreement and the rights and duties of the Parties hereto, shall be governed by and construed in accordance with the laws of the State of Michigan, excluding its conflict of laws principles. Any legal action or proceeding arising under this Agreement will be brought in the state and federal courts located in the Eastern District of Michigan and the Parties hereby irrevocably consent to the personal jurisdiction and venue therein.

19. <u>Survival</u>. Termination or expiration of this Agreement shall not prejudice any rights and remedies of either Party which may have accrued under this Agreement up to the date of termination or expiration and shall not affect any provision of this Agreement which is expressly or by implication intended to come into or remain in effect on or after termination, including, without limitation, Section 11 (Confidentiality), Section 16 (Indemnification), Section 17 (Restrictive Covenants), Section 18 (Governing Law; Choice of Forum), Section 19 (Survival), Section 20 (Incorporation), Section 21 (Definitions), Section 22 (Miscellaneous), Section 23 (Waiver of Jury Trial) and Section 24 (Force Majeure).

20. <u>Incorporation of Addendums, Appendices, Schedules and Exhibits</u>.  Except as set forth expressly to the contrary, any and all Addendums, Appendices, Schedules and Exhibits identified in this Agreement are incorporated herein by reference and made a part hereof as if set out in full in this Agreement.

21. As used in this Agreement, the following terms shall have the meanings set forth below:

(a) "<u>Affiliate</u>" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "<u>control</u>" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise.

(b) "<u>Governmental Authority</u>" means the government of the United States, Canada, Mexico or any other nation, or of any political subdivision thereof, whether state, provincial, territorial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

(c) "<u>Law</u>" and "<u>Laws</u>" means, collectively, all international, foreign, Federal, state, provincial, territorial and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of Law.

(d) "<u>Person</u>" means an individual, corporation, limited liability company, partnership, joint venture, trust or any other organization or association or other form of business enterprise or a Governmental Authority.



9

22. <u>Miscellaneous</u>. This Agreement may be executed in counterpart copies, and, in the absence of an original signature, faxed, PDF or other electronic signatures will be considered the equivalent of an original signature. If a provision of this Agreement is held invalid under any applicable Law, such invalidity will not affect any other provision of this Agreement that can be given effect without the invalid provision. Further, all terms and conditions of this Agreement will be deemed enforceable to the fullest extent permissible under applicable Laws, and, when necessary, the court is requested to reform any and all terms or conditions to give them such effect.

23. **WAIVER JURY TRIAL**. THE PARTIES HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHT, POWER, OR REMEDY UNDER OR IN CONNECTION WITH OR RELATED TO THIS AGREEMENT, OR IN CONNECTION WITH ANY AMENDMENT, INSTRUMENT, DOCUMENT, OR AGREEMENT DELIVERED OR THAT MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS AND DEALINGS BETWEEN THE PARTIES TO THIS AGREEMENT (INCLUDING ALL CLAIMS IN TORT, CONTRACT OR OTHERWISE), AND AGREE THAT ANY SUCH ACTION PERMITTED BY THIS AGREEMENT TO BE TRIED BEFORE A COURT OF COMPETENT JURISDICTION SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE TERMS AND PROVISIONS OF THIS SECTION CONSTITUTE A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.

24. <u>Force Majeure</u>. If a Party is prevented from complying, either totally or in part, with any of the terms or provisions of this Agreement by reason of any cause beyond the reasonable control of such Party, including (but only to the extent beyond the reasonable control of such Party), fire, flood, storm, strike, lockout or other similar work stoppage, embargoes or blockades, any applicable Laws, judicial or administrative process or proceeding, proclamation, ordinance, executive order, demand or requirement of any Governmental Authority, pandemic, riot, war, rebellion, emergencies, terrorist act, terrorism, earthquakes, hurricanes, nuclear accident, power outage, blackout, shortage of adequate power or transportation facilities, or other acts of God (in each case, a "<u>Force Majeure Event</u>"), then upon written notice to the other Party, the affected provisions and/or other requirements of this Agreement, including regarding, payment for interrupted services or obligations to purchase any or all requirements, shall be suspended or reduced by an amount consistent with reductions made to the other operations and business of such Party affected by the Force Majeure Event, and during the period of such disability, the affected Party shall have no liability to the other Party in connection therewith to the extent of such impairment and unless the affected Party is covered by insurance for a portion or all of the amount of loss owed to the other Party; provided, however, that upon the occurrence of a Force Majeure Event, the affected Party shall promptly implement its own business continuity plan and disaster recovery plan, as applicable, in order to resume its obligations and duties under this Agreement.

The Parties have executed this Agreement to be effective on and as of the Effective Date.

*(Signatures contained on next page)*



DocuSign Envelope ID: B5438665-F-49C9-4553-980D-0FFECD8D0368

| **"GROWER"** | **"MASTRONARDI"** |
|---|---|
| **VETANOVA INC.** | **MASTRONARDI PRODUCE LIMITED** |
| By:_____ | By:_____ |
| Print Name: _____ | Print Name: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |
| Signed in _____ | Signed in _____ |
| I have authority to bind the above company | I have authority to bind the corporation |

Master USA Purchase and Marketing Agreement (June 2021)

*Signature Page Grower Agreement*

11

# EXHIBIT A

## Non-Solicitation and Non-Competition Restrictive Covenants

Grower and Mastronardi further agree to the following Non-Solicitation and Non-Competition provisions. Capitalized terms not otherwise defined in this Exhibit A will have the meanings set forth in the body of the Master Exclusive Purchase and Marketing Agreement of which this exhibit is a part.

1.    Additional Definitions.

    (a)    "Mastronardi Business" means the business of Mastronardi and its Affiliates consisting of any or all of, the (i) growing, producing, procuring, packaging, warehousing, selling, marketing and distributing Mastronardi Products, and (ii) any services or products related to the foregoing.

    (b)    "Mastronardi Products" means, fresh produce products that are, (i) Products that are any or all of, grown, harvested, packaged, furnished, distributed or sold from operations of the Facility to Mastronardi at any time during the Term of the Agreement, and (ii) field or protected agriculture manufactured fresh produce products (including greenhouse products) consisting of, (y) fresh tomatoes, cucumbers, peppers, lettuce, leafy greens and berries (including strawberries, raspberries, blueberries, blackberries), and (z) any other produce products that are offered for sale by Mastronardi or its Affiliates in North America at any time during the Term.

2.    Grower on behalf of Grower and Grower Parties acknowledge and agrees that as a result of entering into the Agreement and conducting business with Mastronardi, including the development and operation of a Facility, Grower and Grower Parties have intimate knowledge of the Mastronardi Business, including knowledge of Mastronardi's Confidential Information and relationships with its customers, vendors, suppliers and growers, and that such knowledge and relationships are such that if Grower or Grower Parties were to compete with Mastronardi or the other Mastronardi Parties within the geographical area that encompasses North America, including the United States, Canada and Mexico (collectively, the "Territory"), Mastronardi would be severely and irreparably damaged, and that the restrictive covenants are a fundamental element of the transactions contemplated under the Agreement. Accordingly, Grower and Grower Parties shall not, and shall cause the other Grower Parties not to, directly or indirectly, either individually, in partnership, jointly, or in conjunction with, or on behalf of, any Person, other than for the direct benefit or upon the written permission of Mastronardi that specifically references this Exhibit A, do any of the following:

    (a)    Non-Solicitation and Employ  During the Term of the Agreement and for a period of two (2) years thereafter, employ or engage, recruit, solicit, attempt to employ or engage, or affirmatively assist any other Person in employing, engaging or soliciting for employment or engagement any employee of Mastronardi or any of its Affiliates without first obtaining Mastronardi's express written consent. Nothing contained herein shall preclude the hiring of any such employee who responds to a general solicitation of employment through a general advertisement not targeted specifically at Mastronardi, its Affiliates or their respective employees, provided that such general advertisement was not directly or indirectly instructed or induced by the Grower or any of the other Grower Parties to solicit the employees of Mastronardi or its Affiliates;

    (b)    No Solicitation of Customers. During the Term of the Agreement and for a period of two (2) years thereafter, solicit sales of any fresh produce products sold or distributed by Mastronardi or its Affiliates in the Territory, Asia or Europe, for a period of two years following the termination of this Agreement, from any customer of Mastronardi or any customer introduced by Mastronardi to Grower, without the prior written consent of Mastronardi; and

    (c)    Non-Compete Mastronardi Business. During the Term of the Agreement, invest, sell, manage, endorse, support, promote, advertise, market, sponsor, operate, control, provide any form of assistance to, or provide services or products, or otherwise engage in any undertaking that compete with the Mastronardi Business in the Territory provided, however, in the event that Grower is not in breach of the Agreement or any other agreement among Grower and/or its Affiliates, and Mastronardi and/or its Affiliates, the following shall be permitted subject to the terms and conditions set forth, below:

Permissible Activities. Under Section 7.2(d) of the Agreement, in the event that Grower has provided a timely and valid Additional Products ROFR and New Grower Facility ROFR, as applicable, and Mastronardi has timely elected not to proceed with such ROFR or otherwise not responded to the RFR Notice within the applicable Election Period Agreement, Grower may proceed with the transaction in the manner set forth in the RFR Notice and the Contingency Information, and in accordance with the following Permissive Activities, which means that with respect to such fresh produce products that are grown and harvested at Facilities within the Territory for which such RFR Election was not exercised (collectively, "**Permissible**

*Products*"), Grower may market, sell and distribute such Permissible Products within the Territory only to third parties that are (A) non-related and/or unaffiliated to Grower, its Affiliates, subsidiaries, officers and Persons for whom Grower is legally responsible or controls and (B) to industry recognized bona fide third party marketers (collectively, the "*Permissible Activities*"), provided that under no circumstances shall Grower use or identify such Permissible Products with any trade name, trademark, or other marks associated with Mastronardi, including its SUNSET® brand and no Mastronardi related packaging or similar materials shall be used to transport, sell, distribute or otherwise dispose of such Permissible Products, without express written authority to use from Mastronardi. Notwithstanding anything to the contrary, Grower shall not be afforded any Permissible Activities with respect to any Permissible Products that represent growing / production acreage that is not in conformity with the Contingency Information during the five (5) year period from the first commercial harvest, on a variety by variety and grower / production acreage amount and location basis. For clarity, not in conformity with the Contingency Information, includes, without limitation, any fact or circumstance inconsistent with the Contingency Information, such as any change or modification in the items set forth in any or all of Sections 7.2(b)(A) through (D), or any fact or circumstances in which Grower would be reasonably deemed to directly or indirectly circumvent the intent of this Amendment. In the event and in each and every case that any growing / production acreage in any Grower Facility is not in conformity with the Contingency Information, such growing / production acreage shall be subject to the ROFR's on an evergreen basis, and Mastronardi shall be afforded all rights to make a RFR Election under the Additional Products ROFR and New Grower Facility ROFR, as applicable. Except for the Permissible Activities as permitted in this Amendment, the Restrictive Covenants continue in all respects.

3.      In no event shall anything in this <u>Exhibit A</u> prohibit or restrict the right of Grower and its controlled Affiliates to trade securities or financial instruments (whether physical or derivative, including any OTC derivative or other instrument referenced to such security or financial instrument) of any publicly-traded or listed issuer, whether traded on a United States exchange, a Canadian exchange or any other international exchange or equivalent thereto, except that Grower and its controlled Affiliates (A) may not own more than 10% of the common equity (assuming the conversion and exchange of all securities which are convertible into, or exchangeable for, common equity), and (B) may not have any director, officer or employee of Grower or any of its controlled Affiliates serve as a director, of any publicly-traded or listed issuer that, as a primary line of its business, conducts, or engages in, the Mastronardi Business except in furtherance of the Agreement of which this Addendum is a part.

4.      If any court of competent jurisdiction determines that any of the covenants set forth in the Agreement, or any part thereof, is unenforceable because of the duration, geographic scope or terms of such provision, such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to the Agreement or by making such other modifications as it deems warranted for the purpose to carry out the intent and agreement of the Parties as embodied in the Agreement to the maximum extent permitted by applicable law.

5.      Grower hereby acknowledges and agrees that a breach of this Agreement with respect to provisions relating to the restrictive covenants will cause Mastronardi or the other Mastronardi Parties irreparable damages, for which an award of damages would not be adequate compensation and agrees that, in the event of such breach or threatened breach, such opposing Party will be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court, in addition to any other remedy to which such other Party may be entitled under applicable law, including equity, without posting of a bond or proving actual harm. Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available under applicable law including equity.

## ADDENDUM I.A

### Facilities

---

**I.A.    Keystone Regional Industrial Park**

| Grower's Designated Facility: | Pueblo County, Colorado |
|---|---|
| Facility Name: | |
| Facility Address: | |
| Facility Products: | Any or all of, tomatoes, cucumbers, peppers, berries, lettuce and other leafy greens |
| Initial Production Acres: | to be determined |
| Initial Facility Term: | 10 years |
| Initial Term Commencement Date: | Date of first commercial planting, expected to occur in _____ (month) of 20___ |

### SCHEDULE 1 TO ADDENDUM I.A

### Description of Products

| Products | Packaging |
|---|---|
| Any or all of, tomatoes, cucumbers, peppers, berries, lettuce and other leafy greens | to be determined |
| | |
| | |
| | |
| | |

| "GROWER" | "MASTRONARDI" |
|---|---|
| Vetanova Inc., a Nevada corporation | Mastronardi Produce Limited, an Ontario corporation |
| By:_____ | By:_____ |
| Print Name: _____ | Print Name: _____ |
| Title:_____ | Title:_____ |
| Date Signed:_____ | Date Signed:_____ |
| I have authority to bind the corporation | I have authority to bind the corporation |

**Tuesday, August 6, 2024 at 06:07:52 Mountain Daylight Time**

| | |
|---|---|
| **Subject:** | Re: Two Rivers Farms F-2 v. GrowCo, et al, Adv #24-1112 & Two Rivers Farms F-2 v. GCP-1, et al, Adv #24-1111 |
| **Date:** | Monday, August 5, 2024 at 6:33:38 PM Mountain Daylight Time |
| **From:** | johnmckowen |
| **To:** | Jamie Buechler |
| **CC:** | Jennifer Salisbury, Boughner, Samuel (USTP), Mark Dennis, Hartl, Theodore J. |
| **Attachments:** | image001.png, image002.png, image003.png |

Dear Mr. Buechler,

Thank you for your additional emails dated August 5, 2024. I appreciate your diligence in addressing these matters.

I understand your concerns regarding the consistency of my pleadings with my stated intent. To clarify:

1.      Derivative Action Clarification: My intent has always been to act in my personal capacity as a creditor with a direct and substantial interest in this case. Given VetaNova, Inc.'s lack of capital, I am pursuing this action derivatively. My actions are governed by Federal Rule of Bankruptcy Procedure 7023.1, which allows for derivative actions to be brought by creditors on behalf of a corporation when the corporation fails or is unable to act. This position is consistent with the principle of demand futility under Delaware law, as established in Aronson v. Lewis, 473 A.2d 805 (Del. 1984), and Rales v. Blasband, 634 A.2d 927 (Del. 1993).

2.      Pleadings Consistency: While I understand your request to review and amend my pleadings, I would like to respectfully point out that such a "demand" is more appropriately addressed within the context of this court of equity. In equity, the court considers all circumstances to ensure fairness to all parties involved. Therefore, I suggest that if you believe this issue requires resolution, we should bring it before the court for a decision. I will, however, review the referenced pleadings to ensure they accurately reflect my intent. If any inconsistencies or misstatements are found, I will address them as necessary.

3.      Reservation of Rights: I reserve all rights to argue the merits of my standing and the applicability of derivative action principles in this context. If there are any further legitimate concerns, I am open to discussing them to ensure the integrity of the proceedings.

Thank you for your understanding, and please confirm if you require any further clarification on this matter.

Best regards,

John McKowen
303 248 6883
john@johnmckowen.com
https://gettr.com/user/mckowen

**From:** Jamie Buechler <Jamie@kjblawoffice.com>

1 of 9

**Date:** Monday, August 5, 2024 at 5:18 PM
**To:** johnmckowen <john@johnmckowen.com>
**Cc:** Jennifer Salisbury <jsalisbury@markuswilliams.com>, Samuel Boughner <Samuel.Boughner@usdoj.gov>, Mark Dennis <mdennis@slbiggs.com>, "Hartl, Theodore J." <hartlt@ballardspahr.com>
**Subject:** RE: Two Rivers Farms F-2 v. GrowCo, et al, Adv #24-1112 & Two Rivers Farms F-2 v. GCP-1, et al, Adv #24-1111

Mr. McKowen

Thank you for your response.  However, your pleadings contradict your emails and stated intent. For example, see the Motion to Dismiss you filed, Page 11 of Docket No. 12 in the GrowCo Adversary, Paragraph 21 "Derivative Standing and Demand Futility".

As tomorrow is the deadline to response to the Counterclaims and the Motion for Authorization, demand is hereby made upon to immediately file Corrected Pleadings – each and every pleading to date – stating that you are not acting derivatively and withdraw any attempts to do so on behalf of VetaNova and/or GCP-1.

To the extent you refuse this demand and/or file any future pleadings claiming derivative standing for or on behalf of VetaNova and/or GCP-1, the Debtor reserves all rights to seek appropriate relief given your admission of the lack thereof.


Sincerely, Jamie
*Ms/she/her*

***Legal Solutions to Your Financial Puzzle***



K. Jamie Buechler, Esq.
Buechler Law Office, LLC
999 18th Street, Suite 1230-S
Denver, Colorado 80202
Tel: 720-381-0045 x301
Fax: 720-381-0382
Jamie@KJBlawoffice.com
www.KJBlawoffice.com

**Ms. Buechler is Board Certified in Business Bankruptcy Law
by the American Board of Certification**

The information contained in or attached to this electronic transmission is intended only for the confidential use of

the individual(s) named above.  If you are not the named recipient or an agent responsible for delivering it to the named recipient, you are hereby notified that you have received this document in error and that review, dissemination or copying of the communication is prohibited.  If you have received this communication in error, please notify us immediately by telephone and destroy any copies of the message.

---

**From:** johnmckowen <john@johnmckowen.com>
**Sent:** Monday, August 5, 2024 1:42 PM
**To:** Jamie Buechler <Jamie@kjblawoffice.com>
**Cc:** Jennifer Salisbury <jsalisbury@markuswilliams.com>; Boughner, Samuel (USTP) <Samuel.Boughner@usdoj.gov>; Mark Dennis <mdennis@slbiggs.com>; Hartl, Theodore J. <hartlt@ballardspahr.com>
**Subject:** Re: Two Rivers Farms F-2 v. GrowCo, et al, Adv #24-1112 & Two Rivers Farms F-2 v. GCP-1, et al, Adv #24-1111

Dear Mr. Buechler,

Thank you for your prompt response dated August 5, 2024. I appreciate your attention to the procedural aspects of this case and your concerns regarding representation.

First, I apologize for using the wrong email address in my previous communication. I did not intend to cause any confusion regarding my role in this matter.

To clarify:

I am not attempting to represent VetaNova, Inc. in this proceeding. Rather, I am acting in my personal capacity as a creditor with a direct and substantial interest in this case. My involvement is not as an officer or shareholder of VetaNova, Inc., but as an individual creditor who is pursuing claims derivatively due to VetaNova's inability to do so.

Legal Basis for My Representation

1.      Pro Se Representation as a Creditor: As an individual creditor, I have the right to represent my own interests in court. The cases you cited regarding the prohibition of non-attorney representation for corporations, such as Palazzo v. Gulf Oil Corporation (764 F.2d 1381, 1385–86 [11th Cir. 1985]) and Flora Construction Co. v. Fireman's Fund Insurance Co. (307 F.2d 413, 414 [10th Cir. 1962]), are indeed well-established, but they do not pertain to my situation as I am not representing the corporation itself.
2.      Derivative Action by Creditors and Demand Futility: My actions are governed by Federal Rule of Bankruptcy Procedure 7023.1, which allows for derivative actions to be brought by creditors on behalf of a corporation when the corporation fails or is unable to act. In this context, I invoke the principle of "demand futility." Under Delaware law, as established in Aronson v. Lewis, 473 A.2d 805 (Del. 1984), demand on the board is excused when the directors are not disinterested or independent, or where the challenged transaction was not a valid exercise of business judgment.

Additionally, Rales v. Blasband, 634 A.2d 927 (Del. 1993), clarified that in cases where the board has not made a business decision regarding the litigation, the standard is whether there is a reasonable doubt that the board can make an impartial decision. Given that VetaNova's current management is either conflicted or complicit in the wrongful conduct at issue, making a demand on them would be futile.

       3.     Precedent for Creditor Representation: The right of a creditor to represent their own interests in bankruptcy proceedings is further supported by cases such as In re Omni Video, Inc., 60 F.3d 230 (5th Cir. 1995), where the court underscored the importance of allowing parties with a direct interest in the case to pursue their claims without undue delay.

Clarification of My Role

To reiterate, I am participating in this proceeding solely in my capacity as a creditor. I am not filing or signing pleadings on behalf of VetaNova, Inc., nor am I representing the corporation in any legal capacity. My objections and motions are made to protect my individual rights and interests as a creditor, consistent with the provisions of the Bankruptcy Code and relevant case law, including the doctrine of demand futility.

Request for Consideration

Given this clarification, I respectfully request that you review your perspective related to unauthorized representation of VetaNova, Inc. If there are any remaining concerns or questions regarding my role in this proceeding, I am open to further discussion or, if necessary, seeking guidance from the court to ensure that all procedural requirements are met.

Thank you for your understanding, and once again, I apologize for any confusion caused by my previous communication.

Best regards,

John McKowen
303 248 6883
john@johnmckowen.com
https://gettr.com/user/mckowen

---

**From:** Jamie Buechler <Jamie@kjblawoffice.com>
**Date:** Monday, August 5, 2024 at 12:54 PM
**To:** John McKowen <john@vtanva.com>
**Cc:** Jennifer Salisbury <jsalisbury@markuswilliams.com>, Samuel Boughner <Samuel.Boughner@usdoj.gov>, Mark Dennis <mdennis@slbiggs.com>, "Hartl, Theodore J." <hartlt@ballardspahr.com>

**Subject:** RE: Two Rivers Farms F-2 v. GrowCo, et al, Adv #24-1112 & Two Rivers Farms F-2 v. GCP-1, et al, Adv #24-1111

Mr. McKowen

Thank you for your response.  We will note your objection to the extension of time in our pleading.

With respect to the cases you reference on standing, such cases do not pertain a *pro se* individual's ability **to sign and file pleadings for or on behalf** of a corporation. *Commercial & Railroad Bank of Vicksburg v. Slocomb,* 39 U.S. (14 Pet.) 60, 10 L.Ed. 354 (1840); *Osborn v. Bank of United States,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824); *Palazzo v. Gulf Oil Corporation,* 764 F.2d 1381, 1385–86 (11th Cir.1985); *In re K.M.A., Inc.,* 652 F.2d 398 (5th Cir. Unit B 1981); *In re Las Colinas Development Corp.,* 585 F.2d 7 (1st Cir.1978).

There is simply no question that a corporation cannot be represented by someone who is not an authorized attorney, even if that person is the president and sole shareholder of the corporation. *Palazzo, supra; Las Colinas, supra.* See also, *Flora Constr. Co. v. Fireman's Fund Ins. Co.,* 307 F.2d 413, 414 (10th Cir.1962).

As a general matter, a corporation or other business entity can only appear in court through an attorney and not through a non-attorney corporate officer appearing pro se. *Harrison v. Wahatoyas, LLC,* 253 F.3d 552, 556 (10th Cir. 2001); *see also Riviera Drilling & Exploration Co. v. Gunnison Energy Corp.,* 412 F..App'x 89, 92 (10th Cir. 2011) ("[A] corporation cannot appear pro se."); *Tal v. Hogan,* 453 F.3d 1244, 1254 (10th Cir. 2006) ("It has been our long-standing rule that a corporation must be represented by an attorney to appear in federal court."). "The continued failure of the corporate defendant to obtain new counsel may result in a default judgment against it." *Bank of Commerce & Trust Co. v. Strauss,* No. 07–1122–JTM, 2008 WL 191396, at *1 (D. Kan. Jan. 22, 2008).

As a result, VetaNova, Inc.'s arguments for lack of counsel lack merit.  I strongly suggest you obtain legal counsel for yourself and/or VetaNova, Inc.


Sincerely, Jamie
*Ms/she/her*


**Legal Solutions to Your Financial Puzzle**



K. Jamie Buechler, Esq.
Buechler Law Office, LLC

999 18th Street, Suite 1230-S
Denver, Colorado 80202
Tel: 720-381-0045 x301
Fax: 720-381-0382
Jamie@KJBlawoffice.com
www.KJBlawoffice.com

**Ms. Buechler is Board Certified in Business Bankruptcy Law
by the American Board of Certification**

The information contained in or attached to this electronic transmission is intended only for the confidential use of the individual(s) named above.  If you are not the named recipient or an agent responsible for delivering it to the named recipient, you are hereby notified that you have received this document in error and that review, dissemination or copying of the communication is prohibited.  If you have received this communication in error, please notify us immediately by telephone and destroy any copies of the message.

---

**From:** John McKowen <john@vtanva.com>
**Sent:** Monday, August 5, 2024 12:18 PM
**To:** Jamie Buechler <Jamie@kjblawoffice.com>
**Cc:** Jennifer Salisbury <jsalisbury@markuswilliams.com>; Boughner, Samuel (USTP) <Samuel.Boughner@usdoj.gov>; Mark Dennis <mdennis@slbiggs.com>; Hartl, Theodore J. <hartlt@ballardspahr.com>
**Subject:** Re: Two Rivers Farms F-2 v. GrowCo, et al, Adv #24-1112 & Two Rivers Farms F-2 v. GCP-1, et al, Adv #24-1111

Dear Mr. Buechler,

Thank you for your email dated August 5, 2024, regarding the "Motion for Authorization to Provide Alternative Service to Co-Defendants and Request for Extension of Time to Complete Service" filed in the above-referenced adversary proceedings.

I must respectfully object to your request for an additional 14 days to respond to these motions. This matter involves significant issues of fraud, and further extensions would only serve to prolong the resolution of these serious concerns. As you are aware, I am pursuing this action derivatively on my own behalf and not on behalf of VetaNova, Inc.  It is crucial that this matter proceeds without unnecessary delays.

In support of my right to act derivatively, I refer you to Federal Rule of Bankruptcy Procedure 7023.1, which governs derivative actions in bankruptcy cases and allows such actions when brought on behalf of an individual with a direct interest in the corporation. Furthermore, the landmark case Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 (1949) established that shareholders have the right to bring derivative actions to protect a corporation's interests, particularly when the corporation itself fails to act. This principle was further reaffirmed in Kamen v. Kemper Financial Services, Inc., 500 U.S. 90 (1991).

6 of 9

Additionally, Federal Rule of Civil Procedure 1 emphasizes the need for a "just, speedy, and inexpensive determination of every action and proceeding." The case In re Omni Video, Inc., 60 F.3d 230 (5th Cir. 1995) further underscores the court's discretion to deny extensions where delays could result in prejudice, particularly in cases involving fraud.

The timeline provided under L.B.R. 7007-1 is sufficient for your response, and adhering to this timeline will allow the Court to address these critical issues in a timely manner.

Thank you for your understanding.

Best regards,

John McKowen

Respectfully,

John McKowen
Chief Executive Officer
VetaNova Inc
2831 St Rose Parkway, Suite 200
Henderson, NV  89052
(303) 248-6883
john@vtanva.com
https://gettr.com/user/mckowen

*THIS IS NOT AN OFFER TO SELL SECURITIES. Information contained in this email is not an offer to sell securities or the solicitation of an offer to buy securities, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of such jurisdiction.*

*This email may include estimates, financial projections, common share valuations, and other statements as to VETANOVA's projected future operational and share performance that are not historical facts and that are referred to as "forward-looking statements." VETANOVA's actual future results may differ materially from those suggested by forward-looking statements depending on various factors, many of which are outside VetaNova's control.  John McKowen is the founder of VETANOVA and one of its Directors.*

*SECURITY NOTICE: This message (including any attachments) is covered by the Electronic Communications Privacy Act 18 U.S.C. 2510-2521 and is confidential and legally privileged. In addition, the information contained in this E-mail message is personal and confidential and is intended for a specific individual (s) and purpose and therefore is protected from disclosure under the Gramm-Leach-Bliley Act.  If you are not the intended recipient, you should delete this message immediately, and any of its attachments and are hereby notified that any disclosure, copying, or distribution of this message and its attachments, or the taking of any action based on it, is STRICTLY PROHIBITED as noted above. If you have received this communication in error, please notify the sender and erase this e-mail message immediately. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, codified at 18 U.S.C. §§ 1367, 2510-2521, 2701-2710, 3121-3126.  Also, see https://it.ojp.gov/PrivacyLiberty/authorities/statutes/1285  Gramm-Leach-Bliley Act15 USC, Subchapter I, Sec. 6801-6809.*

**From:** Jamie Buechler <Jamie@kjblawoffice.com>
**Date:** Monday, August 5, 2024 at 12:00 PM

**To:** John McKowen <john@vtanva.com>
**Cc:** Jennifer Salibury <jsalisbury@markuswilliams.com>, Samuel Boughner <Samuel.Boughner@usdoj.gov>, Mark Dennis <mdennis@slbiggs.com>, "Hartl, Theodore J." <hartlt@ballardspahr.com>
**Subject:** Two Rivers Farms F-2 v. GrowCo, et al, Adv #24-1112 & Two Rivers Farms F-2 v. GCP-1, et al, Adv #24-1111

Mr. McKowen

On July 23, 2024, you filed, pro se, a "Motion for Authorization to Provide Alternative Service to Co-Defendants and Request for Extension of Time to Complete Service" in the above referenced Adversary Proceedings. See Docket Nos. 9 & 14, respectively.

The Pleadings were also filed, allegedly, on behalf of VetaNova, Inc.  No attorney has entered an appearance for VetaNova, Inc., in either of the two Adversary Proceedings.  Similarly, you are not an attorney licensed to practice before the Bankruptcy Court nor in Colorado.

Nonetheless, pursuant to L.B.R. 7007-1, the Debtor's responses to such motions are due within 14 days.  The Debtor, Two Rivers Farms F-2, Inc., requires additional time to investigate and respond to such pleadings.  The Debtor intends to file motions in both Adversary Proceedings seeking an additional 14 days to respond to these motions.  Please advise if you have any opposition to such extension.

Thank you.


Sincerely, Jamie
*Ms/she/her*


**Legal Solutions to Your Financial Puzzle**



K. Jamie Buechler, Esq.
Buechler Law Office, LLC
999 18th Street, Suite 1230-S
Denver, Colorado 80202
Tel: 720-381-0045 x301
Fax: 720-381-0382
Jamie@KJBlawoffice.com
www.KJBlawoffice.com


**Ms. Buechler is Board Certified in Business Bankruptcy Law**

**by the American Board of Certification**

The information contained in or attached to this electronic transmission is intended only for the confidential use of the individual(s) named above.  If you are not the named recipient or an agent responsible for delivering it to the named recipient, you are hereby notified that you have received this document in error and that review, dissemination or copying of the communication is prohibited.  If you have received this communication in error, please notify us immediately by telephone and destroy any copies of the message.

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## Notice of Effectiveness

**Effectiveness Date:** September 27, 2021 4:00 P.M.

**Form:** S-1

**CIK:** 0001280396

**Company Name:** VetaNova Inc.

**File Number:** 333-258344

**Castle Placement, LLC**
**1460 Broadway, 4th Floor**
**New York, New York 10036**
**(212) 418-1180**

December 6, 2021

VetaNova, Inc. ("Company")
335 A Josephine St.
Denver, CO 80206
john@vtanva.com ("Company Notification Email Address")

Attention: John McKowen

This agreement (the "Agreement") is made and entered into by and between Company and Castle Placement, LLC ("Castle"). Company hereby engages Castle as an independent contractor to solicit a Transaction. "Transactions" shall be defined as a proposed offering and sale of Investments (as defined below).

1.  **Services.** Castle will use its commercially reasonable efforts to provide Company with certain services, which may include: (i) completing appropriate due diligence on Company and its principals; (ii) identifying prospective Investors and providing a teaser and/or investor presentation to those Investors; (iii) conducting a mock investor call with Company and sharing insights and suggestions with Company regarding positioning and marketing the opportunity to Investors in calls and meetings; (iv) assisting Company in connection with Investors throughout the entire process through closing; (v) reviewing and helping to prepare written material and forecasts prepared by Company such as the investor presentation, financial model, and final definitive documents; (vi) attempting to obtain executed NDAs between Investors and Company from interested Investors; (vii) setting-up, administrating, and assisting Company in populating the VDR on Castle's VDR platform; (viii) working with Company to provide information, answer questions, and follow-up with Investors; (ix) including the Transaction on castleplacement.com and CPGO (Castle's proprietary app) for prospective investors to review; (x) conducting an accredited investor email campaign (optional - extra cost to Company); (xi) providing paid (optional - extra cost to Company) and/or organic digital marketing outreach to prospective investors; (xii) coordinating with a third-party videographer to help Company create an elevator pitch video for investors (optional - extra cost to Company); (xiii) providing Company with detailed information on CPGO regarding the status of each Investor currently interested in the Transaction, and allowing Company to communicate with Investors directly through CPGO; (xiv) helping Company to structure the Transaction, negotiating with Investors, seeking proposals from Investors; (xv) attempting to obtain term sheets from Investors; and (xvi) assisting in arranging and closing the Transaction.

2.  **Exclusivity.** This is an exclusive engagement. Castle may decline to participate in the Transaction if it reasonably determines that the Transaction has become impractical or undesirable. Unless Castle has notified Company in writing of its decision to terminate, Company will not allow any other party to participate in the Transaction without Castle's prior written consent, so long as this Agreement has not been terminated by Castle. Castle will consent to additional brokers that earn a 5% selling concession. Company may not terminate the Agreement unless a) Castle is not performing in a commercially reasonable way and pace, and b) Company informs Castle in writing and allows a 60 days time for Castle to improve its performance.

    "Investors": potential and actual investors (including existing investors in the Company) or participants in a Transaction, regardless of whether Castle, the Company, or a third party is the source of such investors or participants.

3.  **Indemnification, Fees and Expenses.** Company and Castle agree to the provisions regarding Company's indemnity of Castle and other matters set forth in Schedule II. Company agrees to the provisions for the payment of Castle's fees and other matters set forth in Schedule I.

4.  **Term.** Unless earlier terminated as herein provided, the term of this engagement shall begin on the date herein and end: i) twelve months (the "Term") from the date that the investor presentation is completed and sent to prospective investors; and ii) the Term will automatically be extended by six months if one or more Investors has commenced negotiation of a term sheet in connection with the Transaction (these time periods - both i and ii above - shall be the "Initial Term"). After the Initial Term has ended the Term will be extended on a month to month basis until either party terminates this Agreement upon thirty days' prior written notice to the other. Company will not directly or indirectly solicit an employee of Castle to work for or with Company during the Term and until one year after the expiration of the Term.

Castle Placement, LLC
Page 2

5.  **Additional Transactions.** If one or more Transactions close during the term or tail of this Agreement, and Company conducts an additional Transaction (other than the Transaction that closed) within 18 months from the later of the closing of the Transaction or any termination of the Agreement, then Company will offer to engage Castle to act as the sole private placement agent, on the same terms as those contained in this Agreement.

6.  **Tail.** Company shall pay to Castle pursuant to the same fee schedule contained herein with respect to any Transaction with an Investor which is consummated, or for which a definitive agreement has been signed, within 18 months after the later of the closing of the Transaction or any termination of the Agreement (the "Tail").

7.  **Survival/Investments.** Provisions relating to the status of Castle as an independent contractor, the limitation as to whom Castle shall owe any duties, governing law, successors and assigns, the waiver of the right to trial by jury, Additional Transactions, the Tail, and other provisions herein that extend beyond the termination of this Agreement, shall survive any termination of this Agreement. "Investments": any transaction involving Company, including without limitation an equity or debt investment, management agreement, asset management structure, fund, consulting arrangement, merger, acquisition, loan, joint or strategic venture, asset or loan purchase or sale, securitization, one-off or special purpose vehicle transaction, digital security, partnership, fee agreement, licensing or servicing agreement.

8.  **Entire Agreement.** This Agreement, and all schedules, annexes, or attachments hereto, and any rights, duties or obligations hereunder, constitutes the entire agreement of the parties, supersedes all prior written or oral and all contemporaneous oral agreements, understandings and negotiations with respect to the subject matter hereof, and shall inure to the benefit of and be binding upon the successors, assigns, and personal representatives of each of the parties hereto, and may not be waived, amended, modified or assigned, in any way, in whole or in part, including by operation of law, without prior written consent signed by each of the parties hereto. The provisions of this Agreement may not be explained, supplemented or qualified through evidence of industry standards, trade usage or a prior course of dealings.

9.  **Severability; Execution; Representations.** In case any provision of this Agreement is found to be void, invalid, illegal or unenforceable by reason of law or public policy, all other remaining provisions of this Agreement shall, nevertheless, remain in full force and effect. This Agreement may be executed in several counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. Facsimile, PDF or electronic signatures shall be deemed original signatures and be binding. Castle and Company hereby make the representations, warranties and agreements set forth in Schedule III.

10. **Choice of Law; Arbitration.** This Agreement and any claim or dispute of any kind or nature whatsoever arising out of, or relating to, this Agreement or Castle's engagement hereunder, directly or indirectly (including any claim concerning services provided pursuant to this Agreement), shall be governed by and construed in all respects, including as to validity, interpretation and effect, in accordance with the laws of the State of New York without giving effect to the conflicts or choice of law provisions thereof. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be adjudicated in accordance with the provisions set forth in Schedule IV.

11. **Schedules; Communications.** All schedules to this Agreement shall be made a part hereof, are an integral part of this Agreement, and shall survive any termination or expiration of this Agreement. All communications hereunder shall be in writing e-mailed to the parties hereto as follows:

    **If to Castle email to:** rluftig@castleplacement.com

    **If to Company email to:** Company Notification Email Address

Castle Placement, LLC
Page 3

We are pleased to accept this engagement and look forward to working with Company. Upon execution and delivery by both parties this shall constitute a binding agreement.

Very truly yours,

Castle Placement, LLC

*Richard Luftig*

By: _____

    Name: Richard Luftig
    Title:  Managing Partner

Accepted and agreed to
as of the date first written above:

VetaNova, Inc.

*John R McKowen*

By: _____

    Name: John McKowen
    Title: CEO

SCHEDULE I

## FEE SCHEDULE

Company shall pay Castle as compensation for its services under this Agreement fees as follows:
(See Schedule V for payment instruction by the Company to Castle)

a)   For Reg CF capital raises:

    i.   7% on all capital raised from Investors.

    ii.   In connection with the first closed transaction under paragraphs (a)-i, in addition to the cash fee, Castle will be granted equity in the Company in the amount of [  ]% multiplied by the capital raised divided by the post-money valuation of the company at closing.

b)   For Reg A+ capital raises: 7% on all capital from Investors

c)   For Reg D capital raises:

    i.   [7]% on debt capital expected to yield 14% or more or equity (including preferred equity or convertible debt) capital from Investors and on the exercise price of all securities constituting warrants, options or other rights to purchase securities issued to Investors

    ii.   [3]% on debt capital expected to yield 7% or more, mezzanine debt or subordinated debt capital from Investors

    iii.   [2]% on debt capital expected to yield less than 7% from Investors

    iv.   In connection with the first closed transaction under paragraphs (c)-i or (c)-ii, in addition to the cash fee, Castle will be granted equity in the Company in the amount of [  ]% multiplied by the capital raised divided by the post-money valuation of the company at closing. The parties will use their best efforts to structure these warrants such that the economic result is achieved in the most tax efficient manner for Castle.

    v.   In connection with any closed transaction under clauses (c)-i, ii, or iii, the minimum cash fee, in the aggregate to Castle shall be $150,000 (payable upon initial closing). This is merely a minimum fee - it is not an additional fee with respect to the fees set forth above. This minimum cash fee shall not be impacted by, and shall be in addition to and separate from, the additional compensation set forth herein;

d)   If the Transaction is structured as a non-standard transaction ("Non-Standard Transaction") with Investors such as a merger, purchase, or other non-standard structure, [ ]% times the equivalent capitalization of such Non-Standard Transaction. Note if the Transaction is a Non-Standard Transaction, the fees set forth in (a) and (b) shall not be applicable to such Transaction.

e)   Company shall pay to Castle a $10,000 non-refundable upfront fee, payable upon execution of this Agreement.

f)   Company shall pay to Castle a $5,000 non-refundable fee per month (upfront each month) for months 1 through 3.

Castle has not communicated to the Company, and does not guaranty, that its efforts will be successful in raising capital. Many factors could prevent any capital from being raised including without limitation market, economic, political, regulatory, management team, business sector, structure, opportunity, business plan, financial projections, expected returns, perceived risks, or other unanticipated factors.

Success fees payable to Castle pursuant to this Agreement shall be paid by Company in cash upon the funding or closing of Transactions during: i) for all Investors, the Term or the Tail; and ii) for Investors that completed a Transaction during the Term or the Tail, commencing on the initial closing and ending when there is a final sale, disposition, or entity termination. This paragraph shall survive any termination or expiration of this Agreement.

Payment of Castle's fee on any closed transaction shall not be contingent in any respect on whether Castle introduced the Investor or Investors, Castle's performance, or Castle's interaction with the Investor, Investors, or counterparty.

Company agrees to pay Castle's reasonable out-of-pocket expenses in connection with this engagement, including expenses for background investigations/reports on Company prior to marketing ($250 total cost if key people and company are in the US). Castle will not incur any material expenses (including digital advertising expenses) without the prior written consent of Company.

Company shall pay a penalty for any payment that is not received as required herein, which shall be computed on a daily basis, based on an annual interest rate equal to 18%.

SCHEDULE II

## INDEMNIFICATION

Company and its affiliates, on a joint and several basis, agree to indemnify Castle, any affiliate or controlling person of Castle and each of their respective directors, officers, employees, agents, affiliates, independent contractors, and representatives (each, an "Indemnified Party", and all indemnified on a joint and several basis) and hold each of them harmless against any and all losses, claims, damages, expenses, and liabilities (collectively, "Liabilities") to which the Indemnified Parties may become liable, directly or indirectly, arising out of, or relating to, the Agreement to which this schedule is attached (the "Agreement") or Castle's services thereunder, unless there is a final arbitral or judicial determination, not subject to appeal, that the Liabilities resulted from the Actionable Misconduct (as defined below) of such Indemnified Party (the "Final Judicial Determination"). Actionable Misconduct is defined solely as: i) actual fraud; or ii) negligence that is both willful and gross. No other conduct shall constitute Actionable Misconduct, and the following conduct, without limitation, shall expressly be excluded from this standard: negligence (other than negligence that is both willful and gross), misconduct, fraudulent inducement of Company to work with Indemnified Party, or Indemnified Party's actions in connection with the preparation of marketing materials, financial models, or other materials, advice, strategy, timing of activities, the Indemnified Party's experience, relationships, or abilities, etc. If Company becomes aware of Actionable Misconduct by the Indemnified Party then Company must immediately notify Indemnified Party in writing, including a description of such Actionable Misconduct.

Company shall reimburse each Indemnified Party immediately upon request for all expenses (including reasonable attorneys' fees and expenses) reasonably incurred in connection with the investigation of, preparation for, defense of, or providing evidence in, any action, claim, suit, proceeding or investigation, including any action brought by Company against an Indemnified Party or by an Indemnified Party against Company (each and collectively, an "Action"), directly or indirectly, arising out of, or relating to, the Agreement or Castle's services thereunder, whether or not pending or threatened, and whether or not any Indemnified Party is a party to such action.

No Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to Company or any person asserting claims on behalf of or in right of Company, directly or indirectly, arising out of, or relating to, the Agreement or Castle's services thereunder, unless there is a Final Judicial Determination.

Any amounts that an Indemnified Party may owe to Company shall be limited to the lesser of: (i) actual damages incurred by Company (which shall not include any consequential or speculative damages); and (ii) actual cash fees paid by Company to the Indemnified Party in connection with this Agreement.

Company will not, without Castle's prior written consent, agree to any settlement of, compromise or consent to the entry of any judgment in or other termination of (each and collectively, a "Settlement") any action in respect of which indemnification could be sought hereunder (whether or not Castle or any other Indemnified Party is an actual or potential party to such action), unless (i) such Settlement includes an unconditional release of each Indemnified Party from any Liabilities arising out of such action; and (ii) the parties agree that the terms of such Settlement shall remain confidential.

If any indemnification or reimbursement sought pursuant to the first paragraph of this schedule is for any reason unavailable or insufficient to hold any Indemnified Party harmless (except by reason of Actionable Misconduct by Indemnified Party) then, whether or not Castle is the person entitled to indemnification or reimbursement, Company shall contribute and Castle shall contribute, in each case, to the Liabilities for which such indemnification or reimbursement is held unavailable in such proportion as is appropriate to reflect the relative fault of the parties as well as any other relevant equitable considerations.

The rights of the Indemnified Parties referred to above shall be in addition to any rights that any Indemnified Party may otherwise have.

## REPRESENTATIONS AND WARRANTIES

Castle represents, warrants and agrees that:

(i) The Investments will be offered and sold in compliance with all applicable federal, state and foreign securities or blue sky laws, rules, regulations, and registration requirements.

(ii) It has all requisite power and authority to execute and perform this Agreement. All corporate action necessary for the authorization, execution, delivery and performance of this Agreement has been taken. This Agreement constitutes a valid and binding obligation of it.

(iii) It is duly registered as a broker-dealer pursuant to the Exchange Act and is a member in good standing of FINRA.

Company represents, warrants and agrees that:

(i) If applicable, the Investments will be offered utilizing general solicitation of investors, and offered and sold in compliance with all applicable federal, state and foreign securities or blue sky laws, rules, regulations, and registration requirements; and prior to closing It will be responsible for verification of the accredited status of each investor participating in such closing.

(ii) If applicable, the legal documents will include all information required to be furnished to investors under Regulation D and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated in the legal documents or necessary to make the statements therein not misleading. The Information will be accurate and complete in all material respects.

(iii) It is solely responsible for preparing legal documents, including all materials and financial projections, for potential Investors, and will notify Castle promptly of any material information or change. If applicable, it will not, following the final closing date of the Transaction, offer for sale or sell any securities that would jeopardize the availability of the exemptions from all registration and qualification requirements, and it has not engaged in any such offering during the six months prior to the date of this Agreement.

(iv) It has done its own independent due diligence on Castle prior to entering into the Agreement and has not relied on any oral or written statement not contained in this Agreement as an inducement to enter into this Agreement or otherwise, including without limitation statements regarding Castle's track record, abilities, experience, relationships with investors and others, staffing and execution plans, expectations for success, or knowledge of It or the industry. To the extent it (a) discovers Castle has made any false statements or omitted any facts prior to or during this Agreement, (b) is not satisfied with Castle's performance in any way, or (c) has any other concerns regarding Castle's activities, it agrees to notify Castle promptly in writing so that such matter may be resolved.

(v) The required services of Castle are limited to those services explicitly contained in this Agreement. There are no other services required of Castle, expressly or implicitly, for Castle to fulfill its requirements under this Agreement. For purposes of clarifying the meaning of Castle's commercially reasonable efforts (as set forth in this Agreement), Castle (a) is under no obligation and provides no express or implied commitment or guarantees to place the Transaction with any Investor; (b) will not invest in the Transaction with its own capital nor will it incur any on-going out-of-pocket expenses that are not reimbursable under the Agreement; and (c) shall not assume the responsibilities of an advisor, fiduciary or agent for it, and although Castle may provide advice to it, it agrees that it will make its own decisions and agrees to hold Castle harmless regarding any advice it may or may not receive from Castle or its other advisors. It also acknowledges that the Transaction has a limited market and Castle makes no representations, commitments or guarantees regarding its knowledge of or relationships with, or the level of interest from, potential Investors that are known to Castle. It also acknowledges that Castle has limited knowledge of, and Castle makes no representations, commitments or guarantees regarding its knowledge of, It, its market, or its industry.

(vi) It has all requisite power and authority to execute and perform this Agreement; this Agreement constitutes a valid and binding obligation of it; the execution and performance of this Agreement by it and the offer and sale of the Investments in the Transaction will not violate any provision of its charter or bylaws or any agreement or other instrument to which it is a party or by which it is bound; and any necessary approvals, governmental and private, will be obtained by it before the closing of the Transaction.

(vii) The services performed by Castle in connection with this engagement are for the benefit and use of it in considering the Transaction to which such services relate. No such services shall be used for any other purpose or be disclosed, reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, nor shall any public references to Castle be made, in each case without Castle's prior written consent, which consent shall not be unreasonably withheld.

(viii) It is a sophisticated business enterprise with competent internal financial advisors and legal counsel, and it has retained Castle for the limited purposes set forth in this Agreement. The parties acknowledge and agree that their respective rights and obligations as set forth herein are contractual in nature. It agrees that (i) Castle has been retained to act solely in connection with the activities stated herein, (ii) Castle shall not assume the responsibilities of an advisor to or fiduciary or agent of it in connection with the performance of Castle's services hereunder and (iii) any duties of Castle arising out of its engagement shall be owed solely to it. Accordingly, (i) it disclaims any intention to impose any fiduciary obligations on Castle by virtue of this Agreement, (ii) Castle shall not be deemed to have any fiduciary duties or obligations to the investors, it, any other business entities, or their respective officers, directors, shareholders, partners, members, affiliates or creditors, as a result of this Agreement or the services provided

hereto and (iii) it hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against Castle with respect to any breach or alleged breach of fiduciary duty hereunder.

(ix) Under no circumstances shall the execution of this Agreement or any act of Castle hereunder commit or be deemed a commitment by Castle to provide or arrange any bank financing or other debt or equity financing for any transaction or to purchase any security in connection therewith. Its Board of Directors will not base its decisions regarding whether and how to pursue the Transaction on Castle's advice, but will consider the advice of its legal, tax and other business advisors and such other factors which they consider appropriate. Castle has no responsibility to it with respect to any transaction contemplated hereby except the obligations expressly set forth in this Agreement.

(x) Castle may be engaged in a broad range of securities transactions and activities and financial services that involve interests that differ from, compete with, or overlap with those of it and Castle has no obligation to disclose any of such interest by virtue of any advisory, agency or fiduciary relationship. In the ordinary course of Castle's business Castle or its clients may at any time be involved in competing transactions or be raising capital, or providing or arranging debt, equity, or other types of financing and other financial services for or to a prospective issuer, client, company, fund, prospective investor, or other entities that may be involved in competing transactions or businesses. The rights and obligations it may have to Castle under any other agreement are separate from its rights and obligations under this Agreement and will not be affected by Castle's services hereunder.

(xi) It will furnish to Castle such information as Castle believes appropriate to the engagement (all such information, the "Information"). Castle will rely solely on the accuracy and completeness of the Information without assuming any responsibility for investigation or independent verification whether or not Castle reviews it. Castle has not made and may not make any physical inspection of the properties or assets of it, and will assume that any financial forecasts furnished to or discussed with Castle by it have been reasonably prepared and reflect the best estimates and judgments of management. At the closing of the Transaction it will provide Castle with a copy of the closing binder (soft copy) including: an index (or table of contents) and the transaction documents.

(xii) It will comply with all applicable laws, rules, regulations, and registration requirements for all offers and sales of securities. Castle will be able to rely on it with respect to blue sky matters, and for updating, amending and supplementing legal documents and filings as required by applicable laws.

(xiii) Investors will be able to see Transaction information on castleplacement.com and information regarding their interest in the Transaction (status, notes from Castle and it, etc.) on cpgoapp.com ("CPGO").

(xiv) Castle's marketing of the transaction may include email campaigns, social media posts (LinkedIn, etc.), phone calls, and/or meetings. In addition, Castle may include it and Transaction information on Castle's website (consistent with the presentation of other transactions on Castle's website) and social media sites (LinkedIn, etc.).

(xv) It will promptly inform Castle of interest that it receives from a third party with respect to the Transaction. If an affiliate (any new or existing other entity or person with any common officers, employees, management, control (10% voting or more), or ownership (10% or more) with it) does a Transaction, or it restructures the proposed Investment using an affiliate, then it shall require such affiliate to become a party to this Agreement.

(xvi) If a Transaction is completed: i) if it takes part in any type of announcement of the transaction (including without limitation a press release) it shall include in such announcement that Castle was the exclusive placement agent and/or advisor for the transaction; and ii) Castle may make announcements (including without limitation in a press release, in its marketing materials, on social media sites (LinkedIn, etc.), and on its web site) including a description of the transaction noting that it was the exclusive placement agent and/or advisor.

SCHEDULE IV

## ARBITRATION/LITIGATION/VENUE

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be adjudicated by arbitration ("Arbitration") administered by the American Arbitration Association (the "AAA") in accordance with its Commercial Arbitration Rules in place when the Arbitration is filed (the "Rules"). The award of the arbitrator shall be final and binding, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Except as provided by the Rules, the Arbitration shall be the sole, exclusive and final remedy for any dispute between the parties.

The Arbitration shall be heard by a panel of three arbitrators. Within 15 days after the commencement of the Arbitration, each party shall select one person to act as arbitrator and the two selected shall select a third arbitrator within ten days of their appointment. If any party fails to select an arbitrator or the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator, such arbitrator shall be selected by the AAA. The place of arbitration shall be New York, New York.

The Commercial Arbitration Optional Rules for Emergency Measures of Protection are also incorporated by the parties. The award of the arbitrators shall be accompanied by a reasoned opinion.

Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. If, in connection with any judicial proceedings to modify, vacate or confirm any order or award, confidential information must be filed with any court, the party submitting such confidential information shall file such confidential information under seal and shall also file a motion with the court requesting that the confidential information remain under seal and no party shall oppose such request.

The parties agree that failure or refusal of a party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that party to present evidence or cross-examine witnesses. In such event, the other party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award. Such waiver shall not allow for a default judgment against the non-paying party in the absence of evidence presented as provided for above.

Notwithstanding the requirements in this section that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be adjudicated by binding arbitration as set forth in this schedule, if one of the parties attempts to litigate in court (for example to argue that the arbitration clause herein is not binding or that the ruling of the arbitrator is not binding) the parties hereby irrevocably submit to the exclusive jurisdiction of the courts of the State of New York and the federal courts of the United States of America located in the Borough of Manhattan in New York City, New York solely in respect of the interpretation and enforcement of the provisions of this Agreement and of the documents referred to in this Agreement, and hereby waive and agree not to assert as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or of any such document, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement or any such documents may not be enforced in or by said courts. All claims with respect to such action or proceeding shall be heard and determined in such New York court or federal courts of the United States of America located in the Borough of Manhattan in New York City, New York. The parties hereby consent to and grant any such court exclusive jurisdiction over the person of the parties and over the subject matter of any such dispute. For avoidance of doubt, nothing contained in this paragraph shall prevent a party from asserting as a defense that such action, suit or proceeding is prohibited by the binding arbitration provisions contained in this Schedule IV. The parties agree that issues of arbitrability shall be resolved by the arbitrators, and that all matters involving the Agreement shall be tried in the arbitration forum.

Unless there is a final judicial determination, not subject to appeal, that Castle's liability resulted from the Actionable Misconduct (as defined herein) of Castle, then in the event of litigation relating to this Agreement, in a court or an arbitration, Company shall be liable and pay to Castle the reasonable legal fees and costs, and/or arbitration costs, incurred by Castle in connection with such litigation and/or arbitration, including any appeal therefrom.



SCHEDULE V

## PAYMENT INFORMATION

Two options to pay: 1) Wire, 2) Credit Card

1)   Wire to Castle Placement, LLC

Bank                                    Citibank. N.A.
ABA                                     021000089
Account                                 4991671355
FBO                                     Castle Placement, LLC

2)  Credit Card - Company hereby pre-authorizes Castle to bill the Company's Credit Card (information for both the initial fees in connection with this Agreement and the background fee) as set forth in this Agreement and Schedule I.

(A) Credit Card (circle one): Visa, MasterCard, Amex, Discover

Credit Card Number: _____ 3-Digit Number: _____

Name as it appears on Credit Card: _____ Expiration Date: _____

Billing address: _____

Date: _____

Print Name: _____

Signature: _____

**VTNA**

Last: 0   ↑ 0 (0.00%)
Volume: 0

OPEN: 0.105
CLOSE: 0.105

HIGH: 0.105
LOW: 0.105

VOL: 0
DATE: 12/10/2021



Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.coloradosos.gov.

Colorado Secretary of State
Date and Time: 08/28/2023 06:33 PM
ID Number: 20141670821

Document number: 20231905025
Amount Paid: $100.00

ABOVE SPACE FOR OFFICE USE ONLY

**Articles of Reinstatement**
filed pursuant to §7-90-301, et seq. and §7-90-1003 of the Colorado Revised Statutes (C.R.S)

1.  For the entity, its ID number and entity name are

    ID number

    20141670821
    *(Colorado Secretary of State ID number)*

    Entity name

    GrowCo Partners 1, LLC, Dissolved August 28, 2023 .

2.  Following reinstatement the domestic entity name of the domestic entity shall comply with section 7-90-1004.

3.  The domestic entity name of the entity following reinstatement is

    GrowCo Partners 1, LLC .

4.  The registered agent name and registered agent address of the registered agent are
    Name
    (if an individual)

    | *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

    **OR**
    (if an entity)

    Two Rivers Water & Farming Company
    *(**Caution**: Do not provide both an individual and an entity name).*

    The person appointed as registered agent has consented to being so appointed.

    <u>Street</u> address

    999 18th Street
    *(Street name and number)*

    Suite 3000

    Denver                         CO        80202
    *(City)*                      *(State)*   *(Postal/Zip Code)*

    <u>Mailing</u> address
    (**leave blank** if same as street address)

    *(Street name and number or Post Office Box information)*

    *(City)*              *(State)*        *(Postal/Zip Code)*

    United States
    *(Province – if applicable)*   *(Country – if not US)*

5.  The principal office address of the entity's principal office is

    <u>Street</u> address

    999 18th street
    *(Street name and number)*

    Suite 3000

    Denver                         CO        80202
    *(City)*                      *(State)*   *(Postal/Zip Code)*

    CO                            United States
    *(Province – if applicable)*   *(Country – if not US)*

<u>Mailing</u> address
***(leave blank*** *if same as street address)*

999 18th Street
*(Street name and number or Post Office Box information)*
Suite 3000

Denver                                      CO    80202
*(City)*                          *(State)*          *(Postal/Zip Code)*
United States
*(Province – if applicable)*      *(Country – if not US)*

6.  The date of formation of the entity is  10/31/2014  .
*(mm/dd/yyyy)*

7.  The date of dissolution of the entity is (if known)  08/28/2023  .
*(mm/dd/yyyy)*

8.  *(If the following statement applies, adopt the statement by marking the box and including an attachment.)*
    ☐ This document contains additional information as provided by law.

9.  ***(Caution****: <u>Leave blank</u> if the document does not have a delayed effective date. Stating a delayed effective date has significant legal consequences. Read instructions before entering a date.)*

    *(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*

    The delayed effective date and, if applicable, time of this document is/are _____ .
    *(mm/dd/yyyy hour:minute am/pm)*

10. The Colorado statute under which the entity existed immediately prior to its dissolution is
    7-90-1002                                                                                      .

11. All applicable conditions of CRS §7-90-1002 have been satisfied.

**Notice**:

Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that such document is such individual's act and deed, or that such individual in good faith believes such document is the act and deed of the person on whose behalf such individual is causing such document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S. and, if applicable, the constituent documents and the organic statutes, and that such individual in good faith believes the facts stated in such document are true and such document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is identified in this document as one who has caused it to be delivered.

12. The true name and mailing address of the individual causing the document to be delivered for filing are

Harrington              Greg              _____    _____
*(Last)*                    *(First)*            *(Middle)*      *(Suffix)*
999 18th Street
*(Street name and number or Post Office Box information)*
Suite 3000

Denver                                      CO    80202
*(City)*                          *(State)*          *(Postal/Zip Code)*
United States
*(Province – if applicable)*      *(Country – if not US)*

REINSTATE                          Page 2 of 3                          Rev. 1/6/2017

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

**Disclaimer:**

This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty. While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet. Questions should be addressed to the user's legal, business or tax advisor(s).



Colorado Secretary of State
Date and Time: 08/28/2023 02:47 PM
ID Number: 20141670821

Document number: 20231903793
Amount Paid: $10.00

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.coloradosos.gov.

ABOVE SPACE FOR OFFICE USE ONLY

### Statement of Dissolution
### Limited Liability Company
Filed pursuant to §7-80-802 of the Colorado Revised Statutes (C.R.S)

ID number: 20141670821

1. Entity name: GrowCo Partners 1, LLC

2. Principal office address:

Street address  335A Josephine St.
*(Street number and name)*

Denver                    CO        80206
*(City)*                  *(State)*  *(ZIP/Postal Code)*
CO                        United States
*(Province – if applicable)*  *(Country)*

Mailing address           335 A
(leave blank if same as above)  *(Street number and name or Post Office Box information)*
Josephine St

Denver                    CO        80206
*(City)*                  *(State)*  *(ZIP/Postal Code)*
                          United States  .
*(Province – if applicable)*  *(Country)*

3. *(Optional)*  Delayed effective date: _____
*(mm/dd/yyyy)*

4. ☐  This document contains additional information as provided by law.

Notice:

Causing this document to be delivered to the secretary of state for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the secretary of state, whether or not such individual is named in the document as one who has caused it to be delivered.

5. Name(s) and address(es) of the individual(s) causing the document to be delivered for filing:

| McKowen | John | | |
|---|---|---|---|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

335 A
*(Street name and number or Post Office Box information)*

Josephine St

| Denver | | CO | 80206 |
|---|---|---|---|
| *(City)* | | *(State)* | *(Postal/Zip Code)* |

United States

| | |
|---|---|
| *(Province – if applicable)* | *(Country – if not US)* |

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

**Disclaimer:**

This form, and any related instructions, are not intended to provide legal, business or tax advice, and are offered as a public service without representation or warranty. While this form is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form. Questions should be addressed to the user's attorney.

OFFICE OF THE SECRETARY OF STATE
OF THE STATE OF COLORADO

# CERTIFICATE OF FACT OF GOOD STANDING

I, Jena Griswold, as the Secretary of State of the State of Colorado, hereby certify that, according to the records of this office,

GrowCo Partners 1, LLC

is a

Limited Liability Company

formed or registered on 10/31/2014  under the law of Colorado, has complied with all applicable requirements of this office, and is in good standing with this office.  This entity has been assigned entity identification number 20141670821 .

This certificate reflects facts established or disclosed by documents delivered to this office on paper through 08/06/2024  that have been posted, and by documents delivered to this office electronically through 08/08/2024 @ 12:22:16 .

I have affixed hereto the Great Seal of the State of Colorado and duly generated, executed, and issued this official certificate at Denver, Colorado on 08/08/2024 @ 12:22:16  in accordance with applicable law. This certificate is assigned Confirmation Number 16280811     .



_____
Secretary of State of the State of Colorado

**********************************************End of Certificate**********************************************
*Notice: A certificate issued electronically from the Colorado Secretary of State's website is fully and immediately valid and effective. However, as an option, the issuance and validity of a certificate obtained electronically may be established by visiting the Validate a Certificate page of the Secretary of State's website, https://www.coloradosos.gov/biz/CertificateSearchCriteria.do entering the certificate's confirmation number displayed on the certificate, and following the instructions displayed. Confirming the issuance of a certificate is merely optional and is not necessary to the valid and effective issuance of a certificate. For more information, visit our website, https://www.coloradosos.gov click "Businesses, trademarks, trade names" and select "Frequently Asked Questions."*



Colorado Secretary of State
Date and Time: 11/30/2023 11:59 AM
ID Number: 20141670821

Document number: 20238254387
Amount Paid: $100.00

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.coloradosos.gov.

*ABOVE SPACE FOR OFFICE USE ONLY*

## Articles of Reinstatement
filed pursuant to §7-90-301, et seq. and §7-90-1003 of the Colorado Revised Statutes (C.R.S)

1. For the entity, its ID number and entity name are

   ID number                    20141670821
                                 *(Colorado Secretary of State ID number)*

   Entity name                  GrowCo Partners 1, LLC, Dissolved November 1, 2023 .

2. Following reinstatement the domestic entity name of the domestic entity shall comply with section 7-90-1004.

3. The domestic entity name of the entity following reinstatement is
                                 GrowCo Partners 1, LLC                              .

4. The registered agent name and registered agent address of the registered agent are
   Name
   (if an individual)
                          _____  _____  _____  _____
                              *(Last)*        *(First)*   *(Middle)*  *(Suffix)*

   **OR**
   (if an entity)         VetaNova Inc
                              *(**Caution**: Do not provide both an individual and an entity name).*

   The person appointed as registered agent has consented to being so appointed.

   <u>Street</u> address          2831 St. Rose Parkway
                                 *(Street name and number)*

                                 # 200

                                 Henderson                    CO     89052
                                    *(City)*                 *(State)*  *(Postal/Zip Code)*

   <u>Mailing</u> address
   (**leave blank** if same as street address)     *(Street name and number or Post Office Box information)*

                                 _____  _____  _____
                                    *(City)*          *(State)*  *(Postal/Zip Code)*
                                                      United States
                                 *(Province – if applicable)*  *(Country – if not US)*

5. The principal office address of the entity's principal office is
   <u>Street</u> address          2831 St. Rose Parkway
                                 *(Street name and number)*

                                 # 200

                                 Henderson                    NV     89052
                                    *(City)*                 *(State)*  *(Postal/Zip Code)*
                                                      United States
                                 *(Province – if applicable)*  *(Country – if not US)*

Mailing address
**(leave blank** if same as street address)

_____
*(Street name and number or Post Office Box information)*

_____

_____
*(City)*           *(State)*           *(Postal/Zip Code)*

United States
_____
*(Province – if applicable)*      *(Country – if not US)*

6.  The date of formation of the entity is  10/31/2014  .
                                            *(mm/dd/yyyy)*

7.  The date of dissolution of the entity is (if known)  11/01/2023  .
                                                         *(mm/dd/yyyy)*

8.  *(If the following statement applies, adopt the statement by marking the box and including an attachment.)*
    ☐ This document contains additional information as provided by law.

9.  **(Caution**: Leave blank *if the document does not have a delayed effective date. Stating a delayed effective date has significant legal consequences. Read instructions before entering a date.)*

    *(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*

    The delayed effective date and, if applicable, time of this document is/are  _____ .
                                                                                *(mm/dd/yyyy hour:minute am/pm)*

10. The Colorado statute under which the entity existed immediately prior to its dissolution is
    CRS 7-90-1002                                                                              .

11. All applicable conditions of CRS §7-90-1002 have been satisfied.


**Notice**:

Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that such document is such individual's act and deed, or that such individual in good faith believes such document is the act and deed of the person on whose behalf such individual is causing such document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S. and, if applicable, the constituent documents and the organic statutes, and that such individual in good faith believes the facts stated in such document are true and such document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is identified in this document as one who has caused it to be delivered.

12. The true name and mailing address of the individual causing the document to be delivered for filing are

McKowen_____    John_____    _____    _____
*(Last)*              *(First)*          *(Middle)*          *(Suffix)*

335 A Josephine St_____
*(Street name and number or Post Office Box information)*

Denver_____    CO    80206_____
*(City)*                          *(State)*   *(Postal/Zip Code)*

United States
_____
*(Province – if applicable)*      *(Country – if not US)*

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

**Disclaimer:**

This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty. While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet. Questions should be addressed to the user's legal, business or tax advisor(s).

**Fill in this information to identify the case:**

Debtor 1 ____Two Rivers Farms F-2 Inc_____

Debtor 2 ____Orlando Reservoir No. 2 Company, LLC_____
(Spouse, if filing)

United States Bankruptcy Court for the:  District of Colorado

Case number ___23-15627_____

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

John McKowen
_____
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor   VetaNova Inc, VitaNova Partner LLC, GrowCo Inc, GrowCo Part

**2. Has this claim been acquired from someone else?**

☐ No
☑ Yes.  From whom? _VetaNova Inc_____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

John McKowen
_____
Name

335 A Josephine St
_____
Number          Street

Denver              CO          80206
_____
City                State            ZIP Code

Contact phone   303 248 6883_____

Contact email   john@johnmckowen.com

**Where should payments to the creditor be sent?** (if different)

_____
Name

_____
Number          Street

_____
City                State            ZIP Code

Contact phone   _____

Contact email   _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☐ No
☑ Yes.  Who made the earlier filing?  _VetaNova Inc_____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  ____  ____  ____  ____

**7. How much is the claim?**

$_____ 2,391,913.00 . **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money Invested and/or Loaned

**9. Is all or part of the claim secured?**

☐ No

☑ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** Deeds of Trust Huerfano County, CO # 404224 and 404225

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $  2,391,913.00

**Amount of the claim that is secured:**  $  2,391,913.00

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $  2,391,913.00

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☑ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410                                  **Proof of Claim**                                  page 2

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   01/31/2024
                          MM  /  DD  /  YYYY

Signature   *John McKowen*

Print the name of the person who is completing and signing this claim:

Name     John McKowen
           First name          Middle name          Last name

Title    Investor

Company  _____
         Identify the corporate servicer as the company if the authorized agent is a servicer.

Address  335 A Josephine
         Number        Street

         Denver                      CO         80206
         City                        State      ZIP Code

Contact phone   303-248-6883          Email   john@johnmckowen.com

---

# EXHIBIT 7

## CASTLE PLACEMENT AGREEMENT

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### WASHINGTON, D.C. 20549

# FORM 8-K
### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
Date of Report: December 7, 2021

# VETANOVA, INC.
(Name of registrant as specified in its charter)

| Nevada | 000-51068 | 85-1736272 |
|---|---|---|
| State of Incorporation | Commission File Number | IRS Employer Identification No. |

335 A Josephine St.
Denver, CO 80206
Address of principal executive offices

(303) 248-6883
Telephone number, including area code

Former name or former address if changed since last report

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 30.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-14(c) under the Exchange Act (17 CFR 240.13e- 4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| None | N/A | N/A |

Indicate by check mark whether the Registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (240.12b-2 of this chapter).

Emerging Growth Company ☒

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13a of the Exchange Act. ☒

**ITEM 1.01   Entry Into a Material Definitive Agreement**

On December 6, 2021, VetaNova Inc (VetaNova) entered into an agreement with Castle Placement, LLC (Castle). Castle is a FINRA registered broker/dealer. The agreement calls for Castle to assist VetaNova in the development and sale of a Regulation A+ offering through Castle's platform. Castle's website is located at https://castleplacement.com/

Regulation A+ offerings are registered with the Securities and Exchange Commission (SEC) and allow for an investment of up to $75 million within a 12 month period by offering shares to the general public.

About VetaNova

The Company is in its development stage and intends to build and operate solar-powered, carbon-negative greenhouses utilizing artificial intelligence assisted technologies to control the growing environment. The Company's revenue is expected to come from growing farm-fresh fruits and vegetables sold to local markets. The Company's ability to build and operate solar-powered, carbon-negative greenhouses is dependent on the Company's ability to raise additional capital.

The foregoing is not an offer or a solicitation of any offer to purchase any securities of the Company. No money or other consideration is being solicited, and if sent, will not be accepted. No offer to buy any securities of the Company can be accepted and no part of the purchase price can be received until the Company's Reg A offering statement is qualified, and any such offer may be withdrawn or revoked, without obligation or commitment of any kind, at any time before notice of its acceptance given by the Company after the qualification date of the Company's offering statement.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

December 7, 2021

VETANOVA, INC.

Tuesday, August 13, 2024 13:21

## Electronic Document Dropbox

| | |
|---|---|
| **Name** | John R. McKowen |
| **Debtor's Name (if different)** | Two Rivers Farms F-2 |
| **Email** | john@johnmckowen.com |
| **Phone Number** | (303) 248-6883 |
| **Case Number (if known)** | 24-01111, 24-01112, 23-15627 KHT |
| **Please upload your document(s)** | 📄 AT. 20231130 GCP-1 Reinstat….pdf |
| | 📄 AT. McKowen Form 410.pdf |
| | 📄 AU. Castle Placement Agree… .pdf |